## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN MICHAEL QUINN | : | |
| 2159 Dunmore Lane, N.W. | : | |
| Washington, D.C. 20007 | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| KREINDLER & KREINDLER LLP | : | Civil Actions No.: __21-1824_____ |
| DOS Process: DTR of Administration | : | |
| 750 Third Ave 32nd FLR | : | |
| New York, New York, 10017-2725 | : | |
| | : | |
| and | : | |
| | : | |
| JAMES P. KREINDLER | : | |
| c/o Kreindler & Kreindler LLP | : | |
| 750 3d Avenue | : | |
| New York, NY, 10017-2725 | : | |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT

**COMES NOW,** Plaintiff, JOHN MICHAEL QUINN ("**Plaintiff**" or "**Quinn**"), by counsel, complains as follows herein:

### SUMMARY

1.      This is an action against Defendants for breach of contract based on Defendants' denial of and refusal to honor their obligations to Plaintiff,  after securing the benefits of years of his work on behalf of both the Defendants and the clients they and Plaintiff jointly represent. Those shared clients are thousands of family members and representatives of the victims of the September 11, 2001 terrorist attacks ("**9/11 families**" or "**9/11 family members**").

2.      Plaintiff's substantial and effective efforts on behalf of Defendants and their shared clients were predicated on a series of Agreements among the parties. The initial agreement was

authored by Defendant Kreindler in 2013 and offered by him to Plaintiff Quinn, who accepted it and began his work for Defendants and their shared clients. Subsequent revisions of the initial contract made significant changes, all of which were agreed to by Defendants. Those contracts are appended hereto as Exhibits One, Two, Three, and Four (collectively, "**Agreements**").

3.      Eschewing essential principles of American jurisprudence, Defendants deny that any of these written "Agreements" were meant to be binding contracts. Having fully accepted the economic and other benefits of Quinn's efforts under these Agreements, Defendants advance the absurd theory that the Agreements were are "memoranda." At the same time, Defendants apparently reject that they are obligated to pay Quinn either the agreed upon formula for his compensation or the value of his services and, instead, imply that Quinn has been a mere volunteer for their firm since 2013. Quinn is not, and never was, a volunteer for Kreindler & Kreindler, LLP, as Defendant James Kreindler knows well.

4.      The Agreements among the parties executed in 2017 repeatedly include language to the effect that Quinn is due compensation in connection with recoveries that result from "litigation, settlement or otherwise." The inclusion of the word "otherwise" was deliberate and was specifically discussed with Defendant James Kreindler in the drafting process. It entitles Quinn to fees from the Defendants in all circumstances where (a) the shared clients, the 9/11 families, receive compensation for 9/11-related claims; and (b) Defendants receive a fee. Those conditions have already been met, but Defendants have withheld fees due to Quinn on the pretense that their Agreements are not binding contracts.

5.      Plaintiff therefore seeks damages, costs and a declaratory judgment as to (a) the validity and enforceability of the Agreements among the Parties, which are appended hereto as Exhibits Two, Three, and Four; (b) his specific entitlement to fees when and as awards are made

to any of the shared clients, whether based on "judgment(s), settlement(s) or otherwise," including specifically, but not limited to, overdue compensation to which Plaintiff is entitled in connection with the United States Victims of State Sponsored Terrorism Fund (henceforth, **VSSTF**"); and (c) his entitlement in the alternative to the alternative remedies pleaded *infra*, including but not limited to *quantum meruit.*

## JURISDICTION AND VENUE

6.      Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332(a)(1), as there is complete diversity between the parties as the Plaintiff and Defendants are citizens of different states. Further the amount in controversy vastly exceeds the $75,000 minimum for a case in controversy.

7.      Venue is proper in the District of Columbia because the contractual Agreements at issue were executed in the District of Columbia, the breaches and violations of duties and their resulting injury, occurred in the District of Columbia, the Plaintiff resides in the District of Columbia, and the discussions between Plaintiff and Defendants and the conduct Plaintiff performed on the contractual Agreements between the parties occurred almost exclusively in the District of Columbia.

8.      Defendants are also subject to personal jurisdiction of this Court pursuant to D.C. Code §13-423(a)(l).

## PARTIES

9.      Plaintiff John (a/k/a "Jack") Quinn is a resident of the District of Columbia. Plaintiff Quinn was admitted to the District of Columbia Bar in 1976 and is a well-respected attorney with a wealth of experience, including in and before the Congress and the Executive Branch of Government. Quinn was Counsel to the President of the United States from 1995 to 1997. He was Chief of Staff and Counsellor to the Vice President of the United States from 1993 to 1995. Earlier, Quinn worked in the Congress from 1969 to 1975. Quinn entered private practice as an associate

3

at the law firm of Arnold & Porter in 1976 and was a partner at that firm from 1982 to 1993 and from 1997 to 2000. He was a co-founder, co-chair and then chair of the public affairs firm Quinn Gillespie & Associates from 2000 to 2015. He currently is the sole proprietor of the Law Office of John M. Quinn (2013-present) and is also a partner at the law firm of Manatt, Phelps & Phillips (2016-present). Quinn's representation of 9/11 families, certain property insurers and others involved in the 9/11 litigation commenced in 2013 and is carried out through his Law Office of John M. Quinn.

10.     Defendant Kreindler & Kreindler, LLP ("**K&K**") is a law firm which is believed to be organized and existing under the laws of New York and having its principal place of business at 750 3d Avenue, New York, New York 10017.

11.     Defendant James Kreindler ("**Kreindler**") is an attorney admitted to practice in New York who is believed to be  a  resident of the State of  New York and, on information and belief, serves as the managing partner at K&K.

## FACTS

### I.     THE 9/11 ATTACKS

12.     On the morning of September 11, 2001, often referred to as "9/11," coordinated terrorist attacks were launched by the terrorist group al-Qaeda, with the avowed purpose of striking at the political, military, and economic symbols of the United States and maximizing death and destruction to highlight the Nation's vulnerabilities. Four passenger airliners were hijacked by nineteen Al-Qaeda terrorists. Two of the planes were crashed into the World Trade Center complex in Lower Manhattan, causing their utter collapse. A third plane crashed into the Pentagon, headquarters of the U.S. Department of Defense in Arlington, Virginia. The fourth plane was flying toward Washington, D.C., but crashed into a field in Stonycreek Township, Pennsylvania after passengers thwarted the hijackers.

4

13.     The 9/11 attacks immediately resulted in 2,977 fatalities and, to date, tens of thousands of injuries. They also resulted, over the course of many years, in overseas military actions costing lives and resulting in enormous hardship at home and abroad.

14.     Since 2013, the parties hereto have co-represented thousands of family members whose relatives were killed or injured as a result of the attacks and estates of the deceased.

## II.    THE LEGAL BARRIERS THE 9/11 FAMILIES FACED

15.     The family members of victims of the 9/11 attacks initially faced significant legal barriers to obtaining just compensation for their harm and that of their loved ones.

16.     One such important barrier was the doctrine of sovereign immunity which, at the time of the attacks, sharply limited suits against foreign nations and agencies of foreign governments in U.S. courts, unless the nation at issue had previously been identified by the U.S. Department of State as a "state sponsor" of terrorism. Then and today, the only designated "state sponsors of terrorism" were and are Cuba, Iran, Syria, and North Korea. Although most of the 9/11 hijackers came from the Kingdom of Saudi Arabia ("**KSA**"), the Department of State has never declared KSA to be a state sponsor of terrorism.

17.     Additionally, by the time Defendants sought out Quinn's services, the United States Solicitor General had twice intervened in litigation initiated in the Southern District of New York ("**SDNY**") and submitted briefs that indicated ongoing opposition to U.S. citizens bringing suit in the circumstances like the 9/11-related cases.

18.     With Defendants' active and ongoing coordination, Quinn devoted considerable effort to removing this barrier to achieving access to justice for the parties' shared clients, the 9/11 family members, and others.  Only once this barrier was removed by statute, as described below, did Defendants bring suit against the Kingdom of Saudi Arabia and other nation states.

## III. HISTORY OF THE PARTIES' RELATIONSHIPS AND THEIR BINDING CONTRACTS

19.     The relationship among Plaintiff and Defendants began in the period 2008-09. Kreindler, at that time, sought out and engaged Quinn's firm, Quinn Gillespie & Associates ("**QGA**"), to assist him and K&K in an effort to achieve compensation for the victims of the terrorist bombing of Pan Am 103 over Lockerbie, Scotland.  QGA partners assisted Kreindler in successfully advocating for a settlement with the Government of Libya. Both an Act of Congress and an Executive Order were necessary to a final settlement with Libya on behalf of the families of the victims of the bombing.  Kreindler's and QGA's collaboration was successful, and Plaintiffs paid to QGA an agreed-upon multi-million-dollar fee for its work.

20.     In the period 2012-13, Kreindler again sought out Quinn, this time to assist in K&K's representation of the 9/11 families, including to help deal with the legal barriers facing the 9/11 families, some of whom Kreindler represented and many others of whom K&K was actively seeking to represent.

21.     The first contract among the parties was authored and offered by Defendant Kreindler to Quinn and signed by the parties in 2013. That contract was followed by a number of others that replaced and significantly modified the terms of the initial contract. The essential fee structure of the Defendants' contracts with Quinn, however, has remained the same ever since the initial Agreement where: (1) the shared clients of the parties (principally, families and estates of 9/11 victims) receive compensation for their losses, and (2) Defendants receive fees in connection therewith, then Plaintiff is entitled to fees, <u>payable by Defendants and not the 9/11 families</u>, equal to either 0.775 percent or 1.0 percent (depending on circumstances defined in the contracts) of the amounts recovered by the shared clients.

22.     Defendant Kreindler drafted and offered to Quinn the initial 2013 contract for

Quinn's services, hoping that Quinn could help Defendants promote the cause of the 9/11 families in the media and in Congress and thereby overcome the barriers they faced in seeking compensation for the 9/11 families. *See* Exhibit One. Kreindler offered his proposal, with stated consideration, to Quinn *as a contract* – nothing else, and certainly nothing less. Quinn accepted. As a result of that contractual arrangement, Quinn became co-counsel to Defendants' clients, as Kreindler later described Quinn in emails with others, including certain of his colleagues and third parties.

23.     The initial Agreement provided that Plaintiff and the firm of Nelson, Mullins, Riley & Scarborough would be entitled to equal shares of a "fee of 1% of the net recovery on each … wrongful death … and each personal injury case where Kreindler & Kreindler has or receives a fee in the litigation captioned "In Re: Terrorist Attacks on September 11, 2001" ("**the SDNY litigation**"). The principal involved at the Nelson, Mullins, Riley & Scarborough was Robert Crowe, Esq. This contingency fee arrangement was acceptable to Quinn because the Defendants had previously entered into contingency fee arrangements with the 9/11 families and, more importantly, because so many of the 9/11 families could not bear the expense of standard legal or consulting rates for ongoing services.  *See* Exhibit One. Due to the prolonged nature of the proceedings that the 9/11 families already had been through in the SDNY litigation, none of the Agreements among the parties included a termination date.

24.     The new Agreements at Exhibits Two, Three and Four replaced and amended the initial 2013 Agreement ("**2017 Agreements**"). They were executed and made effective on different dates in 2017.[1]   Together, they set forth Quinn's promises to provide services to

---

[1] *See* Exhibit Two ( "Agreement Between John M. Quinn, Esq. and The Law Office of John M. Quinn, PLLC, and Kreindler & Kreindler LLP"), May 19, 2017; *See* also Exhibit Three "Agreement Between Kreindler & Kreindler LLP, The Law Office of John M. Quinn, PLLC, and

Defendants and Defendants' promises to pay to Quinn specific fees as and when the clients they jointly represent (the "**Shared Clients**") receive all or part of any compensation on 9/11-related matters with respect to which Defendants collect fees – whether by "judgment, settlement *or otherwise."* The several 2017 Agreements thus collectively replaced the earlier Agreement at Exhibit One and included major changes.

25.     First, all of Quinn's Agreements with Defendants from May 2017 forward were on his behalf only and not that of Nelson, Mullins, Riley & Scarborough which, on information and belief, contracted separately with Defendants.

26.     Second, because Defendants agreed that Quinn was performing appreciably more of the work expected under the initial contract than was the Nelson, Mullins, Riley & Scarborough, Quinn's fee was increased from 0.5 percent to 0.775 percent of the net recoveries by the shared clients. On information and belief, Defendants likely contracted with Nelson, Mullins, Riley & Scarborough at a fee that reflected a decrease in its fee from 0.5 percent to 0.225 percent of the net recoveries. *See* Exhibit Two at ¶ 4; but see also Exhibit Four at ¶ numbered 3.

27.     Third, as a result of the parties' Agreement that there was a growing possibility that compensation for the 9/11 families would come from sources to-be-determined, or as a result of proceedings other than or in addition to the 9/11-related litigation that was pending in the SDNY, the parties agreed to broaden the fee calculation to include recoveries realized in the SDNY litigation or in any other proceedings or fora. The new Agreements therefore provided that Quinn's compensation from Defendants would henceforth come as a fraction (0.775%) of the "net recovery

John M. Quinn, Esq. Relating to New Claims and Additional Compensation" May 19, 2017;  *See* also Exhibit Four ("Amendments to Agreements Dated May 19, Between John M. Quinn, Esq., The Law Office of John M. Quinn, PLLC and Kreindler & Kreindler LLP, August 26, 2017. Exhibit 2 at ¶ 4; Exhibit 3 at ¶ 2; see also Exhibit 4 at ¶¶ numbered 2-3.

on each decedent's wrongful death and each personal injury claim with respect to which K&K receives a fee, "*whether by judgment, settlement or otherwise*" *and the limitation relating recoveries to the specific SDNY litigation was removed.* (Exhibit Two at ¶ 4). Further, Exhibit Two states clearly that "[T]his Agreement [signed on May 19, 2017] is to be "effective *nunc pro tunc*, January 1, 2017, and "extinguishes, supersedes and replaces...all prior agreements or understandings … including … those dated in July 2013 or the Earlier Agreement…." Exhibit Two at ¶ 2.

28.     Fourth, a separate new contract executed on the same day as the one set forth in Exhibit Three, effective *nunc pro tunc*, January 2, 2017, established Quinn's entitlement to a larger fraction (1%) of certain specific recoveries: first, "on each wrongful death, injury or any other claim for which K&K receives a fee, whether by judgment, settlement or otherwise, for its representation of clients on whose behalf K&K filed *claims on or after July 10, 2014, or [*second*,] with respect to whom K&K is awarded fees by virtue of common benefit awards or participation in representation of other clients as a member of the plaintiffs' executive committee or through the operation of any common fund the purpose of which is to award compensation to other claimants in the litigation,* except that K&K shall not be obligated to pay a fee to Quinn where and to the extent Quinn receives a fee in respect of the same claim pursuant to a separate fee-sharing agreement to which K&K and Quinn are parties." (Exhibit Three at ¶¶ 2-3).

29.     Fifth, on August 26, 2017, the parties executed a final amendatory Agreement that (i) provides that the earlier Agreements (Exhibits Two and Three), in referring to "the litigation," include the provision of services in cases "for which [K&K] is retained to file *or otherwise provide services* in connection with matters arising out of the attacks" (Exhibit Four at ¶ number 1); (ii) states that, in addition to other bases of compensation, Quinn shall receive "compensation for the

representation of clients on whose behalf claims are not filed in the litigation but who have retained K&K to assist in recovering compensation whether through the filing of claims or otherwise and who in fact receive a recovery with respect to which K&K receives a fee" (ibid. ¶ number 2); and (iii) amends the earlier Agreement by providing that "[i]f, for any reason, Nelson, Mullins, Riley & Scarborough and/or Robert Crowe are unable or ineligible *or otherwise fail to receive all or part of the fees contemplated by their contract with K&K, then such fees shall be paid to Quinn* to the extent of the difference between the amount represented by 0.225 of the net recoveries contemplated by their contract with K&K and the amount actually received by them." (ibid. ¶ number 3).

30.     The Agreements among Defendants and Plaintiff call for fees to Quinn based on a percentage of recovery formula. (*Compare* Exhibit Two to Exhibit Three, requiring fees of 0.775 percent and 1.00 percent, respectively, of the "net recovery on each…wrongful death and each personal injury claim with respect to which K&K receives a fee, *whether by judgment, settlement or "otherwise."*)  These contracts were made effective "*nunc pro tunc*" as of January 1, 2017, and January 2. 2017, respectively. And each includes the italicized "or otherwise" language precisely to emphasize that Quinn's entitlement is applicable even where the shared clients receive recompense *other than* through litigation or settlement. In sum, *what is required for Quinn's entitlement to his fees is, first, that Defendants receive a fee and, second, that such fee is received in connection with recoveries paid to the 9/11 families co-represented by Plaintiff and Defendants*.

31.     Quinn also serves in the capacity of co-counsel or has attorney-client relationships with other firms, including the firm that filed the putative class action against Saudi Arabia in the SDNY litigation in 2004 and several insurance companies whose clients insured properties destroyed in the 9/11 attacks, such as Travelers, Inc. and syndicates of Lloyd's of London. Those

10

additional contractual relationships were the result of Kreindler's recommendations that they contractually engage the services of Quinn.

32.     Although there have not yet been judgments or awards in the SDNY litigations as to the parties' shared clients, the parties anticipate that recoveries may finally be realized soon. Discovery in the SDNY Litigation will close on June 30, 2121. And there have already been awards to the parties' shared clients by the VSSTF. These awards are the result of statutory authorizations, and appropriations enacted in the last several years.

33.     Defendants have asserted, through counsel, that Plaintiff is not entitled to fees as prescribed in the valid contracts outlined above and appended hereto, including awards made to the shared clients by the VSSTF or that might be made as a result of any litigation or settlement. Given the plain inconsistency of this assertion with the binding contracts among the parties, Plaintiff has a reasonable belief that Defendants will abscond with his rightful share of fees based on awards to date and then with fees as yet to be determined based on future awards.

34.     While Quinn has been devoted to the cause of the 9/11 families, he never offered to spend eight years laboring on legal, political and media activities as an unpaid volunteer for the Defendants. Rather, the Exhibits hereto make clear that the parties knew well that Quinn expected to be paid for his work from the very outset of their discussions in 2012-13.

## IV.   AMONG OTHER LABORS, QUINN WORKED TO FACILITATE PASSAGE OF THE JUSTICE AGAINST STATE SPONSORS OF TERRORISM ACT (JASTA)

35.     On the basis of their Agreements, Kreindler repeatedly sought out Quinn and exploited his services over the course of the last eight years. In turn, Quinn has vigorously and effectively worked, and continues to work, on behalf of the clients he shares with Defendants. Quinn's years-long efforts pursuant to his contracts with Defendants made a meaningful contribution to Defendants' renewed determination in 2014 to support (and their subsequent efforts

to advocate for) important changes in federal law, which had previously been interpreted to impose dispositive impediments to legal actions by United States citizens against foreign states and state-supported actors in circumstances like the 9/11 attacks. Defendants specifically acknowledged the value of Quinn's contributions to these efforts in the operative over-arching 2017 Agreement with Quinn, which states that *"Quinn's important contribution to date to the litigation and to the enactment of JASTA [the "Justice Against Sponsors of Terrorism Act"] is hereby acknowledged."* Exhibit Two at ¶ 3.

36.     A large part of Quinn's work for Defendants and their shared clients from 2014 through 2020 has involved analysis of and advocacy for the legal and policy bases justifying enactment of JASTA, as well as subsequent work to help formulate and articulate arguments to defeat efforts to reverse all or part of that important statute in the years after its enactment. Quinn was a resounding voice encouraging the Plaintiffs' Executive Committee ("**PEC**") in the SDNY 9/11 litigation in 2014 to renew efforts to secure enactment of JASTA, and he subsequently devoted major portions of his time to the cause with Kreindler's enthusiastic and regular encouragement. Quinn's work involved him often with members of the PEC, public officials, and the media. This dedicated effort by Quinn and others with whom he has worked has been matched by concerted and well-financed efforts by Saudi Arabia and certain other countries, initially to block any change in the law that could subject them to the jurisdiction of U.S. Courts and, later, to solicit congressional assistance in reversing the important changes in the law brought about by the enactment of JASTA.

37.     Quinn worked prodigiously for the 9/11 families, familiarizing himself with the more important court filings made by Defendants and certain other parties, reviewing and editing proposed legislation, consulting more than weekly with Kreindler, regularly discussing

developments and strategies with certain other lawyers involved in the Plaintiffs' Executive Committee, or otherwise representing large numbers of plaintiffs (other than K&K's) who were especially active in Washington, D.C. on behalf of the 9/11 families, conducting outreach efforts in Congress, particularly with the principal congressional supporters of the 9/11 families' cause and members of the Leadership and Judiciary Committees in Congress, and overcoming Executive Branch deference to KSA's opposition to JASTA by keeping numerous media outlets informed of its efforts to encourage Congress to act against the interests of the clients he shares with Defendants. Defendants benefitted from these efforts, as reflected in their explicit acknowledgement of Quinn's efforts in one of the contract revisions of the parties' contract, adopted by Defendants and Plaintiff in 2017. See Exhibit Three at ¶ 3.

38.    Along with a small group of attorneys, Quinn specifically helped to formulate and execute a plan to secure enactment of JASTA, which had long foundered, and an override of the presidential veto that followed its initial passage in the Congress. See Pub. L. 114-222. Quinn and those other lawyers worked with the Defendants and other law firms and, of critical importance, a number of 9/11 family members who were indispensable to the success of the media and political outreach activities in Washington, D.C. After being vetoed, JASTA was ultimately enacted on September 28, 2016 by overwhelming majorities in the United States Senate and House of Representatives. The United States Senate vote to enact JASTA was 97 to 1 and The House of Representatives vote on the same day was 348 to 77.

39.    Plaintiff's work on behalf of Defendants did not end with the enactment of JASTA. The KSA and others with commercial interests continued to pressure the U.S. Government to amend the new law in ways that would render it a virtual nullity. Plaintiff and others devoted significant additional effort, particularly in late 2016 and in 2017, to discourage Congress from

acting on several baseless predictions of dire consequences of JASTA.

40.    Additionally, in the last half of 2020, Quinn worked with others in Washington to argue, successfully, against efforts on the part of the Government of Sudan and the Department of State to have included in the Sudan Claims Resolution Act, enacted in late December of that year, language that would effectively erase the 9/11 families' 9/11-related claims against Sudan. Defendants were aware of Quinn's involvement, as they were on numerous emails and phone calls during negotiations over the bill with opposing counsel and Quinn.

## V.   THE VICTIMS OF STATE SPONSORED TERRORISM FUND ALLOWS THE 9/11 FAMILIES A SOURCE OF COMPENSATION

41.    In December 2015, Congress enacted the VSSTF, 34 U.S.C. § 20144, to provide a modest funding mechanism to certain victims of state sponsored terrorism and their families.

42.    Initially, the VSSTF was established to provide a compensation mechanism for victims of Iranian-sponsored terrorism such as the bombing of the USS Cole and the attack on the Marine barracks in Beirut, Lebanon. The initial source of funding was the collection of fines imposed on violators of the United States' sanctions regimes against Iran. In July 2016, the VSSTF began accepting applications for payment through the fund.

43.    In 2019, Congress passed the "Justice for United States Victims of State Sponsored Terrorism Clarification Act" ("**Clarification Act**"). The Clarification Act amended the VSSTF to provide coverage for 9/11 victims with judgments against Iran, some of whom were prohibited under the original VSSTF from receiving compensation from the Fund because they had already received compensation from the September 11th Victim Compensation Fund, established by Section 405 of the "Air Transportation Safety and System Stabilization Act" (49 U.S.C. § 40101 note).  Congress also set aside as much as half of the VSSTF to be used to compensate the families of 9/11 victims. This important development was, at least in significant part, a consequence of the

changed political environment that followed a number of developments in the U.S.-Saudi relationship, particularly the overwhelming votes in Congress to enact JASTA.

44.    The Clarification Act also reduced permissible fees charged by attorneys representing claimants from 25% to 15% of any payment made from the Fund. At the time, Kreindler argued to Quinn that Quinn's contractual fees would also have to be reduced by 60% -- despite the fact that K&K had never charged 25% but was, instead, typically charging fees of 15% or less.

45.    Quinn worked at the request of, and with Kreindler to ensure that their shared clients could have access to the VSSTF. At Kreindler's specific request, Quinn reviewed and discussed a draft of the initial legislation establishing the VSSTF that had been prepared by one of the non-governmental drafters of the legislation. Quinn also met, at Kreindler's request, on a number of occasions with a number of the shared clients of the parties who were unhappy with the relative treatment of siblings and parents of victims, as compared to that of spouses and children, in an attempt to help achieve peace among Defendants' and Plaintiff's shared clients.

46.    Kreindler specifically requested that Quinn discuss the proposed VSSTF with one of the persons involved in drafting the statute and, when Kreindler later became concerned about efforts to shape the program in ways that would potentially work an unfairness to certain of the 9/11 family members, Kreindler encouraged Quinn to discuss the matter with congressional parties in order that he might add his voice to help discourage any unfairness to the shared clients.

47.    The Defendants have tried to characterize the VSSTF as a distinct and separate mechanism for recovery, disconnected from Quinn's contractual undertakings with Defendants. This is little more than a post-hoc rationalization by Defendants, prompted by the increasing value of the VSSTF as a source of compensation to the clients whom Kreindler *represents with Quinn*.

The VSSTF, however, is simply that: a funding mechanism that has been made available by Congress to the 9/11 family members whom Defendants and Quinn represent jointly. More importantly, the 2017 Agreements between Quinn and Defendants draw no distinction as to how the shared clients are compensated in triggering Quinn's right to payment by Defendants as set forth in the contracts set forth as Exhibits hereto.

## VI.   QUINN IS ENTITLED TO HIS CONTRACTUAL SHARE OF COMPENSATION

48.    *In all events, the contracts between Plaintiff and Defendants are clear and unambiguous: where the shared clients receive recoveries and Defendants receive a fee in connection therewith, Quinn also is to receive his contractually prescribed fees as set forth in the Exhibits hereto.* Receipts from the Fund, in other words, became a source of recovery that fits the category of "otherwise" in the phraseology of the parties' 2017 contracts, which provide for compensation to Quinn from Defendants wherever the shared clients achieve recoveries "by litigation, settlement *or otherwise*." *See* Exhibit Two at ¶ 4 and Exhibit Three at ¶¶ 2-3. Exhibit Three, moreover, states that "K&K shall pay to Quinn a fee of 1% of the net recovery on each wrongful death, injury *or any other claim* for which K&K receives a fee, whether by judgment, settlement or otherwise, for its representation of clients on whose behalf K&K filed claims on or after July 10, 2014…." Exhibit Three at ¶ 2. Many, if not all of the Defendants' filings of VSSTF claims were likely filed on or after July 10, 2014, as the legislation was enacted only in 2016.

49.    On information and belief,

(a)   the VSSTF has issued substantial awards to Defendants' and Plaintiff's shared clients.

(b)   K&K distributed amounts obtained from the VSSTF to its clients and to both Defendants, potentially including K&K partners with no meaningful role in the 9/11 matters; and

(c) other distributions from the VSSTF receipts may have been made by Defendants to third parties.

50.   No payments whatsoever have been made to Plaintiff, and Plaintiff has received no financial statements, accountings, or information of any kind related to payments made to Defendants or their clients, or expense, or other payments to a third party. Plaintiff has repeatedly requested such information, only to be informed by Defendants' counsel that they owe no obligation to provide such information to Plaintiff.  In fact, and in law, as Defendants' co-counsel, Quinn is entitled to all information relevant to the joint representation of their client, including compensation awards and other financial information provided to Kreindler or to any of his partners, associates or K&K employees.

51.    There have been a number of distributions of benefits to the shared clients through the VSSTF. On information and belief, the VSSTF recoveries by the shared clients may have amounted to hundreds of millions of dollars to date.

52.   A promise was made to compensate Quinn for his services at such time as the shared clients of  Plaintiff and Defendants began receiving compensation. On the strength of the contractual commitments made to him by Defendants, Quinn worked tirelessly to promote the cause of obtaining justice and compensation for the 9/11 families through eight years, before five Congresses and three Administrations. Although, on information and belief, K&K has been compensating its partners and perhaps others as a result of VSSTF awards realized to date, Defendants have withheld payments to Quinn, which should have been made in appropriate proportion to the monies they are paying to themselves and perhaps to others.

53.   Plaintiff now sues for breach of contract and for the alternative remedies of quantum meruit, quasi-contract and implied contract in fact. He further seeks an accounting and

the creation of a constructive trust on monies due and owing to him, and to pierce the corporate

veil as the Defendants have used their law firm as an alter ego to carry out their breaches. Plaintiff

also requests a trial by jury and asks the Court and the jurors to impose all remedies they may

deem just and proper.

54.     As co-counsel, Defendants owe a duty to provide an accounting and access to all

financial records related to the 9/11 families, payments to the co-defendants and the distribution

of fees and expense reimbursements among the Defendants and to any other persons or entities.

55.     As co-counsel,  Quinn is entitled to access to all communications, records and other

information concerning payouts described in paragraph 27 and hereby seeks an Order that they be

provided to him.

56.     Pursuant to the current Agreements,  Quinn shall receive his contractually set fees

from Defendants for *any* payments to their shared clients for the provision of *"services in*

*connection with matters arising out of the [9/11] attacks"* so long as the clients "have retained

K&K to assist in recovering compensation whether through the filing of claims or otherwise and

who in fact receive a recovery with respect to which K&K receives a fee" as of at least August 26,

2017. *See* Exhibit Four. This, of course, includes payments from the VSSTF.

57.      A goal of many involved on behalf of the 9/11 families is a diplomatic

breakthrough that might lead to recoveries for the 9/11 families before the twentieth anniversary

of the 9/11 attacks. Moreover, of urgent concern to Plaintiff is that Defendants have been receiving

substantial fees in connection with payments paid to the shared clients of the parties through the

VSSTF and, on information and belief, have and are paying to themselves fees in connection

therewith. Defendants have withheld from Plaintiff both fees to which he is similarly entitled and

any information as to how those fees are being distributed and to whom.

58.     For his services over eight years, Quinn has reasonably expected to be paid pursuant to these contracts, particularly as Kreindler has, on a number of occasions, described Quinn in writing as his "co-counsel." Quinn's efforts on behalf of Defendants are well-known and documented by their presence on thousands of emails.

59.      Defendants have not only been collecting fees from the parties' shared clients in connection with VSSTF payments to the shared clients (while denying that Quinn is entitled to fees in connection with these VSSTF awards)*, but now also deny Quinn's right to fees in connection with the action pending in the SDNY, which was Kreindler's stated incentive to Quinn to accept the original contract among the parties initiated by Kreindler for himself and K&K in 2013. (Set forth in Exhibit One and modified by mutual consent in Exhibits Two, Three and Four.)*

60.     Quinn also reasonably expected to be provided accountings and information as to the status of any incoming receipts and outgoing payments and to be accorded the full access to information regarding the clients he co-represented with Defendants including specifically recoveries for the shared clients and fees charged in connection therewith. No such information was ever provided to Quinn, even upon his request. This impedes not only Quinn's clear right of recovery, but also makes infeasible his ability to perform his ethical obligations to comprehend fully and protect the financial interests of the 9/11 families, clients he shares with Defendants.

## COUNT I
## BREACH OF CONTRACT

61.     Plaintiff incorporates by reference, the allegations contained in paragraphs 1-60 as if fully realleged herein.

62.     The Defendants freely and voluntarily entered into a series of contractual Agreements with Plaintiff, which are set forth in details in paragraphs 20-31 and 41-46 of this Complaint and appended as Exhibits One through Four hereto.

63.     The Agreements were clear in their terms, included the essential duties of the parties and the way compensation was to be paid, were in writing and were fully executed by the parties.

64.     Plaintiff conferred a benefit on Defendants in the form of services over a period of some eight years.

65.      Defendants knew Plaintiff was providing such services; indeed, they were advised at every step of the process of the work Quinn was performing and understood and specifically noted the value of that performance in the contract that appears as Exhibit Two hereto.

66.     Defendants specifically sought out Quinn, personally, to assist them in establishing a basis for compensation to the victims of the 9/11 attacks whom they represented.

67.     Quinn devoted thousands of hours and the bulk of his professional practice to this effort, which Defendants specifically acknowledged as essential to their achieving recoveries for their clients.

68.     Plaintiff performed numerous tasks related to the 9/11 attacks, including but not limited to ensuring the enactment of a jurisdictional basis to pursue sponsors of terrorism in U.S. Courts, ensuring Congressional support for the VSSTF and compensation of the 9/11 families, conducting media efforts to build support for such initiatives, working with Congressional leaders to overcome intransigence from the Executive branch and strong resistance from Saudi Arabia and other states that threatened to retaliate against the U.S. if JASTA were passed, building and cementing sufficient bi-partisan support to overcome a Presidential veto, and coordinating a broad based effort to build a coalition of attorneys, advocates and victims and survivors of the 9/11 attacks, some of which he continues to work with to this day.

69.     Quinn was to be compensated for his efforts to advance these undertakings, and the basis for payments for his services would extend to all representations by Defendants that involved "the provision of services in cases filed, to be filed or for which Kreindler & Kreindler is retained to file *or otherwise provide services in connection with matters arising out of the attacks*." *See* Exhibit Four at ¶ 1, Number 1.  Quinn provided ongoing services over more than eight years to Defendants and the clients they share with Quinn.

70.     Plaintiff fully and faithfully completed the obligations he had under the contractual Agreements and Defendants received full value for his work. The Defendants have been in continuous breach of their contractual duties and have failed to provide Plaintiff with either payments for his services, or to provide any information, including receipt and expenses or other financial information, expense reports, evidence of costs or any awards assessed against or provided to Defendants. Nor have Defendants provided any accounting of the actual distribution of payouts which Defendants have obtained, the names, addresses and phone numbers of 9/11 families they have or do represent, the breakout of any payments between or among Defendants or between Defendants and third parties, the amounts and manner in which they are charging fees to the shared clients and other financial or factual information related to the Defendants' efforts, charges, fees and distributions.

71.     Plaintiff has been monetarily damaged by the Defendants' breaches and the Defendants' refusal to provide said accountings and related information.

72.     Plaintiff requests both a full and complete accounting and the information necessary for him to calculate the compensation owed to him, payment of any such compensation in full, with interest from the date the payment should have been made, and attorney's fees and costs and such other relief as the Court deems just and proper.

## COUNT II
## QUANTUM MERUIT

73.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-72 as if fully realleged herein.

74.     To the extent Defendants allege that there is no contractual relationship between them and Plaintiff, Plaintiff is entitled to be paid for the value of his services for the period of the relationship – approximately eight and one-half years to date -- between the Defendants and Plaintiff.

75.     Plaintiff performed valuable services for the Defendants as described in detail above in paragraphs 32-46 of the Complaint.

76.     Plaintiff performed those services with an expectation to be compensated for his efforts.

77.     The Defendants fully accepted the Plaintiff's services and knew Plaintiff was devoting time and effort to perform them.

78.     Defendants received substantial value because of Plaintiff's efforts.

79.     Defendants specifically knew that Quinn was performing these services as their co-counsel and that Quinn expected to be paid for his work. Kreindler repeatedly assured Quinn that he would be paid in full for his services.

80.     Quinn's work was important to the success of the Defendants, who assessed significant fees for their own efforts on behalf of the 9/11 families they serviced.

81.     It is anticipated that Kreindler and K&K have received, or will receive, hundreds of millions of dollars for their efforts through a form of a percentage award of any recovery obtained by the victims.

82.     Based on either Quinn's standard rates, or the compensation received by Kreindler

and his firm as a comparator, Quinn is entitled to *quantum meruit* damages, plus interest from the date that portions of these amounts should have been paid by Defendants.

83.     Plaintiff has been damaged to his material detriment by Defendants' refusal to compensate him. Further, given the time committed to and scope of Plaintiff's efforts on the 9/11 families' issues, he suffered a significant opportunity cost in being unable to pursue other valuable business which he would have certainly performed but for his efforts on behalf of the Defendants.

84.      Plaintiff seeks recovery in quantum meruit for the reasonable value of the unpaid services provided to Defendants, in the amount to be proven at trial. Plaintiff also seeks attorneys' fees and costs, and all interest due on any unpaid amounts and such other relief as the Court deems just and proper.

### COUNT III
### BREACH OF FIDUCIARY DUTY IN A JOINT VENTURE

85.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-84 as if realleged herein.

86.     The District of Columbia law defines a joint venture as follows:

> ". . . an association of persons with intent, by way of express or implied contract, to engage in and carry out a single business venture for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, without creating a partnership or a corporation, pursuant to an agreement that there shall be a community of interest among them as to the purpose of the undertaking, and that each participant shall stand in the relation of principal as well as agent as to each of the other adventurers, with an equal right of control of the means employed to carry out the common purpose of the venture." *United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 505 F.Supp.2d 20, 30 (D.D.C.2007).

87.     As identified in the parties' fee agreements, the parties intended for Quinn to serve as co-counsel with Defendants in their representation of the 9/11 families.

88.     The parties combined their expertise and connections to collaborate on strategy for the 9/11 litigation, JASTA, as well as other avenues to benefit the clients that Plaintiff and

Defendants shared in seeking compensation for them in the aftermath of the 9/11 attacks.

89.     The parties agreed to a profit-sharing plan as identified in the parties' fee agreements.

90.     The parties retained the ability to control each other's conduct with Plaintiff often dictating the strategy to be taken for ensuring the success of JASTA and Defendants controlling the litigation strategy of the civil case, while both seeking advisement from the other. Beckman v. Farmer, 579 A.2d 618, 627 (D.C.1990).

91.     The parties, through their writings and conduct, formed a joint venture.

92.     Inherent in, and arising from this joint venture, by reason of their special relationship, are the fiduciary duties of loyalty, integrity, candor, good faith and trust in all matters relating to their obligations identified in the parties' fee agreements.

93.     Defendants breached their obligations under the joint venture and their fiduciary duty to Plaintiff, by engaging in acts and omissions alleged herein including, among other things, concealing from Plaintiff the issuance of VSSTF payments, failing to account to Plaintiff and failing to remunerate Plaintiff pursuant to the parties' Final Fee Agreements and diverting fees and payments to their own benefit while depriving the Plaintiff of his renumeration under their joint venture agreement.

94.     Defendants further breached their fiduciary duty to Plaintiff by appropriating the VSSTF payments for their own personal use and enjoyment, while excluding Plaintiff from their agreed-upon fee sharing arrangements without any remotely reasonable basis.

95.     As a direct and proximate result of Defendants' breaches of fiduciary duties owed to Plaintiff, Plaintiff has suffered damage.

96.     In addition, Plaintiff's damages are ongoing and increasing due to Plaintiff's

contractual obligations to continue his efforts to ensure JASTA's survival, and to promote the ongoing availability of the VSSTF.

97.     To the extent the Defendant's deny the existence of a contractual relationship with Plaintiff, the Plaintiff and the Defendants engaged in a joint venture.

98.     To the extent that joint venture is operative, Plaintiff is entitled to his proportionate share of any revenues or fees received by Defendants.

99.     In a joint venture, it is presumed that the venturers shall have equal interests, thus Plaintiff is entitled to one-half of any renumeration paid to Defendants.

100.     As a joint venture involves fiduciary duties, which have been breached in this matter, Plaintiff demands a full and complete accounting and provision of the information necessary for him to calculate with precision the compensation owed to him, payment of any such compensation in full, with interest from the date the payment should have been made, other compensatory damages, punitive damages, attorney's fees and costs and such other relief as the Court deems just and proper.

## COUNT IV
## ACCOUNTING

101.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-100 as if  realleged herein.

102.     Defendants have received, and continue to receive, compensation for their services to the 9/11 families, including but limited to, disbursements from the VSSTF.

103.     Plaintiff, as co-counsel under a contractual arrangement, as a joint venturer or under any implied-in-fact contract or quasi-contract theory, is entitled to all information and an accounting that identifies all clients represented by Defendants; all compensation paid to or by any client, jointly or severally; the total compensation paid to all clients; the manner in which any claim, whether outstanding or paid in full or in part, was calculated; the date on which any

compensation was paid; the deductions made by Defendants for any services or costs they covered or provided; the date, precise nature, and recorded payees to whom any payment was made for such services or other costs; the total amount of the payment of all costs associated with the representation of the claimants; the nature, amount and date of any distribution to the Defendants; the nature, amount and date of any distribution to the third parties, including but not limited to K&K partners besides Kreindler; the current status, nature and amount of any pending claims by or against Defendants in connection with their representation of the clients they share with Plaintiff; the charges, if any, assessed to any client of the Defendants for Plaintiff's work and such other financial or factual information, data or internal K&K documents that might bear on the amount of compensation received or expected to be received by the Defendants or their clients that is related to the 9/11 attacks or any representation related to clients who claimed any compensation or damages as a result of such attacks. Plaintiff is further entitled to all records detailing any legal services performed by or costs incurred by Defendants as co-counsel.

104.    The calculations of amounts owed to Plaintiff rely on the amount of funds received by Defendants, the payment of fees and expenses to Defendants, the number of claims Defendants filed, the fees Defendants charged, the distributions made to Defendants and the identity of the various claimants, the claims they filed, the status of such claims and the payouts made from any source on such claims. Since all this information is strictly within Defendants' custody and or control, it is incumbent on Defendants to fully produce all such records to Plaintiff.

105.    Indeed, as co-counsel, Defendants have an ethical duty to disclose such information to Plaintiff to allow him to comply with his own ethical duties of competence in the representation of the 9/11 families.

106.    Plaintiff lacks an adequate remedy at law, since Defendants have exclusive custody

and control over the accounts, records, and assets in which the payments, compensation, and awards subject to the fee agreements are held.

107.    The information necessary to ascertain the amount due and owing to Plaintiff cannot be ascertained without an accounting of K&K's monthly, quarterly, annual, and year-end financial statements, including but not limited to, balance sheets, statements of profits and loss, general ledgers, financial reports, accounts receivable and accounts payable ("**Financial Documents**").

108.    Accordingly, Plaintiff seeks an accounting of K&K and a review of its Financial Documents.

109.    Plaintiff has demanded an accounting from Defendants and payment of the amount due, but Defendants have failed and refused, and continue to fail and refuse, to render such an account and pay such sum as are due to Plaintiff.

110.    Considering the history of misconduct and mismanagement by Defendants regarding thepayments received subject to the fee agreements, a remedy at law would not suffice to substitute for the equitable relief of an accounting.

111.    Plaintiff demands a full and complete accounting to be provided to Plaintiff; access to all financial information on which that accounting is made; access to payouts to claimants and to the Defendants and others paid by Defendants in connection with any payouts for clients handled by Defendants; and complete access to the matters, communications and information regarding the payouts to any of the Defendants or to their clients who are claimants in the 9/11 matters and to any matters, communications or information related to prospective claims, to injunctive relief, to attorneys' fees and costs and to the claims that the Plaintiff has heretofore made to Defendants and for such other relief as the Court would deem proper.

## COUNT V
## IMPLIED IN FACT CONTRACT

112.    Paragraphs 1-111 are incorporated by reference as if fully realleged herein.

113.    The conduct of the parties in this case clearly created an implied-in-fact contract.

114.    The facts as alleged in this Complaint establish that there were valuable services being rendered by Quinn for Defendants and their shared clients, to whom Quinn was co-counsel, that Defendants accepted, used, and enjoyed on their behalf, and on behalf of the shared clients whom Plaintiff and Defendants represented, under circumstances that would reasonably notify the Defendants that Quinn was performing services for them and expected to be paid for them.

115.    For over eight years Quinn performed valuable and useful services for Defendants, who, in fact, enlisted and repeatedly requested Quinn to perform specific services on their behalf.

116.    Plaintiff performed numerous tasks related to the related to the 9/11 attacks, including, but not limited to, ensuring the enactment of a jurisdictional basis to pursue sponsors of terrorism in U.S. Courts, ensuring Congressional support for the VSSTF and the compensation of the 9/11 families, conducting media efforts to build support for such initiatives, working with Congressional leaders to overcome intransigence from the Executive branch and strong resistance from Saudi Arabia and other states that threatened to retaliate against the U.S. if JASTA was passed, cementing sufficient bi-partisan support to overcome a Presidential veto of JASTA, advocating for the families of victims of 9/11, assisting Defendants in drafting pleadings, and assisting in the development of a political and media strategy to support suits against the perpetrators of the 9/11 attacks and their state sponsors, and participating in a coordinated effort to align attorneys, advocates and victims and survivors of the 9/11 attacks, which he continues to work on to this day.

117.    Defendants had actual knowledge of Quinn's prodigious efforts. They held

discussion with Quinn on strategy, discussed legal issues related to fostering the 9/11 families'
efforts to change American law and to establish sources of compensation for them, discussed
media and Congressional efforts and routinely discussed the details of their efforts on behalf of
the 9/11 families.

118.    Defendants received extensive benefits from Quinn, which they explicitly
acknowledged in their 2017 Contract, see Exhibit Two at ¶ 3.

119.    Defendants negotiated a compensation agreement with Quinn that recognized that
Defendants and the shared clients had to be able to obtain Quinn's services without paying him a
set fee consistent with the rates normally charged by any of the firms in which Quinn has been a
principal.

120.    Defendants knew that Quinn expected to be compensated, and Kreindler repeatedly
referred to the rewards he would receive.

121.    It is unknown whether the Defendants have apprised their actual clients of the
failure to pay Quinn, or whether they have assessed charges or calculated fees and costs to the 9/11
families based on Quinn's services. Plaintiff requires such information in order to assess whether
additional claims against Defendants might be in order.

122.    Quinn seeks establishment of an implied-in-fact contract, and for all remedies to
which he is entitled under the agreed upon arrangements established by the writings and course of
conduct of the parties, including those set forth in the writings between the parties as to the payouts
to be made to Quinn based on the total compensation paid to the 9/11 families including amounts
that have been claimed, but that are awaiting payment.

## COUNT VI
## QUASI-CONTRACT; UNJUST ENRICHMENT

123.    Paragraphs 1-122 are incorporated by reference as if realleged herein.

124.     The facts of this case establish grounds for equitable relief, under a theory of Quasi-Contract, that is, a contract established for equitable reasons to avoid a party being unjustly enriched for the services provided. Quinn also seeks restitution and disgorgement of any unjust enrichment, an accounting, injunctive relief  and damages and attorney's fees and costs. To the extent quasi-contract sounds in tort, Quinn seeks punitive damages in an amount to be awarded by the Court or trier of fact and such other relief as is just and proper.

**COUNT VII**
**PIERCING THE CORPORATE VEIL AS TO K&K, LLP**

125.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-124 as if realleged herein.

126.     The fee agreements state that K&K shall pay Plaintiff a percentage of the  net recovery it receives from its representation of the clients whom the parties share within the 9/11 families.

127.     The fee agreements define net recovery as the "amount realized by each clientless out-of-pocket costs to K&K and exclusive of legal fees paid to K&K." *See* Exhibit Two at ¶ 5, Exhibit Three at ¶ 4.

128.     Upon information and belief, Defendants have been transferring VSSTF payments disbursements to certain K&K partners who have not substantially participated in representing the 9/11 families which Defendants share with Plaintiff with the impermissible effect of increasing the "net recovery", and thereby decreasing Plaintiff's compensation.

129.     Defendants are thereby engaging in inappropriate transfers of assets with the effect of delaying and hindering Plaintiff's contractual right to compensation.

130.     Additionally, on information and belief, payments from the VSSTF have resulted in compensation awards to Kreindler and K&K partners, the Defendants herein.

131.    The business entity of K&K is thus being used improperly to facilitate a diversion of monies owed to Plaintiff.

132.    A party may be permitted to pierce the corporate veil upon proof, that there is (1) unity of ownership and interest, and (2) use of the corporate form to perpetrate fraud or wrong, or 'other considerations of justice and equity justify it. *Estate of Raleigh v. Mitchell,* 947 A.2d 464, 470 (D.C.2008) (citing *Bingham v. Goldberg, Marchesano, Kohlman, Inc.,* 637 A.2d 81, 92 (D.C.1994)).

133.    Factors for determining when to pierce the corporate veil include, *inter alia,* (1) whether corporate formalities have been disregarded, (2) whether corporate funds and assets have been extensively intermingled with personal assets . . . (3) inadequate initial capitalization, and (4) fraudulent use of the corporation to protect personal business from the claims of creditors. *Estate of Raleigh,* 947 A.2d at 470–71.

134.    In the instant action, it appears that the corporate formation is being used to allow Kreindler to conceal and divert compensation that should have been paid to Quinn and to excessively enrich himself or others by claiming distributions for his work and distributions to K&K partners and employees who, it is believed, may have performed no meaningful work on behalf of the 9/11 families who are shared clients of the Defendants and Quinn.

135.    This would allow Defendants Kreindler and K&K to lower the calculations on total compensation to which Quinn would be entitled. As such, this scheme may amount to the perpetration of a fraud or, certainly, an injustice against Quinn.

136.    Quinn occupies the position of a creditor against Defendants; thus, any attempt to hide or divert assets to limit the payment to Quinn, would constitute conduct sufficient to allow for piercing the corporate veil, whether that action is as a matter of law, or a claim that must be

plead, or a remedy, it is an action that can be imposed by the Court or trier of fact to ensure equity.

137.    Justice requires recognizing the substance of the relationship between K&K and its partners over the form because the corporate fiction distinguishing between K&K and its partners appears to be being utilized to defeat a rightful claim by Plaintiff.

138.    Equity requires piercing the corporate veil, without which Plaintiff will be unable torecoup damages and monies due and owing by the binding terms of the fee agreements.

**COUNT VII**
**CONSTRUCTIVE TRUST**

139.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-138 as if realleged herein.

140.    Defendants knowingly took possession of specific property, namely funds, belonging to Plaintiff and have wrongfully withheld or failed to distribute such funds, despite requests for both an accounting and disgorgement.

141.    As a result of Defendants' wrongful acts, Plaintiff  has been and is being deprived of his property, specifically the funds either deposited in trust with K&K which are now held by Defendants or those funds that have been obtained, and which have been distributed.

142.    Further, Defendants are expected to secure substantial additional amounts on behalf of their clients, the 9/11 families, whether through judicial disposition of lawsuits, settlements, "or otherwise" -- such as by operation of (1) payouts from the VSSTF to shared clients, and (2) which result in fee payments to Defendants. In all such circumstances the fee agreements require fee awards to Plaintiff Quinn.

143.    Defendants' breach of contract, breach of fiduciary duty, misappropriation of funds and other wrongful acts have caused and will continue to cause harm to Plaintiff and the unjust enrichment of the Defendants.

144.     As a proximate result of Defendants' wrongful acts, as alleged herein, Plaintiff is entitled to a constructive trust in which Defendants, as constructive trustees, should be required to hold all income, profits, commissions, fees, revenues and other funds, received by Defendants as a result of their wrongful acts, for the benefit of Plaintiff.

145.     Further the constructive trust requires an independently appointed trustee to properly deposit, administer and distribute its corpus, including payments to Quinn both for past due amounts and for amounts that are to be received in the future.

146.     Without the imposition of a constructive trust, equity would be defeated, and the Defendants could continue to divert funds away from Quinn in a manner that would deprive him of his rightful fees and leave him without an appropriate remedy.

147.     As these funds are received for clients in the first instance, the imposition of a trust is also appropriate to protect the interests of the 9/11 families.

148.      Plaintiff requests the imposition of a constructive trust, thes appointment of a neutral trustee, attorneys fees and costs and such other relief that the Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, to the extent not set forth above, Plaintiff prays for relief as follows:

A.     A declaratory judgment that the contracts among the parties, set forth as Exhibits One, Two, Three, and Four hereto, are valid and enforceable and will therefore be enforced by the court.

B.     Actual damages, including punitive or treble damages.

C.     Pre-judgment and post-judgment interest on such monetary relief.

D.     The costs of bringing this suit, including reasonable attorneys' fees and costs.

E.     Piercing the corporate veil as to K&K, LLP.

F.   An accounting of K&K, LLP's 9/11-related receipts, disbursements and other expenses, and a review of its financial documents.

G.   A declaration that Defendants hold all income, profits, commissions, fees, revenues, andother funds received by Defendants as representatives of the 9/11 families in a constructive trust for the benefit of the Defendants' clients with 9/11 claims and Plaintiff.

H.   All other relief to which Plaintiff may be entitled at law or equity, including compensatory damages in an amount to be determined by the Court or trier of fact.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on any and all claims so triable.

Date: July 8, 2021

Respectfully Submitted,
JOHN MICHAEL QUINN
By Counsel

*/s/ Kevin E. Byrnes, Esq.*
Kevin Byrnes, D.C. Bar No. 480195
Marzia Momen, D.C. Bar No. 1500229
**FH+H**
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
T: (703) 590-1234
F: (703) 590-0366
kbyrnes@fhhfirm.com
momen@fhhfirm.com
*Counsel for Plaintiff*