## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN MICHAEL QUINN | : | |
| 2159 Dunmore Lane, N.W. | : | |
| Washington, D.C. 20007 | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| KREINDLER & KREINDLER LLP | : | Civil Action No.: 21-1824 |
| DOS Process: DTR of Administration | : | |
| 750 Third Ave 32nd FLR | : | |
| New York, New York, 10017-2725 | : | |
| | : | |
| and | : | |
| | : | |
| JAMES P. KREINDLER | : | |
| c/o Kreindler & Kreindler LLP | : | |
| 485 Lexington Avenue | : | |
| New York, NY, 10017-2629 | : | |
| | : | |
| Defendants. | : | |

---

### FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff, JOHN MICHAEL QUINN ("Plaintiff" or "Quinn"), by counsel, complains as follows herein:

### SUMMARY

1.      This is an action against Defendants for breach of contract based on Defendants' refusal to honor their obligations to Plaintiff after securing the benefits of years of his work on behalf of both the Defendants and the clients they and Plaintiff jointly represent. Those shared clients are thousands of family members and representatives of the victims of the September 11, 2001, terrorist attacks ("9/11 families" or "9/11 family members"). In addition, the shared clients include hundreds of New York City first responders and others who were exposed to harm in the immediate aftermath of the 9/11 attacks.

2.     Plaintiff's substantial and effective efforts on behalf of Defendants and their shared clients were predicated on a series of Agreements among the parties. The initial agreement was authored by Defendant Kreindler in 2013 and offered by him to Plaintiff Quinn, who accepted it and began his work for Defendants and their shared clients. Ex. 1.[1] Subsequent revisions of the initial contract made significant changes, all of which were agreed to by Defendants.

3.     The Agreements among the parties executed in 2017, that continue in effect today, specify that Quinn is due compensation in connection with recoveries that result from "litigation, settlement or otherwise." The inclusion of the word "otherwise" was deliberate and was specifically discussed with Defendant James Kreindler in the drafting process. It entitles Quinn to fees from the Defendants in all circumstances where (a) the shared clients, the 9/11 families, receive compensation for 9/11-related claims; and (b) Defendants receive a fee. Those conditions have already been met, but Defendants have withheld fees due to Quinn.

4.     Plaintiff therefore seeks damages, costs and a declaratory judgment as to (a) the validity and enforceability of the Agreements among the Parties; (b) his specific entitlement to fees when and as awards are made to any of the shared clients, whether based on "judgment(s), settlement(s) or otherwise," including specifically, but not limited to, overdue compensation to which Plaintiff is entitled in connection with the United States Victims of State Sponsored Terrorism Fund (henceforth, "VSSTF") and the September 11th Victim Compensation Fund ("VCF").

5.     In the alternative, Plaintiff seeks redress under the alternative remedies of quantum meruit, quasi-contract and implied contract in fact. He further seeks an accounting and the creation of a constructive trust on monies due and owing to him, and to pierce the corporate veil as the

---

[1] Agreement Between Kreindler & Kreindler LLP, Nelson Mullins and Quinn Gillespie, dated June 20, 2013

Defendants have used their law firm as an alter ego to carry out their breaches.

6.     Plaintiff also seeks a remedy under a theory that Defendants have breached their duty of good faith and fair dealing under their contractual agreements.  Plaintiff seeks to establish his right to regular accountings and payment from Defendants through the expiration of all payment sources.

## JURISDICTION AND VENUE

7.     Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332(a)(1), as there is complete diversity between the parties as the Plaintiff and Defendants are citizens of different states. Further the amount in controversy vastly exceeds the $75,000 minimum for a case in controversy.

8.     Venue is proper in the District of Columbia because the contractual Agreements at issue were executed in the District of Columbia, the breaches and violations of duties and their resulting injury occurred in the District of Columbia, the Plaintiff resides in the District of Columbia, and the discussions between Plaintiff and Defendants and the conduct Plaintiff performed on the contractual Agreements occurred almost exclusively in the District of Columbia.

9.     Defendants are also subject to personal jurisdiction of this Court pursuant to D.C. Code § 13-423(a)(l).

## PARTIES

10.     Plaintiff John (a/k/a "Jack") Quinn is a resident of the District of Columbia. Plaintiff Quinn was admitted to the District of Columbia Bar in 1976 and is a well-respected attorney with a wealth of experience, including in and before the Congress and the Executive Branch of Government. Quinn was Counsel to the President of the United States from 1995 to 1997. He was Chief of Staff and Counsellor to the Vice President of the United States from 1993 to 1995. Earlier, Quinn worked for Congress from 1969 to 1975. Quinn entered private practice as an associate at

the law firm of Arnold & Porter in 1976 and was a partner at that firm from 1982 to 1993 and from 1997 to 2000. He was a co-founder, co-chair and then chair of the public affairs firm Quinn Gillespie & Associates from 2000 to 2015. He currently is the sole proprietor of the Law Office of John M. Quinn (2013-present) and is also a partner at the law firm of Manatt, Phelps & Phillips (2016-present). Quinn's representation of 9/11 families, certain property insurers and others involved in the 9/11 litigation commenced in 2013 and is carried out through his Law Office of John M. Quinn.

11.     Defendant Kreindler & Kreindler, LLP ("K&K") is a law firm organized and existing under the laws of the State of New York and having its principal place of business at 485 Lexington Avenue, New York, New York 10017.

12.     Defendant James Kreindler ("Kreindler") is an attorney admitted to practice in the State of New York, a name partner in the law firm Kreindler & Kreindler LLP, and who is believed to be a resident of the State of New York.

## FACTS

### I.     THE 9/11 ATTACKS

13.     On the morning of September 11, 2001, universally known as "9/11," coordinated attacks were launched by the terrorist group Al-Qaeda with the avowed purpose of striking at the political, military, and economic symbols of the United States and maximizing death and destruction to highlight the Nation's vulnerabilities. As every American knows, two airplanes were deliberately flown into the World Trade Center complex in Lower Manhattan, resulting in the total collapse of both towers and the deaths of thousands. Terrorists flew the third plane into the Pentagon in Arlington, Virginia resulting in its partial destruction and the additional loss of life. Passengers on the fourth plane overpowered the hijackers who were flying towards Washington, D.C., ultimately crashing in a field in Shanksville, Pennsylvania resulting in the death of all aboard.

14.     The 9/11 attacks immediately resulted in 2,977 fatalities and, to date, tens of thousands of injuries.

15.     Since 2013, the parties hereto have co-represented thousands of family members whose relatives were killed or injured as a result of the attacks, the estates of the deceased, and first responders and others who were near an attack site in the immediate aftermath and suffered injury or illness resulting from the attacks.

## II.     THE 9/11 FAMILIES FACED LEGAL BARRIERS IN BRINGING CIVIL SUITS AGAINST TERRORISTS

16.     The family members of victims of the 9/11 attacks initially faced significant legal barriers to obtaining just compensation for their harm and that of their loved ones.

17.     One such barrier was the doctrine of sovereign immunity which, at the time of the attacks, sharply limited suits against foreign nations and agencies of foreign governments in U.S. courts, unless the nation at issue had previously been identified by the U.S. Department of State as a "state sponsor" of terrorism. Then and today, the only designated "state sponsors of terrorism" were and are Cuba, Iran, Syria, and North Korea. Although most of the 9/11 hijackers came from the Kingdom of Saudi Arabia ("KSA"), the Department of State has never declared KSA to be a state sponsor of terrorism.

18.     Additionally, by the time Defendants sought Quinn's services, the United States Solicitor General had twice intervened in litigation initiated in the U.S. District Court for the Southern District of New York ("SDNY") and submitted briefs that indicated ongoing opposition to U.S. citizens bringing suit in the circumstances like the 9/11-related cases.

19.     Quinn devoted considerable time and effort, together with Defendants' active and ongoing coordination, to removing this barrier to achieving access to justice for the parties' shared clients, the 9/11 family members, and others.  Once this barrier was removed by statute, as

described *infra* Part IV, Defendants were able to bring suit against the Kingdom of Saudi Arabia and other nation states.

## III.   HISTORY OF THE PARTIES' RELATIONSHIPS AND THEIR BINDING CONTRACTS

20.     The relationship among Plaintiff and Defendants began in the period 2008-2009. Kreindler, at that time, sought out and engaged Quinn's firm, Quinn Gillespie & Associates ("QGA"), to assist him and K&K in an effort to achieve compensation for the victims of the terrorist bombing of Pan Am 103 over Lockerbie, Scotland.  QGA partners assisted Kreindler in successfully advocating for a settlement with the Government of Libya. Both an Act of Congress and an Executive Order were necessary to a final settlement with Libya on behalf of the families of the victims of the bombing.  Kreindler's and QGA's collaboration was successful, and Plaintiffs paid to QGA an agreed-upon multi-million-dollar fee for its work.

21.     In the period 2012-2013, Kreindler again sought out Quinn, this time to assist in K&K's representation of the 9/11 families, including dealing with the legal barriers facing the 9/11 families, some of whom Kreindler represented and many others of whom K&K was actively seeking to represent.

22.     The first contract among the parties was authored and offered by Defendant Kreindler to Quinn and signed by the parties in June 2013. Ex. 1. That contract was followed by others that replaced and significantly modified the terms of the initial contract. The essential fee structure of the Defendants' contracts with Quinn, however, has remained the same since the initial Agreement where: (1) the shared clients of the parties receive compensation for their losses, and (2) Defendants receive fees in connection therewith, (3) then Plaintiff is entitled to fees, <u>payable by Defendants and not the 9/11 families</u>, equal to either 0.775 percent or 1.0 percent (depending on circumstances defined in the contracts) of the net recovery on each claim.

23.     Defendant Kreindler drafted and offered to Quinn the initial 2013 contract for Quinn's services, hoping that Quinn could help Defendants promote the cause of the 9/11 families in the media and in Congress and thereby overcome the barriers they faced in seeking compensation for the 9/11 families. Ex. 1. As a result of that contractual arrangement, Quinn became co-counsel to Defendants' clients, as Kreindler later described Quinn in emails with others, including certain of his colleagues and third parties.

24.     The initial Agreement provided that Plaintiff and the firm of Nelson, Mullins, Riley & Scarborough would be entitled to equal shares of a "a fee of 1% percent of the net recovery on each decedent's wrongful death case and each personal injury case where Kreindler & Kreindler has or receives a fee in the consolidated 9/11 Terrorist Litigation," styled as *In Re: Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (SDNY) ("the SDNY litigation").   This Agreement was amended on July 10, 2014.  Ex. 2[2].

25.     The principal involved at the Nelson, Mullins, Riley & Scarborough was Robert Crowe, Esq. This contingency fee arrangement was acceptable to Quinn because the Defendants had previously entered into contingency fee arrangements with the 9/11 families and, more importantly, because so many of the 9/11 families could not bear the expense of standard legal or consulting rates for ongoing services.  Due to the prolonged nature of the proceedings that the 9/11 families already had been through in the SDNY litigation, none of the Agreements among the parties included a termination date.

26.     On May 19, 2017, the parties executed two new agreements, the first of which was effective January 1, 2017 related to the "representation of the Clients on whose behalf [K&K] filed

---

[2]     Amendment to the Agreement Between Kreindler & Kreindler LLP, Nelson Mullins Riley & Scarborough LLP and John M. Quinn, Esq., Dated July 9, 2014. Note: this agreement was signed on July 10, 2014, and is referred to as "the agreement dated July 10, 2014" in Ex. 3.

cases in the litigation as of the date of the Earlier Agreement," that is July 10, 2014.  Ex. 3.[3]

27.     The second agreement was effective January 2, 2017 for recoveries related to "representation of clients on whose behalf K&K filed claims on or after July 10, 2014." Ex. 4.[4]

28.     On August 26, 2017, the parties amended the May 19, 2017 Agreements.[5]

29.     The May 2017 Agreements, as amended in August 2017, replaced the initial 2013 Agreement, as amended in 2014. Thus, although the 2013/2014 Agreements included no termination date, they were in effect through December 31, 2016 only.

30.     The May 2017 Agreements set forth Quinn's promises to provide services to Defendants and Defendants' promises to pay to Quinn specific fees when the clients they jointly represent (the "Shared Clients") receive all or part of any compensation on 9/11-related matters with respect to which Defendants collect fees – whether by "judgment, settlement or otherwise."

31.     All of Quinn's Agreements with Defendants from May 2017 forward were on his behalf only and not that of Nelson, Mullins, Riley & Scarborough.

32.     Because Defendants agreed that Quinn was performing appreciably more of the work expected under the initial contract than was Nelson, Mullins, Riley & Scarborough, Quinn's fee was increased from 0.5 percent to 0.775 percent of the net recoveries by the shared clients. Ex. 3 ¶ 4. On information and belief, Defendants likely contracted with Nelson, Mullins, Riley & Scarborough at a fee that reflected a decrease in its fee from 0.5 percent to 0.225 percent of the net recoveries.

---

[3]     Agreement Between John M. Quinn, Esq. and The Law Office of John M. Quinn, PLLC, and Kreindler & Kreindler LLP, dated May 19, 2017 and effective January 1, 2017.

[4]     Agreement Between Kreindler & Kreindler LLP, The Law Office of John M. Quinn, PLLC, and John M. Quinn, Esq. Relating to New Claims and Additional Compensation, May 19, 2017 and effective January 2, 2017.

[5]     Amendments to Agreements Dated May 19, 2017 Between John M. Quinn, Esq., The Law Office of John M. Quinn, PLLC and Kreindler & Kreindler LLP, dated August 26, 2017.

33.     As a result of the parties' Agreement that there was a growing possibility that compensation for the 9/11 families would come from sources to-be-determined, or as a result of proceedings other than or in addition to the 9/11-related litigation that was pending in the SDNY, the parties agreed to broaden the fee calculation to include recoveries realized in the SDNY litigation or in any other proceeding or fora. The new Agreements therefore provided that Quinn's compensation from Defendants would henceforth come as a fraction (0.775%) of the "net recovery on each decedent's wrongful death and each personal injury claim with respect to which K&K receives a fee, "whether by judgment, settlement <u>or otherwise</u>" and the limitation relating recoveries to the specific SDNY litigation was removed. Ex. 3 ¶ 4 (emphasis added).

34.     A separate new contract executed on May 19, 2017, effective *nunc pro tunc*, January 2, 2017, established Quinn's entitlement to a larger fraction (1%) of certain specific recoveries:

> K&K shall pay to Quinn a fee of 1% of the net recovery on each wrongful death, injury or any other claim for which K&K receives a fee, whether by judgement, settlement or otherwise, for its representation of clients on whose behalf K&K filed claims on or after July 10, 2014 or with respect to whom K&K is awarded fees by virtue of common benefit awards or participation in representation of other clients as a member of the plaintiffs' executive committee or through the operation of any common fund the purpose of which is to award compensation to other claimants in the litigation, ***except that K&K shall not be obligated to pay a fee to Quinn*** where and to the extent Quinn received a fee in respect of the same claim pursuant to a separate fee-sharing agreement to which K&K and Quinn are parties.

Ex. 4 ¶¶ 2-3.

35.     On August 26, 2017, the parties executed a final amendatory Agreement that (i) provides that the earlier Agreements (Exhibits 3 and 4), in referring to "the litigation," include the provision of services in cases "for which [K&K] is retained to file *or otherwise provide services* in connection with matters arising out of the attacks" (Ex. 5 ¶ 1); (ii) states that, in addition to other bases of compensation, Quinn shall receive "compensation for the representation of clients on

whose behalf claims are not filed in the litigation but who have retained K&K to assist in recovering compensation whether through the filing of claims or otherwise and who in fact receive a recovery with respect to which K&K receives a fee" (Ex. 5 ¶ 2); and (iii) amends the May 19, 2017 Agreement effective January 1, 2017 by providing that "[i]f, for any reason, Nelson, Mullins, Riley & Scarborough and/or Robert Crowe are unable or ineligible *or otherwise fail to receive all or part of the fees contemplated by their contract with K&K, then such fees shall be paid to Quinn* to the extent of the difference between the amount represented by 0.225 of the net recoveries contemplated by their contract with K&K and the amount actually received by them." (Ex. 5 ¶ 3) (emphasis added).

36.     Quinn also serves in the capacity of co-counsel or has attorney-client relationships with other firms, including the firm that filed the putative class action against Saudi Arabia in the SDNY litigation in 2004 and several insurance companies whose clients' insured properties were destroyed in the 9/11 attacks, such as Travelers, Inc. and syndicates of Lloyd's of London. Those additional contractual relationships were the result of Kreindler's recommendations that they contractually engage the services of Quinn.

37.     Defendants have asserted, through counsel, that Plaintiff is not entitled to fees as prescribed in the valid contracts outlined above and appended hereto, including awards made to the shared clients by the VSSTF or VCF or that might be made as a result of any litigation or settlement. Given the plain inconsistency of this assertion with the binding contracts between the parties, Plaintiff has a reasonable belief that Defendants will abscond with his rightful share of fees based on awards to date as well as with fees to be determined based on future awards.

38.     While Quinn has been devoted to the cause of the 9/11 families, he never offered to spend eight years laboring on legal, political and media activities as an unpaid volunteer for

Defendants.  As the amount of Quinn's fees is paid from Defendants' fees, the only beneficiaries

of Defendants' nonpayment to Quinn are Defendants themselves, not the 9/11 families. Quinn has

valid enforceable contracts with Kreindler & Kreindler LLP and he seeks to have Defendants honor

their agreements and compensate him according to those contracts.

## IV.   QUINN WORKED TO FACILITATE PASSAGE OF THE JUSTICE AGAINST STATE SPONSORS OF TERRORISM ACT (JASTA), AMONG OTHER LABORS

39.     On the basis of their Agreements, Kreindler repeatedly sought out Quinn and

exploited his services over the course of the last eight years. In turn, Quinn has vigorously and

effectively worked, and continues to work, on behalf of the clients he shares with Defendants.

Quinn's years-long efforts pursuant to his contracts with Defendants made a meaningful

contribution to Defendants' renewed determination in 2014 to support (and their subsequent efforts

to advocate for) important changes in federal law, which had previously been interpreted to impose

dispositive impediments to legal actions by United States citizens against foreign states and state-

supported actors in circumstances like the 9/11 attacks. Defendants specifically acknowledged the

value of Quinn's contributions to these efforts in the operative over-arching 2017 Agreement with

Quinn, which states that "Quinn's important contribution to date to the litigation and to the

enactment of JASTA [the "Justice Against Sponsors of Terrorism Act"] is hereby acknowledged."

Ex. 3 at ¶ 3.

40.     A large part of Quinn's work for Defendants and their shared clients from 2014

through 2020 has involved analysis of and advocacy for the legal and policy bases justifying

enactment of JASTA, as well as subsequent work to help formulate and articulate arguments to

defeat efforts to reverse all or part of that important statute in the years after its enactment. Quinn

was a resounding voice encouraging the Plaintiffs' Executive Committee ("PEC") in the SDNY

9/11 litigation in 2014 to renew efforts to secure enactment of JASTA, and he subsequently

devoted major portions of his time to the cause with Kreindler's enthusiastic and regular encouragement. Quinn's work involved him often with members of the PEC, public officials, and the media. This dedicated effort by Quinn and others with whom he has worked has been matched by concerted and well-financed efforts by Saudi Arabia and certain other countries, initially to block any change in the law that could subject them to the jurisdiction of U.S. Courts and, later, to solicit congressional assistance in reversing the important changes in the law brought about by the enactment of JASTA.

41.    Quinn worked prodigiously for the 9/11 families, familiarizing himself with the more important court filings made by Defendants and certain other parties, reviewing and editing proposed legislation, consulting more than weekly with Kreindler, regularly discussing developments and strategies with certain other lawyers involved in the Plaintiffs' Executive Committee, or otherwise representing large numbers of plaintiffs (other than K&K's) who were especially active in Washington, D.C. on behalf of the 9/11 families, conducting outreach efforts in Congress, particularly with the principal congressional supporters of the 9/11 families' cause and members of the Leadership and Judiciary Committees in Congress, and overcoming Executive Branch deference to KSA's opposition to JASTA by keeping numerous media outlets informed of its efforts to encourage Congress to act against the interests of the clients he shares with Defendants. Defendants benefitted from these efforts, as reflected in their explicit acknowledgement of Quinn's efforts in one of the contract revisions of the parties' contract, adopted by Defendants and Plaintiff in 2017. Ex. 3 ¶ 3.

42.    Along with a small group of attorneys, Quinn specifically helped to formulate and execute a plan to secure enactment of JASTA, which had long foundered, and an override of the presidential veto that followed its initial passage in the Congress. See Pub. L. 114-222. Quinn and

those other lawyers worked with the Defendants and other law firms and, of critical importance, a number of 9/11 family members who were indispensable to the success of the media and political outreach activities in Washington, D.C. After being vetoed, JASTA was ultimately enacted on September 28, 2016 by overwhelming majorities in the United States Senate and House of Representatives. The United States Senate vote to enact JASTA was 97 to 1 and the House of Representatives vote on the same day was 348 to 77.

43.     Plaintiff's work on behalf of Defendants did not end with the enactment of JASTA. The KSA and others with commercial interests continued to pressure the U.S. Government to amend the new law in ways that would render it a virtual nullity. Plaintiff and others devoted significant additional effort, particularly in late 2016 and in 2017, to discourage Congress from acting on several baseless predictions of dire consequences of JASTA.

44.     Additionally, in the last half of 2020, Quinn worked with others in Washington to argue, successfully, against efforts on the part of the Government of Sudan and the Department of State to have included in the Sudan Claims Resolution A5ct, enacted in late December 2020, language that would effectively erase the 9/11 families' claims against Sudan. Defendants were aware of Quinn's involvement, as they were on numerous emails and phone calls during negotiations over the bill with opposing counsel and Quinn.

45.     With regard to the VSSTF, *see infra* Part VII, Quinn worked at the request of, and with Kreindler to ensure that their shared clients could have access to the VSSTF. At Kreindler's specific request, Quinn reviewed and discussed a draft of the initial legislation establishing the VSSTF that had been prepared by one of the non-governmental drafters of the legislation. Quinn also met, at Kreindler's request, on a number of occasions with a number of the shared clients of the parties who were unhappy with the relative treatment of siblings and parents of victims, as

compared to that of spouses and children, in an attempt to help achieve peace among Defendants' and Plaintiff's shared clients.

46.    Finally, Quinn continues to be involved in advancing the claims and interests of the 9/11 Family community, including the clients he represents with Defendants. Even recently, he and other lawyers have taken positive steps on matters of great concern to the 9/11 community at senior levels of our federal Government, under circumstances of confidentiality.

47.    Kreindler specifically requested that Quinn discuss the proposed VSSTF with one of the persons involved in drafting the statute and, when Kreindler later became concerned about efforts to shape the program in ways that would potentially work an unfairness to certain of the 9/11 family members, Kreindler encouraged Quinn to discuss the matter with congressional parties in order that he might add his voice to help discourage any unfairness to the shared clients.

48.    On the strength of the contractual commitments made to him by Defendants, Quinn worked tirelessly to promote the cause of obtaining justice and compensation for the 9/11 families through eight years, before five Congresses and three Administrations.

49.    Plaintiff performed numerous tasks related to the 9/11 attacks, including but not limited to ensuring the enactment of a jurisdictional basis to pursue sponsors of terrorism in U.S. Courts, ensuring Congressional support for the VSSTF and compensation of the 9/11 families, conducting media efforts to build support for such initiatives, working with Congressional leaders to overcome intransigence from the Executive branch and strong resistance from Saudi Arabia and other states that threatened to retaliate against the U.S. if JASTA were passed, building and cementing sufficient bi-partisan support to overcome a Presidential veto of JASTA.  In addition, Plaintiff advocated for the families of victims of 9/11, assisted Defendants in drafting pleadings, and assisted in the development of a political and media strategy to support suits against the

perpetrators of the 9/11 attacks and their state sponsors, and participating in a coordinated effort to align attorneys, advocates and victims and survivors of the 9/11 attacks, which he continues to work on to this day.

50.     In total, Quinn devoted thousands of hours and the bulk of his professional practice to this effort, which Defendants specifically acknowledged as essential to their achieving recoveries for their clients.

## V.    PLAINTIFFS IN THE SDNY LITIGATION HAVE RECEIVED LIABILITY AND DAMAGES JUDGMENTS

51.     K&K filed a complaint on behalf of Kathleen Ashton and her co-plaintiffs in September 2002 against numerous defendants, including the Islamic Republic of Iran. This matter is styled *Ashton, et al v. Al Qaeda Islamic*, SDNY No. 1:02−cv−06977. The original complaint has been amended a number of times. The plaintiffs in this case are known as the Ashton Plaintiffs.

52.     Each Ashton Plaintiff is either the Executor, Administrator, or Personal Representative of the estate of a person killed in the 9/11 attacks, or a person injured in the 9/11 attacks.

53.     On the same day K&K filed the Ashton Plaintiffs' complaint, it filed a second complaint on behalf of Arlene Beyer, as representative of an estate, numerous other estate administrators, as well as numerous individual plaintiffs.  This complaint was styled as *Beyer et al. v. Al Queda Islamic, et al*., No. 02-cv-6978 (SDNY).

54.     The *Beyer* complaint included hundreds of plaintiffs K&K identified as being members of the Fire Department of New York (FDNY), New York Police Department (NYPD), or FDNY Emergency Medical Services (EMS).

55.     On November 19, 2002, the SDNY consolidated six separate cases – including the Ashton (02-cv-6977) and Beyer (02-cv-6978) cases – for liability purposes and directed counsel

to file one Master Complaint. The consolidated case was styled *Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02 cv 6977.

56.     On December 10, 2003, *Ashton, et al v. Al Qaeda Islamic*, No. 1:02−cv−06977 (SDNY), together with a number of other actions, was consolidated as multi-district litigation and is now styled as *In Re: Terrorist Attacks on September 11, 2001*, No. 1:03−md−01570 (SDNY).

57.     On September 12, 2018, K&K filed a complaint on behalf of Sirak Betru and a number of other plaintiffs for wrongful death and personal injury. This case is styled as *Betru et al v. Islamic Republic of Iran*, No. 18-cv-8297 (SDNY), and is consolidated in *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (SDNY).

58.     Kreindler & Kreindler LLP is now, and always has been, the attorney of record for the *Ashton, Beyer* and *Betru* Plaintiffs.

59.     The Southern District of New York has granted numerous plaintiffs final default judgment for liability in their complaints against Defendant Islamic Republic of Iran.

60.     On August 31, 2015, the SDNY issued the Ashton Plaintiffs final judgment on liability by default against the Islamic Republic of Iran.

61.     On March 8, 2016, the SDNY issued an Amended Order of Judgment in which it awarded Ashton Plaintiffs compensatory and punitive damages for each of 844 estates of decedents.

62.     Each estate was eligible for a damages award including economic losses, compensatory damages for conscious pre-death pain and suffering, and punitive damages for conscious pain and suffering.

63.     Economic losses were individually calculated for each estate. Compensatory awards for pre-death pain and suffering were set at $2 million for each estate and punitive damages

for conscious pain and suffering were set at $6.88 million for each estate.

64.     In total for all 844 estates, the SDNY awarded damages in the amount of $1.688 billion for compensatory pain and suffering damages, and $5.8 billion for punitive pain and suffering damages.

65.     In addition to damages awarded to each estate, family members of a decedent were each eligible for a compensatory award of solatium damages in an amount determined by their relationship to the decedent.

66.     On September 13, 2018, the SDNY issued the Betru Plaintiffs final judgment on liability by default against the Islamic Republic of Iran and solatium damages.

67.     A spouse received a compensatory award for solatium damages of $12.5 million, a child or parent, $8.5 million, and a sibling $4.25 million.

68.     Beginning in June 2016 and continuing to the present, more than 2500 Ashton or Betru plaintiffs – family members of decedents – have received final judgments on compensatory damages for solatium damages.   On one day, the SDNY awarded nineteen Betru plaintiffs represented by K&K a total of $118.75 million in compensatory solatium damages. The total amount awarded to the Ashton plaintiffs represented by K&K for compensatory solatium damages is in the billions of dollars.

69.     The references herein to final judgments are not an exhaustive list of every final judgment awarded to every plaintiff by the SDNY. Rather, these examples serve to illustrate that Plaintiffs represented by K&K have received final judgments against Iran for both liability and damages and plaintiffs have been awarded substantial amounts of compensatory damages. As K&K itself readily acknowledges.  *See infra* Part VIII.

## VI.     THE SEPTEMBER 11th VICTIM COMPENSATION FUND PROVIDES COMPENSATION RELATED TO THE 9/11 ATTACKS

70.     The September 11th Victim Compensation Fund ("VCF") was created to provide compensation for any individual (or a personal representative of a deceased individual) who suffered physical harm or was killed as a result of the terrorist-related aircraft crashes of September 11, 2001 or the debris removal efforts that took place in the immediate aftermath of those crashes.

71.     The original VCF operated between 2001 and June 2004 and is sometimes known as VCF1.  In total, VCF1 distributed approximately $7 billion to claimants.

72. In 2011, the VCF was re-opened and reauthorized through the James Zadroga 9/11 Health and Compensation Act (Zadroga Act).  The Zadroga Act also included expanded eligibility criteria.

73.     VCF1 closed prior to the parties entering their first contract in June 2013. Thus only the VCF re-opened in 2011 is relevant in this litigation.[6]

74.     In July 2019, VCF was reauthorized with an extended filing deadline for claims of October 1, 2090.   In additions, funds as may be necessary to pay all eligible claims were appropriated.  The current VCF will thus continue to award compensation to eligible claimants for the next seven decades.

75.     Under certain circumstances, a claimant who received an award through VCF1 may receive a further award through the current VCF.  To do so, a claimant must show that the VCF1 eligible injury or condition has substantially worsened, or that he or she has a new physical injury or condition which the claimant had not suffered at the time of the VCF1 claim filing or which was not compensable at the time of VCF1; and that the claimant has not already been fully compensated for the losses.

---

[6]     References to the 2001- 2004 VCF are denoted as VCF1.  Any reference to the current VCF reauthorized in 2011 is denoted as VCF.

76.     Eligibility for compensation through the VCF is limited to individuals who were present at one of the attack sites, or within the New York City Exposure Zone, or along the routes of debris removal at some point during the period beginning on September 11, 2001, through May 30, 2002.  Claimants must have a physical injury or condition caused by the terrorist-related aircraft crashes of September 11, 2001, or the rescue, recovery, and debris removal efforts during the immediate aftermath.

77.     By statute, an attorney representing a claimant before the VCF may charge a fee of up to 10% of the amount of the VCF award.

78.     Potential claimants file claims directly with the VCF.  VCF evaluates each claim and decides both entitlement and the amount awarded on an individualized basis.

79.     VCF does not make public either the names of claimants or the amount awarded.

## VII.     THE VICTIMS OF STATE SPONSORED TERRORISM FUND PROVIDES A FUNDING MECHANISM TO SATISFY DISTRICT COURT JUDGMENTS

80.     In December 2015, Congress enacted the VSSTF, 34 U.S.C. § 20144, to provide a funding mechanism to certain victims of state sponsored terrorism and their families, including the 9/11 family members whom Defendants and Quinn represent jointly.

81.     In 2019, Congress passed the "Justice for United States Victims of State Sponsored Terrorism Clarification Act" ("Clarification Act"). The Clarification Act amended the VSSTF to provide coverage for 9/11 victims with judgments against Iran, some of whom were prohibited under the original VSSTF from receiving compensation from the Fund because they had already received compensation from the September 11th Victim Compensation Fund (VCF).  Congress also set aside as much as half of the VSSTF to be used to compensate the families of 9/11 victims. This important development was, at least in significant part, a consequence of the changed political environment that followed a number of developments in the U.S.-Saudi relationship, particularly

the overwhelming votes in Congress to enact JASTA.

82.     The VSSTF Clarification Act also reduced permissible fees charged by attorneys representing claimants from 25% to 15% of any payment made from the VSSTF. At the time, Kreindler argued to Quinn that Quinn's contractual fees would also have to be reduced by 40% -- despite the fact that K&K had never charged 25% but was, instead, typically charging fees of 15% or less. For example, K&K has entered into agreements with clients for a 10% contingency fee. *See In re Thompson*, 66 A.D.3d 1035, 1036 (N.Y. App. Div. 2009) ("At issue in this proceeding is the reasonableness of the 10% contingency attorney's fee charged by Kreindler & Kreindler and Meaders, Duckworth & Moore . . . , the law firms that assisted the petitioner in filing and presenting her claim to the VCF.").

83.     An eligible VSSTF claimant is an individual with a final judgment issued by a United States district court against a foreign state that was designated as a state sponsor of terrorism at the time the acts that are the subject of the claimant's federal complaint were committed.

84.     VSSTF considers a default judgment to be a final judgment and will compensate a claimant with a default judgement from a federal district court.

85.     After a one-time appropriation of $1.025 billion for fiscal year 2017, 34 U.S.C. § 20144(e)(5), all funding for the VSSTF comes from proceeds of federal enforcement actions.

86.     VSSTF began accepting applications in July 2016.  Claims from existing judgment holders were due by October 12, 2016.  Claimants who obtained judgments after July 14, 2016, have 90 days from the date they obtain the judgment to file a claim with VSSTF.

87.     The VSSTF has issued three rounds of payments based on claims presented by eligible claimants.  The first VSSTF distribution was in late 2016 or early 2017 and totaled approximately $1.1 billion. The second VSSTF distribution began in early January 2019 and

totaled approximately $1.095 billion. A third VSSTF distribution is in progress and is expected to total approximately $1.075 billion.

88.     In each distribution, VSSTF pays eligible claims on a *pro rata* basis out of available funds, based on the amounts outstanding and unpaid on eligible claims.  An eligible claimant may thus receive partial payment on a single judgment in multiple distributions.  VSSTF will continue to issue pro rata payments to a claimant until all such amounts have been paid in full or the VSSTF terminates in 2030.

89.     Plaintiffs for whom K&K is counsel of record are eligible claimants, as defined by the VSSTF.  They hold final judgments from the SDNY against Iran - a foreign state that was designated as a state sponsor of terrorism during September 2011.

90.     VSSTF does not make public either the names of claimants or the amount awarded.

## VIII.  K&K TOUTS THE SUBSTANTIAL RECOVERIES IT HAS ACHIEVED FOR NUMEROUS CLIENTS FROM BOTH THE VSSTF AND THE VCF

91.     K&K publicly touts its accomplishment of securing compensation through the VSSTF for its clients.  "Kreindler has obtained default judgments against Iran for our 9/11 clients and has recovered on those judgments from the United States Victims of State Sponsored Terrorism Fund."

92.     Similarly, K&K touts its accomplishment in achieving recoveries for clients from the VCF.  "In all, over $3 billion has been recovered due to Kreindler's diligence and leadership in helping to create and aiding victims in accessing the September 11th Victim Compensation Fund."

93.     According to K&K, "[o]ver the two decades since September 11, 2001, no law firm in the world has recovered more money for 9/11 victims and their families than Kreindler. This includes not only those who died that day but also the many first responders, workers, NYC

residents, and visitors who have been diagnosed with cancer and serious respiratory illnesses, long after breathing in the poisonous fumes and toxins following the destruction of the World Trade Center."

## IX.   K&K OWES FEES TO QUINN FOR CLIENT RECOVERIES THROUGH AT LEAST THE VSSTF AND VCF

94.     A promise was made to compensate Quinn for his services at such time as the shared clients of Plaintiff and Defendants began receiving compensation. On information and belief, K&K has been compensating its partners and perhaps others as a result of VSSTF or VCF awards realized to date.

95.     Defendants have failed to provide Plaintiff with any payment under either the 2013/2014 Agreement or the 2017 Agreements.

96.     Defendants have failed to provide Plaintiff with any financial statements, accountings, or information of any kind related to payments made to Defendants or their clients, or out-of-pocket expenses incurred by K&K, or other payments to a third party. Plaintiff has repeatedly requested such information, only to be informed by Defendants' counsel that K&K has no obligation to provide such information to Plaintiff.

97.     In fact, and in law, as Defendants' co-counsel, Quinn is entitled to all information relevant to the joint representation of their clients, including compensation awards and other financial information provided to Kreindler or to any of his partners, associates or K&K employees.

98.     As co-counsel, Defendants owe a duty to provide an accounting and access to all financial records related to the 9/11 families, payments to the co-defendants and the distribution of fees and expense reimbursements among the Defendants and to any other persons or entities.

## COUNT I
## BREACH OF CONTRACT – 2013/2014 AGREEMENTS

99.     Plaintiff incorporates by reference, the allegations contained in paragraphs 1-98 as if fully realleged herein.

100.     To prevail on a breach of contract claim, a party must demonstrate (i) that a contract existed, (ii) that the party performed his contractual obligations, (iii) that the other party breached the contract, and (iv) that the party suffered damages due to the breach. *Armenian Assembly of Am., Inc. v. Cafesjian*, 772 F.Supp.2d 20 (D.D.C. 2011) (citing *Dorsey v. Am. Express Co.,* 680 F.Supp.2d 250, 254 (D.D.C.2010)).

101.     The parties entered into a valid enforceable contract on June 20, 2013, amended on July 10, 2014, which remained in force through December 31, 2016.  Exs. 1 & 2.

102.     Plaintiff conferred a benefit on Defendants in the form of services over a period of more than three years, and he performed his obligations under the 2013/2014 agreement.  *See supra* Part IV.

103.     Defendants have failed to perform their obligations to Quinn under the 2013/2014 Agreement. *See supra* Part IX.

104.     Defendants have publicly acknowledged recovering compensation for clients under both the VCF and the VSSTF.  *See supra* Part VIII.

105.     Each plaintiff for whom K&K is counsel of record who received a final judgment from the SDNY is eligible to file a claim with the VSSTF for payment on that judgment.  These VSSTF payments are payments for the Consolidated 9/11 Terrorist Litigation, as specified in the 2013/2014 Agreement. Thus, Plaintiff is entitled to a fee on these recoveries.

106.     Upon information and belief, Defendant K&K has made distributions of fees received from both VSSTF and VCF client recoveries to K&K partners.

107.    Defendants have realized a net recovery on every claim filed with the VSSTF.

108.    Defendants possess all the information needed to calculate the net recovery on any VSSTF payment at any time. Defendants know the amount awarded to each client by VSSTF, and they know the amount of their own legal fees charged to each client.

109.    Defendants also know the out-of-pocket expenses K&K has incurred in connection with the consolidated 9/11 Terrorist Litigation as of any particular date.

110.    Thus, K&K can calculate the net recovery for each claim and can calculate the fee it owes Quinn.

111.    Despite requests from Quinn for payment, Defendants refuse to pay Quinn fees due to him on the amounts Defendants have recovered for clients to date.

112.    Plaintiff has been monetarily damaged by the Defendants' breaches and the Defendants' refusal to provide accountings and related information.

113.    Plaintiff requests both a full and complete accounting and the information necessary for him to calculate the compensation owed to him, payment of any such compensation in full, with interest from the date the payment should have been made, and attorney's fees and costs and such other relief as the Court deems just and proper.

## COUNT II
## BREACH OF CONTRACT – 2017 AGREEMENTS

114.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-113 as if  realleged herein.

115.    The parties entered into two valid enforceable contracts on May 19, 2017, one effective January 1, 2017 and the other effective January 2, 2017.  Ex. 3 (Jan. 1); Ex. 4 (Jan. 2). The two May 19, 2017 agreements were amended on August 26, 2017.  Ex. 5.  Collectively, the three agreements are the 2017 Agreements.

116.    The 2017 Agreements have no termination date.

117.    Quinn performed his obligations under the 2017 Agreements.  *See, e.g. supra* Part IV.

118.    Defendants knew Plaintiff was providing such services; indeed, they were advised at every step of the process of the work Quinn was performing and understood and specifically noted the value of that performance. *See* Ex. 3 ("Quinn's important contribution to date to the litigation and to the enactment of JASTA is hereby acknowledged.").

119.    Defendants have failed to perform their obligation to Quinn under the 2017 Agreements. *See supra* Part IX.

120.    Defendants have publicly acknowledged recovering compensation for clients under both the VCF and the VSSTF.

121.    Each K&K client who received a final judgment from the SDNY is eligible to file a claim with the VSSTF for payment on that judgment.

122.    As provided in the 2017 Agreement effective January 1, 2017, both VSSTF and VCF payments are payments "on each decedent's wrongful death and each personal injury claim with respect to which K&K received a fee, whether by judgement, settlement or otherwise, for its representation of the Clients on whose behalf it filed cases in the litigation as of the date of the Earlier Agreement," July 10, 2014.  Ex. 3.  Thus, Plaintiff is entitled to a fee on these recoveries.

123.    As provided in the 2017 Agreement effective January 2, 2017, both VSSTF and VCF payments are payments "on each wrongful death, injury or any other claim for which K&K receives a fee, whether by judgement, settlement or otherwise, for its representation of clients on whose behalf K&K filed claims on or after July 10, 2014 or with respect to whom K&K is awarded fees by virtue of common benefit awards or participation in representation of other clients as a

member of the plaintiffs' executive committee or through the operation of any common fund the purpose of which is to award compensation to other claimants in the litigation . . . ." Ex. 4. Thus, Plaintiff is entitled to a fee on these recoveries. To the extent that Defendants have received payment from any source other than VCF or VSSTF, Plaintiff is entitled to a fee on those recoveries as well. *Id.*

124.   Further, as provided in the August 2017 amendment to the May 2017 Agreements,

> In addition to the other bases for compensation, Quinn (as defined in the May 19 Agreements) shall receive compensation as specified in each of the May 19 Agreements for the representation of each client on whose behalf K&K has filed claims and receives fee shall also receive the same level of compensation for the representation of clients on whose behalf claims are not filed in the litigation but who have retained K&K to assist in recovering compensation whether through the filing of claims or otherwise and who in fact receive a recovery with respect to which K&K receives a fee.

Ex. 5 ¶ 2.

125.   Defendants have realized a net recovery on each client's claim filed with either the VCF or VSSTF.

126.   Defendants possess all the information needed to calculate the net recovery on any VCF or VSSTF payment at any time. Defendants know the amount awarded to each client by VCR or VSSTF, and they know the amount of their own legal fees charged to each client.

127.   Defendants also know the out-of-pocket expenses K&K has incurred in connection with the consolidated 9/11 Terrorist Litigation as of any particular date.

128.   K&K can thus calculate the net recovery for each claim and can calculate the fee it owes Quinn for each claim.

129.   Despite requests from Quinn for payment, Defendants refuse to pay Quinn fees due to him on the amounts Defendants have recovered for clients to date.

130.   Plaintiff has been monetarily damaged by the Defendants' breaches and the

Defendants' refusal to provide said accountings and related information.

131.    Plaintiff requests both a full and complete accounting and the information necessary for him to calculate the compensation owed to him, payment of any such compensation in full, with interest from the date the payment should have been made, and attorney's fees and costs and such other relief as the Court deems just and proper.

## <u>COUNT III</u>
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

132.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-131 as if  realleged herein.

133.    "[A]ll contracts contain an implied duty of good faith and fair dealing, which means that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *Ihebereme v. Capital One, N.A*., 730 F.Supp.2d 40, 49 (D.D.C. 2010) (quoting *Paul v. Howard Univ.,* 754 A.2d 297, 310 (D.C. 2000)).

134.    "This [good faith and fair dealing] duty prevents a party from evading the spirit of the contract, willfully rendering imperfect performance or interfering with the other party's performance." *Ihebereme v. Capital One, N.A*., 730 F.Supp.2d 40, 49 (quoting *Hais v. Smith,* 547 A.2d 986, 987-88 (D.C. 1988)).

135.    K&K is in sole possession of all the information necessary to determine fees due to Quinn.  K&K knows the names of its clients who have received a recovery.  K&K knows the exact amount of each recovery, the amount of its out-of-pocket expenses, and the amount of its own fees.

136.    Quinn has asked K&K for an accounting of the information from which his own fees may be calculated.

137.    K&K has refused to provide Quinn with an accounting.

138.    In refusing to provide Quinn with information necessary to determine fees owed to him, K&K is evading the spirt of the contract.

139.    As currently authorized, VSSTF will operate through 2030 and the VCF will operate through 2090.  Accordingly, Quinn will need regularly scheduled accountings long after the conclusion of this litigation to ensure K&K complies with the 2017 Agreements.

140.    Plaintiff seeks a monthly accounting through the conclusion of every funding source by which any K&K client may receive a recovery that falls under 2017 Agreements.  *See* Ex. 3-5.

## COUNT IV
## ACCOUNTING

141.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-140 as if  realleged herein.

142.    An accounting . . . "may be obtained *at the close of a litigation*. . . as long as the plaintiff is able to show that 'that the remedy at law is inadequate.'" *Armenian Assembly of America, Inc. v. Cafesjian*, 692 F.Supp.2d 20, 48 (D.D.C. 2010) (quoting *Bates v. Nw. Human Servs., Inc.,* 466 F. Supp. 2d 69, 103 (D.D.C. 2006)).

143.    Plaintiff has demanded an accounting from Defendants and payment of the amount due, but Defendants have failed and refused, and continue to fail and refuse, to render such an account and pay such sum as are due to Plaintiff.

144.    Plaintiff, as co-counsel under a contractual arrangement, is entitled to all information and an accounting that identifies all clients represented by Defendants; all compensation paid to or by any client, jointly or severally; the total compensation paid to all clients; the manner in which any claim, whether outstanding or paid in full or in part, was calculated; the date on which any compensation was paid; the deductions made by Defendants for

any services or costs they covered or provided; the date, precise nature, and recorded payees to whom any payment was made for such services or other costs; the total amount of the payment of all costs associated with the representation of the claimants; the nature, amount and date of any distribution to the Defendants; the nature, amount and date of any distribution to the third parties, including but not limited to K&K partners besides Kreindler; the current status, nature and amount of any pending claims by or against Defendants in connection with their representation of the clients they share with Plaintiff; the charges, if any, assessed to any client of the Defendants for Plaintiff's work and such other financial or factual information, data or internal K&K documents that might bear on the amount of compensation received or expected to be received by the Defendants or their clients that is related to the 9/11 attacks or any representation related to clients who claimed any compensation or damages as a result of such attacks. Plaintiff is further entitled to all records detailing any legal services performed by or costs incurred by Defendants as co-counsel.

145.    The calculations of amounts owed to Plaintiff rely on the amount of funds received by Defendants, the payment of fees and expenses to Defendants, the number of claims Defendants filed, the fees Defendants charged, the distributions made to Defendants and the identity of the various claimants, the claims they filed, the status of such claims and the payouts made from any source on such claims. Since all this information is strictly within Defendants' custody and or control, it is incumbent on Defendants to fully produce all such records to Plaintiff.

146.    Indeed, as co-counsel, Defendants have an ethical duty to disclose such information to Plaintiff to allow him to comply with his own ethical duties of competence in the representation of the 9/11 families.

147.    The information necessary to ascertain the amount due and owing to Plaintiff

cannot be ascertained without an accounting of K&K's monthly, quarterly, annual, and year-end financial statements, including but not limited to, balance sheets, statements of profits and loss, general ledgers, financial reports, accounts receivable and accounts payable ("Financial Documents").

148.    Accordingly, Plaintiff seeks an accounting of K&K and a review of its Financial Documents.

149.    Plaintiff demands a full and complete accounting to be provided to Plaintiff; access to all financial information on which that accounting is made; access to payouts to claimants and to the Defendants and others paid by Defendants in connection with any payouts for clients handled by Defendants; and complete access to the matters, communications and information regarding the payouts to any of the Defendants or to their clients who are claimants in the 9/11 matters and to any matters, communications or information related to prospective claims, to injunctive relief, to attorneys' fees and costs and to the claims that the Plaintiff has heretofore made to Defendants and for such other relief as the Court would deem proper.

150.    Plaintiff lacks an adequate remedy at law, since Defendants have exclusive custody and control over the accounts, records, and assets in which the payments, compensation, and awards subject to the fee agreements are held.

151.    Further Plaintiff lacks an adequate remedy at law as Plaintiff seeks a monthly accounting through the conclusion of every funding source by which any K&K client receives a recovery that falls under either of the May 2017 Agreements. As the VSSTF will operate through 2030 and the VCF will operate through 2090, Quinn will need regularly scheduled accountings long after the conclusion of this litigation to ensure K&K complies with the 2017 Agreements. Plaintiff seeks an Order directing such compliance.

## COUNT V
## QUANTUM MERUIT

152.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-151 as if fully realleged herein.

153.     To the extent Defendants allege that there is no contractual relationship between them and Plaintiff, or that any portion of the net recoveries Defendants obtained on behalf of family members and representatives of the victims of the September 11, 2001 terrorist attacks fall outside of the contractual relationship between Defendants and Plaintiff, Plaintiff is entitled to be paid for the value of his services for the period of the relationship – approximately eight and one-half years to date -- between the Defendants and Plaintiff.

154.     Plaintiff performed valuable services for the Defendants.  *See supra* Part IV.

155.     Plaintiff performed those services with an expectation to be compensated for his efforts.

156.     The Defendants fully accepted the Plaintiff's services and knew Plaintiff was devoting time and effort to perform them.

157.     Defendants received substantial value because of Plaintiff's efforts.

158.     Defendants specifically knew that Quinn was performing these services as their co-counsel and that Quinn expected to be paid for his work. Kreindler repeatedly assured Quinn that he would be paid in full for his services.

159.     Quinn's work was important to the success of the Defendants, who assessed significant fees for their own efforts on behalf of the 9/11 families they serviced.

160.     It is anticipated that Kreindler and K&K have received, or will receive, hundreds of millions of dollars for their efforts through a form of a percentage award of any recovery obtained by the victims.

161.     Based on either Quinn's standard rates, or the compensation received by Kreindler and his firm as a comparator, Quinn is entitled to *quantum meruit* damages, plus interest from the date that portions of these amounts should have been paid by Defendants.

162.     Plaintiff has been damaged to his material detriment by Defendants' refusal to compensate him. Further, given the time committed to and scope of Plaintiff's efforts on the 9/11 families' issues, he suffered a significant opportunity cost in being unable to pursue other valuable business which he would have certainly performed but for his efforts on behalf of the Defendants.

163.     Plaintiff seeks recovery in quantum meruit for the reasonable value of the unpaid services provided to Defendants, in the amount to be proven at trial. Plaintiff also seeks attorneys' fees and costs, and all interest due on any unpaid amounts and such other relief as the Court deems just and proper.

### COUNT VI
### CONSTRUCTIVE TRUST

164.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-163 as if realleged herein.

165.     Defendants knowingly took possession of specific property, namely funds, belonging to Plaintiff and have wrongfully withheld or failed to distribute such funds, despite requests for both an accounting and disgorgement.

166.     As a result of Defendants' wrongful acts, Plaintiff has been and is being deprived of his property, specifically the funds either deposited in trust with K&K which are now held by Defendants or those funds that have been obtained, and which have been distributed.

167.     Further, Defendants are expected to secure substantial additional amounts on behalf of their clients, the 9/11 families, whether through judicial disposition of lawsuits, settlements, "or otherwise" -- such as by operation of (1) payouts from the VSSTF to shared clients, and (2) which

result in fee payments to Defendants. In all such circumstances the fee agreements require fee awards to Plaintiff Quinn.

168.     Defendants' breach of contract, breach of fiduciary duty, misappropriation of funds and other wrongful acts have caused and will continue to cause harm to Plaintiff and the unjust enrichment of the Defendants.

169.     As a proximate result of Defendants' wrongful acts, as alleged herein, Plaintiff is entitled to a constructive trust in which Defendants, as constructive trustees, should be required to hold all income, profits, commissions, fees, revenues and other funds, received by Defendants as a result of their wrongful acts, for the benefit of Plaintiff.

170.     Further the constructive trust requires an independently appointed trustee to properly deposit, administer and distribute its corpus, including payments to Quinn both for past due amounts and for amounts that are to be received in the future.

171.     Without the imposition of a constructive trust, equity would be defeated, and the Defendants could continue to divert funds away from Quinn in a manner that would deprive him of his rightful fees and leave him without an appropriate remedy.

172.     As these funds are received for clients in the first instance, the imposition of a trust is also appropriate to protect the interests of the 9/11 families.

173.      Plaintiff requests the imposition of a constructive trust, the appointment of a neutral trustee, attorneys fees and costs and such other relief that the Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, to the extent not set forth above, Plaintiff prays for relief as follows:

A.     A declaratory judgment that the contracts among the parties, as attached hereto, are valid and enforceable and will therefore be enforced by the court.

B.      Actual damages, including punitive or treble damages, in an amount to be determined at trial.

C.      Pre-judgment and post-judgment interest on such monetary relief.

D.      The costs of bringing this suit, including reasonable attorneys' fees and costs.

E.      Piercing the corporate veil as to Kreindler & Kreindler, LLP.

F.      An accounting of Kreindler & Kreindler, LLP's 9/11-related receipts, disbursements and other expenses, and a review of its financial documents.

G.      A declaration that Defendants hold all income, profits, commissions, fees, revenues, and other funds received by Defendants as representatives of the 9/11 families in a constructive trust for the benefit of the Defendants' clients with 9/11 claims and Plaintiff.

H.      All other relief to which Plaintiff may be entitled at law or equity, including compensatory damages in an amount to be determined by the Court or trier of fact.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby requests a jury trial on any and all claims so triable.

Date: October 18, 2021

Respectfully Submitted,
**JOHN MICHAEL QUINN**
By Counsel

*/s/ Kevin E. Byrnes, Esq.*
Kevin Byrnes, D.C. Bar No. 480195
Thomas M. Craig, D.C. Bar No. 494503
Rachel Leahey, D.C. Bar No. 999385
FH+H
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
T: (703) 590-1234
F: (703) 590-0366
kbyrnes@fhhfirm.com
tcraig@fhhfirm.com
rleahey@fhhfirm.com
*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 18th day of October, 2021, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to counsel of record for all parties.

*/s/ Kevin E. Byrnes, Esq.*
Kevin Byrnes, D.C. Bar No. 480195
