## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SUSANNA QUINN, personal representative, of the Estate of John M. Quinn<br><br>*Plaintiff*<br>v.<br><br>KREINDLER & KREINDLER LLP, *et al.*<br><br>*Defendants.* | Case No. 1:21-cv-01824-RDM<br><br>Date:   October 18, 2024 |

## PLAINITFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Susanna Quinn, personal representative of the Estate of John M. Quinn, ("Plaintiff") by and through undersigned counsel, respectfully moves for partial summary judgment pursuant to Fed. R. Civ. P 56, on the issue of the scope of the Agreements at issue in this matter. Specifically, the Plaintiff respectfully requests that this Court grants the Motion for Partial Summary Judgment, and finds that the Plaintiff is entitled to Plaintiff's share of any fee Defendants receive for cases and claims arising out of the terrorist attacks occurring on September 11, 2001, whether received from litigation, settlement, payments from the United States Victims of State Sponsored Terrorism Fund or the Victim's Compensation Fund, or otherwise.

This Motion is accompanied by a statement of undisputed facts, memorandum of law, exhibits, and a proposed order.

Dated: October 18, 2024

Respectfully Submitted,
By Counsel

/s/ Kevin E. Byrnes
Kevin E. Byrnes, D.C. Bar No. 480195
Thomas M. Craig, D.C. Bar No. 494503
**Fluet**
1751 Pinnacle Drive, Ste 1000,
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
kbyrnes@fluet.law
tcraig@fluet.law

*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 18, 2024, I sent the forgoing to counsel of record

for the Defendants via ECF:

Brandon R. Nagy
Eric Liebeler
STINSON LEONARD STREET, LLP
brandon.nagy@stinson.com
eric.liebeler@stinson.com

Emily Bab Kirsch
KIRSCH & NIEHAUS PLLC
emily.kirsch@kirschniehaus.com


/s/ Kevin E. Byrnes
Kevin E. Byrnes, Esq.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SUSANNA QUINN, personal representative, of the Estate of John M. Quinn | ) ) ) |
| *Plaintiff* | ) |
| v. | ) |
| | ) |
| KREINDLER & KREINDLER LLP, *et al.* | ) |
| | ) |
| *Defendants.* | ) |

Case No. 1:21-cv-01824-RDM

Date:    October 18, 2024

## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On September 11, 2001, members of the Al-Qaeda terrorist group, 15 of whom were Saudi Arabian nationals, hijacked commercial airplanes and crashed them into the World Trade Center Twin Towers in New York City, and the Pentagon in Arlington, Virginia; another aircraft crashed into a field in Shanksville, Pennsylvania killing all on board (the "9/11 Attacks").[1]

2.      The 9/11 Attacks resulted in the deaths of 2,977 people, excluding the attackers, is the largest terrorist attack against the United States in the nation's history. *Id.*

3.      At all relevant times, Defendant James Kreindler,[2] Robert Crowe, and Plaintiff John "Jack" Quinn were barred attorneys, though they worked for different employers. PEX 1 at 5:14-18; 6:15-7:5 (FILED UNDER SEAL); PEX 2 at 8:17-9:25; PEX 3 at 6:11-18.

4.      Quinn was a member of the Washington D.C. Bar, and Defendant Kreindler is and was a member of the New York Bar. PEX 48 at 2.

---

[1] The federal government conducted an extensive investigation into the 9/11 Attacks, through a legislatively authorized Commission, which issued a Final Report. *See* Nat'l Comm'n on Terrorist Attacks Upon the U.S., *The 9 /11 Commission Report* (the "9/11 Commission Report"), available at https://govinfo.library.unt.edu/911/report/911Report.pdf (last visited Oct. 17, 2024).

[2] For clarity, this brief will refer to Kreindler & Kreindler LLP as "Kreindler LLP", James Kreindler as "Kreindler", and collectively "Defendants".

5.      Until his death on May 8, 2024, Quinn was an attorney who devoted much of his later career in pursuing legal and economic remedies for those killed or injured by the 9/11 Attacks, and their surviving family members ("9/11 Claimants").[3]

6.      Quinn's work focused on determining and pursuing mechanisms for the 9/11 Claimants to secure financial compensation for the harm inflicted by the terrorist attack. PEX 1 at 33:16-21, 40:22-41:21; PEX 3 at 111:14-23.

7.      The Parties shared a goal: to secure compensation for the 9/11 Claimants regardless of the source. PEX 1 at 52:6-53:15, *passim*; PEX 2 at 13:5-8, 15:4-9, 88:12-14; PEX 3 at 14-17.

8.      On November 26, 2008, 10 terrorists from a Pakistan-based militant group called Lashkar-e-Tayyiba, conducted coordinated attacks across the city of Mumbai, resulting in nearly 200 deaths, including six Americans, and wounding hundreds more. (the "Mumbai Attacks"). PEX 4.

## AGREEMENTS BETWEEN THE PARTIES FOR 9/11 RECOVERY EFFORTS (2013-2014)

9.      In 2013, the Defendants and Plaintiff entered contracts to seek and secure compensation of victims for the Mumbai Attacks and later the 9/11 Attacks. PEX 1 at 16:6-21.

10.      At the time of the Mumbai Attacks, Kreindler was an attorney and Partner in Kreindler LLP, a firm that specialized in aviation accident law and torts. PEX 5; PEX 1 at 6:16-7:2, 8:9-12.

---

[3] 9/11 Families United, *9/11 Families United Mourns Passing of Former White House Counsel and Longtime 9/11 Community Advocate Jack Quinn*, available at https://911familiesunited.org/9-11-families-united-mourns-passing-of-former-white-house-counsel-and-longtime-9-11-community-advocate-jack-quinn/ (last visited Oct. 16, 2024).

11.    At the time of the Mumbai Attacks, Robert Crowe ("Crowe") was a Partner at Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins"). PEX 1 at 16:10-18; PEX 2 at 9:13-16.

12.    At the time of the Mumbai Attacks, Quinn was Co-Founder and Chair of Quinn Gillespie & Associates, ("QGA"), a premier lobbying and communications firm.[4]

13.    Prior to founding QGA, Quinn had previously served as counsel to President William Jefferson Clinton, and Chief of Staff to Vice President Al Gore.[5]

14.    On or around February 7, 2013, Kreindler reached out to Quinn and Crowe to assist Kreindler in securing a recovery for the victims of the Mumbai Attacks. PEX 1 at 7:14-8:1; PEX 2 at 56:15-22.

15.    Quinn also knew Crowe, a partner at Nelson Mullins, who claimed to have a close personal connection to Secretary of State John Kerry. PEX 2 at 10:21-23.

16.    Quinn and Crowe[6] were retained by a simple agreement that contained extremely broad language as to the scope of their duties. PEX 2 at 11:13-18, PEX 6 at QUINN_000672-000674.

17.    Crowe later testified their mutual task was to "explore all avenues to get compensation" for the victims including from the "Government." PEX 2 at 13:4-6.

---

[4] Ryan Lizza, "Republican Lobbyist Ed Gillespie is Running for Senate," *The New Republic*, January 10, 2014, https://newrepublic.com/article/116176/ed-gillespie-runs-senate-virginia.

[5] Michael S. Rosenwald, *Jack Quinn, Lobbyist and White House Counsel for Clinton, Dies at 74*, available at https://www.nytimes.com/2024/05/15/us/politics/jack-quinn-dead.html (last visited Oct. 17, 2024).

[6] Quinn also included Quinn Gillespie & Associates in the agreement and Crowe included his law firm, Nelson, Mullins.

18. On February 7, 2013, Kreindler entered into a joint representation contingency fee agreement for services from Quinn (for QGA) and Crowe (for Nelson Mullins) to assist the Defendants with securing a recovery for the victims of the Mumbai Attacks. PEX 7 at KK000122-000123 and QUINN_000851.

19. The Mumbai Agreement allowed for Quinn and Crowe to be paid on "a *contingent-fee basis and our fees will be payable only out of amounts recovered*." PEX 7 at KK000123. (Emphasis supplied)

20. Under the Mumbai Agreement, Nelson Mullins and QGA will collectively be compensated by 20% of the gross proceeds of the legal fees awarded to Kreindler & Kreindler and Silverman in the Matter, *whether obtained by settlement, or by judgment or other recovery. Id*. (Empasis supplied).[7]

21. On June 20, 2013, Kreindler expanded its relationship with Quinn and Crowe to include representation of the families of the 9/11 Attack victims who were injured or killed, and their surviving family members. Dkt. 19-1 at 2.

22. Crowe testified that the agreement was intentionally written broadly to facilitate exploring all avenues to get compensation for the victims. *See* PEX 2 at 13:5-8, 15:4-9. This included efforts to create a compensation fund. PEX 2 at 15:4-9.

23. Following some discussions, Kreindler presented Quinn with a one paragraph contract that tasked Crowe, through Nelson Mullins, and Quinn, through Quinn Gillespie, with "efforts in assisting in obtaining recovery for the 9/11 victims and their families". Dkt. 19-1 at 2. The language did not provide any greater specificity on the duties of Quinn and Crowe, through their respective entities. *Id*. PEX 1 at 9:13-21.

---

[7] Silverman references a party who is not directly related to these proceedings.

24.     On June 20, 2013, Quinn signed an agreement to aid Kreindler in obtaining recovery for the families' of 9/11 victims. *Id*. Although Crowe was referenced in the Agreement, he did not actually sign it, until later. Dkt. 19-1 at 2; PEX 8 at QUINN_000810. Crowe signed in counterpart. PEX 9 at QUINN_000039.

25.     On June 28, 2013, Quinn wrote to Kreindler clarifying QGA would focus on government relations matters, while Quinn individually would provide legal services as a solo practitioner. PEX 10 at QUINN_000824. Kreindler responded, "Fine". *Id*.

26.     Thus, from the first agreements, the contracts contemplated that Quinn was retained not just as a lobbyist, but also to serve as an attorney and co-counsel. PEX 1 at 20:7-13; PEX 12 at QUINN_000179.

27.     The 2013 agreement provided Quinn and Crowe with "a fee of 1% percent (sic) of the net recovery on each decedent's wrongful death case and each personal injury case where Kreindler & Kreindler has or receives a fee in the consolidated 9/11 Terrorist Litigation." Dkt. 19-1 at 2. The fee would come from "the attorneys' fees in all said cases where Kreindler & Kreindler has or receives a fee." *Id*.

28.     In or around June 2013, QGA and Quinn began representing the interests of the 9/11 community in various ways, including advocacy related to claims against or recovery from the Kingdom of Saudi Arabia ("KSA"). *See, e.g*., PEX 13 at QUINN_000825 and QUINN_000833.

29.     Defendant Kreindler himself admitted, from the outset Quinn and QGA explored the idea of a U.S. government supported compensation fund for the 9/11 victims. PEX 1 at 29:9-32:11.

5

30.     Quinn was part of an effort to present the idea of a comprehensive fund to the Obama Administration. PEX 1 at 31:13-32:11.

31.     On July 1, 2013, Quinn entered into an agreement with Kreindler that accepted the confirmation of Quinn's roles and acknowledged he could provide legal services. Agreement. PEX 14 at QUINN_000840-000841). PEX 7 at QUINN_000851.

32.     On July 2, 2013, Quinn, through QGA, defined an approach to create a "comprehensive fund" for 9/11 victims, which would address their damages and avoid judicial impediments to recovery. PEX 15 at QUINN_000843, 000859, 000861.

33.     As of July 2, 2013, KSA had prevailed in earlier lawsuits against it filed by 9/11 claimants on sovereign immunity grounds. PEX 1 at 11:10-14.

34.     On October 10, 2013, Quinn and Crowe suggested that they meet then Secretary of State John Kerry's Chief of Staff, David Wade. PEX 16 at QUINN_000875-000880. Quinn would function as the legal advocate and subject matter expert before the United States Department of State ("State Department") to encourage it into action *Id*.

35.     On October 18, 2013, Quinn set forth an additional strategy regarding a potential victims compensation fund to compensate victims and the families of victims impacted by state sponsored terrorism in both the Mumbai Attacks and the terrorist attacks on September 11, 2001. PEX 17 at QUINN_000928. The document outlined the legal issues related to the sovereign immunity of foreign nations and entities like the KSA.

36.     On October 17, 2013, Kreindler and Quinn discussed approaching the State Department regarding a fund for the compensation of victims who faced sovereign immunity bars to actions related to terrorism. Discussion of Justice Against Sponsors of Terrorism Act ("JASTA") PEX 18 at QUINN_000916-000922; PEX 1 at 29:9-30:5. Additionally, around the

same time, Kreindler and Quinn discussed legislative action to allow for direct suit against the KSA. PEX 18 at QUINN_000916-000922; PEX 3 at 27:23-28:9.

37. Also on October 17, 2013, Kreindler communicated edits to the memo for the meeting with Wade directly to Quinn and QGA, addressing the compensation for victims for presentation to the State Department for consideration. PEX 18 at QUINN_000916-000922.

38. Thus, Kreindler acknowledged via email that the approach which included Quinn was broader than just obtaining relief through litigation against the KSA. PEX 18. Indeed, he later testified that Quinn would be entitled to a fee if there was a recovery through "state to state" intervention by way of the State Department, or a settlement, which could also include a fund type mechanism. PEX 1 22:5-23:4).[8]

39. On October 18, 2013, following their correspondence with Kreindler, Quinn, and Crowe approached the State Department with the idea of a victims compensation fund. PEX 17 at QUINN_000928, PEX 19 at QUINN_000939.

40. On October 23, 2013, Quinn and Kreindler revisited the concept of a broad-based strategy using the courts, the various branches of government, and diplomatic and administrative channels to advance compensation efforts for the 9/11 families. PEX 18 at QUINN_000921.

---

[8] Q. So in your view, under what circumstances would either Mr. Quinn or Quinn, Gillespie be owed a fee under this agreement?

A. Sure. So, if we succeeded in our mission. In and, through John Kerry, we were able to settle the 9/11 litigation with Saudi Arabia and/or other defendants in the litigation, Jack would get half of one percent, which itself would be divided half to Jack [Quinn], lobbyist, half to Jack, [Quinn] lawyer.

Q. So, you said if you succeeded in settling it. Would that include a fund-type settlement like what was being discussed for Mumbai?

A. Yes.

41.     On October 23, 2013, Quinn and Kreindler produced a statement, which touted their representation of "most of the victims of the Mumbai and 9/11 terrorist attacks. […]" and advocating for the creation of a victim's compensation fund, and other means to obtain compensation for victims of terrorist attacks. This memo was then sent to the State Department representative via email. PEX 20 at QUINN_000885 (Memorandum) and QUINN_000944 (Email).

42.     Although Defendant has claimed that Quinn was retained "as a lobbyist," *see* Affidavit of Megan Wolfe Bennett, Esq. at ¶ 4, (Dkt. 33-2 at 3), Kreindler himself referred to Quinn as "Co-Counsel" on the issue of representing the 9/11 families. *See, e.g.*, PEX 21 at QUINN_012191 ("Jack [Q]uinn [sic] must be called K&K co-counsel."); PEX 22 at QUINN_012195, PEX 23 at QUINN_003820; *see also* PEX 12 at QUINN_000179.

43.     Throughout November and December 2013, Quinn, through QGA, kept Kreindler informed on Quinn's efforts for their mutual clients advocating for creation of a victims compensation fund, forfeiture actions from those entities who funded terrorist attacks, and other matters to secure sources of compensation for clients they represented. This included:

a.   November 19, 2013 – Quinn communication regarding Northern District of Illinois litigation related to funds implicated in a pending forfeiture action. PEX 24 at QUINN_000949-000954.

b.   November 21, 2013 – Preparation of White Paper on victim compensation issues for 9/11 victims and their families. PEX 24 at QUINN_000955.

c.   December 3, 2013 – Email correspondence with Sean Carter, of Cozen O'Connor discussing proposed JASTA legislation and 9/11 claims resolution settlement fund or a "state to state" agreement." PEX 24 at QUINN_000956.

d. December 9, 2013 – Quinn registers as Lobbyist for Kreindler & Kreindler on 9/11 ("on behalf of the Ashton plaintiffs in the case In Re Terrorist Attacks on September 11, 2001") and Mumbai litigation ("on behalf of the plaintiffs in the case Rosenberg et al v. Lashkar-E-Taiba et al., E.D.N.Y."). PEX 24 at QUINN_000966.

### 2014: CONTINUED EFFORTS AND UPDATED AGREEMENTS

44. On January 6, 2014, a dinner with Secretary Kerry was held to discuss how to address issues with the KSA. PEX 25 at QUINN_001015-001016.

45. During February 2014, Kreindler, Quinn, and Sean Carter met with Secretary of State Chief of Staff Wade to further the effort to seek a resolution of the 9/11 claims. PEX 26 at QUINN_001025. These efforts continued into the Spring of 2014. PEX 26 at QUINN_001025. PEX 25 at QUINN_001015.

46. During March 2014, Quinn and Crowe exchanged additional emails with Jim Kreindler and Sean Carter about a possible state-to-state resolution. PEX 27 at QUINN_001065.

47. Between May and June 2014, Quinn continued to assist in efforts to secure State Department efforts aimed at an agreement with KSA. PEX 28 at QUINN_001279.

48. On July 10, 2014, Crowe, Quinn, and Kreindler signed an Amended Agreement titled "Amendment to the Agreement Between Kreindler &Kreindler LLP, Nelson Mullins Riley & Scarborough LLC and John M. Quinn, Esq. dated July 9, 2014." PEX 29 at QUINN_001507-0001508. Dkt. 19-2 at 2.

49. The July 10, 2014, Agreement focused not on specific litigation against the KSA but on "efforts in assisting Kreindler & Kreindler LLP, in obtaining recovery for the 9/11 victims and their families." *Id*.at ¶ 1.

50. The agreement stated in pertinent part that Kreindler & Kreindler LLP would pay Nelson Mullins and John M. Quinn, Esq.:

9

"[…] a *combined fee of one percent of the net recovery* on each decedent's wrongful death case and each personal injury case where Kreindler & Kreindler LLP has or receives a fee in the consolidated 9/11 Terrorist Litigation. *The term 'net recovery' shall mean the amount awarded to each plaintiff of Kreindler &Kreindler LLP or others.*"

*Id*. (emphasis supplied).

It further stated the one percent "…shall be paid from the attorneys' fees in all said cases where Kreindler & Kreindler LLP has or receives a fee." *Id*.

51.     The July 10, 2014, Agreement tied recovery to personal injury and wrongful death cases and did not state that such recovery must be obtained from litigation against the KSA. *Id.*

52.     On September 2, 2014, Quinn drafted a memorandum that followed up on efforts with the State Department to seek a "state to state" resolution of the 9/11 claims. PEX 30 at QUINN_001542-001543.

53.     On November 13, 2014, Quinn (and QGA) drafted questions to be presented before the House Financial Services Committee Hearing on Terrorist Financing and the Islamic State. PEX 31 at QUINN_002043. That memorandum addressed JASTA and its potential impact on litigation. *Id*. Congress did not ultimately pass JASTA during that session.

54.     For the remainder of 2014 and 2015, Quinn pursued efforts to secure relief for the 9/11 families before the executive and legislative branches of federal government and acted as co-counsel in litigation. *See, e.g.,* PEX 32 at QUINN_002061. *See also* PEX 50 at QUINN_000257.

**2016: JASTA PASSES OVER PRESIDENTIAL VETO**

55.     During 2016, Quinn continued efforts to obtain passage of The Justice Against State Sponsors of Terrorism Act ("JASTA") (Pub. L. 114–22), which was later codified at 28 U.S.C.A. § 1605B.

56.     JASTA authorized federal court jurisdiction over a civil claim against a foreign state for physical injury to a person or property or death that occurs inside the United States as a

result of: (1) an act of international terrorism, and (2) a tort committed anywhere by an official, agent, or employee of a foreign state acting within the scope of employment. 28 U.S.C.A. § 1605B(b).

57.     JASTA also removed the requirement that the defendant be designated a state sponsor of terrorism by the Secretary of State. *Id.* In addition, JASTA allowed U.S. nationals to bring claims against foreign sovereigns under the Antiterrorism Act ("ATA"), 18 U.S.C.A. § 2333, provided that JASTA's requirements for withholding sovereign immunity are otherwise met. 28 U.S.C.A. § 1605B(c).

58.     On September 23, 2016, President Barack Obama vetoed JASTA. On September 28, 2016, both houses of Congress voted to override the veto.[9]

59.     JASTA's stated objective is to "provide civil litigants with the broadest possible basis ... to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." Pub. L. 141-222 §2(b).

60.     JASTA extended liability to "any person who aids and abets … the person who committed such an act of international terrorism." 18 U.S.C.A. § 2333(d)(2). JASTA would have eliminated a defense of sovereign immunity for those entities, including sovereign governments, who sponsored terrorist activities. (*See e.g.*, PEX 33 *Evaluating the Justice Against Sponsors of Terrorism Act*, S. 2930: Hearing of the Crime and Drugs Subcommittee of The Senate Judiciary Committee at 6, 111th Cong. (2010) (noting that JASTA "is required in large part due to the

---

[9] NPR, *Congress Overrides Obama's Veto On Sept. 11 Lawsuit Bill* (Sept. 28, 2016), *available at* https://www.npr.org/2016/09/28/495709481/sept-11-lawsuits-vote-today-could-be-first-reversal-of-an-obama-veto (last visited Oct. 17, 2024).

Second Circuit's unfortunate and clearly erroneous construction of the Foreign Sovereign Immunities Act Act…"); PEX 34 at QUINN_000916; PEX 1 at 34:2-8. The Kingdom of Saudi Arabia had obtained dismissal of prior litigation involving its role in the 9/11 terrorist attacks by invoking the doctrine of sovereign immunity. *See In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71 (2d Cir. 2008) (affirming dismissal of the case under the basis of foreign sovereign immunity).

61.     Quinn was deeply and integrally involved in the passage of JASTA, which Kreindler has acknowledged. *See, e.g.*, PEX 35 at QUINN_001811-001814; PEX 1 at 33:17-22, 34:1-11, 40:22-41:8.

### 2017: PARTIES' CLIENTS SUE THE KINGDOM OF SAUDI ARABIA

62.     On March 20, 2017, the 9/11 survivors and their families filed suit in the Southern District of New York against the Kingdom of Saudi Arabia. (Case No. 1:17:cv-02003, Dkt. 1-4). The Complaint alleged that the KSA "knowingly provided material support and resources to the al Qaeda terrorist organization and facilitating the September 11th Attacks." *Id*. The complaint expressly relied on JASTA as a basis for jurisdiction. *Id*.

63.     Quinn was part of the legal team bringing the complaint, reviewing, and editing the complaint itself. Such activities are consistent with the scope of Quinn's multi-faceted involvement and inconsistent with serving as a mere lobbyist. *In re Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570 (S.D.N.Y.) ("the MDL"). PEX 36 at QUINN_000172, 000284, 010649, 010654, 011118, 011310, 011960, 012177.

### POST-JASTA, QUINN'S EFFORTS CONTINUE

64.     On January 3, 2017, in anticipation of a new Republican Presidential administration, and citing Crowe's lack of effort for their mutual clients, Quinn proposed that

Kreindler alter the agreements concerning the 9/11 Claimants. PEX 7 at QUINN_000172), PEX 37 at QUINN_10278.

65.     During January 2017, Quinn outlined the reasons that Crowe's lack of efforts, and diminished role moving forward required new contracts reducing Crowe's fee. PEX 38 at QUINN_000159).

66.     On January 20, 2017, Donald Trump became the President.[10]

67.     In discussion about amending the agreements to reduce Crowe's fees, Quinn clarifies that Crowe had done little work and been ineffective. PEX 37 at QUINN_10278), PEX 39 at QUINN_18772).

68.     QGA was sold and on April 1, 2017, Quinn advised Kreindler that he would continue to work on the 9/11 compensation efforts through his solo practice, the Law Offices of John M. Quinn, PLLC. PEX 20 at QUINN_013032.

69.     On May 9, 2017, Quinn, wrote to Dina Powell, the Deputy National Security Advisor to President Trump. PEX 12 at QUINN_000179.

70.     Quinn advised Powell that he was as co-counsel to "thousands of the 9/11 families involved in litigation with the Kingdom of Saudi Arabia" and sought to have the Trump administration reach out to the KSA for a "state to state" solution for the 9/11 victims. *Id.*

71.     Powell acknowledged that she was collaborating with the President on these matters. *Id.*, PEX 42 at QUINN_028011. President Trump was preparing for a trip to the KSA at the time. PEX 41 at QUINN_024392.

---

[10] "President Donald J. Trump" Donald Trump Presidential Library official website, available at, https://www.trumplibrary.gov/trumps/president-donald-j-trump.

72.     Kreindler was aware of these efforts, including those described above in paragraphs 64-71, and that Quinn continued to pursue access and solutions during the new Administration. PEX 42 at QUINN_028011; PEX 1 at 40:17-41:2; PEX 51 at QUINN_000184.

73.     Quinn also reached out to Thomas Barrack, a close advisor to President Trump. *See* PEX 43 Affidavit of Robert H. Lowe, March 15, 2024. Quinn sought to have Mr. Barrack support all avenues for providing compensation to the 9/11 families. *Id.*

74.     The Foreign Sovereign Immunities Act authorizes courts to order foreign state sponsors of terrorism to pay damages to victims of their acts. 28 U.S.C.A. §1605A. Congress passed the Justice for United States Victims of State Sponsored Terrorism Act in 2015, which established a fund to compensate claimants, the United States Victims of State Sponsored Terrorism Fund ("USVSST"). Pub. L. No. 114-113, tit. IV, § 404, 129 Stat. 2242, 3007-017 (2015) (codified as amended at 34 U.S.C.A. § 20144).

75.     The statute drew on two different sources of funding for the USVSST: (1) an initial appropriation of $1.025 billion from "money in the Treasury not otherwise appropriated" ("General Fund"); and (2) proceeds from penalties paid by companies and individuals that violate sanctions imposed on state sponsors of terrorism, specifically, one hundred percent of criminal penalties and fifty percent of civil penalties. § 404(e)(2), (e)(5), 129 Stat. 3012, 3014.

76.     Mr. Quinn was involved with reviewing drafts of the legislation and assisting in ensuring Congress passed the amendments creating the USVSST. PEX 44 at QUINN_033362.[11]

### 2017: PARTIES SIGN UPDATED AGREEMENTS WITH EVEN BROADER LANGUAGE

---

[11] *See* PEX 1 at 41:12-16) ("So Jack was working with me to ensure that the creation of the USVSST and the anger a few clients had with the notion of siblings recovering under the USVSST would not undercut JASTA or our attempt to recover from Saudi Arabia…")

77.     In February 2017, the USVSST made initial payments to the 9/ 11 victims.[12]

78.     On May 19, 2017, Quinn and the Defendants signed another amended agreement. ("The May 2017 Agreement"). Dkt. 19-4 at 2-8.

79.     The May 2017 Agreement began by expressly acknowledging the July 10, 2014, Agreement noting that Quinn had been performing services

> "in support of the representation by K&K of approximately 2000 clients who are plaintiffs in litigation whose claims were filed as of the earlier agreement (hereinafter the "Clients") in the Southern District of New York asserting wrongful death or personal injury causes of action relating to or arising out of the terrorist attacks that occurred on September 11, 2001, in New York, New York, Arlington, Virginia and Shanksville Pennsylvania...."

> *Id.* at 5, ¶1.

80.     The May 2017 agreement superseded and extinguished all prior agreements and related back to January 1, 2017. Dkt.19-3 at 2, ¶ 2. It also acknowledged that a separate agreement had superseded the earlier agreements with Robert Crowe and Nelson Mullins. *Id.* The agreement stated:

> Quinn will *continue to serve as counsel* to and to advise K&K and Kreindler as requested or as Quinn deems advisable [,] relating to the preservation of or changes proposed to the Justice Against State Sponsors of Terrorism Act ("JASTA") and efforts to accomplish *reasonable settlement or other resolution of the litigation.* Quinn and the Law Office of John M. Quinn, PLLC [,] will specifically provide a sustained effort, using and adhering to legal precedent, statutory requirements, and *lawful and appropriate government procedure* to accomplish and make effective such advocacy and the *fair and expeditious resolution* of the subject claims.

> *Id.* at ¶3. (emphasis supplied).

---

[12] USVSST Fund has a website www.usvsst.com and releases periodic updates about distributions from the USVSST Fund in the aggregate. *See e.g., U.S. Victims of State Sponsored Terrorism Fund Payment Calculation Explanation February 2017,* available at https://www.usvsst.com/Content/Documents/USVSSTFundPaymentCalculationExplanation_Init ialDistribution.pdf (last visited Oct. 17, 2024).

81.     The May 2017 Agreement stated Quinn would receive a fee of .775 percent of the "*net recovery* in each decedent's wrongful death and each personal injury claim with respect to which K&K receives a fee, *whether by judgment settlement or otherwise*, for its representation of the Clients on whose behalf it filed cases in the litigation as of the date of the Earlier Agreement [July 10, 2014]." *Id.* at ¶4. (emphasis supplied).

82.     On August 8, 2017, the May 2017 agreement was amended again (the "August 2017 Agreement"). Dkt. 19-5 at 2. PEX 52 at QUINN_000028.

83.     Under the August 2017 agreement, Quinn was entitled to receive his compensation to include clients whose claims that "are not filed in the litigation…who in fact receive a recovery" Dkt. 19-5 at 2, ¶2.

84.     None of the 2017 agreements limit Kreindler's compensation of Quinn to compensation obtained in the KSA litigation. *Compare* Dkt. 19-3 and 19-4 *with* PEX 45 at KK000112-000113, specifically tying Crowe's compensation from Kreindler to the KSA litigation expressly. PEX 45 at KK000112 at ¶4.

85.     Quinn's understanding of his compensation scheme was also consistent with Kreindler's own communications. On February 1, 2018, Kreindler advised his partners that Quinn was entitled to "1% of the recovery." PEX 46 at KK000118. Kreindler does not advise his partners of any limitation of the recovery to the KSA litigation or exclusion from that recovery of any amounts received from a victim's compensation fund. *Id.*

86.     On July 29, 2019, President Trump signed "The Never Forget the Heroes: James Zadroga, Ray Pfeifer, and Luis Alvarez Permanent Authorization of the September 11th Victim Compensation Fund Act." ("VCF Permanent Authorization Act") Pub. L. 116-34, 133 Stat. 1040 (July 29, 2019).

87.     The VCF Permanent Authorization Act extends the Victim Compensation Fund ("VCF")'s claim filing deadline from December 18, 2020, to October 1, 2090, and appropriated such funds as may be necessary to pay all eligible claims.[13] Such claims obviously were incorporated after 2014.

88.     In 2019, certain additional 9/11 victims, spouses, and dependents became eligible for distributions from the USVSST.[14] 2020 legislation required the Government Accountability Office ("GAO") to estimate the amount of "catch up" payments owed to newly eligible claimants, to align new payments with those past distributions to other 9/11 family members[15].

89.     GAO estimated the "catch up" payments identified in paragraph 88 above, to be approximately $2.7 billion.[16] Congress later allocated funds to be distributed as "catch up" payments to these claimants, which included claimants which Kreindler represented.

90.     In 2020, Quinn became aware that Kreindler LLP and Kreindler were receiving and disbursing money from the USVSST Fund to their clients. PEX 47 at QUINN_033346. Quinn also

---

[13] Department of Justice, "About the September 11th Victim Compensation Fund" April 29, 2024, available at https://www.justice.gov/civil/vcf.

[14] Specifically, Congress passed the Justice for United States Victims of State Sponsored Terrorism Clarification Act (Title VII of P.L. 116-69) ("Clarification Act").

[15] As explained by the Congressional Research Service, "The catch-up payments allow eligible 9/11 victims to receive a percentage of their claims from the Fund equal to the percentage other 9/11 family members received in earlier rounds." *Justice for United States Victims of State Sponsored Terrorism Act: Eligibility and Funding*, April 11, 2023, https://crsreports.congress.gov/product/pdf/IF/IF10341#:~:text=Fairness%20for%209%2F11%2 0Families%20Act&text=The%20Fairness%20Act%20appropriates%20sufficient,which%20is%2 0approximately%20%242.7%20billion.

[16] Government Accountability Office, "U.S. Victims of State Sponsored Terrorism Fund: Estimated Lump Sum Catch-Up Payments" available at https://www.gao.gov/products/gao-21-105306.

believed the Defendants were taking their own fees and compensation from the federal funding scheme. *Id*.

91.     To date, it is estimated that the USVSST has paid over $6 billion dollars to victims of the 9/11 Attacks.[17] Collectively, Defendants' clients have received hundreds of millions in payments from the USVSST.

92.     As of the date of this filing, Kreindler LLP's website claims "Kreindler has secured over $4 Billion for 9/11 victims and their families" and states the firm has dedicated employees to facilitate claims to the VCF.[18] The second round of VCF Funding, and later rounds of USVSST payments occurred after Quinn was retained.

93.     To date, Quinn has received no monetary compensation from the Defendants for his work on behalf of Kreindler's clients.

94.     Prior to filing this suit in 2021, Quinn requested an accounting from Kreindler concerning distributions to clients, including those funds originating from the VCF or the USVSST Fund where Kreindler has or received a fee. PEX 47 at QUINN_033346.

95.     In 2021 Kreindler refused this request and has stated Defendants have no obligation to share such information, nor distributed any funds to Quinn. Dkt. 29 at 10, ¶95.

---

[17] Dep't of Justice, *Justice Department Announces Anticipated Distribution of at Least $940M to Victims of State Sponsored Terrorism in 2025*, available at https://www.justice.gov/opa/pr/justice-department-announces-anticipated-distribution-least-940m-victims-state-sponsored (last visited Oct. 17, 2024).

[18] The Kreindler website states, "September 11, 2001: Kreindler has secured over $4 Billion for 9/11 victims and their families" and "over $4 billion collected" for 9/11 claimants. *See* https://www.kreindler.com/practices/911-vcf.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SUSANNA QUINN, personal representative, of the Estate of John M. Quinn | ) ) ) |  |
|  | ) | Case No. 1:21-cv-01824-RDM |
| *Plaintiff* | ) |  |
| v. | ) | Date:    October 18, 2024 |
|  | ) |  |
| KREINDLER & KREINDLER LLP, *et al.* | ) |  |
|  | ) |  |
| *Defendants.* | ) |  |
|  | ) |  |

## BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

    I.    Quinn's Early Advocacy Included an Enhanced Compensation Fund Scheme with the
          Executive Branch. ................................................................................................. 4

    II.   Quinn's Efforts Continue Through the Trump and Biden Administrations. ..................... 6

STANDARD OF REVIEW ................................................................................................ 12

ARGUMENT ..................................................................................................................... 13

    I.    This Motion is Limited to the Scope of Recovery under the Agreement. ........................ 13

    II.   The Text of the 2017 Agreements, as Amended, Controls the Parties' Obligations. ....... 14

       A.   The Court Should Rely on the Text of the 2017 Agreements. ....................................... 15

           i.    The 2017 Agreements Expressly Supersede the Prior Agreements. ........................ 15

           ii.   The Meaning of the 2017 Agreements is Unambiguous. ......................................... 16

           iii.  The Amendment Confirms the Breadth of Quinn's Recovery. ............................... 20

       B.   The SDNY Litigation is Covered by the Agreement. .................................................... 22

       C.   Fees Received from the VSST are Covered by the 2017 Agreement. ........................... 23

           i.    VSST Fund Background. ............................................................................................ 23

           ii.   VSST was Developed During the Contract Period. .................................................. 24

           iii.  VSST is logically related to the passage of JASTA, addressing the same clients'
               claims. ...................................................................................................................... 24

       D.   The structure of the VSST Confirms that VSST claims are covered by the 2017
           Agreements. .................................................................................................................. 25

       E.   Funds from the VCF are also Covered. ........................................................................ 26

           iv.  Description of the VCF. ............................................................................................. 26

ii

     v.     The VCF is Another Fund Covered under the fees received through litigation "or otherwise" which are words of requirement. ........................................................... 27

III.   If Parol evidence is considered, it supports Quinn's interpretation of the contract .......... 27

     i.     Defendants testified that the purpose of the 2017 Agreements and the Amendment was to broaden the scope and extent of Quinn's fees. ............................................... 29

     ii.    Defendants admit that the Agreements cover recovery from administrative funds.. 30

     i.     Quinn Worked on SDNY case and other advocacy after 2017. .............................. 35

     ii.    Quinn Worked on VSST issues. ................................................................. 36

     iii.   Quinn also Worked on VCF issues. ......................................................... 37

CONCLUSION .................................................................................................. 39

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*,
    485 A.2d 199 (D.C. 1984) ..................................................................................... 21

*Abdelrhman v. Ackerman*,
    76 A.3d 883 (D.C. 2013) ...................................................................................... 15

*Affordable Elegance Travel, Inc. v. Worldspan*,
    774 A.2d 320 (D.C.2001) ..................................................................................... 16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...................................................................................... 12, 13

*Ashton, et al. v. Kingdom of Saudia Arabia*,
    No. 1L17 ev 02003 ............................................................................................... 22

*Atty. Gen. of U.S. v. Wynn*,
    104 F.4th 348 (D.C. Cir. 2024) ........................................................................... 18

*Burbridge v. Howard University*,
    305 A.2d 245 (D.C. 1973) .................................................................................... 13

*Call Carl, Inc. v. BP Oil Corp.*,
    554 F.2d 623 (4th Cir. 1977) ............................................................................... 34

*City of Glendale v. National Union Fire Ins. Co. of Pittsburgh, PA*,
    2013 WL 1296418 (D. Ariz. Mar. 19, 2013) ...................................................... 20

*Davis v. Chevy Chase Fin., Ltd.*,
    667 F.2d 160 (D.C. Cir. 1981) ............................................................................ 19

*District of Columbia v. Reuter*,
    15 App. D.C. 237 (D.C. 1899) ............................................................................ 20

*Encino Motorcars, LLC v. Navarro*,
    584 U.S. 79 (2018) ............................................................................................... 18

*Evening News Ass'n v. Peterson*,
    477 F. Supp. 77 (D.D.C. 1979) ..................................................................... 17, 21

*Fistere, Inc. v. Helz,*
    226 A.2d 578 (D.C. 1967) ............................................................................ 32

*Greene v. Dalton,*
    164 F.3d 671 (D.C. Cir. 1999) ...................................................................... 13

*Harnish v. Shannon,*
    392 Pa. 419 (1958) ....................................................................................... 32

*Hercules & Co., Ltd. v. Shama Restaurant Corp.,*
    613 A.2d 916 (D.C. 1992) ............................................................................ 15

*Hisler v. District of Columbia Dep't of Emp't Servs.,*
    950 A.2d 738 (D.C. 2008) ............................................................................ 14

*Intelsat USA Sales Corp. v. Juch-Tech, Inc.,*
    935 F. Supp. 2d 101 (D.D.C. 2013) .............................................................. 16

*Jacobson v. Hofgrad,*
    168 F.Supp.3d 187 (D.D.C. 2016) ................................................................ 15

*Kaplan v. Lebanese Can. Bank SAL,*
    999 F.3d 842 (2d Cir. 2021) ........................................................................... 6

*Kass v. William Norwitz Co.,*
    509 F. Supp. 618 (D.D.C. 1980) ................................................................... 13

*Laningham v. Navy,*
    813 F.2d 1236 (D.C. Cir. 1987) .................................................................... 13

*Luther Williams, Jr., Inc. v. Johnson,*
    229 A.2d 163 (D.C. 1967) ............................................................................ 32

*Mason v. United States,*
    260 U.S. 545 (1923) ..................................................................................... 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ..................................................................................... 13

*Metro Area Transit, Inc. v. Nicholson,*
    463 F.3d 1256 (Fed. Cir. 2006) .................................................................... 34

v

*Noble v. National Association of Letter Carriers, AFL-CIO*,
 103 F.4th 45 (D.C. Cir. 2024) ........................................................................ 18

*One-O-One Enters., Inc. v. Caruso*,
 848 F.2d 1283 (D.C. Cir. 1988) ...................................................................... 34

*Pennsylvania Ave Development Corp. v. One Parcel of Land*,
 494 F. Supp. 45 (D.D.C. 1980)…………………………………………………………… 30, 32

*Regan v. Spicer HB, LLC*,
 134 F. Supp. 3d 21 (D.D.C. 2015) .................................................................. 15

*Sagalyn v. Found. for Pres. of Historic Georgetown*,
 691 A.2d 107 (D.C. 1997)................................................................................ 14

*Segal Wholesale, Inc. v. United Drug Serv.*,
 933 A.2d 780 (D.C. 2007)................................................................................ 16

*Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*,
 833 F.2d 1560 (Fed. Cir. 1987)....................................................................... 13

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Proj., Inc.*,
 576 U.S. 519 (2015) ........................................................................................ 18

*Tillery v. D.C. Contract Appeals Bd.*,
 912 A.2d 1169 (D.C. 2006).............................................................................. 14

*United States v. Woods*,
 571 U.S. 31 (2013) .......................................................................................... 18

*Washington Properties, Inc. v. Chin, Inc.*,
 760 A.2d 546 (D.C. 2000)................................................................................ 13

*Weaver v. Bratt*,
 421 F.Supp.2d 25 (D.D.C. 2006) .................................................................... 19

**Statutes**

129 Stat. 3007 (Dec. 18, 2015) ............................................................................... 24

2016 Consolidated Appropriations Act. Pub. L. 114–113, div. O, title IV, §404, Dec. 18, 2015,
 129 Stat. 3007.................................................................................................. 23

28 U.S.C. § 1605B(b); ............................................................................................ 22

34 U.S.C. § 20144 ..................................................................................... 23, 24, 25

Pub. L. 107-42, 115 Stat. 237 (Sept. 22, 2001) ................................................... 26

Pub. L. 111-347, 124 Stat. 3624 (Jan. 2, 2011) .................................................. 26

Pub. L. 114-113, 129 Stat. 2996 (Dec. 18, 2015) ............................................... 26

Pub. L. 116-34, 133 Stat. 1040 (July 29, 2019). ................................................. 27

Pub. L. 116-69 Title VII, 133 Stat. 1140 (Nov. 21, 2019).................................. 24

Pub. L. 117-328, Division MM of P, 136 Stat. 6106 (Dec. 2, 2022)................... 24

Pub. L. No. 114-222 § 2(b), 130 Stat. at 853 .................................................. 6, 22

**Treatises**

RESTATEMENT (SECOND) OF CONTRACTS § 202(4) (1981) ........................... 35

RESTATEMENT (SECOND) OF CONTRACTS § 210(1) ................................... 16

RESTATEMENT (SECOND) OF CONTRACTS § 213 ....................................... 15

## INTRODUCTION

As noted in the Complaint, this case arises out of an attempt by the Defendants to ignore their obligations to compensate the Estate of the now deceased John "Jack" Quinn ("Quinn" or "Plaintiff"), for his prodigious efforts in using his considerable reputation, skills and labor to ensure that the victims of the September 11, 2001 terrorist attacks, and their surviving family members, receive compensation for the losses. Those attacks claimed nearly 3,000 lives and reoriented American foreign and domestic policy while ushering in a world of religious and sectarian conflict that still defines America today.

As the facts show, the Defendants, personal injury lawyers with experience in aircraft accident law, enlisted a successful, well-liked attorney advocate, Jack Quinn, to assist them. Quinn advocated for the parties' mutual clients before all branches of government, executive, legislative, and judicial, to remove the impediments that limited or prohibited the victims of state sponsored terrorists from being able to pursue those terrorist organizations and their state sponsors, whether in a court of law or otherwise, including through administrative funds. Additionally, as set forth below, and contrary to the Defendants' utterly self-serving, revisionist history, Quinn worked jointly with Defendants to develop methods to obtain compensation for the victims of September 11, 2001, from all available sources.

While the Defendants publicly advertise their multi-billion-dollar level monetary recovery on behalf of the September 11, 2001 attack victims, they have refused to pay first Quinn, and now his estate, a single cent. Statement of Material Facts ("SMF") ¶¶ 90, 92, 93. They contend that Quinn is entitled to nothing for his years of efforts, citing a disagreement over the tactics and ethics of attempting to enlist the incoming United States Attorney General in the cause as justification for denying Quinn his contractual fee. Quinn, despite failing health, pressed on with efforts to

settle litigation, long pending before the Southern District of New York ("SDNY litigation"), to open government administered funds to 9/11 victims, and to ensure the 9/11 families were not forgotten nor left without remedy.

In response to Quinn's demands for just compensation, the Defendants have refused to provide access to information on the payouts they received and apparently disbursed, and refused to pay anything to Quinn. Defendants seem to believe Quinn's efforts, which extended from the time he signed his initial agreement with Defendants a decade ago, through the passage of the Justice Against Sponsors of Terrorism Act ("JASTA"), and continuing through the Trump and Biden Administrations, warrant no consideration. For the reasons set forth below, the Defendants' theories are meritless. The Estate of Jack Quinn is entitled to a finding that Quinn is owed a percentage of the vast recovery that Defendants were awarded for their representation of the 9/11 families, that the Defendants must provide financial information to determine the extent of that obligation, and that their illogical reading of the agreements they largely created is unpersuasive.

## BACKGROUND

Defendant James Kreindler, on behalf of his firm, Kreindler & Kreindler LLP ("Defendants"), retained Quinn on or about June 20, 2013, to work on a joint and broad-based strategy to obtain financial compensation for the victims of the September 11, 2001 terrorist attacks. SMF ¶ 27; Dkt. 19-1 at 2. Defendants first worked with Quinn at Quinn Gillespie & Associates ("QGA"), between 2006 through 2008, which involved successful efforts to hold the government of Libya financially liable to the victims of the destruction of Pan Am Flight 103 in Lockerbie, Scotland. PEX 1 at 12:7-8. In 2013, Defendants again retained Quinn's expertise to address the November 26, 2008, Lashkar-e-Tayyiba, attacks in Mumbai, India, which led to the death and injuries of hundreds of victims, including American citizens. SMF ¶ 8-10, 14, 18-20,

31; PEX 4; PEX 6. Congressional Report on Mumbai Attacks. At the time of Defendants' 2013 outreach, Quinn was not only a practicing attorney, but also a principal and driving force behind the premier lobbying firm of QGA, founded alongside Ed Gillespie.

The Parties' contracts that established Quinn's roles were short, but involved advocating the interests of the 9/11 families to obtain compensation through both legal advocacy, as co-counsel and through efforts directed at legislative or executive action. SMF ¶¶ 21, 26, 42, 54, 62, 63; PEX 2 at 11:13-18, 13:4-6. Thus, Quinn was to function as both counsel on legal matters and to use his skills to obtain compensation generally by government-based action. SMF ¶¶ 13, 25, 28. PEX 21 at QUINN_012191, PEX 22 at QUINN_012195, PEX 23 at QUINN_03820, PEX 12 at QUINN_000179, PEX 32 at QUINN_002061. Defendants also hired Robert Crowe ("Crowe"), a political consultant and lawyer who claimed he was close friends with then U.S. Secretary of State John Kerry. SMF ¶ 15; PEX 2 at 10:21-23. The goal was to use any available means to secure a financial remedy for the 9/11 victims and their families, whether it came from the courts, through Congress, or by Executive action between governments or state actors. PEX 20 at QUINN_000885, 000944. Indeed, Defendants and Crowe, testified that the thrust of the joint effort was to quite simply obtain money for the victims to compensate their losses, and that the means to accomplish that end were broad based. SMF ¶¶ 16, 17, 22, 23; PEX 2 at 13:4-6; PEX 1 at 52:6-53. At the outset of the relationship, as this Court noted in its March 3, 2023 statements on the record, the actual contract between the parties, both experienced lawyers, was brief, no doubt reflecting the levels of trust that had built between themselves in prior interactions. Later amendments clarified the earlier agreement.[1]

_____

[1] Although Defendants contend at deposition that Quinn was retained as part of an effort to seek a direct resolution from Saudi Arabia, the initial agreement fails to mention that country, PEX 1 at

The goal to secure compensation was never restricted to the litigation in the Southern District of New York. On July 2, 2013, Quinn advocated seeking Congress to develop "comprehensive fund" to compensate 9/11 victims. SMF ¶¶ 29, 32, 36; PEX 15 at QUINN_000843, 000859, 000861. This was done at a time in which no district court suits against the Kingdom of Saudi Arabia ("KSA") were pending. During that time, the KSA had successfully dismissed litigation against it relying, in part, on sovereign immunity. SMF ¶ 33; PEX 1 at 11:10-14.

From the outset of the engagement, Quinn and his then-associate Crowe, sought executive branch assistance through the United States Department of State ("State Department") and legislative assistance through Congress. PEX 16 at QUINN_000875, 000876, 000878, 000880. Quinn also pursued "state to state" options of negotiated resolution, as a means of supporting possible litigation.[2] PEX 30 at QUINN_001542-001543. The primary, overarching strategy was to assist Defendants' ability to obtain recovery for 9/11 community members, including their mutual clients.

I.      **Quinn's Early Advocacy Included an Enhanced Compensation Fund Scheme with the Executive Branch.**

As part of this strategy Quinn and Crowe met with senior "State Department" officials in October 2013, notably then-Secretary of State John Kerry's chief of staff David Wade. SMF ¶¶ 34, 37, 45; PEX 17 at QUINN_000928. Crowe's value to the efforts was Crowe's purported close

---

11:1-14, and, of course, at the time the parties signed the agreement of June 20, 2013, no trial court litigation was pending against the KSA, in fact all such suits had been dismissed. *Id.* at 11:10-14; 18:14-19:2.

[2] A "state to state" resolution could involve agreements with a foreign government to make direct payments to the families or to use intermediaries or state or private entities to funnel that compensation, while avoiding any admissions of direct culpability.

personal relationship with Secretary Kerry. PEX 2 at 10:21-23. Quinn devoted considerable effort to assemble briefing and advocacy materials for the meetings, to help spur the State Department into action. PEX 18 at QUINN_000916. Quinn explicitly proposed a victim's compensation fund that would address the legal limitations the victims faced due to the law at that time. SMF ¶ 36; PEX 17 at QUINN_000928.

Quinn also articulated and advocated, "state to state" negotiations to resolve the 9/11 victim's claims, since the efforts to secure judicial remedies were blocked on sovereign immunity grounds. SMF ¶¶ 46, 47, 52; PEX 30 at QUINN_001542-001543. Defendant Kreindler himself testified that the intention was to pursue any and all available avenues for compensation, with the understanding that any given solution might not work. PEX 1 at 29:9-32:11. From late 2013 through 2014, Quinn directed the efforts to move the State Department to act. PEX 16 at QUINN_000875, 000876, 000878, 000880. That effort involved Quinn-sponsored attempts to appeal directly to Secretary of State John Kerry. *Id.*; SMF ¶ 44; *see also* PEX 25 at QUINN_001016.[3]

Quinn was twin-hatted, however, and while he pursued executive branch and legislative efforts, he recognized the need to change the legal framework, by getting Congress to enact legislation that would allow direct lawsuits against the KSA or other state-sponsored terrorist actors. SMF ¶¶ 53, 76. PEX 34 at QUINN_000916; PEX 3 at 27:23-28:9.

---

[3] It should be noted that seeking support from the State Department also furthered both the legal strategy of the 9/11 and the ultimate quest for compensation. Prior to the passage of the JASTA in 2016, no federal civil action against a foreign government that was not listed by the State Department as a state sponsor of terrorism had succeeded. Thus, speaking with the Secretary of State, either to elicit support for brokering a "state to state" resolution, a compensation fund, or through adding a country to the list of state sponsors of terrorism, would have advanced the interests of the parties' mutual clients.

In fall of 2014, Quinn was fully engaged in advocating for both a "state to state" resolution, and a change to the law itself. PEX 30 at QUINN_001542-001543. From 2014 until the passage of JASTA in 2016, Quinn also worked extensively so that Congress would pass JASTA, an act that would allow direct lawsuits against sovereign governments who supported terrorist attacks. *Id.*; *see also* PEX 24 at QUINN_000956. Quinn's positions were actively opposed by the KSA, the Obama Administration, and the State Department, which he had sought assistance from in vain. PEX 1 at 31:13-32:11.

On September 28, 2016, Congress overrode Obama's presidential veto of JASTA, enacting the legislation. SMF ¶¶ 55-61. Congress enacted JASTA "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against [any person or entity that] provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA Pub. L. No. 114-222 § 2(b), 130 Stat. at 853 (emphases added); *see, e.g., Kaplan v. Lebanese Can. Bank SAL*, 999 F.3d 842, 855 (2d Cir. 2021) (discussing this language). Defendants specifically acknowledged Quinn's efforts in writing. PEX 1 at 33:17-22, 34:1-11, 40:22-41:8.[4] While the passage of JASTA opened new efforts to pursue litigation against the KSA and other foreign states linked to terrorism, could proceed.

## II.     Quinn's Efforts Continue Through the Trump and Biden Administrations.

After President Donald J. Trump assumed office as President, Quinn adjusted his strategy to advance the 9/11 cause before the new administration, continuing his work to advocate for his clients. PEX 12 at QUINN_000179. Quinn approached Deputy National Security Advisor for

---

[4] *See* Dkt. 19-3 at 1, where the May 29, 2017 Agreement states in part, "Quinn's important contribution to date to the litigation and to the enactment of JASTA is hereby acknowledged."

Strategy Dina Powell in May 2017, hoping to convince the new Administration to support direct efforts to have the KSA compensate the 9/11 families. *Id.* Quinn drafted a memorandum to provide to President Trump and enlisted Robert Lowe to reach out to Trump's close friend and advisor Thomas Barrack to get the President's ear. PEX 43. The passage of JASTA was therefore not the endpoint of Quinn's efforts on behalf of the 9/11 families. His commitment, labor, and energy remain directed to getting the victims compensated, the central premise of the Defendants' engagement and strategy. SMF ¶¶ 62-95. PEX 28 at QUINN_001279. Quinn recognized that litigation would be protracted and potentially chimerical for the litigants if it was never resolved. As time passed and the litigation dragged on, the victims would continue to incur losses and even a victory in Court would not ensure payments were ever made.

From the outset of his being retained by Defendants, Quinn had contemplated and advocated a fund was necessary. PEX 1 at 29:9-32:11. Through the efforts of the advocates for the 9/11 victims, including Quinn, there are now two main funds that may pay claims to certain claimants impacted by the 9/11 Attacks. The September 11th Victim's Compensation Fund, ("VCF")[5] and the United States Victims of State Sponsored Terrorism Fund ("USVSST" or "VSST").

The VSST describes itself as follows:

The USVSST Fund provides compensation to individuals (or personal representatives of deceased individuals) who hold a final judgment issued by a United States District Court awarding the individual compensatory damages. The

---

[5] The VCF Website explains, "The September 11th Victim Compensation Fund ("VCF") was created to provide compensation for any individual (or a personal representative of a deceased individual) who suffered physical harm or was killed as a result of the terrorist-related aircraft crashes of September 11, 2001 or the debris removal efforts that took place in the immediate aftermath of those crashes. The original VCF operated from 2001-2004." U.S. Department of State, *September 11th Victim Compensation Fund* (last visited Oct. 18, 2024) https://www.justice.gov/civil/vcf.

judgment must arise from acts of international terrorism for which a foreign state sponsor of terrorism was found not immune from the jurisdiction of U.S. courts under the Foreign Sovereign Immunities Act (FSIA). Individuals must submit applications not later than 90 days after the date of obtaining the final judgment.

U.S. Department of Justice U.S Victims of State Sponsored Terrorism Fund, *Welcome to the U.S. Victims of State Sponsored Terrorism Fund* (last visited Oct. 18, 2024) https://www.usvsst.com/. As further explained below, the VSST is clearly linked to the 9/11 litigation. In fact, the government retains a subrogation right to the litigation for claims paid by VSST.

In 2015, the Congress passed the "VSST". The VSST served two principal purposes for the parties' mutual clients: (1) to provide a timely mechanism to compensate the 9/11 victims for their losses and (2) to provide a remedial scheme that had broader categories of eligible claimants who could collect judgments already issued against defendants in litigation. The VSST consists of a mix of appropriated funds and seized assets seized in civil and criminal actions brought by the United States.

To obtain payment from the VSST, a claimant must have brought a suit and obtained a judgment against the defendant. Thus, the pool of recipients of funds from the VSST, was the same as those persons who had filed suit and obtained a judgment against a terror supporting entity. To date. More than $6 billion has been paid out to victims from the USVSST.[6] SMF ¶ 91.

The VCF describes itself as follows:

The September 11th Victim Compensation Fund (VCF) is a federally funded program that was established to compensate for physical harm or death caused by the September 11, 2001, terrorist attacks, or the debris removal efforts in the immediate aftermath. The VCF was established to provide a no-fault alternative to lawsuits and is administered by the U.S. Department of Justice and the Special Master, Allison Turkel.

---

[6] *See* "Welcome to the U.S. Victims of State Sponsored Terrorism Fund" available at https://www.usvsst.com/.

September 11th Victim Compensation Fund, *Welcome to the VCF* (last visited Oct. 18, 2024) https://www.vcf.gov/. While the VCF initially operated from 2001 to 2004, its primary expenditures occurred in reauthorizations and reopening of the VCF which occurred in 2011. It was further reauthorized by Congress and extended in 2015 and 2019. As of December 31, 2023, the VCF, since it re-opened in October 2011, has awarded nearly $12.8 billion in compensation to over 56,600 individuals who have suffered physical health conditions (including the families of just over 3,500 people who have died), as a result of their exposure to the terrorist attacks in New York City, at the Pentagon, and in Shanksville, Pennsylvania.[7] SMF ¶¶ 1, 2, 77, 87.

VCF, VSST, and the SDNY litigation are all inter-related. Notably, the VCF contains an offset that could reduce any payout based on recovery from any other source, including VSST or litigation. *See* VCF FAQ 1.12, available at https://www.vcf.gov/faqs/110-can-i-pursue-claim-both-vcf-and-us-victims-state-sponsored-terrorism-fund-usvsst-fund. Each of these sources of recovery are part of an overall scheme to obtain relief for the 9/11 victims, as evidenced by the VSST subrogation rights, and the fact that VCF claims are offset against the other two sources. Thus, any payouts from the funds are part of the overall compensation package to the victims — and part of Quinn's efforts with Defendants.

Defendants have refused to provide an accounting as to whether or how much any of their clients were paid from the VCF or the VSST, the timing of those payments, or whether the Defendants paid themselves any fees or made any deductions to such claims, despite the fact that, as noted in the Amended Complaint, Quinn was entitled to a percentage of any funds recovered by persons Defendants represented in any 9/11 based claim from litigation, settlement, or otherwise. Dkt. 19-5 at 2.

---

[7] https://www.justice.gov/d9/2024-03/vcf_fy_2025_pb_narrative_02.29.24_final_0.pdf.

The passage of JASTA in late 2016 narrowed the sovereign immunity available to certain foreign governments. SMF ¶¶55-57. This meant that previously foreclosed options to recover compensation through litigation against governments that were not open to 9/11 victims were now possible. PEX 1 at 41:12-16. In May 2017, the parties amended their contractual agreement. Dkt. 19-4 at 2-8. Quinn's contract was separated from that of Crowe, and there was greater detail given to the scope of Quinn's duties and authority. The May 2017 agreements were further updated in August 2017 and clarified that the sources of recovery were not simply limited to litigation judgments. SMF ¶ 82, 83. Dkt. 19-3 at 2-5, 19-4 at 2-8, 19-5 at 2. Specifically, the 2017 Agreements stated, in part, Quinn would recover where Defendants have or received a fee for their clients "whether by judgment, settlement, or otherwise, for its representation of the Clients[.]" Dkt. 19-3 at 2, ¶4.

These amendments made clear that if the claimants were compensated and Defendants obtained a fee, Quinn was entitled to his percentage as specified in the agreements. In simplest terms, Quinn was entitled to be compensated his percentage for any funds paid to a claimant from any source. If the claimant received compensation, and Defendants had or received a fee, Quinn was to be paid.

Quinn continued his efforts after the 2017 Agreements, as the affidavits of Robert Lowe and Kelly Love establish, continuing into the Trump Administration. SMF ¶¶ 69-73; PEX 43, Aff. of Robert H. Lowe, Mar. 15, 2024; *see also* PEX at 41:12-16. Quinn continued to advocate compensation for the 9/11 families and sought to advance both a "state to state" resolution and the idea of enhancing funding. PEX 49, Aff. of Kelly Love, Sep. 11, 2024.

The VSST disbursed at least $3.3 billion in three payment rounds (or tranches) in 2017, 2019, and 2020. In April 2023, the VSST informed certain eligible sub-group of 9/11 related

claimants of their lump sum catch-up payment amounts and issued over 90 percent of the payments within one month. Additional rounds of payments are anticipated, and will likely continue into the future. SMF ¶¶ 88-90.

In 2020 Quinn learned that the Defendants were likely disbursing VSST payments to clients and taking a percentage of that award as fees. SMF ¶ 90, 94. Seeking his portion of the payments, Quinn requested Defendants provide an accounting, as without accounting of the total paid to the claimants, Quinn could not determine if he was owed funds. SMF ¶ 94; PEX 47. The Defendants have refused to provide any information related to the claimants they represent, such as the amounts paid to those claimants, the timing and source of such payments, and whether the Defendants have paid any fees or deducted any costs on behalf of themselves from such claims. In fact, Defendants went as far as to deny any contractual relationship between the parties, a position they appeared to have abandoned. PEX 1 at 79:21-80:1.

Despite his concerns over the lack of transparency from Defendants, Quinn continued his efforts on behalf of the 9/11 victims, even after the Biden administration commenced, and Defendants themselves pressed Quinn to persuade the new administration to assist in the resolution of the claims. Quinn worked on efforts to declassify information related to the role of Saudi nationals and their connection to the Saudi government in the 9/11 Attacks. Quinn pursued efforts to have the new Administration pursue a "state to state" resolution and worked with senior administration officials to advance the 9/11 cause and efforts to compensate the victims. Quinn did this despite Defendants' disavowal of the contract between the parties.

Quinn was friends with and had worked with incoming Attorney General Merrick Garland, and Defendants spoke to Quinn about reaching out to Garland, before he was confirmed as Attorney General, to solicit Garland on the release of information held by the government on the

9/11 attacks, expanding the corpus and scope of the USVSSTF and intervening in the SDNY litigation. Quinn disagreed with this tactic, and further felt such conduct inappropriate at best and unethical at worst. The attempt to influence a federal official in such a way, particularly while that official was a then-sitting judge and nominee for a position in the executive branch was odious to Quinn, who informed Defendants it would be possibly illegal and disruptive as a strategy. Defendants persisted and Quinn refused, believing such contracts were both improper and would jeopardize Quinn's personal relationship with the Chief Judge of the U.S. Court of Appeals and a nominee for Attorney General.

After Quinn filed this suit, Defendant Kreindler, having been sued, used the disagreement over contacts with the Attorney General to create a legal fiction that he was discharging Quinn for vague performance-based concerns. Regardless, this pretextual discharge had no impact on Quinn's commitments to the 9/11 families. Quinn continued to work on their behalf, up to shortly before his death. *See* ¶¶ SMF 5-7, 68. To date, the Defendants have refused to pay Quinn or his Estate any funds for his efforts and have refused to provide any accountings as they relate to the payments of 9/11 victims the firm represents. Quinn had similar arrangements in place with other law firms, who paid him a percentage of the amounts 9/11 Claimants received. The Defendants have taken the position that Quinn is assigned to no payment of any kind.

## STANDARD OF REVIEW

Summary judgment is appropriate where no genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine issue of material fact is one that would change the outcome of the litigation. *Id.* at 248. The moving party may prevail on summary judgment by "'showing' – that is point out to the [Court] – that there is an absence of evidence to support the non-moving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d

12

1560, 1563 (Fed. Cir. 1987). The non-movant must proffer specific facts showing that a genuine issue exists for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Supreme Court explained in *Anderson*, "there must be evidence on which the jury could reasonably find for the plaintiff." 477 U.S. at 252; *see also Laningham v. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (the non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor). Allegations or conclusory statements are not sufficient; instead, a nonmoving party must present specific evidence that would enable a reasonable jury to find it its favor. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## ARGUMENT

## I.      This Motion is Limited to the Scope of Recovery under the Agreement.

At the November 9, 2023, hearing in this matter, the Court ordered the parties to file Partial Summary Judgment Motions addressing the issue of "questions of contract interpretation and, in particular, whether the contract applies to the VSST and the VCF." This Motion is limited to those issues of contract interpretation, including whether such analysis requires parol evidence. Accordingly, this Motion does not address other issues that may arise in the case, including the quantum of damages, damage calculations, possible affirmative defenses, and the like.

Under applicable law, a contract term "is not ambiguous merely because the parties to a contract later disagree on its meaning." *Kass v. William Norwitz Co.*, 509 F. Supp. 618, 623 (D.D.C. 1980). Instead, contract language is deemed unambiguous so long as "the court can determine its meaning without any other guide than a knowledge of the simple facts," about the "nature of language in general…." *Burbridge v. Howard University*, 305 A.2d 245, 247 (D.C. 1973); *see also Washington Properties, Inc. v. Chin, Inc.*, 760 A.2d 546, 548 (D.C. 2000) (finding that "courts are enjoined not to create ambiguity where none exists."). The Court endeavors to

determine the "plain meaning" of the contract as "a reasonable person in the position of the parties" would have understood it. *Hisler v. District of Columbia Dep't of Emp't Servs.*, 950 A.2d 738, 746–7 (D.C. 2008) (citing *Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006) and *Sagalyn v. Found. for Pres. of Historic Georgetown*, 691 A.2d 107, 111 (D.C. 1997)).

## II.        The Text of the 2017 Agreements, as Amended, Controls the Parties' Obligations.

Although the parties executed a number of agreements over the many years that Quinn labored to obtain relief for the 9/11 victims, their contractual relationship culminated in two agreements and an amendment to those agreements in 2017, and the terms of those agreements and amendment control today. The two agreements were signed on the same day, May 19, 2017. SMF ¶¶ 78-81. The first controls the fee Defendants owe to Quinn for clients engaged before July 10, 2014, and the other controls the fee Defendants owe to Quinn for clients engaged on or after July 10, 2014. Those Agreements were amended later in 2017 to clarify the scope of Quinn's recovery. We will refer to the two May 19, 2017, Agreements collectively as the "2017 Agreements" and to the later amendment as the "Amendment." Together these three documents encompass the entire agreement between the parties, and clearly encompass all the fees Quinn seeks in this litigation.

The 2017 Agreements, as amended, include plain and unambiguous statements setting forth Defendants' obligation to pay Quinn his share of any recovery regardless of the source. The 2017 Agreements are fully integrated, forming the final expression of the parties' agreement, as later modified by the Amendment. Thus, the Court need not revisit or explore the parties' old agreements, or resort to parol evidence. The Court should instead, following the foundational principles of contract interpretation, find that Defendants' obligation to pay Quinn is governed by the plain meaning of the 2017 Agreements and the Amendment. *See Abdelrhman v. Ackerman*, 76

14

A.3d 883, 888 (D.C. 2013) ("In interpreting contractual language, we adhere to the parol evidence rule, which limits the court's analysis to the plain meaning of the language on the face of a fully integrated contract.").

### A.       The Court Should Rely on the Text of the 2017 Agreements.

A binding, completely integrated agreement discharges prior agreements to the extent that the old agreements fall within the scope of the new agreement. RESTATEMENT (SECOND) OF CONTRACTS § 213. In 2017, the parties entered into two new agreements. Dkt. 19-3 at 2-8, Dkt. 19-4 at 2-8 ("2017 Agreements")); *see also* Dkt. 19-5 at 2 ("the Amendment"). The first of the 2017 Agreements ("First 2017 Agreement") promised Quinn compensation for services rendered to Defendants for the firm's representation of clients who had filed their cases in the litigation as of July 10, 2014. Dkt. 19-3 at 2. The other of the 2017 Agreements ("Second 2017 Agreement") governed Quinn's compensation for services rendered to Defendants in connection with the firm's representation of clients who filed their claims "on or after" July 10, 2014. Dkt. 19-4 at 2-8. The 2017 Agreements discharge the prior agreements in this case because they are (1) completely integrated written agreements with (2) terms that are plain and unambiguous. *See Regan v. Spicer HB, LLC*, 134 F. Supp. 3d 21, 32 (D.D.C. 2015).

### i. *The 2017 Agreements Expressly Supersede the Prior Agreements.*

Contracts are fully integrated "when they generally state that the agreement as written constitutes the entire agreement between the parties and supersedes any prior representations." *Jacobson v. Hofgrad*, 168 F.Supp.3d 187, 201 (D.D.C. 2016). Under D.C. law, "[a] completely integrated contract may not be supplemented with prior representations not ultimately included" in the new agreement, "even if those representations are not expressly contradicted" by the new agreement. *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 613 A.2d 916, 928 (D.C. 1992)

(citation omitted). By signing a completely integrated written agreement, the parties close the door

by relying on old agreements "to contradict, vary, add to, or subtract" from the new agreement.

*Segal Wholesale, Inc. v. United Drug Serv.*, 933 A.2d 780, 783 (D.C. 2007) (citing to *Affordable*

*Elegance Travel, Inc. v. Worldspan*, 774 A.2d 320, 327 (D.C.2001)); *see also* RESTATEMENT

(SECOND) OF CONTRACTS § 210(1) ("A completely integrated agreement is an integrated

agreement adopted by the parties as a complete and exclusive statement of the terms of the

agreement.").

The most forceful expression of complete integration is through inclusion of an integration

clause, which expressly identifies the contract as a complete and final expression of the parties'

wishes. *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101, 113 (D.D.C. 2013). The

2017 Agreements include an integration clause, providing that the "binding

agreement…extinguishes, supersedes, and replaces ... any and all prior agreements or

understandings, whether in writing or otherwise, including but not limited to those dated in July

2013, and the Earlier Agreement." *See* Dkt. 19-3 at 2 (First 2017 Agreement ¶ 2); *see also* Dkt.

19-4 at 2-8 (Second Agreement ¶ 1) (incorporating the terms of the First 2017 Agreement).

Accordingly, the Court should disregard as inoperative parol evidence of the prior agreements that

the 2017 Agreements expressly departed from.

### *ii.   The Meaning of the 2017 Agreements is Unambiguous.*

The Court need not refer to the older agreements because the terms of the 2017 Agreements

are plain and unambiguous, and provide a ready and sufficient source for understanding the parties'

intent. The parties agreed that Quinn is to receive a fee based on a percentage "of the net recovery

on each decedent's wrongful death and each personal injury claim with respect to which

Defendants  receives a fee, whether by judgment, settlement, or otherwise, for its representation

of the Clients on whose behalf Defendants filed cases in the litigation- as of the date of the Earlier

Agreement [July 10, 2014]."[8] Dkt. 19-3 at 1 (First 2017 Agreement). In the same way, the parties

also agreed that Quinn is to receive a fee based on a percentage

> of the net recovery of each wrongful death, injury, or any other claim for which
> K&K receives a fee, whether by judgment, settlement, or otherwise, for its
> representation of clients on whose behalf K&K filed claims on or after July 10,
> 2014 or with respect to whom K&K is awarded fees by virtue of common benefit
> awards or participation in representation of other clients as a member of the
> plaintiffs' executive committee or through the operation of any common fund the
> purposes of which is to award compensation to other claimants in the litigation . . .
> .

Dkt. 19-4 at 1 (Second 2017 Agreement).

Defendants have suggested at times that Quinn's recovery is limited to funds obtained

through the SDNY litigation, and at other times that Quinn's recovery was limited to funds

obtained from the Kingdom of Saudi Arabia. *See, e.g.* PEX 1 at 22:8-13; 43:18-22; 53:8-18; 69:13-

14. This cramped view of the scope of the 2017 Agreements would require the Court to read

outside the plain and unambiguous terms of the contract. No language in the agreements references

the Kingdom of Saudi Arabia or funds particularly associated with that entity, and thus

Defendants' argument fails. *Evening News Ass'n v. Peterson*, 477 F. Supp. 77, 81 (D.D.C. 1979)

("An unsupported assertion that ambiguity exists is insufficient to give a different meaning to a

contract when there is in fact no contractual provision."). If the parties wanted to limit

compensation to funds associated with that lawsuit or entity, the easiest way to achieve that goal

would have been to name the lawsuit or entity in the agreement and clearly, directly, and

---

[8] Under certain circumstances, Quinn is entitled to one percent of net recovery, and in other
circumstances may be limited to 0.775 percent. Because the quantum of damages is outside the
scope of this brief, this brief will focus on the scope of the contract and sources of recovery, and
not on whether the proper measure of damages is 0.775 percent or one percent.

unmistakably state that requirement; such a drastic exclusion cannot be overcome by implication, inference, assumption, or extrapolation.

To the contrary, nothing in the 2017 Agreements limits the source of funding for Quinn's services. The Parties agreed that Quinn will be compensated by fees that Defendants received by "judgment, settlement, or otherwise" as part of representing the 9/11 victims. The use of the disjunctive "or" is a strong indication to include alternatives to what is previously listed. *See Encino Motorcars, LLC v. Navarro,* 584 U.S. 79, 80 (2018) ("'[O]r' is almost always disjunctive.") (citing *United States v. Woods,* 571 U.S. 31, 45 (2013)). The agreement, therefore, anticipated that Quinn will share in fees that are received in ways alternative to the specific items appearing before the disjunctive (judgment or settlement fees).

More importantly, defining the alternatives by using the word "otherwise" indicates that the parties intended to go beyond the types of recovery already listed and include every other type of recovery. *See, e.g., Noble v. National Association of Letter Carriers, AFL-CIO,* 103 F.4th 45, 51 (D.C. Cir. 2024) (finding that the inclusion of the word "otherwise" indicates that the provision "reaches beyond the specific examples listed," and makes "the provision a catch-all provision"). As the D.C. Circuit has acknowledged, the most sensible reading of the word "otherwise" conveys "in a different way or manner" than what is previously listed. *Atty. Gen. of U.S. v. Wynn,* 104 F.4th 348, 354 (D.C. Cir. 2024) (citing *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Proj., Inc.,* 576 U.S. 519, 535 (2015)). Simply put, the parties agreed that Quinn would be entitled to fees that Defendants received through judgment or settlement of certain cases, or received for those cases by some different way or manner.

The Defendants' reading of the agreement is not in line with the agreement's plain text. If the parties intended Defendants' proposed extra-textual meaning, it would have been easy for the

parties to have agreed that Defendants will pay Quinn a percentage of "any judgment or settlement fee paid by or on behalf of the Kingdom of Saudi Arabia." Yet, that is not how the attorneys involved in this agreement crafted the language. *Weaver v. Bratt*, 421 F.Supp.2d 25, 33 (D.D.C. 2006) (adhering closely to the exact text of the agreement when it applied to "licensed attorneys, who possess a heightened knowledge of the law of contracts when compared with non-attorneys."). *See* SMF ¶¶ 3-4. Instead, the parties chose to state that Quinn is entitled to "a fee," and proceeded first to list two specific examples of such "a fee" (judgment or settlement fee), then added the catchall phrase "or otherwise." Because a specific term ("a fee") opens this list clause, the phrase "or otherwise" should be read to include anything that shares the discrete characteristics of that specific opening term—as in "or any other fee"—and not just fees that share the characteristics of the more limited listed items—as in "any fee similar to judgment or settlement fee".

Furthermore, the Court must interpret the contract such that "every word in [the] agreement," is "given meaning." *Davis v. Chevy Chase Fin., Ltd.*, 667 F.2d 160, 170 (D.C. Cir. 1981). Defendants' reading, which would limit the phrase "or otherwise" to specific litigation sources of funding, renders that phrase meaningless unless Defendants can articulate what other types of litigation fee—beyond judgment or settlement fee—even exist for Quinn to be entitled to through the incorporation of the phrase "or otherwise." Because the specific enumerations (judgment and settlement) exhaust all fees of the category they are describing (litigation fees), the general phrase following those specific words should be read instead to go beyond that specific category and encompass all non-litigation fees. *See e.g., Mason v. United States*, 260 U.S. 545, 554 (1923) (finding that when specific terms are "sufficiently comprehensive to exhaust" the category they are describing "the general words" following them would be rendered meaningless unless they are read to cover everything other than the specified terms); *City of Glendale v.*

*National Union Fire Ins. Co. of Pittsburgh, PA*, 2013 WL 1296418, at \*7 (D. Ariz. Mar. 19, 2013) (finding that in order to argue that the general words must be limited to the specific terms listed before them, the proponent must show why the specific words do not "exhaust the class" they are describing); *District of Columbia v. Reuter*, 15 App. D.C. 237, 241 (D.C. 1899) ("The broader and more comprehensive" phrase should be read as distinct from "the special enumeration," when the enumeration "exhausts" its class). Therefore, the phrase "or otherwise" should be read to encompass fees from funding sources other than litigation.

### iii.   *The Amendment Confirms the Breadth of Quinn's Recovery.*

The language of the 2017 Agreements is sufficiently clear to provide a basis for their interpretation. Even if that were not the case, only months after signing the 2017 Agreements, the parties executed the Amendment to further unify the language of their contractual obligations. The Amendment specifies that the term "litigation" as used in the 2017 Agreements "contemplate[s] and include[s] the provision of services in cases filed, to be filed or which Defendant Kreindler & Kreindler is retained to file or otherwise provide services in connection with matters arising out of the [9/11] attacks." Dkt. 19-5 at 2, ¶1 ("the Amendment"). The Amendment also specifically clarified how to treat fees Defendants earned outside of litigation. The Amendment sets forth that Quinn is entitled to his fee

> "for the representation of each client on whose behalf K&K has filed claims and receives a fee [per the 2017 Agreements] and shall also receive the same level of compensation for the representation of clients on whose behalf claims **are not filed in the litigation but who have retained K&K to assist in recovering compensation whether through the filing of claims or otherwise** and who in fact receive a recovery with respect to which K&K receives a fee."

> Dkt. 19-5 at 2 ¶2 ("the Amendment")) (Emphasis added).

This language plainly sets forth that Quinn's fee is not limited to recovery from the SDNY litigation, or to funds received from the Kingdon of Saudia Arabia, but to any source from which

clients receive a recovery "with respect to which K&K receives a fee." Indeed, the parties agree in the Amendment to expressly define litigation as used in the 2017 Agreements, and there is no mention in that definition of any lawsuit, forum, court, or defendant. Again, the Defendants' attempt to impose this purportedly understood limitation, runs contrary to the present in the language of the agreement and thus cannot provide the basis of the interpretation the parties' agreement. *Evening News Ass'n v. Peterson*, 477 F. Supp. 77, 81 (D.D.C. 1979).

The Amendment's language is expressly broad enough to encompass any recovery for a 9/11 victim, reaching fees resulting from both "filed claims" and "claims . . . not filed in the litigation," which it combines with the phrase "whether through filing claims or otherwise" Dkt. 19-5 at 2 ("the Amendment" at ¶2). Additionally, as further explained below, the parties clearly contemplated recoveries from both the SDNY litigation, and other "filing of claims" such as from a government administered fund, such as the VCF and the VSST.

While the parol evidence rule prohibits augmenting, altering, or contradicting the terms of an unambiguous contract, the Court may look to evidence of surrounding circumstances to aid the understanding of an unambiguous contract's language, inform the meaning of any terms actually used, or provide context that elucidates the meaning of those terms. *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 209 n.11 (D.C. 1984) (noting that "[e]xtrinsic circumstances surrounding the execution of a contract may be considered," if they are to "aid in determining the meaning of the contract," as opposed to "alter its terms"). Here, evidence of surrounding circumstances establishes that the phrases "or otherwise" and express inclusion of claims "not filed in the litigation" entitled Quinn to fees received not only from the SDNY litigation, but also any fees from the VSST and the VCF funds.

B.      **The SDNY Litigation is Covered by the Agreement.**

It is not seriously disputed that the 2017 Agreements entitle Quinn to a share of compensation from the ongoing consolidated 9/11 litigation in the Southern District of New York filed in 2017.[9] *See* PEX 1 at 17, 22. Any fees that Defendants receive in this litigation will have a connection "to services rendered…by Quinn to K&K in support of the representation by K&K," of 9/11 victims. Dkt. 19-3 at 2. The Second 2017 Agreement acknowledges the same services by incorporating the terms of the First 2017 Agreement but applying them to cases filed "on or after July 10, 2014." Dkt. 19-4 at 2-8 (Second Agreement ¶ 1, 2). The plaintiffs in *Ashton, et al. v. Kingdom of Saudia Arabia,* No. 1L17 ev 02003 filed their lawsuit under JASTA. *See id.*, Dkt. 1, Compl. ¶ 2 ("Plaintiffs bring this action against the defendant Kingdom of Saudi Arabia under [JASTA]…); *see also* Pub. L. No. 114-222, 130 Stat. 852 (Sept. 28, 2016). Defendants' representation of the plaintiffs in that case is owed, to no small extent, to Quinn's advocacy for JASTA.

JASTA's passage changed that landscape by allowing foreign states to be sued in U.S. courts for acts of international terrorism that cause injury in the United States. *See* 28 U.S.C. § 1605B(b); *see also* Pub. L. No. 114- 222. Quinn's advocacy in support of JASTA, rendered as a part of the 2017 Agreement, was instrumental to make this change a reality. *See* Dkt. 19-5 at 2, ¶3) ("Quinn will *continue* to serve as counsel," in relation to "preservation of (or changes proposed to)" the JASTA) (emphasis added). The use of the word "continue" in the Amendment emphasized the parties' understanding that Quinn's services with regards to JASTA were an ongoing part of all agreements. (*see also* Dkt. 19-4 at 2-8 (Second Agreement ¶ 3) ("Quinn's important

---

[9] Defendants assert a variety of affirmative defenses that they argue would absolve them of any payment for Mr. Quinn's years of work for 9/11 victims, but those affirmative defenses are outside the scope of this Motion.

contribution to date to the litigation and to the enactment of JASTA is hereby acknowledged.")).
SMF ¶ 61.

Kreindler also acknowledges that from the beginning, Quinn was entitled to recover from the "consolidated 9/11 litigation," which he defined as the cases against Saudi Arabia and other countries pending in the SDNY. *See* PEX 1 at 17, 22. A major motivation for the 2013 agreement was the necessity of JASTA. *Id*. at 11. Quinn was heavily involved in passing JASTA, overcoming President Obama's initial veto of the Act, and thwarting Saudi efforts to undercut JASTA's effectiveness. *Id*. at 33–34.

### C.   Fees Received from the VSST are Covered by the 2017 Agreement.

Quinn's entitlement to fees under the agreement also spanned to recovery from government-administered funds that would serve as a method of compensation for 9/11 victims and their families. Here again, Quinn's work under the contract was pivotal in establishing funds including the VSST. To the extent that Defendants received fees as part of the victims' recovery under this fund, the agreements obligate Defendants to compensate Quinn for a share of that recovery.

### i.   *VSST Fund Background.*

In addition to the jurisdictional hurdles that the 9/11 victims and their families faced in bringing lawsuits against state sponsors of terrorism, collecting judgments after prevailing has also been historically challenging. In 2016, Congress passed the Justice for the United States Victims of State Sponsored Terrorism Act as part of the 2016 Consolidated Appropriations Act. Pub. L. 114–113, div. O, title IV, §404, Dec. 18, 2015, 129 Stat. 3007. Codified at 34 U.S.C. § 20144, the Act established the VSST to provide a means for creditors with terrorism judgments against designated state sponsors of terrorism to satisfy the compensatory portion of their judgments. *Id*.

In 2019, Congress passed the Justice for United States Victims of State Sponsored Terrorism Clarification Act to expand the scope of eligibility for compensation under the fund by providing coverage against Iran. Pub. L. 116-69 Title VII, 133 Stat. 1140 (Nov. 21, 2019). In 2022, Congress passed the Fairness for 9/11 Families Act to provide for catch-up payments for 9/11 victims made eligible by the Clarification Act and payments for certain victims of either the 1983 Beirut Marine barracks bombing or the 1996 Khobar Towers bombing. Pub. L. 117-328, Division MM of P, 136 Stat. 6106 (Dec. 2, 2022).

### ii.   VSST was Developed During the Contract Period.

The VSST was developed during the pendency of the parties' ongoing agreements after the Justice for the United States Victims of State Sponsored Terrorism Act was passed. *See* 129 Stat. 3007 (Dec. 18, 2015). Congress established the VSST with an initial deposit of $1,025,000,000. *See* 34 U.S.C. § 20144(e)(5). The VSST began issuing payments on March 10, 2017. U.S. Dep't of Justice U.S. Victims of State Sponsored Terrorism Fund, *Important Dates*, https://www.usvsst.com/Home/ImportantDates (last visited Sep. 23, 2024).

It was shortly after the initial payments from VSST were issued that the parties undertook to enter into the 2017 Agreements, and the Amendment. The Agreements specifically note that they are "effective nunc pro tunc, January 2, 2017." Given the timing, clarifying three-year-old language to confirm the breadth of Quinn's recovery, the clear purpose was to clarify that the Agreements covered the pending fund payments.

### iii.   VSST is logically related to the passage of JASTA, addressing the same clients' claims.

As further discussed above, it is undisputed that Mr. Quinn was engaged by Defendants in part to assist with the passage of JASTA, and that his work was instrumental in getting JASTA passed. SMF ¶ 61. Mr. Quinn's role in JASTA confirms and supports that the administrative funds

that stemmed from the passage of JASTA are included among the sources of funds envisioned by the 2017 Agreements.

In order to be eligible for compensation from the VSST, claimants must, among other requirements, be a litigant. They must hold "a final judgment" by a U.S. federal district court against "a foreign state that was designated as a state sponsor of terrorism" related to acts "for which the foreign state was determined not to be immune from the jurisdiction of the courts of the United States…." 34 U.S.C. § 20144(c). JASTA expanded those opportunities for the 9/11 victims by exposing Saudi Arabia to litigation, including the SDNY litigation. SMF ¶¶ 57, 59, 60

**D.**     **The structure of the VSST Confirms that VSST claims are covered by the 2017 Agreements.**

Moreover, the subrogation provisions of VSST confirm that VSST claims and the SDNY claims are not only related, but are in fact the same claims, and subject to the same provisions of the 2017 Agreements. Congress intended the VSST as a means to expedite the same recovery that the victims hoped to obtain through judgment collection. To this end, the Justice for United States Victims of State Sponsored Terrorism Act included a subrogation and retention of rights section whereby the United States is to be subrogated to the rights of applicants who receive payment from the VSST. Should the SDNY legislation result in a payment from the KSA (or any other state), the Act grants the United States the right to recover any amounts distributed from the fund to eligible claimants in satisfaction of judgments rendered against that state. *See* 34 U.S.C. § 20144(d)(5).

The background and structure of the VSST, and Congress's express words about how VSST is connected to litigation brought by the same victims, remove any doubt that fees obtained through the fund fall under the umbrella of fees that the 2017 Agreements cover. Such fees are "otherwise" obtained by Defendants for seeking resolution of the same claims by the same victims, that is "cases and claims arising out of the terror attacks carried out on September 11, 2001 in New

York City, NY, Arlington, VA, and Shanksville, PA". Dkt. 19-4 at 2-8, ¶ 1. Just as those payments were becoming a reality, the parties acted to clarify the Agreements, and ensured that the plain terms of the contract anticipated compensation for fees received outside of the normal course of litigation and through funds such as the VSST.[10]

### E.  Funds from the VCF are also Covered.

Beyond his work on VSST, Quinn worked extensively under the agreement to ensure claim recovery for 9/11 victims and their families under the Victim Compensation Fund ("VCF"). Just like Quinn's services in furtherance of recovery for claimants from the VSST, to the extent that Defendants have received fees as part of the victims' recovery under the VCF fund, the agreements obligate Defendants to compensate Quinn for a share of that recovery.

### iv.  Description of the VCF.

Congress originally created the VCF fund under Title IV of the Air Transportation Safety and System Stabilization Act which was enacted into law in 2001 to compensate those injured or the representatives of those killed in the 9/11 attacks. *See* Pub. L. 107-42, 115 Stat. 237 (Sept. 22, 2001). Although the original VCF closed to new claims in 2003, Congress reauthorized the fund in 2011 to address injuries incurred by emergency responders and once again in 2015. *See* Title II of the James Zadroga 9/11 Health and Compensation Act of 2010 (Zadroga Act), Pub. L. 111-347, 124 Stat. 3624 (Jan. 2, 2011); Title IV of Division O of the Consolidated Appropriations Act, 2016 (Zadroga Reauthorization Act of 2015), Pub. L. 114-113, 129 Stat. 2996 (Dec. 18, 2015). After

---

[10] The most logical way to think of the federal compensation funds are as alternative remedial funds, designed to provide litigants with claims arising from 9/11 to obtain payments to address immediate costs from their injuries. The VCF and USVSSTF both have indemnification provisions, which could require litigants to reimburse the funds from any subsequent awards. Thus, the contention that the litigation stands separate and apart from for forms of redress arising out of the same tortious conduct is a distinction without merit.

that, in 2019, Congress passed the Never Forget the Heroes: James Zadroga, Ray Pfeifer, and Luis Alvarez Permanent Authorization of the September 11th Victim Compensation Fund Act, which reauthorized the fund through the end of fiscal year 2092. *See* Pub. L. 116-34, 133 Stat. 1040 (July 29, 2019). Therefore, the fund remains active today.

### v. The VCF is Another Fund Covered under the fees received through litigation "or otherwise" which are words of requirement.

Advocacy before Congress played a crucial role in the series of successful VCF reauthorizations, and Quinn's contributions to these efforts directly stemmed from his obligations under the 2017 Agreements. Quinn played an instrumental role in lobbying the Obama and Trump administrations. SMF ¶ 35. He restlessly spoke with key Executive Branch players on behalf of the 9/11 families, including President Trump's National Security Advisor Dina Powell. PEX 12 at QUINN_000179. In his efforts to pass JASTA, Quinn met with a large number of congressional members and their aides. SMF ¶ 55. The sustained efforts of advocates like Quinn generated the political and media attention necessary to bring the 9/11 victims justice. SMF ¶ 43. The 2017 Agreements capture the parties' intention to compensate Quinn for services rendered related to the fund because the 2017 agreements define the scope of compensation to cover fees received "whether by judgement, settlement, or otherwise." SMF ¶¶ 39-41, 43. As such, the plain terms of the agreement dictate that the fees received in association with VCF qualify as compensation for Quinn, because they arise from "cases and claims arising out of the [9/11] terror attacks," and belong in the third category of fees outlined.

### III. If Parol evidence is considered, it supports Quinn's interpretation of the contract

As detailed above, the 2017 Agreements clearly provide for Quinn's recovery of his share of any fees collected by Defendants related to 9/11 cases, including fees obtained through claims made to the administrative funds, and the Court need not consider parol evidence. However, to the

extent that the Court believes it must look beyond the four corners of the documents, the available parol evidence also supports Quinn's claim to his share of fees obtained through the VSST and the VCF.

The testimony of the signatories to the 2017 Agreements confirms that both signatories understood that the Agreements would cover fees obtained through administrative funds, and that the 2017 Agreements and the Amendment were designed to clarify that Quinn's entitlement to a fee share was broad, and not limited to cases or claims filed in the SDNY litigation. Contemporaneous documents are consistent with that interpretation, and the only testimony to the contrary is Defendants' self-serving assertion that he did not understand the Agreements to cover the VCF or the VSST (although he admitted they may cover other unspecified administrative funds).

Similarly, the actions of the parties suggest that the parties understood the Agreements to cover fees obtained through the administrative funds. We are not arguing here that Quinn's actions may have modified the scope of the contracts, nor are we waiving that argument, as we understand that argument to be outside of the scope of the question presented by the Court. However, looking at the actions of the parties to a contract may serve as a form of parol evidence by shedding light on the parties' understanding of the meaning of the contract. Here, undisputed material facts show Quinn played an instrumental role in working towards obtaining recovery for 9/11 victims from both VSST and the VCF, working with both the Obama and Trump administrations. He restlessly spoke with key Executive Branch players on behalf of the 9/11 families, including President Trump's National Security Advisor Dina Powell. PEX 12 at QUINN_000179. In his efforts to pass JASTA, which, as detailed above, eased the burden of obtaining VSST funds for 9/11 victims, Quinn met with a large number of Congressional representative and their aides. The sustained

efforts of advocates like Quinn generated the political and media attention necessary to bring the 9/11 victims justice through the VSST and the VCF.

A.   **Defendants Testimony shows Quinn's broad interpretation is correct.**

All the Agreements at issue here were signed by Defendant Kreindler on behalf of Defendants. Despite their hollow protestation otherwise, Defendants' testimony confirms that fees recovered from the administrative funds are subject to the Agreements.

*i.   Defendants testified that the purpose of the 2017 Agreements and the Amendment was to broaden the scope and extent of Quinn's fees.*

At their deposition on January 25, 2024, Defendants' testimony understandably focused on the purpose and meaning of the 2017 Agreements and the Amendment thereto. Defendants' consistent testimony was that these documents' purpose was to broaden the sources of compensation for Quinn. SMF ¶ 38; PEX 1 at 51-52. Defendants testified that one purpose of the amendments was to "make clear that . . . [Quinn] will get fees on any matter where we get a fee regardless of whether we filed a complaint or are even retained by a 9/11 family member." PEX 1 at 60-61. Defendants even admitted to discussing the issue with Quinn and agreeing on the broadest possible language. In testifying about their discussions, Defendants said:

> So he – and we talked about it. He said, I'm going to write it in the most general, generic way possible to include however we resolve this case and get compensation for the 9/11 victims.

PEX 1 at 54:8-11. When pressed as to whether that language would perforce cover VSST and VCF, Defendants denied that it would do so, but could provide no express reasons for that conclusion, and no language in the contract supporting that conclusion. SMF ¶ 84, 85. *See, generally,* PEX 1 at 54-56. Defendants went as far as to opine that the purpose of the 2017 Agreements as to make 'explicit' that they covered a "common benefit" or any "committee fee,"

despite the fact that the 2017 Agreements do not limit themselves to any such recovery, whether explicitly or implicitly. PEX 1 at 58-60.

Defendants admit that they understood the 2017 Agreements were meant to clarify that Quinn's fee entitlement was broad and not limited to cases filed in the SDNY litigation, and that his discussions with Quinn confirm that was the mutual intent. Whether Defendants privately hoped for a more limited interpretation is not relevant to the Court's analysis. It is black letter law that courts are "bound to determine the intent of the parties as expressed in their writing, not their secret intent." *Pennsylvania Ave Development Corp. v. One Parcel of Land*, 494 F. Supp. 45, 51 (D.D.C. 1980). Whether Defendants privately wished for Quinn to limit the scope of his recovery is irrelevant; Defendants admit that the 2017 Agreements, as amended, were drafted to enable recovery from "any matter" where Defendants received a fee. Because the contract and surrounding parol evidence reflects an intent to allow for broad compensation, the parties must be held to that arrangement.

### ii. *Defendants admit that the Agreements cover recovery from administrative funds.*

Defendants concede that the parties' agreements would cover fees obtained from an administrative fund, but baldly assert that it does not cover these particular administrative funds, without a coherent explanation as to why VCF or VSST are excluded.

Defendants testified that even under the 2013 agreement, Quinn would be entitled to recover from a "fund-like settlement" like the one proposed for Mumbai (wherein terror victims could receive money from a government-operated global fund without the accused state having to admit culpability). PEX 1 at 22-23.

Despite Defendants' admission that their contractual obligations to Quinn always contemplated Quinn's entitlement to fees obtained through an administrative fund, Defendants

asserted that the particular funds at issue currently, VSST and VCF, do not fall under the 2017 Agreements. Although Defendants' reasons for this position (beyond the obvious) are not clear, the main thrust of their argument appears to be that, to be covered by the 2017 Agreements, any administrative fund must be funded by Saudi Arabia:

> Q. So what does "otherwise" mean in your mind?
>
> A. It means 9/11 plaintiffs who receive Saudi funds in the context of the resolution we were working toward, whether or not they're part of the Ashton complaint or whether or not they've even retained us, Kreindler & Kreindler, as of this date, and as I said, the time is significant because this is when Trump is over talking to King Salman, and Jack wants to lock in in writing the new fee split where he gets more and Bob gets less and make sure that his fees are not limited to those cases that we have filed for or are retained in.

PEX 1 at 52:6-18. When queried, Defendants could point to no textual support for their position that the 2017 Agreements only cover funds obtained from Saudi Arabia, instead simply opining that there was no possible source of funds other than Saudia Arabia, and he therefore believed the Agreements were limited to that source. SMF ¶¶49, 50. *See* PEX 1 at 52:19-22. When given another opportunity to explain why the Agreements are limited to Saudi funds, Defendants could not provide any explanation beyond his own assertion:

> Q. So you've consistently said that if Saudi Arabia were involved in a global settlement or words to that effect. Is Saudi Arabia's participation in the settlement required for Quinn to have earned a fee?
> . . . .
> A. Yeah. I can only tell you what I've said before. If there is a global resolution in the real world in which we live, whether Saudi Arabia is the named defendant, the only named defendant, other named defendants, funds are going to come from Saudi Arabia, and Jack would have participated had he not withdrawn and refused to help me and the families in our common effort.[11]

---

[11] Defendants have argued that Quinn is entitled to no fee whatsoever for his years of work because of a dispute between Defendant Kreindler and Quinn related to the tactics and ethics of engaging with the incoming Attorney General. That affirmative defense is beyond the scope of these Motions and is therefore not addressed here.

PEX 1 at 95:10-96:3.

Again, Defendants' secret intention that the Agreements be limited to Saudi funds is not parol evidence and cannot alter the Agreements. *Pennsylvania Ave Development Corp. v. One Parcel of Land*, 494 F. Supp. 45, 51 (D.D.C. 1980). Moreover, while parol evidence can assist in explaining ambiguities, parol evidence must be excluded if it "contradicts some other specific term of the written agreement." *Luther Williams, Jr., Inc. v. Johnson*, 229 A.2d 163 (D.C. 1967). This includes evidence which "tends to . . . add to, or subtract from" the written contract. *Fistere, Inc. v. Helz*, 226 A.2d 578, 580 (D.C. 1967). Here, the 2017 Agreements do not specify Saudia Arabia as the only source for Quinn's compensation or limit the scope of Quinn's participation to Saudi-related matters, so crediting Defendants' self-serving opinion on the possible source of funds would be an impermissible addition to the contract's language. By contrast, the Amendment to the 2017 Agreements broadly defines litigation as being "in connection with matters arising out of the attacks," and no impermissible addition or subtraction is required for that language to encompass VSST or VCF. Because Defendants' extra-textual limitation to Saudi funds adds a requirement for recovery not found in the language of the contract, and contradicts the definition of "litigation" provided for by the parties, it cannot be used as parol evidence. Nor is any regret over the agreed-upon scope of the Agreements relevant, as courts cannot "write a new contract for the parties" simply because one side has struck an improvident bargain. *Harnish v. Shannon*, 392 Pa. 419 (1958). The vast majority of 9/11 recovery has been through government-administered funds such as VSST and VCF, rather than directly through court-ordered judgments. Defendants could and did anticipate that funds would be a part of Quinn's compensation. As he did not limit their scope at the time of the contract, the Court should not do so for him now.

**B.** **Quinn's testimony supports his broader interpretation of the 2017 Agreements.**

Quinn's testimony accords with the language of the 2017 Agreements and the stated aims of the Amendment thereto. In particular, Quinn's testimony illustrates the way in which the various 9/11 recovery mechanisms are intertwined. He correctly observes that "you can't separate out the . . . VSST from the litigation." PEX 3 at 83. The extent of Quinn's work on the 9/11 matters reflects the truth of this statement. He notes that "[o]ver the years, Jim consulted with [him] on a regular basis about recoveries that were to be achieved in reliance on the VCF." PEX 3 at 109-110. He regarded himself as "a de facto co-counsel" for a number of clients and worked to get compensation for them in several ways. SMF ¶42, PEX 3 at 128. Early in the 9/11 litigation, he even considered the idea of a negotiated resolution with Iran. *Id.* at 17. When asked why there was no specific contractual mention of the VCF and VSST, Quinn observes that "[he doesn't] know why there would need to be." *Id.* at 71. The broad language of the 2017 Agreements, as amended, reflects the fact that Quinn promoted the visibility of the 9/11 families, creating a strong political push for their compensation.

Notably, Quinn agrees with Defendants as to the impetus behind the 2017 Agreements; they were written to ensure Quinn's payment from a wide variety of sources. PEX 3 at 114. The words of the contract, the testimony of the parties, and the actions taken by Quinn all manifest that intent.

**C.** **Contemporaneous email communication also supports Quinn's interpretation of the agreement language.**

The written communications of the parties strongly support Quinn's broad interpretation of the scope of the 2017 Agreements.

The parol evidence rule is "grounded in the inherent reliability of a writing as opposed to the memories of the contracting parties." *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283, 1287 (D.C. Cir. 1988) (quoting *Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 630 (4th Cir. 1977)). As such, contemporaneous writings are reliable indicators of a contracting party's intent, and the available written communications here support Quinn's broader interpretation.

The Amendment to the 2017 Agreements was signed in August of 2017. Just before it was signed, in an August 5, 2017, email to Defendants, Quinn worried that the contract's current language could "bite [him] in the ass." He wished to address his interchangeable use of the words "litigation" and "matter" to make it clear that he could still "get a fee via settlement or other resolution," even with respect to clients for whom Defendants "may never actually file a claim." PEX 52 at QUINN_000028. Thus, the contemporaneous emails show that Defendants knew of Quinn's expectations before Quinn had even attempted to collect from the firm. Defendants were clearly aware of the reason for the Amendment to the 2017 Agreements—to ensure Quinn's recovery in a wide variety of circumstances—and agreed to execute the Amendment to memorialize that understanding.

D. **Quinn actually worked on issues beyond the KSA litigation, with Defendants' knowledge and approval, including lobbying for their mutual clients on various issues.**

Quinn's extensive involvement with the SDNY litigation, VSST, and VCF, in service of Defendants' clients and all with Defendants' assent and encouragement, demonstrates the parties' understanding that Quinn's role was broad, and supports the view that the parties' intended him to recover from any source of fees, including VSST and VCF. It is well understood that work performed serves as "highly relevant" parol evidence of the intention of the parties. *Metro Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006). *See* RESTATEMENT (SECOND) OF

CONTRACTS § 202(4) (1981) (stating that a "course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement"). Here, Quinn's course of performance "is considered the best indication of what [the parties] intended the writing to mean." 2A Anderson U.C.C. § 1-205:68 (3d. ed. 2021). Quinn's advocacy was extensive for many years. That work included, but was not limited to, the SDNY litigation. The passage of JASTA advanced the cause of 9/11 victims far beyond that litigation, advocacy before the legislative and executive branches to support the 9/11 community, and creating a new wave of support for government-administered funds such as VSST and VCF. Here, the material facts show that the parties never limited Quinn's involvement to the SDNY litigation. It would be inappropriate to constrain Quinn's compensation to SDNY when he worked for Defendants' and their clients on these other recovery mechanisms, as well.

### i. Quinn Worked on SDNY case and other advocacy after 2017.

The undisputed facts show that Quinn worked on the SDNY litigation, including weighing in on drafts, and messaging surrounding the litigation to outside sources. Even Defendants grudgingly conceded that Quinn "probably" made input into the pleadings in the SDNY litigation, and that Defendants referred to Quinn as "co-counsel" for that case. *See* SMF ¶¶ 42, 70; PEX 1 at 90:17-91:15.

Quinn also did media appearances related to the SDNY case (and other 9/11 victim matters) and met with Congressional offices. For example, Quinn sent emails to Senator Coons' office in 2020, stating that he has "for the last seven years served as co-counsel to Defendant Kreindler & Kreindler and Anderson Kill in connection with their separate suits in the 9/11 litigation in the

SDNY." SMF ¶¶ 72, PEX 51 at QUINN_000184. Quinn regularly communicated his plans with

Defendants, who would agree with or approve Quinn[12]

### ii. *Quinn Worked on VSST issues.*

That the Agreements encompassed VSST is confirmed by the fact that the parties worked

together on obtaining relief for 9/11 victims through the VSST. For years and from the outset of

his work with Defendants, Quinn engaged in discussions over the possibility of a "comprehensive

fund" which would deal with sovereign immunity issues and let innocent people recover money.

*See, e.g.*, PEX 15 at QUINN_000843 000859, 000861) (July 2, 2013: Quinn identifying

"comprehensive fund" to address clients' damages while obviating obstacles to recovery in a

formal suit); PEX 17 at QUINN_000928 (October 18, 2013: Quinn discussing additional strategy

concerning a victims compensation fund including victims of the 9/11 attacks). Defendants were

aware that Quinn was working on VSST related issues. Defendant Kreindler & Kreindler even

included Quinn in communications with the Acting Special Master of the VSST, on behalf of a

large number of 9/11 victims with pending VSST claims. The firm identified itself as counsel for

these victims and inquired about the delays in payment. Including Quinn on communications with

VSST was not only a way to bolster their position with the Fund by including a prominent attorney

and 9/11 advocate; it was a public acknowledgment of Quinn's role in Defendants' VSST efforts.

PEX 50 at QUINN_000257-000258.

---

[12] Some examples of this work included meeting with Senators and Senate staff, (e.g. meeting with Sen. Schumer's office in fall of 2014). He would also perform advocacy and messaging support to advance his client's interests before Congress, (e.g., preparation of responses for the House Financial Services Hearing on Terrorist Financing and the Islamic State, bringing up JASTA and other options for recovery). He would also routinely communicate with senior officials in various posts to advance his client's interests, (e.g., May 2017 emails to Deputy National Security Advisor Dina Powell about the possibility of Trump arranging a state-to-state solution with the Saudis, preventing the need for further litigation). PEX 12 at 2, PEX 51 at QUINN_000184.

### iii.   *Quinn also Worked on VCF issues.*

Similarly, Quinn was involved in Defendants' VCF efforts. From the early days of their work together, Quinn advocated for recovery from a comprehensive victim's fund for their mutual clients. Specifically, in October 2013, Quinn drafted a memo for a State Department meeting. In this memo, he introduces himself as representing "most" 9/11 victims and directly references VCF as a means to get compensation. PEX 17 at QUINN_000928. As with the VSST, by publicly holding out Quinn as part of the team seeking to use VCF to compensate 9/11 victims as noted above, Defendants clearly signaled their understanding that he was connected to the full effort to obtain compensation for 9/11 victims, not just the effort to sue Saudi Arabia, and his entitlement to fees was commensurately broad.

**E.**   **Defendants' separate agreements with Crowe support Quinn's broad interpretation of the 2017 Agreements and the Amendment between the parties.**

In early 2017, Quinn requested that his contractual relationship with Defendants be separated from Crowe's contractual relationship with Defendants due to Crowe's lack of efforts and success, as well as his diminished role going forward. SMF ¶ 64, 65, 67. PEX 37 at QUINN_10278; PEX 38 at QUINN_000159; PEX 39 at QUINN_18772. Defendants agreed, and Quinn and Defendants entered into the 2017 Agreements in May of 2017. Dkt. 19-3 at 2-5; Dkt. 19-4 at 2-8. The First 2017 Agreement expressly acknowledges that Crowe and his law firm were entering into a separate agreement with Defendants, *see* Dkt. 19-3 at 2, and Crowe and the Defendants did enter into such an agreement.

As discussed above, Quinn and Defendants entered into the 2017 Agreements, excluding Crowe, which governed the contractual obligations of Quinn and Defendants toward each other. Quinn and Defendants also amended the 2017 Agreements by executing the Amendment, which did not include Crowe, in order to unify the language and confirm the broad scope of Quinn's

entitlement to fees Defendants earned from sources beyond lawsuits, such as administrative funds. There is no evidence that Crowe sought any such amendments to his agreement with the Defendants.

However, in 2021, Crowe and Defendants entered into another contract. *See* PEX 45 at KK000112-000113. This agreement provides that Crowe is entitled to a percentage

> of the net recovery on each decedent's wrongful death and each personal injury claim with respect to which K&K receives a fee, whether by judgment, settlement, or fund created by Saudi Arabia, Sudan and their related charities, instrumentalities and entities, for his representation of the Clients on whose behalf K&K filed cases in the litigation as of the date of the original July 10, 2014 Agreement.

*Id.* ¶4. In the Crowe-Kreindler 2021 Agreement, Defendants use the exact language from the 2017 Agreements with Quinn, but replace the word "otherwise" with language maintaining the direct tie between Crowe's compensation and the litigation targets, Saudi Arabia and Sudan. Crowe's later agreement shows that Defendants know how to restrict recovery by their contractual partners to specific sources, such as particular litigation or entities, but did not choose to use this narrow approach in the 2017 Agreements and the Amendment that define Defendants obligation to pay Quinn.

Not only does the language of the 2017 Agreement and the Amendment require the broad interpretation of his compensation entitlement that Quinn has consistently sought and asserted since 2017, but the parol evidence in this matter also compels the conclusion that Quinn's broad scope, rather than Defendants' revisionist interpretation narrowing their contractual obligations, is the only reasonable way to read the operative agreements. Accordingly, the court should grant summary judgment for Quinn's estate, and permit this case to continue so that the money the Defendants' owe may finally be paid.

## CONCLUSION

As the foregoing demonstrates, the agreements between the parties establish that Quinn is entitled to his share of any fee Defendants receive for cases and claims arising out of the 9/11 terror acts, whether from litigation, the VSST or the VCF. Even if the operative agreements were not clear, the parol evidence compels the same conclusion. Accordingly, the Plaintiff respectfully requests that this Court grant partial summary judgment in Plaintiff's favor on the issue of the scope of the operative agreements, at issue in this matter.

Dated: October 18, 2024                Respectfully Submitted,
                                       By Counsel

                                       /s/ Kevin E. Byrnes
                                       Kevin E. Byrnes, D.C. Bar No. 480195
                                       Thomas M. Craig, D.C. Bar No. 494503
                                       **Fluet**
                                       1751 Pinnacle Drive, Ste 1000,
                                       Tysons, VA 22102
                                       T: (703) 590-1234
                                       F: (703) 590-0366
                                       kbyrnes@fluet.law
                                       tcraig@fluet.law

                                       *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 18, 2024, I sent the forgoing to counsel of record

for the Defendants via email:

    Brandon R. Nagy
    Eric Liebeler
    STINSON LEONARD STREET, LLP
    brandon.nagy@stinson.com
    eric.liebeler@stinson.com

    Emily Bab Kirsch
    KIRSCH & NIEHAUS PLLC
    emily.kirsch@kirschniehaus.com

*/s/ Kevin E. Byrnes*
Kevin E. Byrnes, Esq.