# PEX 15

# RE: KSA Facts

Tue, Jul 2, 2013 at 4:03 PM EDT (GMT-04:00)

**From:** Bob Crowe <Bob.Crowe@nelsonmullins.com> (sent via Bob Crowe <Bob.Crowe@nelsonmullins.com>)
**To:** Michael DiRoma <mdiroma@quinngillespie.com>; Jack Quinn <jquinn@quinngillespie.com>

Thanks

**Robert B. Crowe** | **Nelson Mullins**
One Post Office Square, 30th Fl., Boston, MA  02109
101 Constitution Avenue NW, Washington, DC  20001
bob.crowe@nelsonmullins.com
T: 617-573-4730; (DC) 202-545-2908 | F: 617-573-4747

**From:** Michael DiRoma [mailto:mdiroma@quinngillespie.com]
**Sent:** Tuesday, July 02, 2013 1:39 PM
**To:** Jack Quinn; Bob Crowe
**Subject:** RE: KSA Facts

Perfect thanks.

**From:** Jack Quinn
**Sent:** Tuesday, July 02, 2013 1:18 PM
**To:** Michael DiRoma; Bob Crowe
**Subject:** Re: KSA Facts

Fixing a little bit below….

Not surprisingly, 98% of pending terrorism claims result from 9/11.  Thus, a comprehensive fund would eliminate nearly all such cases from the courts and provide — at long last — a modicum of justice and recompense for the innocent victims and their families.  At the same time, it would provide a rational template for the handling of future claims and a mechanism far more efficient than the backlogged courts currently afford.  Importantly, this approach would also provide resolution along diplomatic and political means and lessen the adversarial effect of prolonged litigation.

*Jack Quinn*

**QGA Public Affairs**
1133 Connecticut Avenue NW
5th Floor
Washington DC 20036

(P) 202-429-6871
(F) 202-457-1130
jquinn@qga.com
http://www.qga.com



**From:** Michael DiRoma <mdiroma@quinngillespie.com>
**Date:** Tuesday, July 2, 2013 1:10 PM
**To:** Jack Quinn <jquinn@quinngillespie.com>, Robert Crowe <bob.crowe@nelsonmullins.com>
**Subject:** RE: KSA Facts

Thanks, this is great.

**From:** Jack Quinn
**Sent:** Tuesday, July 02, 2013 1:05 PM
**To:** Michael DiRoma; Bob Crowe
**Subject:** Re: KSA Facts

*Jack Quinn*

**QGA Public Affairs**
1133 Connecticut Avenue NW
5th Floor
Washington DC 20036

(P) 202-429-6871
(F) 202-457-1130
jquinn@qga.com
http://www.qga.com

**From:** Michael DiRoma <mdiroma@quinngillespie.com>
**Date:** Tuesday, July 2, 2013 12:55 PM
**To:** Jack Quinn <jquinn@quinngillespie.com>, Robert Crowe <bob.crowe@nelsonmullins.com>
**Subject:** RE: KSA Facts

Thanks…I'm trying to sort through one of the questions that didn't make perfect sense.  Does this work here?

**3) How would this affect terrorism litigation in U.S. courts?**

Since 98% of all terror claims in U.S. courts are 9/11 victims, a fund to pay 9/11 victims can become a comprehensive fund for all U.S. terror claims.  It is in the State Department's best interests to see these claims removed from court and to handle future matters diplomatically.  Indeed, Judge Royce Lamberth acknowledged in one of his own FSIA opinions the futility of terror-related court proceedings and called for a political/diplomatic resolution.[1]  Victims will otherwise receive no compensation from a judgment.

**From:** Jack Quinn
**Sent:** Monday, July 01, 2013 5:23 PM
**To:** Michael DiRoma; Bob Crowe
**Subject:** Re: KSA Facts

Great, thx.  Left minor comments on your chair.  Good work


*Jack Quinn*

## QGA Public Affairs
1133 Connecticut Avenue NW
5th Floor
Washington DC 20036

(P) 202-429-6871
(F) 202-457-1130
jquinn@qga.com
http://www.qga.com




**From:** Michael DiRoma <mdiroma@quinngillespie.com>
**Date:** Thursday, June 27, 2013 11:24 AM
**To:** Jack Quinn <jquinn@quinngillespie.com>, Robert Crowe <bob.crowe@nelsonmullins.com>
**Subject:** KSA Facts

Jack and Bob,

Please find a memo describing the facts of the KSA/FSIA case attached in MS Word and below.  John (at Kreindler & Kreindler) and I crafted this with Jim's direct input.  Please let us know if you have any other questions after a first read.  I have to go to a previously scheduled luncheon but will be available via email.

Many thanks,
Michael


MEMORANDUM                                                                                              June 27, 2013

### PART I: KEY FACTS

In the aftermath of the September 11th terrorist attacks, injured victims and the families of those who were killed sought compensation for their losses.  The U.S. Congress promptly established a Victim Compensation Fund ("VCF") in 2001 to limit the liability of U.S. airlines and other U.S. entities and to compensate victims in a way that was both timely and definitive.  Congress specifically contemplated the 9/11 victims suing al Qaeda's supporters when it created the VCF, which barred victims from filing claims against other parties except for al Qaeda supporters.  97% of the victims opted for VCF compensation.

Nearly 2,000 wrongful death claimants and 1,500 injured victims filed suit against about 500 foreign persons. All of the plaintiffs also sought to make those countries, charities, banks, and individuals who supported al Qaeda's terrorist attacks pay for their participation in the largest mass murder ever committed on U.S. soil. Among the defendants were the governments of the Kingdom of Saudi Arabia ("KSA"), Iran, and Sudan. The governments of Iran and Sudan have defaulted.

## Underlying Case Against KSA

The case against Saudi Arabia for its complicity in the 9/11 terror acts begins with the formal founding of al Qaeda (an event attended by a senior member of a major Saudi government-funded charity). Al Qaeda received financial and logistical support through its formative years from Saudi Princes (both in their governmental and private roles), Royal Family business partners, major Saudi banks (some government-controlled), and above all the network of major charities, based in Saudi Arabia and active in Sudan, Bosnia, Pakistan, Afghanistan and other al Qaeda hotspots.

Saudi Princes, Saudi businessmen and Saudi banks provided money, financial and other services to al Qaeda via the Saudi charities. In essence the Saudi charities provided a laundering mechanism for Saudi Princes and businessmen to support al Qaeda. This use of the charities by the Saudi Defendants provided the rationale for the trial and appellate courts to dismiss many of the major Saudi Defendants.

After the 1998 African Embassy bombings, the U.S. government made urgent requests of the Saudi authorities to rein in these charity supporters of al Qaeda. The Saudi government failed to do so and the 9/11 terror attacks occurred three years later.

## Procedural Background of the 9/11 Cases

Plaintiffs in these cases represent nearly all the families of the people that died on 9/11 and thousands of people injured by the attacks. Five federal judges have worked on this case, one of whom called it the largest and most complex case in U.S. legal history. Every step has been fought over, argued about and after a decade, some defendants are still preparing motions to dismiss. The discovery process shows every sign of being just as slow and tortuous. After a decade of litigation, Plaintiffs have seen most major Defendants dismissed from the case, without a hearing on the merits of the allegations.

Some of the Plaintiffs brought suit against KSA, but KSA was ruled to be immune from suit by the Second Circuit Court of Appeals in 2008 by virtue of the Foreign Sovereign Immunities Act ("FSIA"). The U.S. Supreme Court declined to take up the matter in 2009.

In November 2011, the Second Circuit reinstated claims against Afghanistan in the same underlying matter. In oral arguments before the District Court on March 16, 2012, Plaintiffs sought to use this development to rejoin KSA as a Defendant in the 9/11 cases. The Court denied the motion almost immediately. The Second Circuit heard the appeal on this matter on March 20, 2013, and a decision is currently pending.

Separately, Plaintiffs have brought suit against other quasi-governmental Defendants, including Saudi Princes and charities. Some of these claims were dismissed by the District Court in January and September 2005. The Second Circuit upheld most of these dismissals in August 2008. A handful of defendants, mostly Saudi charities, had their motions to dismiss denied between 2005 and 2008. They are currently in discovery. More defendants were dismissed from 2006 to 2011. The Second Circuit recently upheld most of these dismissals on personal jurisdiction, subject matter jurisdiction, and Sovereign Immunity grounds. The appellate court concluded jurisdictional discovery is warranted with regard to 12 of these defendants, and has tasked the lower court with such discovery.

## Potential Legislative Action: JASTA

In the meantime, the Justice Against Sponsors of Terrorism Act ("JASTA") was introduced in the House and Senate in the 112th Congress. It was passed out of the Senate Judiciary Committee and was at the committee stage in the House at the end of the 112th Congress. If this bill is re-introduced in the 113th Congress and ultimately signed into law, the Second Circuit appeal would cease because KSA would no longer be able to claim sovereign immunity in the 9/11 lawsuits.

## Creation of a Terrorism Victims Fund by the Department of State

There is an alternative path to this litigation. If we create a major settlement fund for 9/11 victims, 99% of terrorism cases could be resolved away from the court system.

Creating such a fund would benefit KSA in the following ways:
- There need be no admission of fault on KSA's part—they are in fact arm in arm with the U.S. in fighting terrorism.
- KSA would contribute to a "fund" that would help compensate victims of 9/11.
- JASTA would die on the vine, so KSA would not be brought back into any 9/11 litigation.
- 9/11 Families' persistence in pursuing KSA would decline, thus Saudis can finally close the book on 9/11.
- KSA would also theoretically now have a contributory claim against Sudan and Iran.

## PART II: KEY QUESTIONS

**1) How much would a terrorism settlement cost?**

The Lockerbie/Libya settlement provided $10 million per death and $3 million per injury. At approximately 3,000 deaths and 3,000 injuries, the total figure here would amount to about $39 billion.

**2) If Plaintiffs prevail in court against the charities, what are their chances of collecting on the judgment?**

The charities have little ready cash or assets to meet a judgment. For Plaintiffs to collect, a judgment against the charities would have to be paid for by the Saudi government.

**3) Will this set a precedent? Will all American victims of terror expect such compensation?**

Yes. Libya was the first time. Mumbai and 9/11 would follow. The common thread here is that the terror sponsoring governments, Libya, Pakistan, and Saudi Arabia, recognize their culpability and provide the funds to compensate. Unfortunately the American victims of Iranian or Hamas terror may have to await a rapprochement with Iran or Hamas. One of the most experienced Federal judges in these types of law suits, Royce Lambreth has called for another method, such as a fund, to deal with American victims of terror. Otherwise, in his opinion, victims receive no compensation from a judgment.

**4) Are the Taliban named as defendants?**

Yes, as an entity and some as individuals. They are in default.

**5) Is Afghanistan named as a defendant?**

Yes, in one of the Complaints, as the successor state to the Taliban's Islamic Republic of Afghanistan.

Michael D. DiRoma
QGA Public Affairs
202.429.6882

[mdiroma@qga.com](mailto:mdiroma@qga.com)

[1]In re: Islamic Republic of Iran Terrorism Litigation, 659 F. Supp. 2d 31 (D.D.C., Sept. 30, 2009).

Confidentiality Notice

This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure.

If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

To ensure compliance with the requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including the attachments) is not intended or written to be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or tax-related matter[s]. To provide you with a communication that could be used to avoid penalties under the Internal Revenue Code will necessarily entail additional investigations, analysis and conclusions on our part.

# Re: KSA Memorandum

Wed, Jul 17, 2013 at 12:03 PM EDT (GMT-04:00)

**From: Jim Kreindler <JKreindler@kreindler.com>** (sent via Jim Kreindler <JKreindler@kreindler.com>)
To: Michael DiRoma <mdiroma@quinngillespie.com>
Cc: Bob Crowe <Bob.Crowe@nelsonmullins.com>; Jack Quinn <jquinn@quinngillespie.com>; John Fawcett <Jfawcett@kreindler.com>

Perfect Sent from my iPhone On Jul 17, 2013, at 10:50 AM, "Michael DiRoma" > wrote: Dear Jim and Bob: Please find our final draft of the KSA Memorandum attached and below. Please let me know if you have any final changes. All the best, Michael MEMORANDUM July 17, 2013 PART I: KEY FACTS In the aftermath of the September 11th terrorist attacks, injured victims and the families of those who were killed sought compensation for their losses. The U.S. Congress promptly established a Victim Compensation Fund ("VCF") in 2001 to limit the liability of U.S. airlines and other U.S. entities and to compensate victims in a way that was both timely and definitive. Victims taking advantage of the VCF were prohibited from also bringing suit against the airlines and other U.S. entities. However, Congress specifically contemplated that the 9/11 victims could still sue al Qaeda's supporters even if they received compensation from the VCF. As a result of this arrangement, nearly 2,000 wrongful death claimants and 1,500 injured victims filed suit against about 500 defendants. All of the plaintiffs sought to hold accountable those countries, charities, banks, and individuals who supported al Qaeda's terrorist attacks and to require that they pay for their participation in the largest mass murder ever committed on U.S. soil. Among the defendants were the governments of the Kingdom of Saudi Arabia ("KSA"), Iran, and Sudan. The governments of Iran and Sudan have defaulted, but finding assets to cover judgments against them is exceedingly difficult. Saudi Arabia presents a very different picture. Underlying Case Against KSA The case against Saudi Arabia for its complicity in the 9/11 terror acts begins with the formal founding of al Qaeda at an event attended by a senior member of a major Saudi government-funded charity. Al Qaeda received financial and logistical support through its formative years from Saudi Princes (both in their governmental and private roles), Royal Family business partners, major Saudi banks (some government-controlled), and above all a network of major charities, based in Saudi Arabia and active in Sudan, Bosnia, Pakistan, Afghanistan and other al Qaeda hotspots. Over a course of years, Saudi Princes, Saudi businessmen and Saudi banks provided money, financial and other services to al Qaeda via the Saudi charities. In essence, the Saudi charities provided a laundering mechanism for Saudi Princes and businessmen to support al Qaeda. After the 1998 African Embassy bombings, the U.S. government made urgent requests of the Saudi authorities to rein in these charity supporters of al Qaeda. The Saudi government failed to do so and the 9/11 terror attacks occurred three years later. Procedural Background of the 9/11 Cases Plaintiffs in these cases represent nearly all the families of the people who died on 9/11 and thousands of people injured by the attacks. Five federal judges have worked on this case, one of whom called it the largest and most complex case in U.S. legal history. Every step has been fought over, argued about and after a decade, some defendants are still preparing motions to dismiss. The discovery process shows every sign of being just as slow and tortuous. After a decade of litigation, Plaintiffs have seen most major Defendants dismissed from the case, without a hearing on the merits of the allegations. Some of the Plaintiffs brought suit against KSA, but KSA was ruled to be immune from suit by the Second Circuit Court of Appeals in 2008 by virtue of the Foreign Sovereign Immunities Act ("FSIA"). The U.S. Supreme Court declined to take up the matter in 2009. In November 2011, the Second Circuit reinstated claims against Afghanistan in the same underlying matter. In oral arguments before the District Court on March 16, 2012, Plaintiffs sought to use this development to rejoin KSA as a Defendant in the 9/11 cases. The Court denied the motion almost immediately. The Second Circuit heard the appeal on this matter on March 20, 2013, and a decision is currently pending. Separately, Plaintiffs have brought suit against other quasi-governmental and non-governmental Defendants, including Saudi Princes and charities. Some of these claims were dismissed by the District Court in January and September 2005. The Second Circuit upheld most of these dismissals in August 2008. A handful of defendants, mostly Saudi charities, had their motions to dismiss denied between 2005 and 2008. They are currently in discovery. More defendants were dismissed from 2006 to 2011. The Second Circuit recently upheld most of these dismissals on personal jurisdiction, subject matter jurisdiction, and Sovereign Immunity grounds. The appellate court concluded jurisdictional discovery is warranted with regard to 12 of these defendants, and has tasked the lower court with such discovery. Potential Legislative Action: JASTA In the meantime, the Justice Against Sponsors of Terrorism Act ("JASTA") was introduced in the House and Senate in the 112th Congress. It was passed out of the Senate Judiciary Committee and was at the committee stage in the House at the end of the 112th Congress. If this bill is re-introduced in the 113th Congress and ultimately signed into law, the Second Circuit appeal would cease because KSA would no longer be able to claim sovereign immunity in the 9/11 lawsuits. Creation of a Terrorism Victims Fund by the Department of State There is an alternative path to this long and frustrating road of litigation and a way to finally bring a measure of justice to the victims of the worst terrorist murder attack in history. That way is the creation of a settlement fund for 9/11 victims. Such a fund could resolve 99% of terrorism cases away from the court system and without significant further delay. Creating such a fund would benefit KSA in the following ways: o There need be no admission of fault on KSA's part—they would be in fact arm-in-arm with the U.S. in fighting terrorism. o KSA would contribute to a "fund" that would help compensate victims of 9/11. o JASTA would die on the vine, so KSA would not be brought back into any 9/11 litigation. o 9/11 Families' persistence in pursuing KSA would decline, thus Saudis can finally close the book on 9/11. o

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    QUINN_000859

KSA would also theoretically now have a contributory claim against Sudan and Iran. PART II: KEY QUESTIONS 1) How much would a terrorism settlement cost? The Pan Am 103 Lockerbie/Libya settlement regarding the bombing of a Pan Am plane over Scotland in 1988 provided $10 million per death and $3 million per injury to the families of the victims. To resolve 9/11 along these lines would require $39 billion (for some 3,000 deaths and 3,000 injuries). 2) If Plaintiffs prevail in court against the charities, what are their chances of collecting on the judgment? The charities have little ready cash or assets to meet a judgment. For Plaintiffs to collect, a judgment against the charities would have to be paid for by the Saudi government. 3) How would this affect terrorism litigation in U.S. courts? Not surprisingly, 98% of pending terrorism claims result from 9/11. Thus, a comprehensive fund would eliminate nearly all such cases from the courts and provide — at long last — a modicum of justice and recompense for the innocent victims and their families. At the same time, it would provide a rational template for the handling of future claims and a mechanism far more efficient than the backlogged courts currently afford. Importantly, this approach would also provide resolution along diplomatic and political means and lessen the adversarial effect of prolonged litigation. 4) Are the Taliban named as defendants? Yes, as an entity and some as individuals. They are in default. 5) Is Afghanistan named as a defendant? Yes, in one of the Complaints, as the successor state to the Taliban's Islamic Republic of Afghanistan. Michael D. DiRoma QGA Public Affairs 202.429.6882 mdiroma@qga.com

# RE: KSA Memorandum

Mon, Jul 22, 2013 at 2:23 PM EDT (GMT-04:00)

**From:** Jim Kreindler <JKreindler@kreindler.com> (sent via Jim Kreindler <JKreindler@kreindler.com>)
**To:** 'Bob Crowe' <Bob.Crowe@nelsonmullins.com>; Michael DiRoma <mdiroma@quinngillespie.com>
**Cc:** Jack Quinn <jquinn@quinngillespie.com>; John Fawcett <Jfawcett@kreindler.com>

Great.

**From:** Bob Crowe [mailto:Bob.Crowe@nelsonmullins.com]
**Sent:** Monday, July 22, 2013 2:07 PM
**To:** Jim Kreindler; 'Michael DiRoma'
**Cc:** Jack Quinn; John Fawcett
**Subject:** RE: KSA Memorandum

I will be at State on Wednesday

**Robert B. Crowe | Nelson Mullins**
One Post Office Square, 30th Fl., Boston, MA 02109
101 Constitution Avenue NW, Washington, DC 20001
bob.crowe@nelsonmullins.com
T: 617-573-4730; (DC) 202-545-2908 | F: 617-573-4747

**From:** Jim Kreindler [mailto:JKreindler@kreindler.com]
**Sent:** Monday, July 22, 2013 2:03 PM
**To:** 'Michael DiRoma'; Bob Crowe
**Cc:** Jack Quinn; John Fawcett
**Subject:** RE: KSA Memorandum

Any movement on new legal advisor? Thanks Jim

**From:** Michael DiRoma [mailto:mdiroma@quinngillespie.com]
**Sent:** Wednesday, July 17, 2013 11:52 AM
**To:** Jim Kreindler; Bob Crowe
**Cc:** Jack Quinn; John Fawcett
**Subject:** KSA Memorandum

Dear Jim and Bob:

Please find our final draft of the KSA Memorandum attached and below. Please let me know if you have any final changes.

All the best,
Michael

MEMORANDUM                                                                                                                                July 17, 2013

**PART I: KEY FACTS**

In the aftermath of the September 11th terrorist attacks, injured victims and the families of those who were killed sought compensation for their losses.  The U.S. Congress promptly established a Victim Compensation Fund ("VCF") in 2001 to limit the liability of U.S. airlines and other U.S. entities and to compensate victims in a way that was both timely and definitive.  Victims taking advantage of the VCF were prohibited from also bringing suit against the airlines and other U.S. entities.  However, Congress specifically contemplated that the 9/11 victims could still sue al Qaeda's supporters even if they received compensation from the VCF.

As a result of this arrangement, nearly 2,000 wrongful death claimants and 1,500 injured victims filed suit against about 500 defendants.  All of the plaintiffs sought to hold accountable those countries, charities, banks, and individuals who supported al Qaeda's terrorist attacks and to require that they pay for their participation in the largest mass murder ever committed on U.S. soil.  Among the defendants were the governments of the Kingdom of Saudi Arabia ("KSA"), Iran, and Sudan.  The governments of Iran and Sudan have defaulted, but finding assets to cover judgments against them is exceedingly difficult.  Saudi Arabia presents a very different picture.

**Underlying Case Against KSA**

The case against Saudi Arabia for its complicity in the 9/11 terror acts begins with the formal founding of al Qaeda at an event attended by a senior member of a major Saudi government-funded charity.  Al Qaeda received financial and logistical support through its formative years from Saudi Princes (both in their governmental and private roles), Royal Family business partners, major Saudi banks (some government-controlled), and above all a network of major charities, based in Saudi Arabia and active in Sudan, Bosnia, Pakistan, Afghanistan and other al Qaeda hotspots.

Over a course of years, Saudi Princes, Saudi businessmen and Saudi banks provided money, financial and other services to al Qaeda via the Saudi charities.  In essence, the Saudi charities provided a laundering mechanism for Saudi Princes and businessmen to support al Qaeda.

After the 1998 African Embassy bombings, the U.S. government made urgent requests of the Saudi authorities to rein in these charity supporters of al Qaeda.  The Saudi government failed to do so and the 9/11 terror attacks occurred three years later.

**Procedural Background of the 9/11 Cases**

Plaintiffs in these cases represent nearly all the families of the people who died on 9/11 and thousands of people injured by the attacks.  Five federal judges have worked on this case, one of whom called it the largest and most complex case in U.S. legal history.  Every step has been fought over, argued about and after a decade, some defendants are still preparing motions to dismiss.  The discovery process shows every sign of being just as slow and tortuous.  After a decade of litigation, Plaintiffs have seen most major Defendants dismissed from the case, without a hearing on the merits of the allegations.

Some of the Plaintiffs brought suit against KSA, but KSA was ruled to be immune from suit by the Second Circuit Court of Appeals in 2008 by virtue of the Foreign Sovereign Immunities Act ("FSIA").  The U.S. Supreme Court declined to take up the matter in 2009.

In November 2011, the Second Circuit reinstated claims against Afghanistan in the same underlying matter.  In oral arguments before the District Court on March 16, 2012, Plaintiffs sought to use this development to rejoin KSA as a Defendant in the 9/11 cases.  The Court denied the motion almost immediately.  The Second Circuit heard the appeal on this matter on March 20, 2013, and a decision is currently pending.

Separately, Plaintiffs have brought suit against other quasi-governmental and non-governmental Defendants, including Saudi Princes and charities.  Some of these claims were dismissed by the District Court in January and

September 2005. The Second Circuit upheld most of these dismissals in August 2008. A handful of defendants, mostly Saudi charities, had their motions to dismiss denied between 2005 and 2008. They are currently in discovery. More defendants were dismissed from 2006 to 2011. The Second Circuit recently upheld most of these dismissals on personal jurisdiction, subject matter jurisdiction, and Sovereign Immunity grounds. The appellate court concluded jurisdictional discovery is warranted with regard to 12 of these defendants, and has tasked the lower court with such discovery.

## Potential Legislative Action: JASTA

In the meantime, the Justice Against Sponsors of Terrorism Act ("JASTA") was introduced in the House and Senate in the 112th Congress. It was passed out of the Senate Judiciary Committee and was at the committee stage in the House at the end of the 112th Congress. If this bill is re-introduced in the 113th Congress and ultimately signed into law, the Second Circuit appeal would cease because KSA would no longer be able to claim sovereign immunity in the 9/11 lawsuits.

## Creation of a Terrorism Victims Fund by the Department of State

There is an alternative path to this long and frustrating road of litigation and a way to finally bring a measure of justice to the victims of the worst terrorist murder attack in history. That way is the creation of a settlement fund for 9/11 victims. Such a fund could resolve 99% of terrorism cases away from the court system and without significant further delay.

Creating such a fund would benefit KSA in the following ways:
- There need be no admission of fault on KSA's part—they would be in fact arm-in-arm with the U.S. in fighting terrorism.
- KSA would contribute to a "fund" that would help compensate victims of 9/11.
- JASTA would die on the vine, so KSA would not be brought back into any 9/11 litigation.
- 9/11 Families' persistence in pursuing KSA would decline, thus Saudis can finally close the book on 9/11.
- KSA would also theoretically now have a contributory claim against Sudan and Iran.

## PART II: KEY QUESTIONS

**1) How much would a terrorism settlement cost?**

The Pan Am 103 Lockerbie/Libya settlement regarding the bombing of a Pan Am plane over Scotland in 1988 provided $10 million per death and $3 million per injury to the families of the victims. To resolve 9/11 along these lines would require $39 billion (for some 3,000 deaths and 3,000 injuries).

**2) If Plaintiffs prevail in court against the charities, what are their chances of collecting on the judgment?**

The charities have little ready cash or assets to meet a judgment. For Plaintiffs to collect, a judgment against the charities would have to be paid for by the Saudi government.

**3) How would this affect terrorism litigation in U.S. courts?**

Not surprisingly, 98% of pending terrorism claims result from 9/11. Thus, a comprehensive fund would eliminate nearly all such cases from the courts and provide — at long last — a modicum of justice and recompense for the innocent victims and their families. At the same time, it would provide a rational template for the handling of future claims and a mechanism far more efficient than the backlogged courts currently afford. Importantly, this approach

would also provide resolution along diplomatic and political means and lessen the adversarial effect of prolonged litigation.

**4) Are the Taliban named as defendants?**

Yes, as an entity and some as individuals. They are in default.

**5) Is Afghanistan named as a defendant?**

Yes, in one of the Complaints, as the successor state to the Taliban's Islamic Republic of Afghanistan.


Michael D. DiRoma
QGA Public Affairs
202.429.6882
mdiroma@qga.com


Confidentiality Notice

This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure.

If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

To ensure compliance with the requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including the attachments) is not intended or written to be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or tax-related matter[s]. To provide you with a communication that could be used to avoid penalties under the Internal Revenue Code will necessarily entail additional investigations, analysis and conclusions on our part.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    QUINN_000864