# PEX 20

**\*[DRAFT]\*** MEMORANDUM                                                                October 23, 2013

      We presently represent most of the victims of the Mumbai and 9/11 terrorist attacks. While our clients have exercised all of the legal options available to them in their attempt to receive recompense from the parties responsible, they have reached an impasse through no fault of their own.  Both sets of victims are in fact finding the legal doctrine of sovereign immunity to be a hindrance in their pursuit of justice.

      Over the last two decades, the victims of the Pan Am 103/Lockerbie bombing faced similar roadblocks in their own pursuit of justice against the government of Libya.  Some of us were involved in assisting the victims of that attack as they sought payment of the final tranche of funds owed to them as a result of a negotiated settlement in 2003.  Using a specially created neutral fund, that final amount was delivered to Lockerbie victims in 2008 after U.S. congressional action and the affirmative involvement of the U.S. Secretary of State.  We believe a similar approach is both feasible and preferable in the Mumbai and 9/11 cases.

      What follows is a brief recitation of the substantive and procedural facts surrounding the Mumbai and 9/11 terrorist attacks, the facts and outcome of the Lockerbie bombing case, and our proposal to use the diplomatic Lockerbie approach to resolve once and for all the remaining claims of the Mumbai and 9/11 victims.

## The Terrorist Attacks in Mumbai, India

      On November 26, 2008, ten terrorists, all Pakistani nationals, began a four day attack that left 166 people dead and 304 wounded.  This monstrous, indiscriminate act of mass murder was ultimately tied to Lashkar-e-Taiba, the Pakistan-based terrorist group that has received assistance over the years from Pakistan's main spy service, the ISI.

      American and Israeli victims filed a law suit in the United States asserting claims arising under the Alien Tort Statute and the Antiterrorism Act against several defendants, to include Lashkar-e-Taiba, the ISI, and two of its former Directors General, Ahmed Shuja Pasha and Nadeem Taj.  Upon considering the Department of State's recommendation of either sovereign or foreign official immunity for all of the defendants involved, the federal district court in New York granted defendants' motions to dismiss for lack of subject matter jurisdiction on September 30, 2013.

      As with Pan Am 103, in the present case, the American survivors and families of those who were killed in the Mumbai attack have patently valid claims for damages.  The defendants are judgment-proof terrorists and Pakistan's ISI, which means the only reasonable party capable of compensating the victims and their families is the Pakistani government.  However, as noted, the U.S. court system, upon the recommendation of the U.S. Department of State, is preventing this from happening through the standard judicial process.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                           QUINN_000885

**The September 11th Terrorist Attacks**

The case against Saudi Arabia for its complicity in the 9/11 terror acts begins with the formal founding of al Qaeda at an event attended by a senior member of a major Saudi government-funded charity.  Al Qaeda received financial and logistical support through its formative years from Saudi Princes (both in their governmental and private roles), Royal Family business partners, major Saudi banks (some government-controlled), and above all a network of major charities, based in Saudi Arabia and active in Sudan, Bosnia, Pakistan, Afghanistan and other al Qaeda hotspots.

Over a course of years, Saudi Princes, Saudi businessmen and Saudi banks provided money, financial and other services to al Qaeda via the Saudi charities.  In essence, the Saudi charities provided a laundering mechanism for Saudi Princes and businessmen to support al Qaeda.

After the 1998 African Embassy bombings, the U.S. government made urgent requests of the Saudi authorities to rein in these charity supporters of al Qaeda.  The Saudi government failed to do so and the 9/11 terror attacks occurred three years later.

Procedural Background of the 9/11 Cases

In the aftermath of the September 11th terrorist attacks, injured victims and the families of those who were killed sought compensation for their losses.  The U.S. Congress promptly established a Victim Compensation Fund ("VCF") in 2001 to limit the liability of U.S. airlines and other U.S. entities and to compensate victims in a way that was both timely and definitive. Victims taking advantage of the VCF were prohibited from also bringing suit against the airlines and other U.S. entities.  However, Congress specifically contemplated that the 9/11 victims could still sue al Qaeda's supporters even if they received compensation from the VCF.

As a result of this arrangement, nearly 2,000 wrongful death claimants and 1,500 injured victims filed suit against about 500 defendants.  All of the plaintiffs sought to hold accountable those countries, charities, banks, and individuals who supported al Qaeda's terrorist attacks and to require that they pay for their participation in the largest mass murder ever committed on U.S. soil.  Among the defendants were the governments of the Kingdom of Saudi Arabia ("KSA"), Iran, and Sudan.  The governments of Iran and Sudan have defaulted, but finding assets to cover judgments against them is exceedingly difficult.  Saudi Arabia presents a very different picture.

Plaintiffs in these cases represent nearly all the families of the people who died on 9/11 and thousands of people injured by the attacks.  Five federal judges have worked on this case, one of whom called it the largest and most complex case in U.S. legal history.  Every step has been fought over, argued about and after a decade, some defendants are still preparing motions to dismiss.  The discovery process shows every sign of being just as slow and tortuous.  After a

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                QUINN_000886

decade of litigation, Plaintiffs have seen most major Defendants dismissed from the case, without a hearing on the merits of the allegations.

Some of the Plaintiffs brought suit against KSA, but KSA was ruled to be immune from suit by the Second Circuit Court of Appeals in 2008 by virtue of the Foreign Sovereign Immunities Act ("FSIA").  The U.S. Supreme Court declined to take up the matter in 2009.

In November 2011, the Second Circuit reinstated claims against Afghanistan in the same underlying matter.  In oral arguments before the District Court on March 16, 2012, Plaintiffs sought to use this development to rejoin KSA as a Defendant in the 9/11 cases.  The Court denied the motion almost immediately.  The Second Circuit heard the appeal on this matter on March 20, 2013, and a decision is currently pending.

Separately, Plaintiffs have brought suit against other quasi-governmental and non-governmental Defendants, including Saudi Princes and charities.  Some of these claims were dismissed by the District Court in January and September 2005.  The Second Circuit upheld most of these dismissals in August 2008.  A handful of defendants, mostly Saudi charities, had their motions to dismiss denied between 2005 and 2008.  They are currently in discovery.  More defendants were dismissed from 2006 to 2011.  The Second Circuit recently upheld most of these dismissals on personal jurisdiction, subject matter jurisdiction, and Sovereign Immunity grounds.  The appellate court concluded jurisdictional discovery is warranted with regard to 12 of these defendants, and has tasked the lower court with such discovery.

**Resolution of the Lockerbie Bombing Claims**

In 1988, PanAm 103 was destroyed by a terrorist bomb over Lockerbie, Scotland.  270 people were killed by terrorists later found to be associated with the government of Libya.  In 2003, Libya agreed to compensate victims of the bombing as it sought to normalize relations with the United States.  However, while Libya paid most of the agreed upon settlement by 2006, it took extra effort to persuade the Libyans to follow through on their original agreement.

We were able to assist the victims' families as they worked out a procedure with an agent of the U.S. Department of State and the government of Libya concerning the final tranche of funds.  Justice was finally achieved, albeit outside the U.S. court system.

The Libyan Claims Resolution Act, which paved the way for final payment by the Libyan government into a non-governmental entity (fund) for victims' families, became Public Law No. 110-301 on August 4, 2008.  The Act encouraged the president to agree with Libya to a comprehensive settlement of private legal claims; allowed the Secretary of State to designate an entity to assist in providing compensation to the families; gave said entity immunity once it was certified by the secretary; and granted immunity to Libya once the secretary certified the funds were received by the entity.

3

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                        QUINN_000887

Previously relevant, the Consolidated Appropriations Act of 2008, at section 654, had denied any financial assistance to Libya unless the secretary made a similar Libyan funding certification.  Also, the terrorism exception to the jurisdictional immunity of a foreign state statute (28 U.S.C. § 1605A) revokes jurisdictional immunity from states that participated in terrorist activities, meaning U.S. courts could hear terrorism cases such as those filed against the sovereign here.

On August 14, 2008, Secretary Rice and a Libyan representative signed the Claims Settlement Agreement.  The stated objectives of the agreement were to 1) reach a final settlement of the parties' claims; 2) terminate permanently all pending law suits on this matter; and 3) preclude any future such law suits.

On October 31, 2008, Secretary Rice certified, under section 5(A)(2) of the aforementioned Libyan Claims Resolution Act, that all funds had been received by the settlement entity.  On the same day, President Bush signed an Executive Order that declared all individual legal claims on this matter settled according to the terms of the aforementioned Settlement Agreement.

**Potential Diplomatic Resolution of the Mumbai and 9/11 Cases**

The diplomatic approach used to facilitate the final tranche of the Pan Am 103 settlement can be used as a template for the Mumbai and 9/11 cases.  The American victims and their families must be made whole.  The only way to accomplish that in these cases is to encourage a settlement between the American victims and the governments of Pakistan and KSA.  We hope the Department and the Administration see this as a way to close the book on these two terrorist incidents, attempting to make the victims whole while not undermining the doctrine of sovereign immunity.

We suggest beginning with the Mumbai case.  Here is the key to resolution:  A portion ($82 million) of the aid planned to be spent by the U.S. for Pakistan can be diverted to a U.S-based escrow account and distributed to the American claimants.  This will represent a small fraction of the billions in U.S. Aid to Pakistan.  We are not asking Pakistan to acknowledge wrongdoing.  In the Pan Am 103 case, there was a complicated negotiation and arrangement for the final tranche of funds that allowed Gaddafi to claim he never paid the victims.  That can be accomplished here as well.

**The question for Secretary Kerry is**: Can we work together to find a mechanism to make certain these innocent victims will be compensated?

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    QUINN_000888

# State Mtg

Wed, Oct 23, 2013 at 11:20 PM EDT (GMT-04:00)

**From: Jack Quinn <jquinn@quinngillespie.com>** (sent via Jack Quinn <jquinn@quinngillespie.com>)
To: Jim Kreindler <jkreindler@kreindler.com>
Cc: Bob Crowe <bob.crowe@nelsonmullins.com>

Bob and I met for over an hour with David Wade, Jonathan Schwartz and John Daley (the latter two, as you know, from the Office of Legal Advisor). We will elaborate when we can all be on the phone or meet in person. In the meantime, here are some of my take-aways: First, Libya's eagerness to get out from under the sanctions doesn't have a precise parallel in 9/11 or Mumbai. Right now, the relationship with the KSA is in a tense period, owing to their unhappiness over our Syria policy and related issues. I assume you saw the WSJ piece today about Bandar and his anger at the U.S., which provides a good summary. Mumbai presents a different set of problems. Among other things, our drone strikes would have to be addressed in any strategy: but our govt is not going to give that up and the continued operation of that program makes exceedingly difficult their making a deal with the U.S. Second, Schwartz continues to have difficulties with how the 9/11 damage claims would and should be affected by the awards received through the victims fund and the significant unavailability in so many other jurisdictions of damages in excess of simple compensatory damages. Schwartz also thinks that the claims of insurers would be an issue, though they can perhaps be just left out. Schwartz, as you no doubt know from him, is something of a fan of the idea of a straightforward victims fund that operates outside the adversarial system. He mentioned legislation that has been proposed in this regard. I'm not familiar with it offhand but I'm certainly familiar with objections to a no fault type of approach. (Schwartz also mentioned that the Lockerbie settlement remains unpopular in Libya and that one of the Libyans who helped pave the way for it is being tried on charges because of his role in it.) There was a great deal more, and we should talk or meet. But my take is that Schwartz has Wade's ear at this point and we need to think though our approach. We have a willing audience and I genuinely think they would like to help us find a solution. By the way, the OLA guys are prepared to meet with the three of us to continue thinking this through. Sent from my iPad

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    QUINN_000944