PEX 26

RESPONSES OF THE 9/11 FAMILIES AND VICTIMS TO STATE DEPARTMENT QUESTIONS REGARDING THE PROPOSED RESOLUTION OF CLAIMS AGAINST SAUDI DEFENDANTS THROUGH STATE TO STATE AGREEMENT

1. Will it be feasible to control all of the 9/11 plaintiffs and bring them all into the fold relative to any state to state settlement agreement with Saudi Arabia?

Yes.  Given the delays and obstacles presented by judicial processes, a state to state agreement likely represents the only path available to the 9/11 families and victims to achieve justice and accountability in the near term.  Executive Branch leadership to secure such an arrangement would demonstrate the United States' commitment to those principles, foster important counter-terrorism goals, demonstrate the State Department's deftness in dealing with a key ally in the Middle East relative to difficult issues, and be met with overwhelming support and appreciation by the 9/11 families and victims.  Support for a diplomatic resolution will be enhanced by the highly centralized nature of the litigation, in which a handful of attorneys working in close coordination represent all plaintiffs.  All of those attorneys endorse the proposal that the disputes be resolved through diplomatic discourse, and have formally approved the White Paper submitted to the State Department.  Further, because a state to state agreement would formally conclude all litigation against covered parties, this approach would ensure finality for the Saudis as a legal and structural matter, and preclude any opposition at the margins.

2. What about the *Havlish* plaintiffs and their judgment against Iran?

Although the scope of any resolution agreement would ultimately be a decision for the Administration, the 9/11 group has not proposed that any state to state agreement with the Kingdom directly address or extinguish the *Havlish* judgment against Iran, or the judgments that are expected to soon issue on behalf of all other 9/11 claimants against Iran.  However, it is expected that the agreement with Saudi Arabia would provide compensation to all individual victims of the 9/11 attacks, and any commercial victims that have formally asserted claims.  Any compensation paid to the *Havlish* plaintiffs or other 9/11 claimants, pursuant to any state to state agreement with Saudi Arabia, would reduce anticipated pressure that will otherwise exist from Congress and the 9/11 families to require Iran to pay full restitution for 9/11 judgments, as a condition to the removal of sanctions against Iran.  Thus, a state to state agreement with the Kingdom should indirectly ease the path to more positive engagements with Iran.

3. What is the rationale for a uniform ($10 million/death) number for all wrongful death plaintiffs?

The compensation model proposed for discussion purposes is consistent with the approach embraced by the U.S. in resolving claims with Libya.  In addition to being grounded in historic precedent, a uniform approach would eliminate the need for family members to submit to cumbersome and potentially traumatic administrative procedures, and for the state parties to administer such processes.  And, because justice and accountability are principal objectives of the families and victims, individualized damage valuations do not hold the same importance as in traditional tort settings.

LEGAL\18108280\1

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                    QUINN_001025

4. Would the resolution encompass only Saudi defendants, or others as well?

The White Paper submitted by the 9/11 families and victims contemplates a resolution with the Kingdom, covering any citizens of the Kingdom named as defendants in the present suits, as well as any Saudi citizens who could potentially be named in later suits under the Anti-Terrorism Act's (ATA) extended statute of limitations. Given the extent to which the pending disputes principally focus on Saudi institutions and citizens, such an agreement with the Kingdom would achieve finality as to the majority of the claims in issue. Only a few non-Saudi parties remain defendants, including Iran, the Republic of Sudan, a handful of Sudanese financial institutions, and Dubai Islamic Bank. Although the proposal does not presently contemplate the inclusion in the same resolution agreement of these other states and parties, extending the resolution to certain of them could present benefits and opportunities to the United States and Saudi Arabia. For example, given the extent of Saudi investment activity in Sudan, it may be worth exploring whether the inclusion of Sudan and Sudanese institutions in the resolution agreement could serve as a vehicle for Saudi Arabia to secure favorable concessions from Sudan, in exchange for the Kingdom's principal funding of the resolution.

5. If others such as Iran are included, legislation would be necessary, which is a complicating factor.

The formal inclusion of Iran would present complications in several respects, and was not proposed by the 9/11 group for that reason. However, the proposed state to state agreement with Saudi Arabia will ease the path for later Congressional action as to Iran, should ongoing discussions with Iran reach that point. Judgments are expected to soon issue against Iran in all of the 9/11 cases, consistent with the judgment already issued in *Havlish*. Given the award in *Havlish*, the entry of judgments against Iran to the remaining 9/11 actions will result in an aggregate award against Iran in the 9/11 suits in the range of $400 billion. In the event no resolution has been achieved with any other parties, pressure will exist to require Iran to pay restitution for the 9/11 judgments, as a condition to the removal of certain sanctions. Iran is likely to resist any such condition for 9/11 judgments, particularly given the anticipated scale of those judgments, and especially if neither Saudi Arabia nor any Saudi institutions have been required to pay any compensation for al Qaeda sponsorship activities. To the extent significant compensation has been paid to the 9/11 families and victims pursuant to a resolution agreement with Saudi Arabia, however, Congressional and public pressure to require Iran to fully satisfy damage awards in favor of the 9/11 families and victims will lessen. And, to the extent meaningful efforts to conclude a resolution agreement with Saudi Arabia are moving forward, the 9/11 group is agreeable to deferring further damage assessments against Iran, to afford the Administration greater flexibility in relation to the claims against Iran. With all of that said, there is broad bi-partisan Congressional support for a political resolution of the 9/11 disputes, and Congressional leaders would almost certainly assist as necessary to achieve that goal.

6. To conclude the proposed resolution, would an Executive Agreement or an Executive Order be the proper tool?

An Executive Agreement would be the appropriate tool for concluding the terms of resolution between the U.S. and Saudi governments.  To the extent the text of the Executive Agreement provided for the termination of all litigation in U.S. courts, courts would be required to treat that provision as self-executing and dismiss all claims upon presentment of the Agreement. *American Insurance Association v. Garamendi,* 539 U.S. 396, 416-17 (2003) (explaining that question of preemption of state law claims would have been "straightforward" if executive Agreements at issue had expressly preempted such claims).  However, to the extent that the U.S. chose to implement an agreement to terminate litigation in U.S. courts through an Executive Order, that approach would be effective as well.  *Dames & Moore v. Regan,* 453 U.S. 654 (1981) (upholding and enforcing Executive Order terminating suits against Iran in U.S. courts).

7.  Why not just negotiate a direct deal with the Saudis?  Doesn't U.S. involvement simply complicate matters?

Executive Branch leadership and diplomacy is needed to resolve these disputes, and remove an irritant to U.S.-Saudi relations, for several reasons.  Most critically, a political resolution can terminate all litigation against covered parties and foreclose further claims against them in U.S, courts, providing finality that cannot be achieved through any private settlement.  This finality is all the more important for the Saudis now that the statute of limitations for bringing 9/11 claims under the ATA has been extended to January 3, 2019, leaving Saudi institutions vulnerable to additional claims.  Further, a political resolution can be structured to allocate fault to parties whose misdeeds already have been acknowledged, whereas a private settlement would implicitly attach some admission of fault to each settling defendant.  U.S. leadership also is needed to convey to the Saudis the full range of policy, diplomatic, and economic benefits that can be achieved through a resolution of the claims at this time, a message that cannot be effectively delivered through the lawyers representing the sides.  In fulfilling these critical roles, the U.S. has an opportunity to assist the 9/11 families and victims secure justice, and realize a significant and tangible victory that will enjoy broad public and bi-partisan political support.  Relatedly, a political resolution would allow the Saudi government to present itself as a reliable partner working with the U.S. to bring closure to difficult disputes between Saudi citizens and victims of the attacks, and emphasize that Saudi institutions operating with insufficient controls prior to 9/11 have been reformed and are functioning properly.  Recent developments in the litigation – including the Supreme Court's referral of the 9/11 victims' pending Petition for a Writ of Certiorari to the Solicitor General for the views of the Administration, and the recent Second Circuit decision restoring the Kingdom itself as a defendant – present natural platforms for further dialogue between the U.S. and Kingdom concerning the disputes.

8.  Why would Saudis agree to pay $40-50 billion?

Although the precise terms of any resolution would of course be the subject of negotiation, there are compelling reasons for the Kingdom to pursue a diplomatic solution of the disputes, and the scope and character of the benefits and protections that would flow from such an arrangement will support a compensation structure that fairly reflects the gravity of the harm suffered, and severity of the wrongdoing in issue.

3

The pending claims directly place at risk a broad range of Saudi Islamic institutions, key Saudi financial and commercial enterprises, and numerous prominent Saudi citizens, including several Saudi government officials.  In addition, the Second Circuit recently restored the Kingdom itself as a defendant.  A strong and growing body of evidence supports the claims that many of these institutions and persons bear significant responsibility for enabling or aiding al Qaeda's cause, and that evidence will only continue to mount as discovery proceeds and additional governmental reports are declassified.  Given the ATA's mandatory treble damage provision, the monetary value that would attach to these claims under applicable tort measures would exceed several hundred billion dollars.  The proposed diplomatic resolution would provide complete finality for the Kingdom and all of its implicated citizens and institutions, for all claims that have been asserted, and any claims that could otherwise be asserted in the future under the ATA's extended statute of limitations.

The economic and reputational risks to many of these defendants are very real, and in certain cases existential.  Several of the Saudi Islamic institutions already have been threatened by the Court with case dispositive sanctions for gross discovery violations, and the evidence to support findings of liability against them is compelling.  These Islamic institutions have been cultivated by the Kingdom for decades, function as recognized brands of Saudi Islam, and are used by the Kingdom as instruments for implementing Saudi foreign and Islamic policy throughout the world.  Their importance to the Kingdom is evidenced by the extensive efforts and diplomatic capital the Kingdom invested to protect and preserve them following 9/11, which included engagements with the U.S. to persuade the U.S. to refrain from designating certain of them as al Qaeda support entities.  Given the intimacy of their ties to the Saudi government, any judgment against these entities will be widely regarded as a finding of liability against the Kingdom itself, and deeply damaging to the interests of the Saudi government.  The judgments will render it impossible for these institutions to continue to function as emissaries of Saudi Islam, and the resulting execution proceedings will target sensitive forms of property owned by these institutions throughout the world, including Islamic centers and mosques.  A political resolution would preserve these institutions, and provide a platform to emphasize reforms that have been undertaken and to redefine the lens through which they are viewed.

Critical Saudi financial and commercial institutions, including the Kingdom's largest banks, remain imperiled as well.  Even to the extent these entities have received favorable rulings from lower courts, they and the Kingdom can take no real comfort in those decisions for several reasons.  First, the claims against those entities are the subject of a Pending Petition for a Writ of Certiorari, which has been referred by the Solicitor General for the views of the United States.  Further, legislation is pending in both the Senate and House, with broad bi-partisan support, that would effectively overturn the rationales underpinning several of their dismissals, and establish new substantive causes of action for the existing plaintiffs.  Further, additional commercial victims of the attacks, with economic losses of several billion dollars, intend to bring claims against those institutions under the ATA's extended statute of limitations this Spring, and will have the benefit of facts and evidence that was not available when the original claims were filed.  In addition to the direct liability and reputational risks posed, the claims against these entities stand as a barrier to their business interests, including by preventing them from entering U.S. markets and impairing potential business partnerships with counterparties in the U.S. and

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    QUINN_001028

elsewhere.  These challenges will persist for some time in light of the new claims to be filed against them, but would be eliminated entirely by a political resolution.

A political resolution in the near term also would close ongoing discovery proceedings that continue to narrow the nexus between actors broadly implicated in extremist activities and elements of the Saudi government, and will increasingly fuel suspicions of Saudi state involvement in the 9/11 attacks.  Discovery is ongoing as to a Saudi government aviation contractor that nominally employed Omar al Bayoumi, the alleged Saudi intelligence agent who provided support directly to two of the 9/11 hijackers.  At core, those proceedings focus on whether there was a direct Saudi government role in the 9/11 attacks.  Tellingly, the aviation contractor has asserted that all documents relating to Bayoumi's employment are privileged under a Saudi Royal Decree prohibiting release of "classified information the disclosure of which undermines the State's national security, interests, policies, or rights."  Similarly, the ongoing discovery of the Saudi Islamic institutions continues to reveal the Saudi government's pervasive role in the oversight and operations of entities most prominently implicated in the sponsorship of al Qaeda by the U.S. government.  Depositions of the most senior officials of those organizations (themselves defendants), many of whom also presently serve or previously held senior government posts, will commence later this year.  The evidence gathered from these discovery processes will soon be presented in public litigation proceedings, flooding the public domain with facts and evidence relating to Saudi involvement in extremist activities.

The Second Circuit's reinstatement of Saudi Arabia as a defendant presents the very real potential for a full judicial inquiry into Saudi Arabia's role in the sponsorship of al Qaeda and events of 9/11, with a significant possibility that discovery proceedings as to the Kingdom will be authorized in the near term.  Any efforts the Kingdom might undertake to avoid these results, such as its announced plan to seek Supreme Court review of the Second Circuit's non-final ruling, will command significant attention from the public, media, and Congress, and only serve to underscore the many questions that remain unanswered about Saudi complicity in the 9/11 attacks.  These processes also may serve to draw the U.S. directly back into the disputes between the 9/11 group and the Kingdom.

In these and other respects, the disputes with Saudi actors over the events of 9/11 present a range of complications and risks to the Kingdom and many of its most important institutions and citizens, all of whom would immediately benefit in many respects from a political resolution of the claims.  Absent a political solution, the scope of the litigation will only expand, and could boil over in any number of unanticipated ways, potentially imperiling U.S.-Saudi cooperation and U.S. initiatives in the region.  A political resolution would eliminate all of these risks, pave the way for enhanced U.S.-Saudi cooperation and commercial integration, deliver a measure of justice to the 9/11 families and victims, and represent a tangible political and diplomatic victory for the Administration.  A state to state resolution can be achieved without requiring any new diplomatic concessions from Saudi Arabia, as the Kingdom already has acknowledged that insufficient controls allowed certain Saudi institutions to be misappropriated for extremist causes, and fault can be allocated to those very entities for purposes of any political resolution.