PEX 34

# Memo re Terrorism Cases

Thu, Oct 17, 2013 at 4:53 PM EDT (GMT-04:00)

**From:** Jack Quinn <jquinn@quinngillespie.com> (sent via Jack Quinn <jquinn@quinngillespie.com>)
**To:** Robert Crowe <bob.crowe@nelsonmullins.com>

Would you like to send this document to Messrs. Summers and Wade?   It has your name on it, btw ‹ trust that's ok :)


*Jack Quinn*

### QGA Public Affairs

1133 Connecticut Avenue NW
5th Floor
Washington DC 20036

(P) 202-429-6871
(F) 202-457-1130
jquinn@qga.com
http://www.qga.com




**From:** Lynn Faught <lfaught@quinngillespie.com>
**Date:** Thursday, October 17, 2013 4:48 PM
**To:** Michael DiRoma <mdiroma@quinngillespie.com>, Jack Quinn <jquinn@quinngillespie.com>
**Subject:** Memo


*Lynn Faught*



1133 Connecticut Avenue NW
5th Floor
Washington DC 20036

(P) 202-429-6871
(F)  202-457-1130
lfaught@qga.com
http://www.qga.com

**Attachments**

- Pending Terrorism Cases 10.23.13 FINAL.docx
- Pending Terrorism Cases 10.23.13 FINAL.pdf

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    QUINN_000917

# Memorandum

**To:** David Wade
**From:** Jack Quinn, Robert Crowe
**Date:** October 23, 2013
**Re:** Pending Terrorism Cases

We assist in the representation of the American victims – and the survivors of the deceased victims – of the 2008 terrorist attack in Mumbai, India. As in the case of other terror attacks, the world watched Mumbai in horror and sympathy was abundant, but justice has proven to be elusive. Our clients have exercised all of the legal options available to them in their attempt to see justice meted out to those responsible and to receive some measure of recompense from those parties.

We also are a part of the effort to finally bring justice to the survivors of the victims of the most horrific act of terrorism in history – the 9/11 attacks on the World Trade Center in New York, the attack on the Pentagon in Washington D.C. and the failed attempt to similarly attack the U.S. Capitol.

In each of these instances, the legal doctrine of sovereign immunity has presented a seemingly insurmountable obstacle to victims and their families in their pursuit of justice. *But, that obstacle has, in fact, been overcome in a fashion that provides an appropriate pathway to justice for the victims of terrorism.*

The successful effort to which we refer is that waged for two decades on behalf of the victims of the "Pan Am 103/Lockerbie" bombing for which the government of Libya was responsible. Some on our team were centrally involved in assisting the hundreds of victims of that attack as they sought payment of the final tranche of funds promised and owed to them as a result of a settlement negotiated in 2003. In essence, using a specially created neutral fund, that final amount was delivered to Lockerbie victims in 2008 after U.S. congressional action and the active engagement of the U.S. Secretary of State. We believe a similar approach is both feasible and appropriate in the Mumbai and 9/11 cases.

*Together, these matters account for nearly all of the outstanding claims against culpable sovereigns; tailoring the Lockerbie process to fit these cases would put to rest once and for all legitimate claims that have been in the courts for years but left the victims with no justice at all. Lockerbie, however, taught us that diplomacy can yield justice at times and in ways that are out of the reach of our judicial processes. All that is required is a determination by the Executive Branch, and the Secretary of State in particular, to exercise its considerable diplomatic capabilities to overcome a legal doctrine that denies justice to Americans who are the victims of acts of violence that are*

1

*among the most shocking and inhuman and that, in truth, were aimed not at the innocent Americans who lost their lives, but at every single American.   The dead were merely proxies for our common humanity; for that, we owe them unending effort and the ingenuity to respect the law AND achieve justice.*

### The Terrorist Attacks in Mumbai, India

On November 26, 2008, ten terrorists, all Pakistani nationals, began a four-day attack that left 166 people dead and 304 wounded.  This monstrous, indiscriminate act of mass murder was perpetrated by Lashkar-e-Taiba, the Pakistan-based terrorist group that has received assistance over the years from Pakistan's main spy service, the Directorate for Inter-Services Intelligence or "ISI."  Indeed the ISI assisted Lashkar in the planning and operation of the November 2008 attack.  The U.S. DOJ elicited from witnesses the role played by the ISI in the Chicago trial of one of the conspirators.

American victims filed a law suit in the United States asserting claims arising under the Alien Tort Statute and the Antiterrorism Act against several defendants, including Lashkar-e-Taiba, the ISI, and two of its former Directors General, Ahmed Shuja Pasha and Nadeem Taj.  Upon considering the Department of State's recommendation of either sovereign or foreign official immunity for all of the defendants involved, the federal district court in New York granted defendants' motions to dismiss for lack of subject matter jurisdiction on September 30, 2013.

As with Pan Am 103, in the present case, the American survivors and families of those who were killed in the Mumbai attack have patently valid claims for damages.  The individual defendants are judgment-proof terrorists.  Pakistan's ISI, i.e. the Government of Pakistan itself, remains the only party capable of compensating the American victims and their families.

### The September 11th Terrorist Attacks

The case against Saudi Arabia for its complicity in the 9/11 terror acts begins with the formal founding of al Qaeda at an event attended by a senior member of a major Saudi government-funded charity.  Al Qaeda received financial and logistical support through its formative years from Saudi Princes (both in their governmental and private roles), Royal Family business partners, major Saudi banks (some government-controlled), and above all a network of major charities, based in Saudi Arabia and active in Sudan, Bosnia, Pakistan, Afghanistan and other known al Qaeda hotbeds.

Over a course of years, Saudi Princes, Saudi businessmen and Saudi banks provided money, financial and other services to al Qaeda via these Saudi charities.  In essence, the Saudi charities provided a laundering mechanism for Saudi Princes and businessmen to support al Qaeda.

After the 1998 African Embassy bombings, the U.S. government made urgent requests of the Saudi authorities to rein in these charity supporters of al Qaeda.  The Saudi government failed to do so and – as a result -- the 9/11 terror attacks occurred three years later.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    QUINN_000919

In the aftermath of the September 11th attacks, injured victims and the families of those who were killed sought compensation for their losses. The U.S. Congress promptly established a Victim Compensation Fund ("VCF") in 2001 to limit the liability of U.S. airlines and other U.S. entities and to compensate victims in a way that was both timely and definitive. Victims taking advantage of the VCF were prohibited from also bringing suit against the airlines and other U.S. entities. *However, Congress specifically contemplated that the 9/11 victims could still sue al Qaeda's supporters even if they received compensation from the VCF.*

As a result of this arrangement, nearly 2,000 wrongful death claimants and 1,500 injured victims filed suit against about 500 defendants. All of the plaintiffs sought to hold accountable those countries, charities, banks, and individuals who supported al Qaeda's terrorist attacks and to require that they pay for their participation in the largest mass murder ever committed on U.S. soil. Among the defendants were the governments of the Kingdom of Saudi Arabia ("KSA"), Iran, and Sudan. The governments of Iran and Sudan have defaulted in these cases, but finding accessible assets to cover judgments against them is virtually impossible. Saudi Arabia presents a very different picture.

Plaintiffs in these cases represent nearly all the families of the people who died and thousands of people injured by the attacks that took place on 9/11. Four federal judges have worked on this case, one of whom called it the largest and most complex case in U.S. legal history. Every step has been fought over, argued about and, after a decade, some defendants are still preparing motions to dismiss. The discovery process shows every sign of being just as slow and tortuous. After a decade of litigation, Plaintiffs have seen most major Defendants dismissed from the case, without so much as a hearing on the merits of the allegations.

Some of the Plaintiffs brought suit against KSA, but KSA was ruled to be immune from suit by the Second Circuit Court of Appeals in 2008 by virtue of the Foreign Sovereign Immunities Act ("FSIA"). The U.S. Supreme Court declined to take up the matter in 2009.

In November 2011, the Second Circuit reinstated claims against Afghanistan in the same underlying matter. In oral arguments before the District Court on March 16, 2012, Plaintiffs sought to use this development to rejoin KSA as a Defendant in the 9/11 cases. The Court denied the motion almost immediately. The Second Circuit heard the appeal on this matter on March 20, 2013, and a decision is currently pending.

Separately, Plaintiffs have brought suit against other quasi-governmental and non-governmental Defendants, including Saudi Princes and charities. Some of these claims were dismissed by the District Court in January and September 2005. The Second Circuit upheld most of these dismissals in August 2008. A handful of defendants, mostly Saudi charities, had their motions to dismiss denied between 2005 and 2008. They are currently in discovery. More defendants were dismissed from 2006 to 2011. The Second Circuit recently upheld most of these dismissals on personal jurisdiction, subject matter jurisdiction, and Sovereign Immunity grounds. The appellate court concluded jurisdictional discovery is warranted with regard to 12 of these defendants, and has tasked the lower court with such discovery.

3

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    QUINN_000920

**Resolution of the Lockerbie Bombing Claims**

In 1988, PanAm 103 was destroyed by a terrorist bomb over Lockerbie, Scotland.  270 people were killed by terrorists associated with the government of Libya.  In 2003, Libya agreed to compensate victims of the bombing as it sought to normalize relations with the United States.  However, while Libya paid most of the agreed upon settlement by 2006, it took extra effort to persuade the Libyans to follow through on their original agreement and pay the last twenty percent of the settlement.

With the steadfast support of both Democrats and Republicans in the Congress and thanks to the leadership of then-Senators Biden, Clinton and Kerry, we were able to assist the victims' families as they worked out a procedure with the U.S. Department of State and the government of Libya concerning the final tranche of funds.  Justice was finally achieved – through diplomacy and outside the U.S. court system.  The lesson here was that matters of this kind can be resolved in ways that

- respect the doctrine of sovereign immunity;
- do not require defendant sovereigns to admit liability;
- AND compensate the innocent victims of terrorism.

The Libyan Claims Resolution Act, which paved the way for final payment by the Libyan government into a non-governmental entity (fund) for victims' families, became Public Law No. 110-301 on August 4, 2008.  The Act encouraged the president to agree with Libya to a comprehensive settlement of private legal claims; allowed the Secretary of State to designate an entity to assist in providing compensation to the families; gave that entity immunity once it was certified by the Secretary; and granted immunity to Libya once the Secretary certified that the funds were received by the entity.

Previously relevant, the Consolidated Appropriations Act of 2008, at section 654, had denied any financial assistance to Libya unless the Secretary made a similar Libyan funding certification.  Also, the terrorism exception to the jurisdictional immunity of a foreign state statute (28 U.S.C. § 1605A) revokes jurisdictional immunity from designated states that participated in terrorist activities, meaning U.S. courts could hear terrorism cases such as those filed against the sovereign here.

On August 14, 2008, Secretary Rice and a Libyan representative signed the Claims Settlement Agreement.  The stated objectives of the agreement were to 1) reach a final settlement of the parties' claims; 2) terminate permanently all pending law suits on this matter; and 3) preclude any future such law suits.

On October 31, 2008, Secretary Rice certified, under section 5(A)(2) of the aforementioned Libyan Claims Resolution Act, that all funds had been received by the settlement entity.  On the same day, President Bush signed an Executive Order that declared all individual legal claims on this matter settled according to the terms of the aforementioned Settlement Agreement.

4

**Potential Diplomatic Resolution of the Mumbai and 9/11 Cases**

The diplomatic approach used to facilitate the final tranche of the Pan Am 103 settlement and to resolve all claims against Libya can and should be used as a template for resolution of the Mumbai and 9/11 cases.

First, the American victims and their families *must know justice for their losses*. The only way to accomplish that in these cases is to encourage a settlement between the American victims of terrorism and the governments of Pakistan and KSA. *That will only happen if the United States Government insists it happen.*

Second, without such a resolution, the Governments of Pakistan and Saudi Arabia will never have the approval of the American people, something that these two governments, which receive *major foreign aid and assistance* from our Government should want to address enthusiastically.

Third, this is simply the right thing to do for Americans who were killed or maimed only because they were Americans.

We hope the Department and the Administration see this as a way to close the book on these two terrorist incidents, while making the victims whole without abdicating the doctrine of sovereign immunity.

We respectfully suggest beginning with the Mumbai case. A key to resolution might be as follows: A portion ($82 million) of the aid planned to be spent by the U.S. for Pakistan can be committed by agreement of the two governments to a U.S.-based escrow account and distributed to the American claimants. This will represent a small fraction of the billions in U.S. Aid to Pakistan. Again, Pakistan would not be asked to acknowledge wrongdoing; it would instead partner with the United States in ensuring justice for Americans who were killed or injured.

**The question for Secretary Kerry is this**: Can we work together to find an appropriate and effective mechanism to make certain these innocent victims of terrorism will receive justice?

5

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    QUINN_000922

# Memorandum

**To:**    David Wade
**From:**  Jack Quinn, Robert Crowe
**Date:**  October 23, 2013
**Re:**    Pending Terrorism Cases

---

We assist in the representation of the American victims – and the survivors of the deceased victims – of the 2008 terrorist attack in Mumbai, India.  As in the case of other terror attacks, the world watched Mumbai in horror and sympathy was abundant, but justice has proven to be elusive.  Our clients have exercised all of the legal options available to them in their attempt to see justice meted out to those responsible and to receive some measure of recompense from those parties.

We also are a part of the effort to finally bring justice to the survivors of the victims of the most horrific act of terrorism in history – the 9/11 attacks on the World Trade Center in New York, the attack on the Pentagon in Washington D.C. and the failed attempt to similarly attack the U.S. Capitol.

In each of these instances, the legal doctrine of sovereign immunity has presented a seemingly insurmountable obstacle to victims and their families in their pursuit of justice.  *But, that obstacle has, in fact, been overcome in a fashion that provides an appropriate pathway to justice for the victims of terrorism.*

The successful effort to which we refer is that waged for two decades on behalf of the victims of the "Pan Am 103/Lockerbie" bombing for which the government of Libya was responsible.  Some on our team were centrally involved in assisting the hundreds of victims of that attack as they sought payment of the final tranche of funds promised and owed to them as a result of a settlement negotiated in 2003.  In essence, using a specially created neutral fund, that final amount was delivered to Lockerbie victims in 2008 after U.S. congressional action and the active engagement of the U.S. Secretary of State.  We believe a similar approach is both feasible and appropriate in the Mumbai and 9/11 cases.

*Together, these matters account for nearly all of the outstanding claims against culpable sovereigns; tailoring the Lockerbie process to fit these cases would put to rest once and for all legitimate claims that have been in the courts for years but left the victims with no justice at all.  Lockerbie, however, taught us that diplomacy can yield justice at times and in ways that are out of the reach of our judicial processes.  All that is required is a determination by the Executive Branch, and the Secretary of State in particular, to exercise its considerable diplomatic capabilities to overcome a legal doctrine that denies justice to Americans who are the victims of acts of violence that are*

1

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                                QUINN_000923

*among the most shocking and inhuman and that, in truth, were aimed not at the innocent Americans who lost their lives, but at every single American.   The dead were merely proxies for our common humanity; for that, we owe them unending effort and the ingenuity to respect the law AND achieve justice.*

### The Terrorist Attacks in Mumbai, India

On November 26, 2008, ten terrorists, all Pakistani nationals, began a four-day attack that left 166 people dead and 304 wounded.  This monstrous, indiscriminate act of mass murder was perpetrated by Lashkar-e-Taiba, the Pakistan-based terrorist group that has received assistance over the years from Pakistan's main spy service, the Directorate for Inter-Services Intelligence or "ISI."  Indeed the ISI assisted Lashkar in the planning and operation of the November 2008 attack.  The U.S. DOJ elicited from witnesses the role played by the ISI in the Chicago trial of one of the conspirators.

American victims filed a law suit in the United States asserting claims arising under the Alien Tort Statute and the Antiterrorism Act against several defendants, including Lashkar-e-Taiba, the ISI, and two of its former Directors General, Ahmed Shuja Pasha and Nadeem Taj.  Upon considering the Department of State's recommendation of either sovereign or foreign official immunity for all of the defendants involved, the federal district court in New York granted defendants' motions to dismiss for lack of subject matter jurisdiction on September 30, 2013.

As with Pan Am 103, in the present case, the American survivors and families of those who were killed in the Mumbai attack have patently valid claims for damages.  The individual defendants are judgment-proof terrorists.  Pakistan's ISI, i.e. the Government of Pakistan itself, remains the only party capable of compensating the American victims and their families.

### The September 11th Terrorist Attacks

The case against Saudi Arabia for its complicity in the 9/11 terror acts begins with the formal founding of al Qaeda at an event attended by a senior member of a major Saudi government-funded charity.  Al Qaeda received financial and logistical support through its formative years from Saudi Princes (both in their governmental and private roles), Royal Family business partners, major Saudi banks (some government-controlled), and above all a network of major charities, based in Saudi Arabia and active in Sudan, Bosnia, Pakistan, Afghanistan and other known al Qaeda hotbeds.

Over a course of years, Saudi Princes, Saudi businessmen and Saudi banks provided money, financial and other services to al Qaeda via these Saudi charities.  In essence, the Saudi charities provided a laundering mechanism for Saudi Princes and businessmen to support al Qaeda.

After the 1998 African Embassy bombings, the U.S. government made urgent requests of the Saudi authorities to rein in these charity supporters of al Qaeda.  The Saudi government failed to do so and – as a result -- the 9/11 terror attacks occurred three years later.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER        QUINN_000924

In the aftermath of the September 11th attacks, injured victims and the families of those who were killed sought compensation for their losses.  The U.S. Congress promptly established a Victim Compensation Fund ("VCF") in 2001 to limit the liability of U.S. airlines and other U.S. entities and to compensate victims in a way that was both timely and definitive.  Victims taking advantage of the VCF were prohibited from also bringing suit against the airlines and other U.S. entities.  *However, Congress specifically contemplated that the 9/11 victims could still sue al Qaeda's supporters even if they received compensation from the VCF.*

As a result of this arrangement, nearly 2,000 wrongful death claimants and 1,500 injured victims filed suit against about 500 defendants.  All of the plaintiffs sought to hold accountable those countries, charities, banks, and individuals who supported al Qaeda's terrorist attacks and to require that they pay for their participation in the largest mass murder ever committed on U.S. soil.  Among the defendants were the governments of the Kingdom of Saudi Arabia ("KSA"), Iran, and Sudan.  The governments of Iran and Sudan have defaulted in these cases, but finding accessible assets to cover judgments against them is virtually impossible.  Saudi Arabia presents a very different picture.

Plaintiffs in these cases represent nearly all the families of the people who died and thousands of people injured by the attacks that took place on 9/11.  Four federal judges have worked on this case, one of whom called it the largest and most complex case in U.S. legal history.  Every step has been fought over, argued about and, after a decade, some defendants are still preparing motions to dismiss.  The discovery process shows every sign of being just as slow and tortuous.  After a decade of litigation, Plaintiffs have seen most major Defendants dismissed from the case, without so much as a hearing on the merits of the allegations.

Some of the Plaintiffs brought suit against KSA, but KSA was ruled to be immune from suit by the Second Circuit Court of Appeals in 2008 by virtue of the Foreign Sovereign Immunities Act ("FSIA").  The U.S. Supreme Court declined to take up the matter in 2009.

In November 2011, the Second Circuit reinstated claims against Afghanistan in the same underlying matter.  In oral arguments before the District Court on March 16, 2012, Plaintiffs sought to use this development to rejoin KSA as a Defendant in the 9/11 cases.  The Court denied the motion almost immediately.  The Second Circuit heard the appeal on this matter on March 20, 2013, and a decision is currently pending.

Separately, Plaintiffs have brought suit against other quasi-governmental and non-governmental Defendants, including Saudi Princes and charities.  Some of these claims were dismissed by the District Court in January and September 2005.  The Second Circuit upheld most of these dismissals in August 2008.  A handful of defendants, mostly Saudi charities, had their motions to dismiss denied between 2005 and 2008.  They are currently in discovery.  More defendants were dismissed from 2006 to 2011.  The Second Circuit recently upheld most of these dismissals on personal jurisdiction, subject matter jurisdiction, and Sovereign Immunity grounds.  The appellate court concluded jurisdictional discovery is warranted with regard to 12 of these defendants, and has tasked the lower court with such discovery.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    QUINN_000925

**Resolution of the Lockerbie Bombing Claims**

In 1988, PanAm 103 was destroyed by a terrorist bomb over Lockerbie, Scotland.  270 people were killed by terrorists associated with the government of Libya.  In 2003, Libya agreed to compensate victims of the bombing as it sought to normalize relations with the United States.  However, while Libya paid most of the agreed upon settlement by 2006, it took extra effort to persuade the Libyans to follow through on their original agreement and pay the last twenty percent of the settlement.

With the steadfast support of both Democrats and Republicans in the Congress and thanks to the leadership of then-Senators Biden, Clinton and Kerry, we were able to assist the victims' families as they worked out a procedure with the U.S. Department of State and the government of Libya concerning the final tranche of funds.  Justice was finally achieved – through diplomacy and outside the U.S. court system.  The lesson here was that matters of this kind can be resolved in ways that

- respect the doctrine of sovereign immunity;
- do not require defendant sovereigns to admit liability;
- AND compensate the innocent victims of terrorism.

The Libyan Claims Resolution Act, which paved the way for final payment by the Libyan government into a non-governmental entity (fund) for victims' families, became Public Law No. 110-301 on August 4, 2008.  The Act encouraged the president to agree with Libya to a comprehensive settlement of private legal claims; allowed the Secretary of State to designate an entity to assist in providing compensation to the families; gave that entity immunity once it was certified by the Secretary; and granted immunity to Libya once the Secretary certified that the funds were received by the entity.

Previously relevant, the Consolidated Appropriations Act of 2008, at section 654, had denied any financial assistance to Libya unless the Secretary made a similar Libyan funding certification.  Also, the terrorism exception to the jurisdictional immunity of a foreign state statute (28 U.S.C. § 1605A) revokes jurisdictional immunity from designated states that participated in terrorist activities, meaning U.S. courts could hear terrorism cases such as those filed against the sovereign here.

On August 14, 2008, Secretary Rice and a Libyan representative signed the Claims Settlement Agreement.  The stated objectives of the agreement were to 1) reach a final settlement of the parties' claims; 2) terminate permanently all pending law suits on this matter; and 3) preclude any future such law suits.

On October 31, 2008, Secretary Rice certified, under section 5(A)(2) of the aforementioned Libyan Claims Resolution Act, that all funds had been received by the settlement entity.  On the same day, President Bush signed an Executive Order that declared all individual legal claims on this matter settled according to the terms of the aforementioned Settlement Agreement.

4

**Potential Diplomatic Resolution of the Mumbai and 9/11 Cases**

The diplomatic approach used to facilitate the final tranche of the Pan Am 103 settlement and to resolve all claims against Libya can and should be used as a template for resolution of the Mumbai and 9/11 cases.

    First, the American victims and their families *must know justice for their losses*. The only way to accomplish that in these cases is to encourage a settlement between the American victims of terrorism and the governments of Pakistan and KSA. *That will only happen if the United States Government insists it happen.*

    Second, without such a resolution, the Governments of Pakistan and Saudi Arabia will never have the approval of the American people, something that these two governments, which receive *major foreign aid and assistance* from our Government should want to address enthusiastically.

    Third, this is simply the right thing to do for Americans who were killed or maimed only because they were Americans.

We hope the Department and the Administration see this as a way to close the book on these two terrorist incidents, while making the victims whole without abdicating the doctrine of sovereign immunity.

We respectfully suggest beginning with the Mumbai case. A key to resolution might be as follows: A portion ($82 million) of the aid planned to be spent by the U.S. for Pakistan can be committed by agreement of the two governments to a U.S.-based escrow account and distributed to the American claimants. This will represent a small fraction of the billions in U.S. Aid to Pakistan. Again, Pakistan would not be asked to acknowledge wrongdoing; it would instead partner with the United States in ensuring justice for Americans who were killed or injured.

**The question for Secretary Kerry is this**: Can we work together to find an appropriate and effective mechanism to make certain these innocent victims of terrorism will receive justice?

5

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER    QUINN_000927