# PEX 38

 Gmail

Jack Quinn <jquinn2000@gmail.com>

# (no subject)
2 messages

**Jim Kreindler** <JKreindler@kreindler.com>  Fri, Jan 13, 2017 at 4:14 PM
To: Jack Quinn <jquinn2000@gmail.com>, Jack Quinn <jquinn@qga.com>

How was wed lunch with Bob?

**Jim Kreindler**
Partner

Kreindler & Kreindler LLP

**KREINDLER & KREINDLER** LLP
TRADITION OF EXCELLENCE

750 Third Avenue    T: 212.973.3449    E-mail: jkreindler@kreindler.com

New York, NY 10017-2703    F: 212.972.9432    Web: www.kreindler.com

þ Please consider the environment before printing this e-mail.

CONFIDENTIALITY NOTE: The information contained in this email and any document attached hereto is intended only for the named recipient(s). If you are not the intended recipient, nor the employee or agent responsible for delivering this message in confidence to the intended recipient(s), you are hereby notified that you have received this transmittal in error, and any review, dissemination, distribution or copying of this transmittal or its attachments is strictly prohibited. If you have received this transmittal and/or attachments in error, please notify Kreindler & Kreindler LLP immediately by telephone at 212.687.8181 and then delete this message, including any attachments.

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

**Jack Quinn** <jquinn2000@gmail.com>  Sun, Jan 15, 2017 at 2:06 PM
To: Jim Kreindler <JKreindler@kreindler.com>
Cc: jack quinn <jquinn2000@gmail.com>

Sorry about the delay, Jim. I've been really swamped -- including with preparing to go public very soon with my exit from QGA. More on that when we can talk, but I mention it because it actually has a connection to this note and the time commitment I've made to our project.

Lunch with Bob was really annoying. He says "you never asked for help." the basic answers to that are:

(1) **I repeatedly let him know, especially in the 6-12 months, that I was overwhelmed with work on JASTA. My phone works two ways** -- I don't ever recall an offer to pitch in or have his firm do so or even to find out how we were doing. Among the reasons for that, I believe, were that Bob never bothered to learn the substance or get someone involved from Nelson Mullins who was conversant with the legal and drafting issues that arose. So, he diminished his own utility on the Hill. Additionally, I suspect that Bob didn't bring the NM lobbyists into the matter to help us because he wanted to drive a hard bargain with his firm to keep the lion's share of any fee he might receive.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER    QUINN_000159

(2) Bob's job from the beginning was principally to deal with John Kerry to facilitate a settlement. Not only did that not happen, but it is really hard not to conclude that (a) **Bob never had meaningful and ongoing discussions with Kerry or (b) from his discussions, he never discerned or, if he did discern, chose not to inform us, that Kerry was personally hostile to our cause, as we eventually learned from Chuck Schumer**. Is it really possible that Schumer figured this out after a couple of conversations with Kerry, but Bob, who repeatedly told us of discussions while having dinner or sailing, had no indication the Kerry was, as Schumer said, "the problem"? For nearly four years, Bob assured us that Kerry really wanted to help us. That was simply false. Is this why Bob never made sure that we had any direct access to Kerry?

(3) Again, it became quickly clear that Bob was not in a position to carry our message to the Hill -- he didn't ever have the least curiosity about the case, the complexities of the FSIA or the evolution of the language of JASTA. All he could offer were connections, to advocacy. And among yourself, Sean, Steven and me we had the connections -- I even had the strongest personal connections on the Republican side to Peter King, and the Chiefs of Staff for Ryan and McCarthy. We **did** task Bob with **one** Hill effort, namely **Lindsey Graham**, because his firm is based in SC and Bob assured us that his partner, Ambassador Wilkins, could keep Graham on board with us. Recall that, when Sean at one point expressed the view that Graham was "slippery," Wilkins and Bob took offense and assured us they could keep him on the reservation; now, of course, we deal with Graham as a principal architect, along with McCain, in the effort to gut JASTA.

(4) **Our contracts on this matter clearly contemplate that our contingent compensation is in exchange for services that will assist in obtaining a recovery for the clients. It is hard to see services by Bob or this firm that have yet made a contribution to any recovery for the clients. JASTA certainly has enhanced the possibility of a recovery, but John Kerry and Lindsey Graham did not. The idea that his value to this effort is the same as mine -- in terms of either effort or effect -- is simply offensive**. (I told Bob that a couple of years after forming Quinn Gillespie, I went to Ed and told him that our partnership deal was unfair -- the I was making too much and he was making too little. I told Bob that it has really puzzled me that he never once expressed to me a similar kind of concern about the fairness of our our relative contributions to the effort.)

**I know that Bob told you -- and he told me -- that he agrees the arrangement is unfair** and that he wants to change it. In his view, this change includes both adjusting the percentages and his playing a more active role now. On the latter, he mentioned that Vinoda went to Wharton with Eric Trump and, of course, that the Saudi "settlement" deal through Paul Hamill is still possible.

As for **Vinoda's "connection,"** it is simply implausible to me that he or Bob have any meaningful possibility of affecting a settlement with Trump's son or, indeed, anyone this new Administration. I at least have begun to establish connections to WH Counsel Don McGahn and I have a longstanding connection to Comms Dir/Press Spokesman Sean Spicer; this evening, the woman who does press for the three older children is coming to dinner. We're building bridges. More importantly, Steven and our friends at ROKK have already been highly effective already with the transition team. (I saw them just last night at the party celebrating Spicer's appointment). Still, all this pales, however, in relation to the bottom line reality that the enactment of **JASTA has been the key to our achieving a near-term settlement**, not the "news" that Vinoda attended grad school with one of Trump's sons or the elusive hope that Hamill can actually work a deal, for which there is absolutely NO evidence.

(On **Hamill**, by the way, I told Bob that I find it strange that we heard absolutely nothing from Hamill as to why the meeting with Saudi officials wasn't happening and why, if it were a possibility soon, the Saudis have been on a hiring binge determined to try to turn the Trump Administration against JASTA.)

**In any event, if Bob can pull a rabbit out of the hat and engineer a settlement, the deal proposed below will reward that. But, let's wait to see the hat -- and the rabbit -- first.**

**New Steps.....**In the end, I told Bob that he needs to remember that fees have to be justified to the court. And I reminded him that both clients and other lawyers involved the case realize he hasn't been much involved and that, if he were challenged, there's **no way** he could produce records reflecting adequate time or effort. At this, he backed down pretty quickly and said several times "I know, we need a new deal....I want to be fair to you (to which I said "I don't think you have a choice.")

So, he clearly expects a proposal to change the deal. He first suggested that he and I have a **side deal** -- Nelson Mullins would still gets it's 0.50% and Bob somehow would "repay" me out of his pocket. **I said no way**. We need **new agreements**.

**SO, what I propose is this --**

(1) **separate** retainers for everyone who may be involved, starting with Bob/Nelson Mullins and me (this will ensure that each of us

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER    QUINN_000160

justifies ourselves) and

(2) The **Bob/NM contract would provide a revised "base fee" of 0.175%**. He should understand that this would still represent millions in fees and that he's risking it all if he doesn't be realistic and fair about this.

(3) The **JQ contract would provide a revised base fee of 0.675%.**

(4) **Both contracts** would provide that **a contingent fee of 0.15% is to be reserved by the retaining parties (Jim/Jerry) and must be utilized by them in the following ways: (a) to retain a third lawyer/firm** who can be rewarded on a contingent basis for securing a negotiated settlement (whether through the Trump Administration or directly with KSA), (b) **to award additional performance bonuses to Bob and/or Jack** for services rendered after the date of our new contracts that contribute to the families' obtaining recoveries (by whatever means) or (c) for any combination of (a) and (b). (Any later contract with a third party should speak in terms of an award "up to" 0.15%" in order to give you flexibility and to make real the possibility of earning further credit for resolution of the case.

This is entirely fair. Bob's reaching 17.5% of our combined fee is virtually a gift to him and NM. He would have no legs to stand on, in my view, if you just terminated the contract. But, assuming that termination would leave him with nuisance value, the approach outlined above more than amply eliminates that **AND** allows him and his firm, at least potentially, to **earn** about a third of the total Quinn/Crowe fee if (and only if) he materially assists us moving forward.

**This proposal would have to come from you and Jerry, not from me.** I'm happy to draft if you like. I look forward to discussing it. (I assume that, once you and I are agreed, you'll review it with Jerry? And, do we want to leave the existing insurance contracts out of this revision?)

Best,

Jack

*Jack Quinn*
[Quoted text hidden]

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

QUINN_000161

justifies ourselves) and

(2) The **Bob/NM contract would provide a revised "base fee" of 0.175%**. He should understand that this would still represent millions in fees and that he's risking it all if he doesn't be realistic and fair about this.

(3) The **JQ contract would provide a revised base fee of 0.675%.**

(4) **Both contracts** would provide that **a contingent fee of 0.15% is to be reserved by the retaining parties (Jim/Jerry) and must be utilized by them in the following ways: (a) to retain a third lawyer/firm** who can be rewarded on a contingent basis for securing a negotiated settlement (whether through the Trump Administration or directly with KSA), (b) **to award additional performance bonuses to Bob and/or Jack** for services rendered after the date of our new contracts that contribute to the families' obtaining recoveries (by whatever means) or (c) for any combination of (a) and (b). (Any later contract with a third party should speak in terms of an award "up to" 0.15%" in order to give you flexibility and to make real the possibility of earning further credit for resolution of the case.

This is entirely fair. Bob's reaching 17.5% of our combined fee is virtually a gift to him and NM. He would have no legs to stand on, in my view, if you just terminated the contract. But, assuming that termination would leave him with nuisance value, the approach outlined above more than amply eliminates that **AND** allows him and his firm, at least potentially, to **earn** about a third of the total Quinn/Crowe fee if (and only if) he materially assists us moving forward.

**This proposal would have to come from you and Jerry, not from me.** I'm happy to draft if you like. I look forward to discussing it. (I assume that, once you and I are agreed, you'll review it with Jerry? And, do we want to leave the existing insurance contracts out of this revision?)

Best,

Jack

*Jack Quinn*
[Quoted text hidden]

---

**Jim Kreindler** <JKreindler@kreindler.com>　　　　　　　　　　　　　　　　　　　　Sun, Jan 15, 2017 at 4:14 PM
To: Jack Quinn <jquinn2000@gmail.com>

I Agee. Let's talk tomorrow

Sent from my iPhone

On Jan 15, 2017, at 2:07 PM, Jack Quinn <jquinn2000@gmail.com<mailto:jquinn2000@gmail.com>> wrote:

Sorry about the delay, Jim. I've been really swamped -- including with preparing to go public very soon with my exit from QGA. More on that when we can talk, but I mention it because it actually has a connection to this note and the time commitment I've made to our project.

Lunch with Bob was really annoying. He says "you never asked for help." the basic answers to that are:

(1) I repeatedly let him know, especially in the 6-12 months, that I was overwhelmed with work on JASTA. My phone works two ways -- I don't ever recall an offer to pitch in or have his firm do so or even to find out how we were doing. Among the reasons for that, I believe, were that Bob never bothered to learn the substance or get someone involved from Nelson Mullins who was conversant with the legal and drafting issues that arose. So, he diminished his own utility on the Hill. Additionally, I suspect that Bob didn't bring the NM lobbyists into the matter to help us because he wanted to drive a hard bargain with his firm to keep the lion's share of any fee he might receive.

(2) Bob's job from the beginning was principally to deal with John Kerry to facilitate a settlement. Not only did that not happen, but it is really hard not to conclude that (a) Bob never had meaningful and ongoing discussions with Kerry or (b) from his discussions, he never discerned or, if he did discern, chose not to inform us, that Kerry was personally hostile to our cause, as we eventually learned from Chuck Schumer. Is it really possible that Schumer figured this out after a couple of conversations with Kerry, but Bob, who repeatedly told us of discussions while having dinner or sailing, had no indication the Kerry was, as Schumer said, "the problem"? For nearly four years, Bob assured us that Kerry really wanted to help us. That was simply false. Is this why Bob never

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER　　QUINN_000162