# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SUSANNA QUINN, personal representative of the Estate of John M. Quinn, | ) ) ) ) | |
| *Plaintiff,* | ) ) | Case No. 1:21-cv-01824-RDM |
| v. | ) ) | |
| KRIENDLER & KRIENDLER LLP, *et al.,* | ) ) | |
| *Defendants.* | ) ) ) | |

**CONSOLIDATED POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT, IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND FOR DISMISSAL AS UNRIPE FOR ADJUDICATION**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

FACTS ...............................................................................................................4

I.    IN 2013, THE KREINDLER FIRM RETAINS JACK QUINN AND
ROBERT CROWE AS LOBBYISTS TO ENLIST U.S. GOVERNMENT
SUPPORT TO URGE KSA TO COMPENSATE THE 9/11 FAMILIES
AND END THE LITIGATION ...................................................................4

    A.    Background ........................................................................................4

    B.    Quinn and Robert Crowe Work Exclusively to Obtain Compensation
from KSA ...........................................................................................5

II.    QUINN PLAYS NO ROLE IN THE KREINDLER FIRM'S EFFORTS TO
OBTAIN COMPENSATION FOR ITS CLIENTS FROM THE VCF AND
VSST .........................................................................................................8

    A.    The Victim Compensation Fund (VCF) ...........................................8

    B.    The Victims of State Sponsored Terrorism Fund (VSST)................11

III.    JASTA IS PASSED AND QUINN SEEKS TO REVISE THE EXISTING
AGREEMENT TO MAXIMIZE HIS FEE.................................................12

IV.    THE LANGUAGE AND STRUCTURE OF THE 2017 AGREEMENTS
EXCLUSIVELY CONCERN RESOLVING THE LITIGATION AND
ENSURING KSA REMAINS A DEFENDANT IN ORDER TO FUND
THE RESOLUTION .................................................................................16

V.    QUINN BREACHES AND IS TERMINATED.......................................19

VI.    QUINN SUES THE KREINDLER FIRM ...............................................20

ARGUMENT ....................................................................................................20

I.    AS A MATTER OF LAW, THE 2017 AGREEMENTS DO NOT
PROVIDE FOR ANY FEE TO BE PAID TO QUINN ON
DISTRIBUTIONS FROM THE VCF OR THE VSST. ...........................20

    A.    Legal Standard .................................................................................20

    B.    The Agreements Unambiguously Limit Any Quinn Fee to Recoveries
from the Final Resolution of the Litigation ....................................21

    C.    Even if the Language of the Agreements Is Ambiguous, the Extrinsic
Evidence of the Parties' Intent Conclusively Limits Any Payment to
Recoveries from the Final Resolution of the Litigation...................35

II.    THE COURT SHOULD DENY QUINN'S MOTION BECAUSE HE HAS
FAILED TO PROVE THAT THE 2017 AGREEMENTS INCLUDE THE
VCF AND VSST AS A MATTER OF LAW............................................45

    A.    Legal Standard .................................................................................45

B.  Quinn Has Not Met His Burden of Proof of Demonstrating that the Only Reasonable Interpretation of the 2017 Agreements Entitles Him to Fees from the VCF and VSST ....................................................................46

III.  THE CASE SHOULD BE DISMISSED AS NOT RIPE FOR ADJUDICATION ..........................................................................................58

A.  Because Defendants Have Received No Recoveries from Resolution of the Litigation, Plaintiff's Breach of Contract Claim Must Be Dismissed ...........................................................................................59

B.  Because Defendants Have Received No Recoveries from Resolution of the Litigation, Plaintiff's Quantum Meruit Claim Must Be Dismissed...........59

CONCLUSION....................................................................................................60

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*,
    485 A.2d 199 (D.C. 1984) ..................................................................................22, 26

*Abdelrhman v. Ackerman*,
    76 A.D.3d 883 (D.C. 2013) ....................................................................................22

*Akassy v. William Penn Apartments Ltd. P'ship*,
    891 A.2d 291 (D.C. 2006) .....................................................................................29

*Alston v. Flagstar Bank F.S.B.*,
    2014 WL 12803918 (D.D.C. Apr. 10, 2014) .......................................................59

*Am. Postal Worker's Union v. U.S. Postal Serv.*,
    550 F.3d 27 (D.C. Cir. 2008) ...............................................................................23

*American First Inv. Corp. v. Goland*,
    925 F.2d 1518 (D.C. Cir. 1991) .....................................................................35, 49

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..............................................................................................21

*Att. Gen. of U.S. v. Wynn*,
    104 F.4th 348 (D.D.C. 2024) ...............................................................................33

*Begay v. U.S.*,
    553 U.S. 137 (2008) ..............................................................................................31

*Bruce v. Dyer*,
    67 Md. App. 499 (Md. Ct. Special App. 1986) ...................................................29

*Burka v. Patrick*,
    34 Md. App. 181 (Md. Ct. Special App. 1976) ...................................................29

*Catalina Enters. Inc. Pension Tr. v. Hartford Fire Ins. Co.*,
    67 F. 3d 63 (4th Cir. 1995) ..................................................................................34

*CNH Indus. N.V. v. Reese*,
    583 U.S. 133 (2018) ..................................................................................22, 23, 28

*Comp. Reserves, Inc. v. Comp. Network Corp.*,
    1988 WL 15178 (D.D.C. Feb. 17, 1988) .............................................................52

*Crabtree v. Miller Pipeline, LLC*,
    2021 WL 1177961 (D.D.C. Mar. 29, 2021) ............................................24, 25, 51

*Deutsche Bank Nat'l Tr. Co. v. FDIC*,
    109 F. Supp. 3d 179 (D.D.C. 2015) ..............................................................35, 49

*Dist. No. 1—Pac. Coast Dist. v. Travelers Cas. and Sur. Co.*,
    782 A.2d 269 (D.C. 2001) ...............................................................................22, 25

*Dist. of Columbia v. Young*,
    39 A.3d 36 (D.C. 2012) ........................................................................................34

*Farmland Indus., Inc. v. Grain Bd. of Iraq,*
    904 F.2d 732 (D.C. Cir. 1990) ............................................................. 35

*Glenn v. Fay,*
    281 F. Supp. 3d 130 (D.D.C. 2017) ...................................................... 60

*Hart v. Vermont Inv. Ltd. P'ship,*
    667 A.2d 578 (D.C. 1995) .................................................................... 25

*Hickey v. Scott,*
    738 F. Supp. 2d 55 (D.D.C. 2010) ....................................................... 48

*Hodge v. Evans Fin. Corp.,*
    778 F.2d 794 (D.D.C. 1985) ................................................................. 29

*Holcomb v. Powell,*
    433 F.3d 889 (D.C. Cir. 2006) ............................................................. 21

*Holt v. St. Louis Union Tr. Co.,*
    52 F.2d 1068 (4th Cir. 1931) ............................................................... 29

*Impac Mortg. Holdings, Inc. v. Timm,*
    255 A.3d 89 (Md. 2021) ....................................................................... 45

*Independence Mgm't Co. v. Anderson & Summers, LLC,*
    874 A.2d 862 (D.C. 2005) ............................................................. 27, 28

*Intercounty Constr. Corp. v. Dist. of Columbia,*
    443 A.2d 29 (D.C. 1982) .................................................. 21, 27, 29, 46

*Jacobs v. Reliance Standard Life Ins. Co.,*
    2023 WL 2708581 (D.D.C. Mar. 30, 2023) ......................................... 45

*Jacobsen v. Oliver,*
    555 F. Supp. 2d 72 (D.D.C. 2008) ....................................................... 48

*Joel Popkin and Co. v. Wharton Econometric Forecasting Assocs., Inc.,*
    659 F. Supp. 343 (D.D.C. 1987) .................................................... 35, 49

*M&G Polymers U.S.A, LLC v. Hobert Freel Tackett,*
    574 U.S. 427 (2015) ............................................................................. 28

*Matthew A. Goldstein, PLLC v. U.S. Dep't of State,*
    153 F. Supp. 3d 319 (D.D.C. 2016) ...................................................... 59

*N.W. v. Dist. of Columbia,*
    107 F. Supp. 3d 141 (D.D.C. 2015) .............................................. 22, 25, 34

*Nat'l Treasury Emps. Union v. United States,*
    101 F.3d 1423 (D.C. Cir. 1996) ........................................................... 58

*Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO,*
    103 F.4th 45 (D.C. Cir. 2024) .............................................................. 32

*Patterson v. Dist. of Columbia*,
   795 A.2d 681 (D.C. 2002) ...................................................................30

*PCH Mut. Ins. Co., Inc. v. Cas. and Sur.*,
   750 F. Supp. 2d 125 (D.D.C. 2010) .....................................................28

*Penn. Ave. Dev. Corp. v. One Parcel of Land*,
   494 F. Supp. 45 (D.D.C. 1980) ............................................................53

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ..............................................................58

*Piedmont Resolution, LLC v. Johnston, Rivlin & Foley*,
   999 F. Supp. 34 (D.D.C. 1998) ............................................................52

*Post v. Bregman*,
   349 Md. 142 (Md. Ct. App. 1998) ........................................................48

*Rosenthal v. Nat'l Produce Co.*,
   573 A.2d 365 (D.C. 1990) ....................................................................27

*Sagalyn v. Foundation for Preservation of Historic Georgetown*,
   691 A.2d 107 (D.C. 1997) ....................................................................21

*Schuff Steel Co. v. Bosworth Steel Erectors, Inc.*,
   718 F. Supp. 3d 1 (D.D.C. 2024) .........................................................46

*Scott v. Harris*,
   550 U.S. 372 (2007) .............................................................................21

*Stewart v. Dist. of Columbia*,
   2019 WL 4261067 (D.D.C. Sept. 9, 2019) ...........................................36

*Thomas v. Union Carbide Agricultural Products Co.*,
   473 U.S. 568 (1985) .............................................................................58

*Urban Masonry Corp. v. N&N Contractors, Inc.*,
   676 A.2d 26 (D.C. 1996) ......................................................................35

*Virtual Defense and Dev. Int'l, Inc. v. Republic of Moldova*,
   133 F. Supp. 2d 9 (D.D.C. 2001) .........................................................29

*Washington Props., Inc. v. Chin, Inc.*,
   760 A.2d 546 (D.C. 2000) ....................................................................22

*Washington-Baltimore News Guild, Local 32035 v. Washington Post*,
   2023 WL 4314177 (D.D.C. July 3, 2023) ..............................................51

*Wharf, Inc. v. Dist. of Columbia Wharf Horizontal Reit Leaseholder LLC*,
   2021 WL 1198143 (D.D.C. Mar. 30, 2021) ...............................25, 26, 28

*Z-Modular, LLC v. MCN Build, Inc.*,
   2024 WL 1486089 (D.D.C. Apr. 5, 2024) .............................................60

**Other Authorities**

11 R. Lord, Williston on Contracts § 30:4 (4th ed. 2012)..........................................................22

Antonin Scalia and Bryan Garner, <u>Reading Law: The Interpretation of Legal Texts</u> (2012)....23

Restatement (Second) of Contracts § 204 (1982) ....................................................................27

**Rules**

Fed. R. Civ. P. 12 ...............................................................................................................58, 59

Fed. R. Civ. P. 37(c)(1)...............................................................................................................37

Fed. R. Civ. P. 56(a)....................................................................................................................21

Defendants Kreindler & Kreindler LLP (the "Kreindler Firm") and James P. Kreindler ("Mr. Kreindler"), by and through their undersigned attorneys, hereby submit this Consolidated Memorandum of Points and Authorities in support of their cross-motion for partial for summary judgment, in opposition to Plaintiff's motion for partial summary judgment, and for dismissal of the case as unripe for adjudication.

## INTRODUCTION

In 2013, Defendants engaged John Michael "Jack" Quinn ("Quinn") for a discrete task: to lobby the United States Government to encourage the Kingdom of Saudi Arabia ("KSA") to compensate the victims, estates, and families of the 9/11 terrorist attacks (the "9/11 Families") in a manner that would fully resolve the multi-district litigation styled *In re Terrorist Attacks of 9/11,* pending in the Southern District of New York (the "Litigation"). The parties agreed and understood that Quinn would be compensated for this work through a calculation based on payments to 9/11 Families resulting from final resolution of the Litigation.

The parties' arrangement was initially memorialized in 2013 and first revised in 2014.  In 2017, at Quinn's initiative, the parties executed a set of three agreements (the "2017 Agreements") that Quinn drafted and that superseded the earlier contracts. Though scant, the 2017 Agreements define the parties' relationship, Quinn's duties thereunder, and the contingent compensation to be paid to Quinn for his efforts.

In this action, Quinn claims fees far beyond and unrelated to that for which the parties agreed he would be compensated. The conditions for Quinn's payment under the 2017 Agreements relate to the Litigation – namely, the resolution of the case and claims in the Litigation, and payment to the 9/11 Families by KSA, directly or indirectly.  Neither of those conditions has occurred. Instead, Quinn seeks fees based on other recoveries from U.S. government administrative funds that predate the 2017 Agreements, and that Quinn played no role in obtaining.

1

Quinn demands compensation from recoveries achieved by the Kreindler Firm for its clients from two relief fund programs, the Victim Compensation Fund (the "VCF") and the United States Victims of State Sponsored Terrorism Fund (the "VSST"), which are entirely separate from the Litigation and from recovering payments from KSA.  These recoveries resulted from decades of Kreindler Firm lobbying and representation efforts, efforts of which Quinn was well aware but in which he had no even tangential involvement.

Defendants now respectfully seek an order of partial summary judgment determining, as a matter of law, that Quinn is not entitled to any compensation based on recovery by Kreindler Firm clients under the VCF and VSST.  Defendants' cross-motion should be granted, and Quinn's motion for partial summary judgment denied, for several reasons.

*First*, the 2017 Agreements are unambiguously limited to the Litigation.  They frame the rights and obligations of the parties entirely in terms of the resolution of the Litigation and the preservation of the Justice Against State Sponsors of Terrorism Act ("JASTA"), the federal jurisdictional statute which enables KSA to be sued directly. In contrast, the 2017 Agreements nowhere mention the VCF or the VSST, by name or by reference. Every canon of construction mandates that the only reasonable interpretation of the 2017 Agreements must be limited to the Litigation. Any broader interpretation is not only strained and produces bizarre results, but causes the 2017 Agreements to fail for indefiniteness and/or vagueness.

*Second*, even if the Court determines the 2017 Agreements are facially ambiguous, Defendants are still entitled to partial summary judgment because the extrinsic evidence demonstrates that neither the Kreindler Firm nor Quinn believed Quinn would, or had any right to, share in the Kreindler Firm's clients' recoveries under the VCF or VSST.  Among other things, the extrinsic evidence conclusively shows that:

2

- The VCF and the VSST are government administrative funds which have no bearing on the resolution of the 9/11 Litigation;

- Quinn, the drafter of the 2017 Agreements, never raised the VCF or the VSST during negotiations of the 2017 Agreements, even though other sources of potential recovery were discussed in detail;

- Record evidence shows Quinn's work was exclusively limited to seeking government help to obtain compensation from KSA for the 9/11 Families in a manner that would finally resolve the Litigation, and nothing else. Quinn was never asked to work on behalf of the Kreindler Firm or its clients and did no work for the Kreindler Firm or its clients related to the VCF or VSST;

- Despite being aware of the Kreindler Firm's heavy involvement in VSST recoveries, Quinn never requested, or even inquired, about receiving a fee on the VSST until April 2020, five years after its enactment, three years after it began distributions, which distributions (to *all* claimants, including both 9/11 and non-9/11 victims of terrorism) had reached almost $2 billion. This was three years after the execution of the 2017 Agreements; and

- Despite being aware of the Kreindler Firm's heavy involvement in VCF recoveries, Quinn never requested or inquired about a fee on the VCF recoveries until his Amended Complaint was filed in October 2021, ten years after the VCF was established and three months after his original lawsuit was filed claiming fees from the VSST. This was four and a half years after the execution of the 2017 Agreements.

*Third*, even if the Court is unable to grant summary judgment for Defendants ruling that the 2017 Agreements as a matter of law exclude compensation from the VCF and VSST, the Court must still deny Plaintiff's motion for summary judgment. A genuine dispute of fact would exist for all the reasons stated above and explained in detail below. Quinn's more creative arguments are unsupported by the facts or the law. Quinn suggests that the VCF and VSST are related to his work because they are "funds," and the compensation for the 9/11 Families Quinn sought from KSA could have taken the form of a "fund." This argument has no support in the record and is based solely on Quinn's deliberate mischaracterization of the word "fund," even when the context makes clear what was intended. Quinn suggests that he viewed himself as co-counsel to the Kreindler Firm, and as a result the 2017 Agreements should be viewed more as profit-share or fee

splitting agreement than a contingency fee arrangement. The record, however, is clear that Quinn was not co-counsel. He never represented the 9/11 Families directly in the Litigation or otherwise, he never had retainers with any of the Kreindler Firm clients, and in fact cannot name a single 9/11 family member. Moreover, such a reading of the parties' arrangement would run afoul of the D.C. Rules of Professional Conduct. The 2017 Agreements cannot reasonably be read as a generalized fee-sharing or profit-sharing arrangement.

Finally, should the Court find, as Defendants urge, that Quinn is not entitled to payment on VCF or VSST recoveries, then the Court should dismiss the case as premature. There has been no recovery from resolving the Litigation, and thus no contingency fee can yet be owed to Quinn.

## FACTS

I.  **IN 2013, THE KREINDLER FIRM RETAINS JACK QUINN AND ROBERT CROWE AS LOBBYISTS TO ENLIST U.S. GOVERNMENT SUPPORT TO URGE KSA TO COMPENSATE THE 9/11 FAMILIES AND END THE LITIGATION**

### A. Background

The basic events surrounding the Terrorist Attacks of September 11, 2001 (the "9/11 Attacks") are well known. Along with victim relief funds established by the U.S. government (discussed below), dozens of lawsuits were filed against a wide array of entities, including the nations of Iran and, later, KSA. In 2003, the various lawsuits seeking accountability for the 9/11 Families were consolidated into the Litigation – a single multi-district litigation in the federal district court for the Southern District of New York. DSUF ¶ 3.[1] The Kreindler Firm represents thousands of 9/11 Families and has been one of the leading law firms driving the Litigation throughout its long lifespan. DSUF ¶ 4; PEX 1 at 89:6-19.

---

[1] Citations to "DSUF" refer to the Defendants' Statement of Undisputed Facts, dated November 15, 2024. Citations to "Br." refer to Plaintiff's memorandum of law filed on October 18, 2024.

The Kreindler Firm obtained many clients and was appointed a leading law firm on the Plaintiffs' Executive Committee ("PEC") in the Litigation in part because of its well-known success in obtaining accountability for acts of terrorism. DSUF ¶ 5; DEX A, ¶ 2, 4; PEX 1 at 36:18-37:3. Previously, the Kreindler Firm had successfully sued the government of Libya for the terrorist attack that brought down Pan Am Flight 103 over Lockerbie, Scotland. DSUF ¶ ¶ 5, 26, 27; DEX A, ¶¶  2, 4. The Kreindler Firm was further successful securing the final 20% of Libya's settlement payment (the "Pan Am Settlement") by working with Congress to pass the Libya Claims Resolution Act (the "LCRA"). The LCRA resolved all then-pending litigation in the United States against Libya once the final 20% of the Pan Am Settlement was paid.  *Id.*  It was in this context that the Kreindler Firm first worked with plaintiff Quinn, his lobbying firm, Quinn Gillespie and Associates ("QGA"), and Quinn's partner, Ed Gillespie. *Id.*

### B.  Quinn and Robert Crowe Work Exclusively to Obtain Compensation from KSA

The Kreindler Firm has always believed it can establish that KSA provided material support to and aided and abetted the 9/11 terrorists. DSUF ¶ 7; DEX A, ¶ 7. In or around 2005, the Court dismissed KSA government officials as defendants in the Litigation pursuant to the Foreign Sovereign Immunity Act ("FSIA"). DSUF ¶ 8; DEX C, ¶ 7. However, dozens of KSA-affiliated organizations and charities, along with many prominent KSA citizens, remained defendants in the Litigation.

In 2013, Mr. Kreindler approached Quinn to help lobby the United States government to persuade KSA to seek a diplomatic resolution that would compensate the victims of the 9/11 Attacks and end the Litigation.[2] DSUF ¶¶ 23, 25; DEX A, ¶ 3; PEX 1 at 7:16-8:12. Mr. Kreindler's idea was to try to replicate the work done in connection with the Pan Am Settlement to get a

---

[2] Quinn's original ambit also included seeking compensation from Pakistan for the 2008 Mumbai terrorist attacks. DEX A, ¶¶ 3, 5.

complete resolution with KSA. DSUF ¶ 28. John Kerry, the incoming Secretary of State ("Secretary Kerry"), had been a principal architect of the Libyan diplomatic resolution, and Mr. Kreindler believed there might be an opportunity to work with the government to help resolve the Litigation by obtaining a diplomatic resolution with KSA. DSUF ¶ 26, 28; DEX C, ¶ 5; PEX 1 at 11:8-12:8, 23:21-24:4; PEX 13, PEX 18, PEX 20, DEX H.

Quinn agreed to work with the Kreindler Firm and brought Robert "Bob" Crowe ("Mr. Crowe") into the effort because Mr. Crowe had a relationship with Secretary Kerry. *Id*. As of February 7, 2013, Mr. Crowe's firm at the time, Nelson Mullins Riley and Scarborough LLP ("Nelson Mullins") and Quinn's firm, QGA, entered into an agreement with the Kreindler Firm and the Silverman Law Firm[3] to "provide strategic counseling and public policy representation to [the Kreindler Firm] and The Silverman Law Firm" with respect to the Pakistani-sponsored 2008 Mumbai attacks. DSUF ¶ 29, 30; PEX 1 at 8:4-12, 24:5-21; PEX 2 at 46:3-47:10; PEX 6. Later that year, Quinn, Mr. Crowe, and the Kreindler Firm entered into an agreement that expanded their relationship beyond the Mumbai attacks to include the Litigation (the "Original 2013 Agreement"). DSUF ¶ 29; PEX 9. The Original 2013 Agreement provides: "As compensation for their efforts in assisting in obtaining a recovery for the 9/11 victims and their families, Nelson Mullins and Quinn Gillespie shall receive a fee of 1% percent (sic) of the net recovery on each decedent's wrongful death and case and each personal injury case where [the Kreindler Firm] has or receives a fee ***in the consolidated 9/11 Terrorist Litigation***." *Id*. (emphasis added).

At all times, beginning with the Original 2013 Agreement, Quinn was expected to help facilitate a resolution with KSA in one particular way – by gathering support from members of

---

[3] The Silverman Law Firm was involved in litigation regarding the Mumbai attacks, but is not otherwise relevant to this dispute.

Congress and other public officials to put appropriate pressure on KSA to resolve the Litigation. DSUF ¶ 30; PEX 3 at 10:8-11:9; PEX 1 at 90:12-16; PEX 2 at 46:3-47:10; DEX A, ¶¶ 5,7; DEX C, ¶ 6. The Kreindler Firm's efforts, with Quinn's assistance, were focused on KSA because huge numbers of KSA citizens and entities were defendants in the Litigation, and because KSA was the only entity with sufficient resources to compensate the 9/11 Families and obtain releases for its entities and citizens. DSUF ¶¶ 31, 33; PEX 3 at 10:8-11:9; PEX 1 at 90:12-16; PEX 2 at 46:3-47:10; DEX A, ¶¶ 5,7; DEX C, ¶ 6.

The work done by Mr. Crowe and Quinn demonstrates a singular focus: to lobby the U.S. government, both the executive and the legislative branches, to bring KSA to the table to fund a resolution that would compensate the victims and fully resolve the Litigation. Every talking point and substantive memo from the parties advances this same goal, and the record reflects no efforts in furtherance of any other goal. DSUF ¶ 37; PEX 13, 15, 18, 26, 30; DEX A, ¶¶ 7-8.

On or about October 23, 2013 Quinn and Mr. Crowe sent a memo to David Wade, Chief of Staff to Secretary Kerry, setting forth a strategy for seeking compensation from KSA for the 9/11 Families. DSUF ¶ 40; PEX 18. The memo states that the diplomatic approach of the LCRA "can and should serve as a template," that the only way to achieve justice is to encourage the government of KSA to compensate the victims of the 9/11 Attacks, and that the U.S. government should insist it happen. DSUF ¶ 40; PEX 18. Similarly, on or about December 19, 2013 a document from the parties for Secretary Kerry reaffirms the strategy and reiterates that Pan Am should be a model. DSUF ¶ 4; DEX H.

In July 2014, Quinn and Mr. Crowe entered into an agreement with the Kreindler Firm (the "2014 Agreement"), essentially identical to the Original 2013 Agreement, but which provided that

Quinn would take the entirety of his portion of any fee instead of sharing it with QGA. DSUF ¶ 32; DEX F at KK000666. The 2014 Agreement provides:

> As compensation for their efforts in assisting [the Kreindler Firm] in obtaining a recovery for the 9/11 victims and their families, [the Kreindler Firm] agrees to pay Nelson Mullins Riley and Scarborough LLP ("Nelson Mullins") and John M. Quinn, Esq. a combined fee of one percent of the net recovery on each decedent's wrongful death case and each personal injury case where [the Kreindler Firm] has or receives a fee in the consolidated 9/11 Terrorist Litigation. *Id.*

## II.    QUINN PLAYS NO ROLE IN THE KREINDLER FIRM'S EFFORTS TO OBTAIN COMPENSATION FOR ITS CLIENTS FROM THE VCF AND VSST

In addition to its litigation practice, the Kreindler Firm has very significant practice areas dedicated to lobbying for and accessing the U.S. government administrative relief funds on behalf of its clients. The undisputed record demonstrates that (1) the Kreindler Firm's practices related to the current VCF, established in late 2010, and to the VSST, established in 2015, are separate from the Kreindler Firm's work in the Litigation, (2) the Kreindler Firm has done and continues to do an enormous amount of work, with very good results, for its clients with respect to the VCF and VSST, and (3) at no time has Quinn had anything to do with either the VCF or the VSST, either advocating or lobbying for them, representing clients, applying to or accessing the VCF or VSST on behalf of the Kreindler Firm's clients, or any other aspect of those practices.  DSUF ¶¶ 11-20; 50-55; DEX B, ¶¶ 4-14; DEX C, ¶¶ 13-17.

### A.  The Victim Compensation Fund (VCF)

The original victim compensation fund was created by an Act of Congress less than two weeks after the terror attacks as an alternative to litigation to provide compensation to the families of those killed and others who were injured in the 9/11 Attacks (the "Original VCF"). The Kreindler Firm represented the families of approximately 500 of the 2,996 people killed that day. DSUF ¶ 2. The Original VCF closed in 2004, and Congress amended the Original VCF statute and reopened it as the VCF of January 2, 2011.  DSUF ¶¶ 11-12. The VCF expanded eligibility for

compensation to include a constellation of specific illnesses based on specific exposure hours in lower Manhattan, the Pentagon, and Shanksville, Pennsylvania. DSUF ¶ 12. The reopening of the VCF in 2011 was a result of intense lobbying efforts of a small group of advocates, most of whom represented labor unions whose members were sickened at ground zero in the days and months after the 9/11 Attacks. *Id*.

The VCF practice group of the Kreindler Firm, led by partner Noah Kushlefsky, was deeply involved in the Original VCF, with Mr. Kushlefsky personally representing more than 150 families accessing the Original VCF. DSUF ¶ 13; DEX B, ¶¶ 3-8.  Because of that deep involvement and experience, the Special Master of the VCF reached out to Mr. Kushlefsky to discuss the reopening and associated logistics and policies. DSUF ¶ 13. Also, because of his involvement and experience, Mr. Kushlefsky was contacted in late 2010 by attorneys representing thousands of first responders to request that the Kreindler Firm represent those individuals in making claims under the VCF. DSUF ¶ 14.

By the end of 2011, nearly two years prior to Quinn's involvement with the Kreindler Firm in connection with the Litigation, the Kreindler Firm already had thousands of clients for the VCF, was involved in lobbying with respect to application, reauthorization and eligibility requirements under the VCF, and not only had direct communications with the Special Master, but in fact acted as trusted source of advice to the Special Master. DSUF ¶¶ 13-15, 18.

Between 2011 and 2015, the Kreindler Firm played a significant role in intense lobbying efforts – together with unions, advocacy groups, and attorneys representing claimants – to fully fund the VCF and to extend it beyond its statutory five-year life.  DSUF ¶¶ 15-17. Mr. Kushlefsky, on behalf of the Kreindler Firm's VCF practice, often traveled with busloads of sick claimants, lawyers, and advocates to Washington, D.C. to meet with senators and representatives seeking to

fully fund awards and extend the life of the VCF. *Id.* The Kreindler Firm also contributed substantially to funding the trips. Quinn played no role in any of these or any related efforts. *Id*.

In December 2015, Congress reauthorized the VCF for five more years on a limited basis. Though helpful, this was insufficient to address sicknesses that 9/11 Families were experiencing, and the Kreindler Firm resumed its lobbying activities in 2017. *Id*. On July 29, 2019, President Trump signed the Never Forget the Heroes: James Zadroga, Ray Pfeifer, and Luis Alvarez Permanent Authorization of the September 11th Victim Compensation Fund (the "VCF Permanent Authorization Act"). DSUF ¶ 17. The VCF Permanent Authorization Act extends the VCF's claim filing deadline from December 18, 2020, to October 1, 2090, and appropriates such funds as may be necessary to pay all eligible claims. Again, Quinn played no role in those efforts. *Id*.

The group within the Kreindler Firm that represents the exposure victims in the VCF is a completely separate practice group from the general litigation group, and is separate from the terror group that oversees the Litigation against KSA. The VCF group at the Kreindler Firm now represents over 11,000 active claimants and is still retaining new claimants on a regular basis. The VCF team at the Kreindler Firm has dedicated websites, email addresses, and telephone numbers separate from the Kreindler Firm's other practice areas. This team includes case managers, in-house marketing and legal advertising personnel, paralegals dedicated to probate and surrogate issues, and a four-person intake team. DSUF ¶¶ 18-20.

Quinn had no interaction with any of this group or any work that they do. DSUF ¶ 50. No document demonstrates Quinn did any work to help the Kreindler Firm access the VCF for its clients. No document reflects any involvement by Quinn in any lobbying effort related to the establishment, amendment, or administration of the VCF, most of which occurred long before his engagement with the Kreindler Firm. Quinn has never been involved in making a claim to the

VCF. Even after preparing for his deposition, Quinn could not name a single individual at the Kreindler Firm that was involved with the VCF. *Id.*; PEX 3 at 109:23-111:6.

**B. The Victims of State Sponsored Terrorism Fund (VSST)**

Similarly, the Kreindler Firm has a team dedicated to applying for compensation from the VSST on behalf of 9/11 Families. DSUF ¶ 51. That dedicated team, led by Megan Benett, is engaged in a difficult and time-consuming practice that has achieved very good results for the Kreindler Firm's clients. *Id.* The VSST was established by statute enacted on December 18, 2015, and is open to individuals and groups who are victims of international state-sponsored terrorism, such as the 9/11 Families. DSUF ¶ 56; DEX X. Payments to claimants totaling $1,040,902,501.89 were authorized by December 2016 and the actual distributions were made in March 2017. *Id.* All of this information was publicly available by government reports and media coverage. DEX X.

The Kreindler Firm's VSST practice focuses on two areas: (1) direct communications with clients, and (2) applications to, and resolving issues with, the VSST and its personnel. Most of the attorneys and investigators at the Kreindler Firm who work on the Litigation are not involved in the work concerning the VSST. Additionally, the paralegals and case managers who work primarily on the VSST efforts have little involvement in the Litigation. DSUF ¶ 53.

The Kreindler Firm has engaged multiple groups of lobbyists to advocate specifically on the VSST, whose registrations reflect that they were engaged in connection with the VSST. While one of those lobbying firms was also engaged in efforts concerning the KSA, that firm's lobbying registrations for the VSST and the KSA are separate, as appropriate, because those are two discrete and separate areas of the Kreindler Firm's work. DSUF ¶¶ 53, 54.

Quinn has never lobbied on behalf of the Kreindler Firm in connection with VSST, and is not registered to do so. DSUF ¶¶ 54-55. Quinn has never engaged with the Kreindler Firm's VSST practice group on efforts to represent clients in accessing the VSST. *Id.* Neither Ms. Benett, nor

any other attorney, has ever discussed with Quinn how the Kreindler Firm accesses the VSST, the work involved, the strategies employed, the legal advice given, the applications prepared, or anything at all related to the VSST. DSUF ¶¶ 54-55; DEX C, ¶ 17. No document demonstrates that Quinn did any work to help the Kreindler Firm access the VSST for its clients or participate in any lobbying efforts related to the establishment, amendment, or administration of the VSST. *Id.* Indeed, even after preparing for his deposition, Quinn does not know what steps need to be followed to file submission to access the VSST, has never seen an application form for the VSST, and could not name a single individual at the Kreindler Firm that was involved with the VSST. *Id.*; PEX 1 at 86:3-17.

## III.    JASTA IS PASSED AND QUINN SEEKS TO REVISE THE EXISTING AGREEMENT TO MAXIMIZE HIS FEE

In addition to the lobbying efforts aimed at obtaining a government-sponsored, state-to-state resolution of claims against KSA, similar to the resolution of the claims against Libya following the Lockerbie bombing, the Kreindler Firm, Quinn, and Mr. Crowe also focused on passing the Justice Against Sponsors of Terrorism Act ("JASTA"). JASTA, now codified at 28 U.S.C § 1605(B) is a jurisdictional act that provides an exception to the FSIA, and permits United States federal courts to exercise jurisdiction over foreign states involved in carrying out terrorist attacks on U.S. soil.  DSUF ¶ 45, 46.[4]

With the help of Quinn, JASTA became law, over a veto by President Obama, on September 28, 2016. DSUF ¶ 46-47. Whereas KSA officials had earlier been dismissed from the Litigation pursuant to the FSIA, JASTA allowed the 9/11 Families to bring their claims against

---

[4] Since 1996, there has been an exception to the FSIA, first codified at 28 U.S.C § 1605(a)(7), and now codified at 28 U.S.C. § 1605A, for sovereigns that were designated as state sponsors of terror by the United States. DSUF ¶ 48; DEX C, ¶ 7.

the KSA itself as a direct defendant in the Litigation. DSUF ¶ 49. In March 2017, the Kreindler Firm filed a new complaint in the Litigation that targeted KSA as the key defendant. *Id*.

Immediately after its enactment, JASTA experienced its first attack. Certain 9/11 widows objected to the breadth of the eligibility requirements for the VSST, wrongly believing that JASTA (passed a year after the VSST was established) broadened who could access the VSST. DEX A, ¶ 17. To protect JASTA (as he was obligated to do), Quinn acted to make clear to relevant members of Congress, including sending a memo to Senator Schumer strongly explaining that JASTA and VSST "have nothing to do with each other." DSUF ¶¶ 59-60; DEX L; DEX M. Quinn agreed that: "They need to stop confusing, conflating or drawing any relationship between JASTA and the [VSST]." DSUF ¶ 59 (though they have similar names, JASTA and the VSST are not "related measure(s)"). Quinn did not support or advocate for the VSST; rather, the VSST was proving to be an obstacle to Quinn's efforts to obtain compensation from KSA pursuant to JASTA. DSUF ¶¶ 59-60.

Beginning in January 2017, three months after JASTA was passed and two months after Quinn sprung into action to defend JASTA *in opposition* to the high profile VSST, Quinn sought to replace the 2014 Agreement. DSUF ¶ 62. Quinn was the main driver of the revisions and the drafter of each version of the various agreements, and the contemporaneous email correspondence reflects that Quinn's sole objective was to define, clarify, and, wherever possible, expand the basis of his fee related to recoveries from KSA within the Litigation, even though the scope of his task remained the same. DSUF ¶ 63; PEX 38; DEX N-U.

The parties entered into the 2017 Agreements between May and August 2017 – the first on May 19, 2017 (the "May 2017 Agreement"), a second on May 19, 2017 (the "Additional Compensation Agreement"), and an amendment on August 8, 2017 (the "August 2017

Amendment"). The 2017 Agreements made no change to Quinn's ongoing duties, which were still limited to supporting the Kreindler Firm, and not representing the Kreindler Firm clients, by (i) protecting JASTA, and (ii) helping the Kreindler Firm achieve a fair and final resolution of the Litigation against KSA.  DSUF ¶ 64; DEX A, ¶ 25; DEX F, G.  Quinn's stated reason to revise the 2014 Agreement was to provide for himself a larger share of the 1% that he had previously agreed to split equally with Mr. Crowe, arguing that he should be entitled to a much larger fee because "JASTA certainly has enhanced the possibility of a recovery."  DSUF ¶¶ 68-69.  Quinn felt entitled to an enlarged fee because "the bottom-line reality [is] … that the enactment of JASTA has been the key to our achieving a near-term settlement…." DSUF ¶ 66.  Quinn himself equates "recovery" with what he hopes to be a near-term "settlement." *Id*.; PEX 38.

Quinn wrote to Mr. Kreindler on January 15, 2017 that "our contracts on this matter clearly contemplate that our contingent compensation is in exchange for services that will assist in obtaining a recovery for the clients."  DSUF ¶ 67; PEX 38 at QUINN_000160. Affirming this statement at his deposition, Quinn also added that he "would not expect to get paid for work that [he] did not do." *Id.*; PEX 3 at 31:9-16; 46:24-47:1.  In writing of his "contingent" compensation, Quinn notes that passage of JASTA enhances the "possibility" of recovery from KSA, and Quinn does not suggest that any recovery had already been received upon which he might get paid, such as the payments that had already been made from the VCF and the VSST – in each case over $1 billion. DSUF ¶ 68.  No document or communication with Quinn during this period mentions the VCF or the VSST, even though it had only been a matter of weeks since Quinn sought to protect JASTA, as the newly established VSST was appearing to undermine his goals to ensure that KSA could be named as a direct defendant in the Litigation. DSUF ¶ 80; PEX 38; DEX N-U.

Rather, Quinn sought to define the sources of recovery *from the Litigation* that would form the basis of his compensation by identifying every possible revenue source, and sought to maximize his percentage in relation to his colleagues. DSUF ¶¶ 72; DEX O; DEX P; DEX R; DEX T.  In a series of email explanations, dated from January-May 2017:

- Quinn sought to increase – and did increase – his share of the Crowe/Quinn fee from resolution of cases filed prior to July 2014, the date of the 2014 Agreement, from 50% to 77.5% (and commensurately reduced Crowe's share of that Crowe/Quinn fee from 50% to 22.5%);

- Quinn sought to secure for himself – and did secure for himself – the entire fee earned from resolution of cases filed in the Litigation after July 2014, while Crowe was deprived of any portion; and

- Quinn additionally sought – and received – an entitlement to be paid his fee on any additional fees that the Kreindler Firm might be awarded by the Court at the end of the Litigation from a common benefit fund or for the Kreindler Firm's work on the PEC, irrespective of whether those fees were tied to Kreindler Firm clients or not.

DSUF ¶¶ 73-75; PEX 38, DEX N-U; DEX F.

Quinn had also requested that the Kreindler Firm and Mr. Kreindler agree to include language that his fee would also include all "new categories of plaintiffs." DSUF ¶ 75. That language does not appear in the final versions. DEX F. However, Mr. Kreindler and the Kreindler Firm agreed to nearly all of the requests that Quinn made to specify the sources of recovery connected to the Litigation from which he would be entitled to a fee. DSUF ¶ 76.

There is not a single reference in any document relating to the 2017 Agreements to the VCF or the VSST, and the parties acknowledge that the VCF and the VSST were never mentioned throughout the process of revising contracts into what became the 2017 Agreements.  DSUF ¶ 80; PEX 3 at 57:24-58:10; DEX A, ¶¶ 24-27.

During the revision process with the Kreindler Firm, Quinn drafted another agreement which was entered into by Mr. Crowe and the Kreindler Firm (the "2017 Crowe Agreement"). The

2017 Crowe Agreement has almost identical language to the May 2017 Agreement, but omits any mention of past contributions to JASTA, and contains a smaller fee percentage. After Quinn brought the instant lawsuit, Mr. Crowe submitted a declaration explaining his understanding of the operative language of the 2017 Agreement, and the parties' intent.

> Neither Quinn nor I was ever involved in efforts to create the [VSST]. We were never asked to lobby for it, or for its application to 9/11 [F]amilies, and we never did so. We were always focused on KSA and paving the way for [the Kreindler Firm] to sue KSA. Our role was to lobby for JASTA to facilitate the [L]itigation and/or to work with the administration to possibly pursue other diplomatic solutions with those sovereigns and entities to secure relief for the 9/11 [F]amilies. Our 2017 Memo memorializes that role and emphasizes only JASTA and KSA for just that reason. The 2017 Agreement[s] [do] not mention the [VSST] whatsoever because it was not within the scope of our work. DEX DD, ¶ 11.

## IV. THE LANGUAGE AND STRUCTURE OF THE 2017 AGREEMENTS EXCLUSIVELY CONCERN RESOLVING THE LITIGATION AND ENSURING KSA REMAINS A DEFENDANT IN ORDER TO FUND THE RESOLUTION

The 2017 Agreements are the governing contracts. DEX F, DEX G. The first paragraph of the May 2017 Agreement defines the "Litigation" as "the litigation in the Southern District of New York relating to or arising out of the attacks that occurred on September 11, 2001."[5] DEX F. By their express terms, the 2017 Agreements replace the 2014 Agreement, which is attached to the May 2017 Agreement as an exhibit. *Id*. The 2014 Agreement is defined as the sole governing agreement "relating to services rendered and to be rendered by Quinn to [the Kreindler Firm] in support of the representation of clients who are plaintiffs in the Litigation asserting wrongful death and personal injury causes of action."[6] *Id*. In its second paragraph, the May 2017 Agreement states

---

[5] Although the defined term "litigation" in the Agreements is not capitalized, it is a defined term. For clarity and consistent with standard practice, the capitalized term Litigation as used herein refers the defined term in the 2017 Agreements.

[6] Plaintiff argues that the Court should not even consider any aspect of the 2014 Agreement. Br. at 15. He is wrong for two reasons: (1) it is an exhibit to the May 2017 Agreement and thus made a part of the 2017 Agreements, and (2) it comprises the basic circumstances of which a reasonable person is presumed to be aware. *See,* Section I B, *infra.*

that it "shall henceforth be the sole basis of any obligation by [the Kreindler Firm] to [Quinn] arising in connection with the Litigation or the resolution of it." *Id*. There is no suggestion that the Kreindler Firm has any obligation to Quinn outside of the Litigation or the resolution of it.

As with most contracts, these introductory paragraphs frame and provide context for the parties' relationship. Despite specific reference to the Litigation and the resolution of it, any mention of the VCF or the VSST – multi-billion-dollar funds that provide relief monies to 9/11 victims outside of the court system – is conspicuously absent. *Id*. The VCF and the VSST were creations of Congress outside of the Litigation, and access to and distributions from them have no bearing on the resolution of any claims in the Litigation. DEX C, ¶ 32.  No language in the 2017 Agreements frames the parties' relationship in terms of lobbying for the U.S. government to appropriate funds to comprise a relief fund or expand eligibility requirements, and no language in the 2017 Agreements frames the parties' relationship in terms of engaging with the efforts of submitting claims.

The third paragraph of the May 2017 Agreement addresses Quinn's only two duties to the Kreindler Firm, past, present, and future: to counsel and advise the Kreindler Firm with respect to (i) the preservation of JASTA, and (ii) "efforts to accomplish reasonable settlement or other resolution of the Litigation."  The 2017 Agreements *do* note that Quinn had, to date, contributed to "the Litigation and the enactment of JASTA." DEX F. The 2017 Agreements make no mention of any work that Quinn has contributed related to the VCF or the VSST – statutes that, like JASTA, had been passed before execution of the May 2017 Agreement. *Id*.; DSUF ¶¶ 22, 56. That is because he made no such contributions.

The fourth paragraph of the May 2017 Agreement ties Quinn's compensation directly to his two duties. DEX F. ("As compensation for his sustained effort in assisting and advising [the

Kreindler Firm] and [Mr.] Kreindler, [the Kreindler Firm] agrees to pay…"). The 2017 Agreements specifically describe the revenue source upon which the fees to be received by Quinn will be paid: "the net recovery on each decedent's wrongful death and each personal injury claim" filed by the Kreindler Firm prior to the 2014 Agreement (July 2014) upon which "[the Kreindler Firm] receives a fee by judgment, settlement or otherwise."[7] There is no mention of the VCF or the VSST, or of any other bases of compensation outside the Litigation or the resolution of it. *Id.*

The parties then entered into the Additional Compensation Agreement that identifies two new bases for compensation to Quinn related to the Litigation. DSUF ¶ 75; DEX F. In addition to the compensation bases laid out in the May 2017 Agreement, Quinn would now receive 1% of the net recovery for wrongful death and personal injury claims filed in the Litigation by the Kreindler Firm *after* July 10, 2014. *Id.* The Additional Compensation Agreement also specifies that Quinn be compensated from fees that the Kreindler Firm might be awarded by virtue of its role on the Plaintiff's Executive Committee in the Litigation, or from a common benefit fund. *Id*. These newly added sources of revenue are further discrete items of a list of sources of recovery on which Plaintiff is to be compensated. Indeed, these sources of recovery are distinct enough that the percentage for Quinn varies depending upon which basis of compensation is implicated.  DEX F.

Three months later, in August 2017, Quinn proposed an amendment to address points raised by Jerry Goldman, Esq. of Anderson Kill P.C. ("Anderson Kill"), another law firm representing victims in the Litigation and a party to a different agreement with Quinn relating to efforts concerning KSA. DSUF ¶ 81; PEX 52. Quinn wrote to Mr. Kreindler that he would like language added to the May 2017 Agreement and the Additional Compensation Agreement to

---

[7] Notably, these do not account for all the cases and claims in the Litigation, excluding for example, cases and claims related to property damage claims by owners and insurers.

address a situation described by Mr. Goldman, namely that Mr. Goldman is "gathering clients with respect to whom he may never actually file a claim – ***but still achieve a recovery and get a fee via settlement or other resolution***." DSUF ¶ 83; PEX 57 (emphasis added). Quinn wanted the same scenario covered in the 2017 Agreements, and explained in the second paragraph of the August 2017 Amendment that the parties' intent was to cover the scenario that there could be a *resolution of the Litigation* that provided compensation to victims who had not yet filed claims in court. DSUF ¶ 84; PEX 3 at 114:22-115:8; PEX 1 at 68: 8-70:11; DEX A, ¶ 30. Quinn, Mr. Kreindler, and other plaintiffs' lawyers involved in the Litigation believed that a diplomatic resolution of the litigation claims against the KSA was possibly imminent in 2017. *Id.* They believed that President Trump might broker a resolution with KSA whereby in exchange for ending the Litigation, KSA could provide a pool of money that would compensate all terror victims irrespective of claims filed in the Litigation. *Id.*; DEX A, ¶¶ 28-31. Quinn wanted to ensure that he would get paid his fee of any KSA-funded payout to a victim resulting from a diplomatically engineered resolution, whether or not the victims had filed claims in the Litigation. *Id.*

Finally, demonstrating Quinn's focus on finding and naming every possible source of recovery upon which he might receive a fee, he further requested that Mr. Crowe be disqualified from receiving his 0.225% fee on the early cases, and that Mr. Crowe's fee be redirected to Quinn. DSUF ¶ 85. The Kreindler Firm agreed to these requests in the August 2017 Amendment. Still, however, the parties never mentioned the VCF or the VSST as encompassed within the 2017 Agreements. DSUF ¶ 80.

## V.    QUINN BREACHES AND IS TERMINATED

In April 2020, Quinn first demanded a percentage under the 2017 Agreements for fees derived from the Kreindler Firm's work in connection with the VSST. DSUF ¶ 90. No request was made prior to this time. DSUF ¶ 91. When the Kreindler Firm denied his request for fees on the

VSST, because such compensation fell outside the scope of the 2017 Agreements, Quinn refused to do any further work under the 2017 Agreements. DSUF ¶ 95. The Kreindler Firm made various requests of Quinn in furtherance of the services he had agreed to provide, but Quinn continued to refuse. DSUF ¶ 95. On September 20, 2021, the Kreindler Firm terminated Quinn pursuant to the 2017 Agreements for material breach. DSUF ¶ 96. Quinn never contested the termination or responded to the Kreindler Firm in any way regarding the breach, nor did he communicate with the Kreindler Firm or Mr. Kreindler after January 2021. DSUF ¶ 98.

Quinn registered as a lobbyist for Anderson Kill for Anti-Terrorism Act matters in 2021, but he did not file any similar lobbying registration to represent the Kreindler Firm because he was not working for the Kreindler Firm at that time. DSUF ¶ 99.

## VI.    QUINN SUES THE KREINDLER FIRM

On July 8, 2021, Quinn filed his complaint in the instant action (the "Complaint"). Dkt. 1. The Complaint made claims for fees deriving from the Kreindler Firm's work on obtaining recoveries for its clients from the VSST. Dkt. 1. Quinn still at this time had never once suggested that he believed himself entitled to fees deriving from the Kreindler Firm's work on obtaining recoveries for its clients from the VCF. Quinn did not advance his theory that the 2017 Agreements included the VCF until the Amended Complaint, filed on October 18, 2021. Dkt. 19. Quinn has never offered an explanation for this delay.

## ARGUMENT

### I.    AS A MATTER OF LAW, THE 2017 AGREEMENTS DO NOT PROVIDE FOR ANY FEE TO BE PAID TO QUINN ON DISTRIBUTIONS FROM THE VCF OR THE VSST

### A.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Liberty Lobby*, 477 U.S. at 248). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  As set forth below, Defendants are entitled to summary judgment because there is no genuine issue of material fact that the 2017 Agreements do not require Quinn to be paid a fee on work done by the Kreindler Firm in connection with the VCF or the VSST. Such fees are not included under the 2017 Agreements, are wholly unrelated to Quinn's duties with of seeking resolution of the Litigation or protecting JASTA, and cannot be read into the Agreements.

**B. The Agreements Unambiguously Limit Any Quinn Fee to Recoveries from the Final Resolution of the Litigation**

The plain language of the 2017 Agreements does not permit Quinn to recover fees unrelated to the final resolution of the Litigation. The District of Columbia adheres to an "'objective law' of contracts, which means that the written language will govern the parties' rights, unless it is not susceptible of clear meaning . . ." *Sagalyn v. Foundation for Preservation of Historic Georgetown*, 691 A.2d 107, 111 (D.C. 1997).  In determining whether a contract is susceptible to clear meaning, the first step is "determining what a reasonable person in the position of the parties would have thought the disputed language meant." *Id.* (*citing Intercounty Constr. Corp. v. Dist. of Columbia,* 443 A.2d 29, 32 (D.C. 1982)).  Further, "[t]he presumption is that the reasonable person knows all the circumstances before and contemporaneous with the making of the agreement," and that the "reasonable person is bound by all usages which either party knows or has reason to know." *Intercounty*, 443 A.2d at 32. "[E]xtrinsic evidence may be considered to

determine the circumstances surrounding the making of the contract, so that it may be ascertained what a reasonable person in the position of the parties would have thought the words meant." *See N.W. v. Dist. of Columbia*, 107 F. Supp. 3d 141, 148 (D.D.C. 2015) (Moss, J.); *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.,* 485 A.2d 199, 205-06 (D.C. 1984); *Abdelrhman v. Ackerman*, 76 A.D.3d 883, 888 (D.C. 2013) (parties may submit "objective" extrinsic evidence showing the parties' knowledge at the time of contracting and the circumstances surrounding the contract).

"A contract is not ambiguous merely because the parties dispute its meaning." *Washington Props., Inc. v. Chin, Inc.,* 760 A.2d 546, 548 (D.C. 2000). Nor is a contract ambiguous merely because its terms are complex or "could have been clearer." *Dist. No. 1—Pac. Coast Dist. v. Travelers Cas. and Sur. Co*., 782 A.2d 269, 274 (D.C. 2001). "A contract is not ambiguous, unless, after applying established rules of interpretation, it remains reasonably susceptible to at least two reasonable but conflicting meanings." *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 139 (2018) (citing 11 R. Lord, Williston on Contracts § 30:4, at 53-54 (4th ed. 2012)).

The 2017 Agreements are unambiguous as written regarding the sources of recovery from which Quinn is to be compensated. Quinn is to provide sustained effort to (i) ensure JASTA remains intact so that KSA remains a defendant in the Litigation, and (ii) support the Kreindler Firm's efforts to accomplish reasonable settlement or other resolution of the Litigation claims. DSUF ¶ 64; DEX F. As compensation for that sustained effort, Quinn is to receive a percentage of recoveries resulting from the resolution of the claims in the Litigation, if or when that should occur. *Id.* Quinn's unsupported assertion that the 2017 Agreements cover compensation derived from U.S.-funded distributions to the 9/11 Families – which have nothing to do with KSA or resolving the Litigation – is without basis in the language or structure of the 2017 Agreements and runs afoul

of every canon of contract construction. The only reasonable interpretation of the 2017 Agreements is that Quinn's fee is to be paid only on recoveries funded by KSA (directly or through its proxies) in connection with a resolution that ends the Litigation, and that Quinn was never entitled to receive a fee for payments made pursuant to the VCF or VSST.

### 1.   The 2017 Agreements make no mention of the VCF or the VSST

It is fundamental contract law that "the expression of one thing is the exclusion of another." Antonin Scalia and Bryan Garner, Reading Law: The Interpretation of Legal Texts, p. 428 (2012); *see also Am. Postal Worker's Union v. U.S. Postal Serv.,* 550 F.3d 27, 30-31 (D.C. Cir. 2008). The 2017 Agreements define the Litigation and specifically identify JASTA, the enabling jurisdictional statute that Quinn helped to be enacted. And yet, nowhere in the three distinct 2017 Agreements do the parties mention the VCF or VSST, or any of the statutes that enable, renew or clarify them.[8]  If the parties intended the 2017 Agreements to encompass the VCF or the VSST, they could and would have said so. *See CNH Indus. N.V.*, 583 U.S. at 140 ("If the parties meant to vest healthcare benefits for life, they easily could have said so in the text.").

Even more damaging to Quinn's interpretation, the 2017 Agreements (and the negotiations leading to each of them) enumerate the specific sources of recovery from which Quinn will derive compensation, and the VCF and VSST are conspicuously excluded. DSUF ¶ 80. Quinn is to receive a fee on: (i) recoveries from wrongful death and personal injury cases filed in the Litigation pre-2014, (ii) recoveries from wrongful death and personal injury cases filed in the Litigation post-2014, (iii) fees awarded to the Kreindler Firm by the Court for its role on the PEC or through a

---

[8] Those statutes in existence before 2017 but conspicuously not mentioned or referred to in the 2017 Agreements include: The Air Transportation Safety and System Stabilization Act of 2001 (establishing the VCF); The James Zadroga 9/11 Health and Compensation Act of 2010; the December 8, 2015 Reauthorization of the Zadroga Act (reauthorizing and extending the VCF); and the United States Victims of State Sponsored Terrorism Act of 2015 (establishing the VSST).

different common benefit fund at the close of the Litigation, and, in addition, (iv) recoveries clients received from a KSA-funded compensation fund that ended the Litigation but did not require filed claims in the Litigation for eligibility. The list is explicit, and specifically does not include the VCF or the VSST.

Where a contract lists or enumerates what it applies to and covers, it is strongly implied that it excludes other things that are not listed. *Crabtree v. Miller Pipeline, LLC*, 2021 WL 1177961, at *6 (D.D.C. Mar. 29, 2021). This is true even where those "other things" are closely related or even intrinsic to the enumerated list. *Id.* at *7. In *Crabtree*, the court looked at a collective bargaining agreement that required the employer to make contributions to an ERISA fund for time spent by employees on work "covered" by the CBA. At issue was whether the employer had to make contributions on time spent by employees in training or safety meetings, even though training and safety meetings were not specifically enumerated as covered work. The Court held that because the CBA addressed "covered work," some work would be covered, and some would not be. *Id.* The Court refused to construe the agreement to include closely-related, even "intrinsically" related, activities as "covered work" if they were not included in the described activities. *Id.* ("While trainings and safety meetings might be incidental, or even a prerequisite to covered work, they are not themselves covered work").

Similarly, some of the clients for whom the Kreindler Firm has obtained recoveries from the VCF and VSST may also be plaintiffs in the Litigation, but that does not qualify those unrelated recoveries as subject to the 2017 Agreements.[9] Applications to the VCF and VSST are entirely different work streams performed by different professionals at different times than the work

_____

[9] Though it would not be enough to alter the plain language in any event, Quinn's effort to link the VSST to his work on JASTA and KSA is founded on a complete misunderstanding of the statutes. DEX C, ¶¶ 10-19.

associated with seeking a resolution of the Litigation encompassed by the 2017 Agreements. Recoveries from the VCF and VSST cannot be swept into the scope of the Agreements simply because there may be some overlap of 9/11 Families to whom they apply. *Crabtree*, 2021 WL 1177961, at *7. Nor do the rules of construction permit adding these additional and fundamentally different sources of recovery. *Wharf, Inc. v. Dist. of Columbia Wharf Horizontal Reit Leaseholder LLC*, 2021 WL 1198143, at *29 (D.D.C. Mar. 30, 2021) (declining to write in an end date to the subject leases to render them reasonable because the rules of construction do not permit the Court to add words to a contract and change the parties' intent); *Hart v. Vermont Inv. Ltd. P'ship*, 667 A.2d 578, 584-85 (D.C. 1995) (citation omitted) (declining to "impose by judicial *fiat* a provision which the parties did not include therein").

### 2. The 2017 Agreements tie Quinn's compensation to his duties to resolving or settling the Litigation

In interpreting the scope of contract terms, courts will presume some connection between the goods and services rendered and the compensation paid, even where they are not expressly tied, as they are here. *See N.W. v. Dist. of Columbia,* 107 F. Supp. 3d at 148-49 (Moss, J.) (reading release in settlement agreement to pertain to claims affecting the 2012-2013 school year in part because the consideration paid for the release was the reimbursement of the tuition paid for 2012-2013 school year); *Dist. No. 1—Pac. Coast Dist.*, 782 A.2d at 275 (where specific payment was "quid pro quo for release and assignment, exactly what the sum was meant to cover is clearly probative" of the rights incorporated (and reserved) by the release and assignment). Here, because Quinn's duties are specifically limited to work on the "fair and expeditious resolution of the Litigation" and maintaining KSA as a defendant, the only reasonable reading of the 2017

Agreements is that, absent a clear statement to the contrary, they are limited to the recoveries derived from the resolution of the Litigation, presumably funded by KSA.[10]

### 3. The absence of the material terms of duration and method or timing of payment limits recoveries to those obtained from a final resolution of the Litigation

The 2017 Agreements lack material terms of duration, timing, or manner of payment of the fees to which Quinn is entitled. As explained below, the absence of these material terms can only be squared with a reading of the 2017 Agreements that is limited to recoveries from the Litigation. Quinn's strained reading of the 2017 Agreements as including the VCF or the VSST without these material terms renders the 2017 Agreements non-sensical, unworkable, and unenforceable for vagueness or indefiniteness, and must be rejected.[11] *Wharf, Inc.*, 2021 WL 1198143, at *28 (contractual agreements should be interpreted in a sensible manner) (collecting cases).

Specifically, a duration clause is not an essential term if, as Defendants contend, the 2017 Agreements are intended to compensate Quinn from the resolution of the Litigation only. If understood as confined to the Litigation, the 2017 Agreements would be in effect until the resolution of the Litigation, at which time the net recovery and Quinn's fee, if any, could be

---

[10] In interpreting a contract "[t]he writing must be interpreted as whole, giving reasonable, lawful and effective meaning to all of its terms." *1010 Potomac Assocs.*, 485 A.2d at 205. Viewed as a whole, the 2017 Agreements define a discrete relationship between the parties. Quinn is to support the Kreindler Firm's effort to seek compensation for the 9/11 Families through a final resolution of the Litigation and, through efforts to preserve JASTA, to ensure that KSA remains a defendant to the Litigation, which applies pressure on KSA to fund a settlement in that resolution. In return, and "as compensation for his services," Quinn will receive a percentage on recovery from certain "wrongful death and personal injury claim[s]" from "cases filed in the Litigation," with certain additional itemized "bases of compensation" defined in the context of the Litigation added thereafter.

[11] Defendants have asserted the affirmative defense that the 2017 Agreements are void for vagueness or indefiniteness in their entirety. Because this this motion is limited to whether the 2017 Agreements reach the VCF or VSST, Defendants assume for purposes of this motion only that the 2017 Agreements can be enforced with respect to the Litigation, but reserve the right to raise, argue, and brief the affirmative defense of unenforceability.

calculated and paid within a reasonable period of time, and the termination of the 2017 Agreements would be self-executing. *Independence Mgm't Co. v. Anderson & Summers, LLC*, 874 A.2d 862, 869 (D.C. 2005) (citing Restatement (Second) of Contracts § 204 (1982) ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.")). However, if the duties to be performed and fees to be paid are not confined to the Litigation and the singular event of its resolution, the 2017 Agreements become subject to an indefinite term. A contract not subject to any term is unenforceable. *See Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990) ("A contract must be sufficiently definite as to its material terms (which include … duration)…"). Limiting the scope of the 2017 Agreements to the Litigation is the only reading that renders them enforceable in light of the absent duration clause.

The absence of method or timing of payment provisions similarly requires that the only reasonable reading of the 2017 Agreements is limited to the Litigation. The parties knew at the time of contracting that the VCF and the VSST had already paid out in excess of $1 billion each overall, and that some of those amounts were paid out to clients of the Kreindler Firm. *See Intercounty Const. Corp.,* 443 A.2d at 32 (one prong of the reasonableness determination is "the presumption that the reasonable person knows all the circumstances surrounding the making of the contract"). It is unreasonable to read, and impossible to enforce, the 2017 Agreements as incorporating VCF and VSST funds while omitting any suggestion of how or when a payment on those amounts *already received and held* by the Kreindler Firm would be made to Quinn.

The absence of timing or method of payment clauses also precludes an interpretation that includes the VCF or VSST when considering recoveries and fees from the VCF and VSST that

may be received after the effective date of the 2017 Agreements.  The VCF and VSST make distributions on a rolling basis and will continue to do so until 2090 and 2039, respectively, subject to further extensions by Congress.  DSUF ¶¶ 12, 16, 17, 25, 26.  Unlike with a single event such as final judgment or settlement of the Litigation which would trigger a single accounting and payment event, a court would be hard pressed to "read in" a full panoply of reasonable commercial terms calculating and paying Quinn a percentage of any ever-changing net recovery from the VCF and VSST, past, present and future, spanning decades, well beyond the life expectancy of the parties. *CNH Indus. N.V.*, 583 U.S. at 135-136 (citing *M&G Polymers U.S.A, LLC v. Hobert Freel Tackett,* 574 U.S. 427, 441 (2015)) ("Contracts that are silent as to their duration will ordinarily be treated not as operative in perpetuity but as operative for a reasonable period of time."); *Wharf, Inc.*, 2021 WL 1198143, at *29 (declining to write in an end date to the subject leases to render them reasonable because the rules of construction do not permit the Court to add words to a contract and change the parties' intent); *Independence Mgm't Co.,* 874 A.2d at 869 (holding that an interpretation that one party must stand perpetually ready to close a transaction that was not guaranteed to close would place a significant burden on that party was untenable absent an express provision in the contract indicating this was the parties' intent).

Indeed, the absence of any specific terms related to the timing or means of payments to Quinn from complex recoveries derived from VCF or VSST, is itself evidence the 2017 Agreements do not contemplate payments to be made from recoveries related to the VCF or the VSST. *See PCH Mut. Ins. Co., Inc. v. Cas. and Sur.*, 750 F. Supp. 2d 125 (D.D.C. 2010) (absence of terms for identifying arbitrator, method for choosing arbitrator or place of arbitration is probative that parties did not consider or agree on all material terms required for an agreement to arbitrate); *Virtual Def. and Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 9, 19 (D.D.C.

2001) (declining to find enforceable contract where court could not infer a meeting of the minds as to the kinds of details typically present in a contract, such as no term for method or timing of payment) (citations omitted).

### 4. The personal services nature of the 2017 Agreements limits recovery to the Litigation

The 2017 Agreements are personal services contracts, specific that Quinn himself must perform his duties. Quinn's expansive reading would span decades beyond his death which is inconsistent with a personal services contract. It is well-established that a contract contemplating personal services on the part of the promisor generally expires at his death. *Holt v. St. Louis Union Tr. Co.*, 52 F.2d 1068, 1070 (4th Cir. 1931); *Burka v. Patrick*, 34 Md. App. 181, 185 (Md. Ct. Special App. 1976) (a contract for personal services does not survive the death of a party); *Bruce v. Dyer*, 67 Md. App. 499, 504-05 (Md. Ct. Special App. 1986) ("The case law is that unless the contract is for personal services … it survives the death of a party and is binding upon his estate."); *Hodge v. Evans Fin. Corp.*, 778 F.2d 794, 797-98 (D.D.C. 1985) (in context of Statute of Frauds, "death terminates a contract for personal services…"). Quinn's effort to turn his personal services contingency agreements into a guaranteed continuing revenue stream for his estate and his progeny to continue for decades after his death without any contractual language suggesting this result was the parties' intent is unreasonable. This is contrary both to the law and to the undisputed facts.

### 5. The parties' course of dealing under the 2017 Agreements limits recovery to the Litigation

The "reasonable person" standard by which a contract will be interpreted applies not only to the background and circumstances of the execution of the contract, but also to the course of conduct of the parties under the contract. *Akassy v. William Penn Apartments Ltd. P'ship,* 891 A.2d 291, 299 (D.C. 2006); *Intercounty Const. Corp.*, 443 A.2d at 32. In this case, Quinn worked with the Kreindler Firm from 2013 until 2020, to persuade KSA to compensate the 9/11 Families

29

and end the Litigation. Quinn never worked on lobbying for or obtaining recoveries from the VCF or VSST for clients of the Kreindler Firm.

Despite the high-profile, high-value distributions made from the VCF and the VSST, resulting in compensation to terrorism victims well in excess of $2 billion during that time period, the parties never mentioned or discussed the possibility that Quinn would receive a fee from VCF or VSST payouts. DSUF ¶ 80. It was not until April 2020, *seven years* into the relationship, *nine* years after the VCF was authorized to make distributions, and nearly *four* years after the VSST was authorized and began making distributions, that Quinn demanded a fee on recoveries from the VSST, based on his sudden, new interpretation of the parties' deal.  Even more startling, Quinn never requested a fee on the VCF distributions until his Amended Complaint was filed on October 2021, three months after the filing of his original Complaint claiming only VSST monies.

Quinn's course of conduct under the 2017 Agreements for seven years can only reflect his understanding that the Agreements were never intended to include the VCF or VSST. *Patterson v. Dist. of Columbia,* 795 A.2d 681, 684 (D.C. 2002) (rejecting defendant's interpretation that term "costs" in a settlement agreement should also include "attorneys' fees" where parties engaged with issues relating to owed attorneys' fees until the defendant advanced its contract construction argument as a litigation position more than a year later). What is more, if Quinn believed that he had always been entitled to monies from the VCF and the VSST, he would not have simply "extinguished, superseded and replaced" the Original 2013 Agreement or the 2014 Agreement without some discussion of what would become of those fees allegedly previously earned.[12]

_____

[12] Moreover, the D.C. statute of limitations for breach of a non-sales contract is three years.  D.C. Code § 12-301.  Because Quinn's argument is that the Kreindler Firm has breached the 2017 Agreements for failure to compensate him on fees from the VCF and the VSST whenever they come in, and VCF and VSST recoveries had already been received at the time of the 2017 Agreements, the alleged breach occurred in August 2017, the day the last of the 2017 Agreements

### 6. No contract language permits Quinn to be paid on the years' long work of the Kreindler Firm on the VCF and the VSST

Quinn points to two phrases in the 2017 Agreements to support his expansive reading. First, Quinn relies on the phrase "or otherwise" as evidence that the parties intended to "go beyond the types of recovery already listed and include *every other type of recovery.*" *See* Br. at 18 (emphasis added). Second, Quinn relies on the second paragraph of the August 2017 Amendment to support his argument that he is entitled to a percentage of fees recovered on VCF and VSST payouts because of language referring to clients who have "filed claims" and those who have "not filed in the litigation." *See* Br. at 21. Neither argument is reasonable, let alone persuasive.

Quinn is entitled to a percentage of recovery obtained from certain cases filed in the Litigation, and on other fees that may be awarded to the Kreindler Firm for its role in leading the Litigation, whether the Kreindler Firm receives the subject fee, "by settlement, judgment or otherwise." DEX F. When construing the residual term "or otherwise," courts will look to the specific examples preceding "or otherwise" to determine the nature and characteristics of what was intended to be included by "otherwise." *See Begay v. U.S.,* 553 U.S. 137, 144 (2008) (Scalia, J. concurring) ("otherwise" is used in statutory construction to draw a substantive connection between the "otherwise" clause and specific examples which precede it).

Here, the preceding specific examples – judgment and settlement – are ways of achieving recovery flowing from a final resolution of the claims in the Litigation.  As such, "or otherwise" in the 2017 Agreements also must refer to another way or manner of finally resolving the Litigation.  An example of such a scenario would be the very state-to-state resolution with KSA

---

were executed. Therefore, the statute of limitations ran on his claims in August of 2020, nearly a year before he first brought suit in July 2021. Defendants have asserted this statute of limitations affirmative defense, and reserve the right to move under it in the future, but it is beyond the scope of this partial summary judgment motion.

that Quinn was hired to lobby for and towards which Quinn was ostensibly working. Had Quinn succeeded in his assigned task and facilitated a final resolution, such as had been done in connection with Pan Am Flight 103 and the LCRA upon which his task here was modeled, the resulting recovery and fee would form the basis of Quinn's fee. That type of final resolution would not have been technically a "settlement" or a "judgment," but it would have been "substantively connected" in that it resolved the claims and generated a recovery, and would have been encompassed by the "or otherwise" language. Quinn's argument that he cannot conceive of another means of accomplishing a final resolution of the Litigation other than settlement or judgment is baffling.  Br. at 19. Seeking a diplomatic state-to-state resolution that would end the Litigation in the manner of the resolution of the Pan Am Settlement was literally the singular thing Quinn was hired to do, and, for a time, tried to do.

The idea that the use of the word "otherwise" opens the floodgates to absolutely anything else under the sun that could produce a recovery, whether or not it is connected to a settlement of or a judgment in the Litigation, is unreasonable, and the cases cited by Quinn certainly do not stand for this proposition. Br. at 18. *Noble* involved a statute that required a union "to comply with all reasonable requests of any candidate [for union office] to distribute by mail or otherwise at the candidate's expense [his] campaign literature…." The issue was whether the union violated its duty by refusing to publish the materials in multiple issues of its member publication (as opposed to simply coordinating a mailing using the list of member addresses). *Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 103 F.4th 45, 49 (D.C. Cir. 2024). The D.C. Circuit Court of Appeals reversed the lower court's dismissal of the suit finding, among other things, that distribution of the candidate's materials by means of its member publication was sufficiently connected to coordinating distribution "by mail" to be included by "or otherwise."  *Id*.  The *Noble* court did not

consider whether the union was required to distribute the candidate's materials by more remote, unconnected means, such as hosting a phone bank or supporting door-to-door canvassing. And certainly, there was no suggestion that "or otherwise" required the union to deliver the candidate's campaign literature by *any means regardless of the method*. *See* Br. at 14 (interpreting the 2017 Agreement to encompass "any recovery, regardless the source."). The fact that the *Noble* court was addressing the issue demonstrates that this Court should not assume that everything under the sun is to be incorporated in a residual "or otherwise." Quinn cites to *Att. Gen. of U.S. v. Wynn,* 104 F.4th 348, 354 (D.D.C. 2024), for the unremarkable proposition that "otherwise" means "a different way or manner." Br. at 18. Defendants do not disagree. Thus, the 2017 Agreements provide that Quinn is entitled to a fee on net recoveries on (i) "wrongful death" and "personal injury claim(s)," (ii) "filed in the Litigation," (iii) with respect to which the Kreindler Firm receives a fee, (iv) "whether by settlement, judgment or" some "different way or manner" of finally resolving the Litigation as a settlement or judgement would.

Quinn also relies on language in the August 2017 Amendment that provides for compensation on behalf of clients whose behalf claims are not filed in the Litigation but who have retained the Kreindler Firm to assist in recovering compensation "whether through the filing of claims or otherwise and who in fact receive a recovery with respect to which [the Kreindler Firm] receives a fee." Quinn argues that this amendment was executed "to further unify the language of their contractual obligations." Br. at 20-21. If the intent of this language were to clarify that the parties wanted to include millions in fees from the VCF and VSST and that had always been the intent (despite those funds never appearing in the text of the earlier agreements), the language could very simply have said "including fees paid from recoveries on the VCF and the VSST." Such language is conspicuously absent. Also, as a technical matter, Quinn's reading actually

excludes the VSST. Any recovery from the VSST is predicated on a default obtained from Iran in 2011, turned into a judgment in 2015. Those default judgments in turn predicated on original claims filed in the MDL in 2003. DEX C, ¶ ¶ 3, 13.

At the time of the 2017 Agreements, President Trump had just been elected, was making a very public push to improve relations with KSA, and had been vocal about his concern for the 9/11 Families. The parties believed that newly-elected President Trump sought to reach a deal with KSA in which KSA would compensate all 9/11 Families – irrespective of whether they were plaintiffs in the current Litigation – in conjunction with a full and final resolution ending all related pending Litigation against KSA. DSUF ¶ 87. As part of Quinn's effort to revise the agreements in 2017 to maximize his fees, he rushed to ensure that this additional source of recovery from a resolution of the Litigation against KSA was included.

*       *       *

In light of all the relevant circumstances, the 2017 Agreements are susceptible to only one reasonable interpretation – that they are limited to recoveries from the Litigation and exclude recoveries from the VCF and VSST. Any other conclusion renders the Agreements non-sensical, unenforceable, and bizarre, and must therefore be rejected. *See N.W. v. District of Columbia,* 107 F. Supp. 3d at 150 (Moss, J.) (rejecting the strained reading that invites "bizarre results" and instead adopting interpretation that "makes sense in context"); *Dist. of Columbia v. Young*, 39 A.3d 36, 40 (D.C. 2012) (a court should "strive to give *reasonable* effect" in its interpretation) (emphasis added); *see also, e.g.*, *Catalina Enters. Inc. Pension Tr. v. Hartford Fire Ins. Co.*, 67 F. 3d 63, 66 (4th Cir. 1995) ("[i]t is axiomatic under Maryland law that a court should avoid reading a contract in a way that produces an absurd result, especially when a reasonable interpretation is available.").

**C. Even if the Language of the Agreements Is Ambiguous, the Extrinsic Evidence of the Parties' Intent Conclusively Limits Any Payment to Recoveries from the Final Resolution of the Litigation**

      1. Legal Standard

Even if the Court cannot determine that the 2017 Agreements exclude the VCF and VSST on their face, summary judgment for defendants is still proper because the extrinsic evidence demonstrates that there is only one reasonable reading of the Agreements. "Even if a contract is found to be ambiguous … and extrinsic evidence is allowed, if the extrinsic evidence demonstrates that only one view is reasonable – notwithstanding the facial ambiguity – the court must decide the contract interpretation question as a matter of law." *Deutsche Bank Nat'l Tr. Co. v. FDIC*, 109 F. Supp. 3d 179, 198 (D.D.C. 2015) (quoting *American First Inv. Corp. v. Goland*, 925 F.2d 1518, 1522 (D.C. Cir. 1991)); *see also Farmland Indus., Inc. v. Grain Bd. of Iraq*, 904 F.2d 732, 736 (D.C. Cir. 1990); *see also Urban Masonry Corp. v. N&N Contractors, Inc.*, 676 A.2d 26, 32 (D.C. 1996); *Joel Popkin and Co. v. Wharton Econometric Forecasting Assocs., Inc.*, 659 F. Supp. 343, 348 (D.D.C. 1987).

      2. Quinn and Mr. Crowe were hired to enlist the U.S. government to persuade KSA to compensate the 9/11 Families and end the Litigation

Mr. Kreindler approached Quinn and Mr. Crowe in 2013 to help lobby the United States government to persuade KSA to resolve the 9/11 claims against them – ideally in a state-to-state resolution similar to that achieved, with help from Quinn, in connection with obtaining Libya's final settlement payment for the Pan Am Flight 103 Lockerbie bombing and enacting the LCRA. DSUF ¶¶ 23-28.   There is no genuine dispute that all parties understood the goal of Quinn's engagement since 2013, unchanged at any time thereafter, was to seek compensation from KSA, directly or indirectly, to end the Litigation. DSUF ¶¶ 35, 37, 41, 43. The focus on KSA funding compensation for the 9/11 Families in exchange for ultimate immunity from suit was set forth with

clarity (and with specific reference to KSA and specific reference to the Libya model) in the earliest memos and talking point documents prepared for and used by Quinn and Mr. Crowe. DSUF ¶¶ 35, 37, 41, 43; PEX 15, 18; DEX H.

At no time during the engagement did the scope of Quinn's discrete tasks change. When an early state-to-state resolution of the 9/11 Families' claims against KSA proved difficult, Quinn focused on lobbying for the passage of JASTA to exert more pressure on KSA by naming it a direct defendant in the Litigation. The idea was that JASTA would incentivize KSA to compensate 9/11 Families and finally end the Litigation.

Once JASTA was passed, Quinn continued making some efforts to engage with the Trump administration in pursuit of the identical goal he had been pursuing for the Kreindler Firm since 2013. In a May 2017 email to Dina Powell, Quinn purports to write on behalf of "several insurers" and "thousands of the 9/11 Families involved in litigation with the Kingdom of Saudi Arabia" presenting a proposal of how "the President could orchestrate a state-to-state resolution of the cases." PEX 12.[13]   The document that Quinn may be referring to is titled "Resolving the 9/11

---

[13] This exhibit, along with several other exhibits, is entitled to very little weight, if admissible at all. While PEX 12 reflects an e-mail that Quinn did send, it cannot be relied on for the truth of the matter asserted. To the extent Quinn relies on PEX 12 as purported evidence that the Kreindler Firm ratified Quinn as "co-counsel," it is entitled to no weight because it was neither authenticated nor has any competent witness testimony explaining its import and appears to have been sent without the Kreindler Firm's knowledge or input. Additionally, the Affidavits of Robert H. Lowe (PEX 43) and Kelly Love (PEX 49) are also hearsay that should be precluded in their entirety because neither Mr. Lowe nor Ms. Love were disclosed at any time during discovery as persons with relevant knowledge of the issues, either in Rule 26 Disclosures or in response to specific interrogatories. *See Stewart v. Dist. of Columbia*, 2019 WL 4261067, at *6-7 (D.D.C. Sept. 9, 2019) (excluding and disregarding summary judgment exhibits which Plaintiff "was obligated to disclose … and failed to do … during discovery"); *see also* Fed. R. Civ. P. 37(c)(1) ("If a party to fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... to supply evidence on a motion ... unless the failure was substantially justified or harmless."). Nor were these declarations themselves ever produced to defendants pursuant to Plaintiff's ongoing duty to disclose.  Mr. Lowe's Affidavit appears to have been prepared in March 2024.

Claims," and describes an opportunity for President Trump, namely, "initiating and concluding a state-to-state negotiation and just resolution of the ongoing legal battle between Saudi Arabia and the 9/11 Families."[14] PEX 43.  In other words, the record reflects Quinn working on a state-to-state resolution that resolves claims against KSA (including working on enacting JASTA to increase leverage over KSA), and *not* helping the Kreindler Firm obtain compensation for its clients through any other means.

### 3. Quinn was *not* hired to assist with the Kreindler Firm's work with respect to the VCF or the VSST

On the other side of the coin from what Quinn *was* hired to do – bring pressure on KSA to resolve the claims against it – is what Quinn was *not* hired to do – assist the Kreindler Firm's efforts in obtaining victim relief from the U.S. government via the VCF and VSST.  To the extent that the 2017 Agreements are in any way ambiguous, the parties' actions – and in Quinn's case, lack of action – with respect to the VCF and VSST clearly demonstrate that the 2017 Agreements were not meant to award a fee to Quinn from VCF and VSST recoveries.

#### a. The Victim Compensation Fund (VCF)

The Original VCF was first created by Congress to provide compensation to 9/11 Famlies without the need for litigation.  After its initial expiration in 2004, the VCF was renewed by Congress effective January 2, 2011 to expand coverage.  By the end of 2011, prior to any involvement by Quinn with the Kreindler Firm in connection with 9/11 matters, the Kreindler Firm already had thousands of clients for the VCF and was a trusted source for advice to the VCF Special Master. DSUF ¶¶ 15-16; 18.  Between 2011 and 2015 the Kreindler Firm played a significant role

---

[14] An incomplete version of this document is attached as an exhibit to what purports to be an Affidavit Robert Lowe, submitted as PEX 43. For the reasons set forth in Footnote 11, this exhibit, along with several other exhibits, is entitled to very little weight, if admissible at all.

in the successful lobbying efforts to extend the VCF beyond its statutory five-year life.  DSUF ¶¶ 15-16. The Kreindler Firm resumed lobbying efforts in 2017, ultimately obtaining an extension of the VCF through October 1, 2090, and appropriations for such funds as may be necessary to pay all eligible claims.  Quinn played no role in these efforts and never, prior to filing the Amended Complaint in this matter in October 2021, sought compensation out of the funds the Kreindler Firm obtained through these efforts.  DSUF ¶¶ 15-18.

Nor, once he began work with respect to KSA, did Quinn assist the Kreindler Firm in obtaining funds from the VCF.  Quinn had no interaction with any of the Kreindler Firm's VCF practice group or any work that it does and could not name a single Kreindler employee working to recover VCF funds. DSUF ¶¶ 15-16.  Quinn did no work to help the Kreindler Firm access the VCF for its clients, was involved in no lobbying efforts related to the establishment, amendment or administration of the VCF, and has never been involved in making a claim to the VCF.  *Id.*

### b.  The Victims of State Sponsored Terrorism Fund (VSST)

The Kreindler Firm's efforts regarding the VSST, and Quinn's lack of engagement with any aspect of the VSST, follow the same pattern as the VCF.  The Kreindler Firm maintains a team devoted to work relating to the VSST for 9/11 Families. That team spends thousands of hours annually doing so, and that work is wholly separate from the Litigation. And while the Kreindler Firm has hired other outside lobbyists to advocate specifically with respect to the VSST, and their lobbying registrations reflect that fact, Quinn was not so hired, and the lack of any mention of VSST on his lobbying registration confirms this.  DSUF ¶ 53; DEX I, J, CC.

Quinn has never lobbied for VSST, never engaged with the Kreindler Firm's VSST practice group on efforts to represent clients in accessing the VSST, knows nothing of how to

access the VSST Fund, the work involved, the strategies employed, the legal advice given, the applications prepared, or anything else related to the VSST. DSUF ¶¶ 54-55.

As with the VCF, it is simply impossible that the parties believed Quinn was to share VSST proceeds but have no involvement in any aspect of the work.

### 4. All parties always understood that Quinn and Mr. Crowe would receive contingent compensation tied to the success of the work they performed

The parties understood the arrangement and the 2017 Agreements to be contingency fee arrangements, payments would be linked to the success of Quinn's and Mr. Crowe's services, and neither Quinn nor Mr. Crowe would be compensated for work they did not do.

Quinn wrote in 2017 that "Our contracts on this matter clearly contemplate that our contingent compensation is in exchange for services that will assist in obtaining a recovery for the clients," DSUF ¶ 67, and testified at deposition that he "would not expect to get paid for work that [he] did not do." PEX 3 at 46:17-47:1. Similarly, Mr. Crowe testified that his "entitlement to fees would derive from [his] efforts to resolve the litigation funded by monies that came from the defendants to the litigation." PEX 2 at 112:1-6. All parties always described the various agreements as "contingency" agreements, both originally and as revised. DSUF ¶¶ 34,70. A contingency refers to an event that may or may not occur in the future, and a contingency fee is defined by Merriam-Webster as "a fee for services (as of a lawyer) paid upon successful completion of the services".[15] That Quinn and Mr. Crowe both considered the relevant agreements to be "contingency" agreements reflects (a) the parties' intent to condition recovery on a successful recovery based on the work they in fact did, and (b) that they knew it was uncertain whether they would receive any compensation at all. But at the time of *every iteration* of the parties'

---

[15] https://www.merriam-webster.com/dictionary/contingency%20fee

agreements, including the now-operative 2017 Agreements, funds had already been received by the Kreindler Firm in connection with the VCF and VSST, and were the VCF and VSST to be part of the deal, there was no "contingency" associated with recoveries related to those funds – the work had been done, and the money was in hand.  The 2017 Agreements do not encompass non-contingent fees on already recovered funds (for which Quinn did no work).

  **5.**   **Had Quinn, the drafter who was focused solely on specifying and maximizing his fees, intended to include the VCF and VSST, he would have done so**

  In January 2017, Quinn began his effort to revise the Original 2013 Agreement and the 2014 Agreement. The email correspondence between Quinn and Mr. Kreindler demonstrates that Quinn was laser focused on specifying in detail every possible source of revenue that could form the basis of his compensation and maximizing both the sources of recovery that would form the basis of compensation and the percentage fee to which he would be entitled. DEX A, ¶¶ 24-28. The documentation of the negotiations belies Quinn's argument that the parties took for granted that the agreements were naturally broad and presumed to encompass the VCF and VSST. Br. 19-21. Quinn was deeply thoughtful about every category of recovery that would serve as the basis of compensation and he was diligent about securing a maximum fee for himself and ensuring the details were reduced to writing.[16]

  Beginning on January 3, 2017, Quinn first informs Mr. Kreindler that he believes he should have his percentage increased relative to Mr. Crowe "for spending about thousand times more effort and time – to good effect." DEX N.  Quinn underscores the importance of rewarding his

---

[16] In 2013, Quinn contracted to work with the Kreindler Firm through his lobbying firm, QGA. A few months later, Quinn sought to amend the agreement such that half of his portion of the contingency fees would come directly to his solo practice and only half go to his firm, QGA, bypassing his firm and his partner. By 2014, Quinn amended the agreements again so the entirety of any contingency fee would come directly to him. DEX A, ¶ 26; DEX E, F.

work because as Quinn reads the agreements "performance on his part was an explicit expectation." DEX N. Following up on January 15, 2017, Quinn repeats to Mr. Kreindler that "[o]ur contracts in this matter clearly contemplate that our contingent compensation is in exchange for services that will assist in obtaining a recovery for the clients." PEX 38. Reaffirming that the agreements were always about KSA, Quinn writes: "JASTA certainly has enhanced the possibility of a recovery," and the "bottom-line reality [is] that the enactment of JASTA has been the key to our achieving a near term settlement." PEX 38. Quinn's sole argument for increasing his percentage is that the recovery from KSA he expects can be tied to his work (not to Mr. Crowe's).

On February 18, 2017, Quinn continues with a more numbers-based analysis of how the fee splits should change in his favor. Quinn proposes to reapportion the existing 50/50 split between himself and Mr. Crowe to 75/25, respectively. But even more than that, Quinn devises a mechanism for splitting the recoveries that the Kreindler Firm might obtain from the Litigation into two groups, those who retained the Kreindler Firm before the date of the 2014 Agreement, and those after. The purpose of dividing the cases is to limit Mr. Crowe only to old cases and entitle Quinn to the entirety of the contingency fee on all later cases, subject to no split with Mr. Crowe at all. DEX O.

On March 21, 2017, Quinn follows up again, this time seeking to increase his fee on the old cases to 0.775% and still maintain the entire 1% for himself on new cases. DEX P. There has been no pushback on these negotiations, and Quinn is intent on finalizing the revisions. DEX P.

An April 12, 2021 email from Quinn to Mr. Goldman and Mr. Kreindler, further reflecting the care that all these lawyers took with fees, addresses certain technicalities, such as how they will with fee caps that may be later imposed by the Court. DEX Q.

41

On May 5, 2017, Quinn follows up again, having heard of developments suggesting that some efforts toward resolution "could move quickly." DEX R. Quinn displays a sense of urgency to complete the new agreements that secure the details of his enlarged fee because once the discussion toward settlement starts, he fears it will be more difficult to obtain Mr. Crowe's consent to the reapportionment. *Id.*; DEX A, ¶ 28. Quinn's sense of urgency to finalize the 2017 Agreements before Mr. Crowe hears of the progress toward a resolution is echoed on May 17, 2017. Quinn writes that "I'd like to get this wrapped up soon. We're gonna get a deal. I feel it and I think it…." DEX U.

On May 11, 2017, Quinn requests that the 2017 Agreements document his entitlement to a fee on new categories of plaintiffs, and any court awarded fees that the Kreindler Firm might receive for its role as a lead plaintiff's firm in the Litigation. DEX T ("I think the original agreements clearly include this as injuries and recoveries, but we might as well pin that down too."). Remarkably, Quinn never once asks whether the original agreements also include the tens if not hundreds of millions in recoveries from the VCF or VSST, or if they did, suggest that "we might as well pin that down as well." DEX T. Quinn thinks of myriad ways he can find sources of recovery to add to his bases of compensation and requests that each one be specifically called out in the 2017 Agreements – but never once mentions the VCF or the VSST. DSUF ¶ 80.

Three months later, in August 2017, Quinn proposed an amendment to address points raised by Mr. Goldman of Anderson Kill and had another opportunity to "pin down" whatever else he thought he needed to. Quinn wrote to Mr. Kreindler that he would like language added to the May 2017 Agreement and the Additional Compensation Agreement to address the parties' belief that a diplomatic solution effected by President Trump was imminent. DSUF ¶ 87. They believed that President Trump might push a resolution with KSA whereby in exchange for ending the

Litigation, KSA could contribute to a fund that would compensate all terror victims irrespective of claims filed in the Litigation. *Id.* Quinn noted that Mr. Goldman is "gathering clients with respect to whom he may never actually file a claim – ***but still achieve a recovery and get a fee via settlement or other resolution***," and requested similar language from the Kreindler Firm. DSUF ¶ 83 (emphasis added).   Quinn explained that by the second paragraph of the August 2017 Amendment, the parties' intent was to cover the scenario that there could be a *resolution of the Litigation* that provided compensation to victims who had retained the law firms in connection with the Litigation, but not yet filed claims in court. DSUF ¶ 84.   Quinn wanted to ensure that he would get paid his fee of any KSA-funded payout to a victim resulting from a diplomatically engineered resolution, whether or not the victims had formally filed claims in the Litigation. DSUF ¶ 87.

Further demonstrating Quinn's focus on finding and naming every possible source of recovery upon which he might be entitled to receive a fee, he further requested that Mr. Crowe be conflicted or disqualified from receiving his 0.225% fee on the early cases, and that Mr. Crowe's fee be redirected to Quinn, rather than have Mr. Crowe forfeit the fees back to the Kreindler Firm. DSUF ¶ 85. The Kreindler Firm agreed to these requests in the August 2017 Amendment. Still, however, the parties never once mentioned the VCF or the VSST as encompassed within the 2017 Agreements in any manner whatsoever. DSUF ¶ 80. If there were any question whatsoever as to whether Quinn believed in 2017 that the 2017 Agreements reached the VCF or VSST recoveries, this history of negotiations removes all doubt.

### 6.    Quinn's conduct demonstrates that he never believed the 2017 Agreements entitled him to fees from the VCF or VSST

Having secured the 2017 Agreements precisely as he had wanted, requesting and receiving a more specifically articulated and maximized fee, Quinn made a few additional efforts to try to

access the Trump administration to pursue a diplomatic resolution with KSA that would compensate the 9/11 Victims and resolve the Litigation. DSUF ¶ 88. Despite certain unsupported and self-serving conclusions in Quinn's brief, the record remains devoid of any efforts or involvement in the VCF or the VSST, or any support to the Kreindler Firm in connection therewith.

At no time before April 2020 did Quinn (or any party) suggest that recoveries from the VCF or the VSST be encompassed by the 2017 Agreements. It was simply never once raised or mentioned for years. On or about April 21, 2020, Quinn writes to Mr. Kreindler explaining that his demand rests on the August 2017 Amendment language, but that the August 2017 Amendment was not new and merely reaffirmed the "breadth of the Agreement". DEX Y. Notably, even Quinn at this time does not suggest that the parties had ever before discussed the topic and merely points to language that he *now* reads as "broad." DSUF ¶ 93. When Mr. Kreindler reminded Quinn that the parties never contemplated VSST would be part of his fee, Quinn agreed, but added that his friends who were lawyers told him the broad language might reach those funds. DSUF ¶ 93.

For more than seven years of the relationship, Quinn never mentioned that he believed himself entitled to any fees from the separate VCF or VSST, until he was present at a meeting with Senator Schumer, who apparently errantly looked at Quinn while mentioning a new round of funding legislation for the VSST.[17] DEX Z. And while this April 2020 meeting apparently triggered an idea that Quinn might make a play for VSST fees, it would be another eighteen months before Quinn and his counsel decided to make a play for VCF fees as well, in the Amended

---

[17] To the extent Quinn is understood as arguing that he was unaware that funds had come into the Kreindler Firm, the argument must be disregarded. Br. at 11. First, the enormity of the distributions, media coverage, and government reporting make that claim implausible for someone who claims to have dedicated this part of his career advocating for the 9/11 community. Second, such ignorance is not consistent with Quinn's allegations and briefing that tout the purported and allegedly important work for the VCF. *See, e.g.,* Dkt. No 19 at ¶¶ 45, 70-90; Br. at 36-37.

Complaint. This conduct is inconsistent with an actual belief that the parties' arrangement or the 2017 Agreements, drafted by Quinn, contemplated VCF or VSST fees.[18]

*   *   *

There is no genuine issue of material fact that Quinn was hired for a discrete task, for which he might earn a contingent fee if successful. Even if the 2017 Agreements were facially ambiguous as to whether the parties intended their scope to reach beyond seeking a final resolution of the Litigation as against KSA, the extrinsic evidence, including the facts surrounding the original engagement, the fact that duties never changed over time, and the actual work performed by Quinn pursuant to the 2017 Agreements, removes any doubt that any compensation was limited to resolution of the Litigation funded by KSA, directly or indirectly.

## II. THE COURT SHOULD DENY QUINN'S MOTION BECAUSE HE HAS FAILED TO PROVE THAT THE AGREEMENTS INCLUDE THE VCF AND VSST AS A MATTER OF LAW

### A. Legal Standard

The general legal standard for granting a motion for summary judgment is set forth in Section I.A, *supra.* Similarly, the legal standard for construing contracts as a matter of law in the summary judgment context, including the reasonableness test applied in the District of Columbia, is set forth in Section I.B, *supra.* "When parties file cross motions for summary judgment, each motion is viewed separately, in the light most favorable to the non-moving party, with the court

---

[18] As Quinn was the drafter of the 2017 Agreements, any ambiguity in their meaning must be construed against Quinn. The *contra proferentem* principle holds that "ambiguous language in a contract that is not clarified by extrinsic evidence or interpretive aids is construed against a party to the contract when that party drafted the language in question." *Jacobs v. Reliance Standard Life Ins. Co.*, 2023 WL 2708581, at *15 (D.D.C. Mar. 30, 2023) (citing *Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 97 (Md. 2021).

determining, for each side, whether a judgment may be entered in accordance with the Rule 56

standard." *Schuff Steel Co. v. Bosworth Steel Erectors, Inc.*, 718 F. Supp. 3d 1, 4 (D.D.C. 2024).

**B. Quinn Has Not Met His Burden of Proof of Demonstrating that the Only Reasonable Interpretation of the 2017 Agreements Entitles him to Fees from the VCF and VSST**

### 1. The agreements are unambiguous that Quinn is not entitled to fees from the VCF or VSST

Defendants set forth in Section I, *supra*, how the canons of construction and consideration

of the relevant circumstances necessarily lead to the conclusion that there is only one reasonable

interpretation of the 2017 Agreements, namely that the 2017 Agreements do not entitle Quinn to

a fee on recoveries from the VCF or the VSST. At a minimum, however, those arguments present

a genuine issue of material fact precluding summary judgment for Quinn. Quinn does not

overcome Defendants' reading, and does not eliminate materially disputed facts.

Indeed, Quinn's motion rests on faulty presumptions and an improper shifting of burdens.

Specifically, Plaintiff assumes that the 2017 Agreements, despite centering in every way only

around the Litigation and its resolution, by default include every dollar earned on a Kreindler Firm

client, whether or not tied to the work that Quinn was retained to do, unless Defendants prove

otherwise. This is contrary to law, canons of construction, and the reasonableness test applied to

contract interpretation. *See Intercounty Constr. Corp.*, 443 A.2d at 32.

First, no contractual language supports Plaintiff's expansive "default" reading. The VCF

and VSST, which are wholly separate programs for offering relief to 9/11 victims that have no

bearing on resolving the Litigation, are not mentioned or referred to in the 2017 Agreements in

any manner. The 9/11 Litigation is expressly defined and referred to throughout the 2017

Agreements repeatedly.[19] The language that Plaintiff points to for the breadth of his reading is

---

[19] Quinn argues that "if the parties wanted to limit compensation to funds associated with that lawsuit or [KSA], the easiest way to achieve that goal would have been to name the lawsuit or

that Quinn's compensation may be derived from a resolution of the claims in the Litigation that may come about by "judgment, settlement *or otherwise*". Br. at 18-19 (emphasis added). As explained above, proper construction of "or otherwise" requires that anything falling within the otherwise clause be substantively connected to the specific examples that precede it. *See* Section I.B.6, *supra.* Because the VCF or the VSST have no bearing whatsoever on a final resolution of the Litigation (such as by settlement or judgment), "otherwise" hardly sweeps the unrelated VCF and VSST within its ambit.

Quinn argues that the opening of the list is the word "fee," and thus any "fee" that the Kreindler Firm receives is subject to Quinn's compensation. Br. at 19. This is grammatically and syntactically wrong. The 2017 Agreements state that Quinn to be compensated from "net recovery on *each decedent's wrongful death and each personal injury claim* with respect to which [the Kreindler Firm] receives a fee, whether by settlement, judgment or otherwise…." DEX F (emphasis added). The opening of the list is a certain type of fee: *fees obtained in respect of "wrongful death"* and *"personal injury" claims asserted in the Litigation, whether that fee is obtained by a settlement, by a judgment*, or by some other substantively similar mechanism, i.e., one that finally resolves the Litigation and is funded by the defendants.

Second, the nature and structure of the 2017 Agreements do not support Quinn's expansive "default" reading. Quinn was to be paid a contingent fee for performance of a discrete task – obtain compensation for the 9/11 victims funded by KSA, and end the Litigation. DSUF ¶¶ 23. 30. Ignoring this fundamental relationship, Quinn wrongly claims that he was co-counsel to the

---

[KSA] in the agreement" and clearly state the requirement. Br. at 17. And indeed, the parties did name the Litigation, and did state that compensation was to come from "each decedent's wrongful death and personal injury claim with respect to which [the Kreindler Firm] receives a fee, by judgment, settlement or otherwise …" DEX F.

Kreindler Firm and as such the 2017 Agreements should be seen as a sort of fee-share or profit-share arrangement. Br. at 33, 35. From this vantage point, Plaintiff challenges Defendants to point to express language of limitation stating that some profits should be excluded from the general default of sharing all fees. Br. at 17, 30. Quinn's assertion that he was a co-counsel is unsupported by the record, and it is at best a self-serving statement that is materially disputed.  DEX A ¶¶ 36-40; DEX C ¶ 5.

More fundamentally, the 2017 Agreements cannot be read as fee-splitting or profit-sharing arrangement because they would run afoul of Rule 1.5 of the D.C. Rules of Professional Conduct. Rule 1.5(e) provides that lawyers of different firms may not split a fee unless (1) the division is in proportion to the services performed by each lawyer, or each lawyer assumes joint responsibility for the representation; (2) the client is advised in writing of the lawyers participating in the representation, the division of responsibility, and the effect of the outside lawyer on the fee being charged; (3) the client gives informed consent to the arrangement; and (4) the total fee is reasonable.  Quinn has not met, and cannot meet, any of these conditions. *See, e.g.,* DSUF ¶ 36; DEX B, ¶ 15 (compare the Kreindler Firm's estimated 67,200 annual man-hours spent on VCF to Quinn's zero and there is no proportionality justifying Quinn's fee split). Thus, it is unreasonable to read the 2017 Agreements as a fee splitting agreement because to do so would violate public policy. *Jacobsen v. Oliver*, 555 F. Supp. 2d 72, 79 (D.D.C. 2008) ("A promise or other term of an agreement is unenforceable on grounds of public policy if … the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms."); *see also Hickey v. Scott*, 738 F. Supp. 2d 55, 62 (D.D.C. 2010) ("Contractual provisions that violate the attorney's rules of professional conduct undoubtedly fall into this category."); *Post*

*v. Bregman*, 349 Md. 142, 168 (Md. Ct. App. 1998) ("A fee-sharing agreement in violation of Rule 1.5(e) may be held unenforceable…").

### 2. Even using extrinsic evidence, Plaintiff cannot show that the only reasonable reading of the 2017 Agreements includes the VCF or VSST

If the Court finds the 2017 Agreements to be ambiguous, Plaintiff's motion must be denied unless Plaintiff can prove that extrinsic evidence shows that his interpretation is the only reasonable interpretation to be read from the Agreement. *Deutsche Bank Nat'l Tr. Co.*, 109 F. Supp. 3d at 198 ("Even if a contract is found to be ambiguous … and extrinsic evidence is allowed, if the extrinsic evidence demonstrates that only one view is reasonable – notwithstanding the facial ambiguity – the court must decide the contract interpretation question as a matter of law.") (quoting *American First Inv. Corp. v. Goland*, 925 F.2d 1518, 1522 (D.C. Cir. 1991)); *Joel Popkin and Co.*, 659 F. Supp. at 348 ("When extrinsic evidence demonstrates that only one possible interpretation is reasonable, the Court may grant summary judgment.").  Plaintiff has not made such a showing.

Quinn makes two primary extrinsic evidence arguments: (1) the deposition testimony shows that the parties understood that the 2017 Agreements covered the VCF and the VSST; and (2) the parties' actions confirm that the 2017 Agreements covered fees obtained through the VCF and the VSST. Br. at 28-29. But Quinn either misrepresents evidence to force it to fit his narrative, or postures legal argument and subjective interpretation as fact.

### a. The parties' testimony does not show that Quinn's interpretation is the only reasonable one

Quinn argues that Mr. Kreindler's testimony shows that the purpose of the 2017 Agreements was to broaden the sources of compensation for Quinn.[20] Br. at 29; PSUF ¶ 38; PEX

---

[20] Defendants note that while Plaintiff refers to the deposition testimony of "Defendants," Mr. Kreindler was noticed for deposition only in his individual capacity and he testified on behalf of himself only in his individual capacity, and not on behalf of the Kreindler Firm. Plaintiff did not

1 at 51-52. This is true. The documentary evidence shows specifically how Quinn's compensation was broadened, by what sources of recovery, and by what percentages. *See* Section I.C.4, *supra.*

Mr. Kreindler's cited testimony reinforces that the 2017 Agreements are to compensate Quinn from recoveries if and when the Litigation is fully resolved, though that final resolution could take several forms other than a settlement or judgment. PEX 1 at 54:8-11 ("So he – and we talked about it. He said, I'm going to write it in the most general, generic way possible *to include however we resolve this case and get compensation for the 9/11 victims*.") (emphasis added). This testimony is unrebutted.  Mr. Kreindler explains that Quinn's fee entitlement may be triggered by numerous ways that end the Litigation: by judgment, by settlement, or by a potential act of Congress as was done with the LCRA in the case of Pan Am Flight 103.

Plaintiff again cites to Mr. Kreindler's deposition supposedly in support of his claim that "Defendants admit that they understood the 2017 Agreements were meant to clarify that Quinn's fee entitlement was broad and not limited to cases filed in the SDNY litigation…" Br. at 30.  But Mr. Kreindler's testimony says the opposite. Mr. Kreindler explains that Quinn wanted a percentage of any fees that the Court might one day award the Kreindler Firm for its leading role in the Litigation, as often happens in large class actions or other multi-district litigations, and Mr. Kreindler agreed to this request. PEX 1 at 58-60. First, this new source of recovery, committee fees awarded by the Court, pertains solely to the Litigation, and it is entirely unclear why Quinn thinks this points to an understanding that the parties intended to include any bases of compensation outside the Litigation. Second, the inclusion of this very specific source of recovery being enumerated in the 2017 Agreements is evidence that the parties did not understand that

---

notice any deposition for the Kreindler Firm pursuant to Fed. R. Civ. P. 30(b)(6). Mr. Kreindler's testimony is not binding on the Kreindler Firm.

Quinn would be entitled to "his share of any recovery regardless of the source" (Br. at 14), but rather that each source of recovery to be included would be specifically mentioned. *See, e.g., Crabtree,* 2021 WL 1177961, at *6 (where a contract lists or enumerates what it applies to and covers, it is strongly implied that it excludes other things that are not listed). Plaintiff's evidence demonstrates the opposite of Plaintiff's argument: each source of recovery to be included was discussed and negotiated, and if it were to be included, the parties expressly said so. *Washington-Baltimore News Guild, Local 32035 v. Washington Post*, 2023 WL 4314177, at *3 (D.D.C. July 3, 2023) ("Nowhere in Article XIII(6) of the CBA is there mention that the parties are bound by the terms of Article after its expiration, which notably is language the parties included in other portions of the CBA."). For Plaintiff to present this negotiated and itemized additional basis of recovery as evidence that the parties must have intended to include all sorts of things whether or not listed is meritless.

Perhaps most alarmingly, Quinn, as he does throughout his motion, misleads the Court by deliberately confusing reference to a "settlement fund" (such as the type Quinn was supposed to be securing from KSA) with the VCF and VSST (funds administered by the United States as a policy matter which have no bearing on the resolution of the Litigation). For example, Quinn argues that Defendants "concede" that the 2017 Agreements cover fees obtained from an "administrative fund." Br. at 30. But Mr. Kreindler's cited testimony addresses "fund-type settlements" that "could be broader than, simply, the Mumbai America victims and the 9/11 victims." PEX 1 at 22:17-23:4. The "fund-type settlement" about which Mr. Kreindler testified was, in his own words just a few lines down, a settlement that "would constitute a global resolution of the 9/11 Litigation and perhaps other cases." PEX 1 at 23:21-24:4. The fund-related settlement to which Mr. Kreindler refers (and from which Quinn would enjoy a fee under the then-current

agreement) is one that finally resolves the Litigation and is funded by defendants, specifically, KSA. Neither the VCF nor the VSST is funded by the defendants in the Litigation, and neither the VCF nor the VSST has any bearing on ending the Litigation.  Equating a Litigation-ending, defendant-funded with the VCF or the VSST because they all employ the commonplace mechanism of a pool of money is a superficial attempt to mislead the Court.  DEX A, ¶¶ 47-48.

Plaintiff makes a legal argument that Mr. Kreindler's testimony concerning the sources of recovery must be excluded to the extent it contradicts a specific term of the written agreement. Br. at 32. While this general proposition is true, none of Mr. Kreindler's testimony contradicts a term of the 2017 Agreements. Rather, Mr. Kreindler's testimony clarifies the meaning of Quinn's entitlement to a percentage of fees recovered "by judgment, settlement or otherwise," which evidence the Court can and should consider. *See Piedmont Resolution, LLC v. Johnston, Rivlin & Foley*, 999 F. Supp. 34, 51 (D.D.C. 1998) (finding evidence to be "consistent" with and clarify the terms of the agreement, and that it does not "contradict, vary, add to, or subtract from" the agreement); *Comp. Reserves, Inc. v. Comp. Network Corp.*, 1988 WL 15178, at *4 (D.D.C. Feb. 17, 1988) (finding that extrinsic evidence offered "does not contradict but only supplements the writing"). The 2017 Agreements require Quinn to work to preserve and protect JASTA to ensure KSA remains a defendant in the Litigation.  Mr. Kreindler's testimony about KSA and the role they hoped it would play in finally resolving the Litigation in which it is the principal defendant, is hardly contradictory to the terms of the 2017 Agreements.

Nor are Quinn's self-serving conclusory statements that the 2017 Agreements cover VSST and VCF sufficient to obtain summary judgment.[21] Quinn's testimony that "you can't separate out the … VSST from the litigation" (Br. at 33; PEX 3 at 83) is belied by his absolute lack of

---

[21] Nor to defeat Defendants' Cross-Motion for Summary Judgment. (*See* Section I.B.4, I.C.2-4.)

knowledge on the creation, processing, or disposition of VSST or any of its funds. PEX 3 at 83-86, 92-93. Moreover, that Quinn may have "regarded himself as 'a de facto co-counsel'" (Br. at 33, PSUF ¶42) cannot serve as extrinsic evidence to change the nature of the 2017 Agreements from a contingency fee lobbying agreement to some sort of broader profit-share. Quinn's secret belief in his role is not relevant to understanding the objective intent of the parties and the interpretation of the Agreements. *Penn. Ave. Dev. Corp. v. One Parcel of Land*, 494 F. Supp. 45, 51 (D.D.C. 1980) ("[Courts] are bound to determine the intent of the parties as expressed in their writing, not their secret intent.").   Moreover, the record is replete with evidence that he was not in fact co-counsel. DSUF ¶ 36; DEX A, ¶¶ 36-39; PEX 3 at 6:25-7:4, 127:1-12, 152:14-153:6.

Finally, Quinn's communications contemporaneous with the August 2017 Amendment, and his testimony related thereto, only underscore the fact that Plaintiff's interpretation of the 2017 Agreements is not the only reasonable one. On August 5, 2017, Plaintiff stated to Mr. Kreindler that the August 2017 Amendment was intended to address those amounts received from clients who never actually filed a claim, but still achieve a recovery and get a fee "via settlement or other resolution." PEX 52. The meaning of the August 2017 Amendment, based on the fact that the parties expected President Trump to obtain a deal with KSA quickly that would end all litigation and provide compensation for all 9/11 Families whether or not they had filed a claim in the Litigation, is explained at Section I.B.6, *supra*. There is no evidence that this amendment was intended to cover or did cover the VCF or VSST. Indeed, the parties defined JASTA in the 2017 Agreements. DEX F. The parties had three opportunities to simply state that the 2017 Agreements were intended to reach the VCF and the VSST and did not do so. *Id.*

      b.  Plaintiff's extrinsic evidence concerning the work Plaintiff performed does <u>not help show that the VSST or the VCF are included in the 2017 Agreements</u>

Plaintiff, in vain, argues that his allegedly extensive involvement in all aspects of the Litigation, the VCF, and the VSST, show an intention that he would be entitled to "recover from any source of fees, including VSST and VCF." Br. at 34. Although Defendants do not disagree with the legal proposition that course of performance is evidence "of what the parties intended the writing to mean," the evidence referred to provides no support for the proposition that Quinn did any work beyond, at most, seeking a diplomatic resolution of the Litigation.  It is entirely unclear why Quinn thinks his evidence suggests he is entitled to compensation from the VCF and VSST.

Quinn begins by relying on Mr. Kreindler's following deposition testimony:

> Did he look at any pleadings in seven or eight years? Probably and possibly, but he had very little, if any, role in pleadings, is the best way I could answer it.

PEX 1 at 90:17-91:3.

This unremarkable statement demonstrates only that Mr. Kreindler assumed that a lobbyist retained to pursue a resolution of a case probably looked at the pleadings of the case he sought to resolve. Similarly ineffective is Plaintiff's reliance on a single email in 2020 to Senator Coons' office.  Plaintiff introduces himself by claiming that he has served as co-counsel to different firms, including the Kreindler Firm, in connection with the Litigation, including his involvement with the effort to enact JASTA. PEX 51. Putting aside the question of whether he was authorized to refer to himself as co-counsel, this provides no evidence to suggest that he in fact did anything other than work on JASTA (which is not disputed).

Plaintiff points to no evidence that he "worked on VSST issues," let alone to show the fact is undisputed. *See* DEX A, ¶15; DEX C, ¶¶ 20-25. PEX 15 is a 2013 memo that sets forth the limited task he was hired to do with remarkable clarity.  The memo explains how Quinn is to

encourage the United States government to encourage KSA to fund compensation 9/11 Families

and end the Litigation. DSUF ¶ 37; PEX 15.  What is more, it is unclear how this 2013 document

could possibly demonstrate involvement with the VSST as claimed, because the VSST would not

come into being for another two years, in December 2015.

Quinn also cites to PEX 17 as purportedly showing his work on VSST.  PEX 17 is an email

from Mr. Crowe to the State Department that fails to attach the relevant documentation, also dated

in 2013, more than two years before the VSST is passed. PEX 17. Finally, Quinn relies on a 2020

letter concerning VSST payments on which Plaintiff was cc'ed by Defendants. PEX 50.

Irrespective of whether receiving a copy of a letter could be considered evidence of doing work on

a specific topic, Ms. Benett, one of the three signatories on this letter, has explained that the letter

was prepared by Mr. Goldman of Anderson Kill, another lawyer with whom Quinn worked.  Ms.

Benett did not know and has no idea why Quinn would be cc'd. She attests that copying Quinn

had nothing to do with anything related to the Kreindler Firm and its clients. DEX C, ¶¶ 27-30.

Not one exhibit shows that Plaintiff worked on lobbying for or obtaining relief for 9/11 victims

through the VSST. Br. at 36. Finally, Quinn cites only to PEX 17, a bare cover transmittal email

from Mr. Crowe to the State Department with the attachment missing, as demonstrating that

"Quinn also worked on VCF issues." Br. at 37. It does not demonstrate anything other than suggest

that Mr. Crowe sent some unknown document to the State Department.[22] Quinn has not shown, let

alone demonstrated with undisputed evidence, that he worked on the VCF or VSST, nor has he

---

[22] To the extent it were speculated that the transmittal email attached the David Wade memo (see PEX 18), that memo has nothing to do with the VCF or the not yet created VSST.  The Wade memo proposes a state-to-state resolution whereby KSA compensates 9/11 Families together with an end to all 9/11 Litigation, based on the Pan Am 103 resolution.

credibly suggested what about this evidence suggests that the only reasonable reading of the Agreements is that he should be entitled to compensation from VCF or VSST monies.

      c.   Extrinsic evidence concerning other parties' agreements makes clear that <u>Plaintiff's interpretation is not the only reasonable interpretation</u>

As a last-ditch effort, Plaintiff compares the 2017 Agreements to those separate agreements between the Kreindler Firm and Mr. Crowe, but to no avail. Plaintiff points to a 2021 agreement between Crowe and Defendants (the "2021 Crowe Agreement"), wherein Crowe would be entitled to a percentage of the Kreindler firm's net recovery of fees "whether by judgment, settlement, or fund created by Saudi Arabia, Sudan and their related charities, instrumentalities and entities…" Br. at 38; PEX 45. This agreement, according to Plaintiff, shows that Defendants could have used this "narrow approach" in the 2017 Agreements, but chose not to. Br. at 38.

Mr. Crowe has explained why he was amenable to including specific clarifying language in the 2021 Crowe Agreement at the Kreindler Firm's request in a declaration he prepared and later confirmed in his deposition. He states that:

> Neither Quinn nor I was ever involved in efforts to create the [VSST]. We were never asked to lobby for it, or for its application to 9/11 Families, and we never did so. We were always focused on KSA and paving the way for [the Kreindler Firm] to sue KSA. Our role was to lobby for JASTA to facilitate the [L]itigation and/or to work with the administration to possibly pursue other diplomatic solutions with those sovereigns and entities to secure relief for the 9/11 Families. Our 2017 memo memorializes that role and emphasizes only JASTA and KSA for just that reason. The 2017 Agreement does not mention the VSST whatsoever because it was not within the scope of our work.

DEX DD, ¶ 11.  The impetus to revise the 2017 Crowe Agreement in 2021 was to accommodate Mr. Crowe's decision to retire from Nelson Mullins and make Mr. Crowe personally the signatory.  DSUF ¶¶ 100-102; DEX A, ¶ 32. But since Quinn had already sued the Kriendler Firm asserting his claims to the VSST, Mr. Crowe was willing to clarify that neither the VSST nor anything like it was ever contemplated by the 2017 Agreements. *Id.;* DEX A, ¶¶ 33-35; DEX DD.

Additionally, since Quinn relied on the "or otherwise" language as a hook to make his meritless claims, Mr. Crowe was willing to memorialize an agreement with additional specificity. *Id*. Mr. Kreindler testified that he would have asked Mr. Crowe to more specifically exclude VCF as well, but that Quinn had not yet filed his Amended Complaint seeking those recoveries as well. Quinn did not claim VCF recoveries until he filed his Amended Complaint in October 2021. *Id.*

Quinn's argument neither conforms to the evidence nor is plausible. The 2021 Crowe Agreement *clarifies*, rather than narrows, Mr. Crowe's entitlement to fees. As Mr. Crowe's deposition testimony makes clear, the prior agreements between Crowe, Quinn, and Defendants never intended to provide Quinn or Crowe compensation from VSST or VCF. DEX DD at KK000152 ("[A]t no time from the first of the earlier agreements through today have these agreements included, and none of the parties have hereto intended that these agreements include payments and/or fees obtained or received through the USVSST Fund."); PEX 2 at 38:15-40:15.

> d. Extrinsic evidence surrounding the VSST, misunderstood by Quinn, shows that <u>VSST claims are not covered by the 2017 Agreements.</u>

In his brief, Plaintiff argues that the United States Victims of State Sponsored Terrorism Act, codified at 34 U.S.C. §20144 *et seq.* (the "VSST Act") is logically related to JASTA. Br. at 24-25. It is not. Plaintiff does not address the record evidence reflecting himself explaining in 2016 that the two are unrelated. DSUF ¶ 59. Plaintiff also appears to misunderstand the VSST Act when suggesting that JASTA expands opportunities to 9/11 victims to access the VSST. Br. at 25. The VSST is available only to victims of state sponsors of terror (e.g., Iran) pursuant to 28 U.S.C. § 1065A. The VSST is expressly unavailable to a victim holding a judgment against a defendant sued under JASTA (e.g., KSA) pursuant to 28 U.S.C. § 1605B. Although KSA is exposed to litigation supporting terrorism under JASTA, that plaintiff can never access the VSST based on a judgment against KSA. DEX C, ¶¶ 15-17.

Quinn also misunderstands the subrogation provisions of the VSST Act, which enable the U.S. government to stand in the shoes of the judgment holder to seek reimbursement from the obligor (e.g., Iran) after making payment to the judgment holder. DEX ¶¶ 18-19.  Plaintiff seems to suggest that if or when KSA should compensate a 9/11 victim who previously obtained a VSST payment related to its default judgment against Iran, that the U.S. government would claw back some of that Iran-based payment in reimbursement. Br. at 25. Quinn therefore sees himself as entitled to share in the Iran-based payments. This is a suspect reading of the subrogation provision and clearly not the VSST Act's intent. DEX ¶¶ 18-19. That said, the scenario Quinn suggests is highly speculative, rests on a series of events that have not occurred and may never occur, and certainly does not suggest some connection between the VSST and the Litigation that supports Quinn's expansive reading of the 2017 Agreements.

*      *      *

Accordingly, Plaintiff has failed to meet his burden to show that his interpretation of the 2017 Agreements – *i.e.*, that his entitlement to compensation includes not only funds received from resolution of the Litigation, but also from the VSST and VCF, funds that had been established and paying out long before his unrelated work in the Litigation began– is the *only* reasonable interpretation of the 2017 Agreements. The motion for summary judgment must be denied.

## III.     THE CASE SHOULD BE DISMISSED AS NOT RIPE FOR ADJUDICATION

"The ripeness doctrine generally deals with when a federal court can or should decide a case." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 632 (D.C. Cir. 2017). The doctrine is grounded in Article III of the Constitution, which requires a party to have an actual injury in order to have standing. *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). Claims are not ripe, and a court should not adjudicate a matter, if they are contingent upon future events. *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580-81 (1985).

58

The Amended Complaint is subject to dismissal under both Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction, as Plaintiff has not suffered an injury and has no standing to sue, and under 12(c) because the Court *should not* decide a case which is unripe as a practical matter. *See Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 153 F. Supp. 3d 319, 331 n.9 (D.D.C. 2016).

### A. Because Defendants Have Received No Recoveries from Resolution of the Litigation, Plaintiff's Breach of Contract Claim Must Be Dismissed

Because Defendants have shown that the 2017 Agreements limit Quinn's compensation to final resolution of the Litigation, and because no funds have been received by Defendants in connection with the resolution of the Litigation, either by judgment, settlement, or otherwise, Defendants cannot be in breach of any of their obligations, and there is no issue ripe for adjudication by the Court. *Alston v. Flagstar Bank F.S.B.*, 2014 WL 12803918, at *2 (D.D.C. Apr. 10, 2014) ("[P]recedent in this jurisdiction supports the proposition that mere speculative or hypothetical injury cannot sustain a breach of contract claim."). It is undisputed that the Litigation is ongoing and no recoveries from it have yet been recognized. DEX C, ¶ 31.  As such, the Court should dismiss all three breach of contract branches (VCF, VSST, Litigation) of the Amended Complaint.

### B. Because Defendants Have Received No Recoveries from Resolution of the Litigation, by Plaintiff's Quantum Meruit Claim Must Be Dismissed

Similarly, the Court should dismiss Plaintiff's claim for quantum meruit as unripe. Count V asserts a cause of action for quantum meruit in the event no contractual relationship exists. Plaintiff's Amended Complaint alleges, in sum or substance, that he is entitled to funds received by Defendants from the Litigation based on the value of his services. However, Plaintiff's services have not yet resulted in any value to the Defendants, who have not recovered any amounts from resolution of the Litigation, by judgment, settlement, or otherwise.

Plaintiff's quantum meruit recovery has not yet accrued. The District of Columbia uses a two-part test to determine when a quantum meruit claim accrues. The first part of the test is a "last rendition of services" test. *Glenn v. Fay, 281 F. Supp. 3d 130, 136* (D.D.C. 2017). A quantum meruit claim may not accrue before the time that the final service was performed. *Id.* In our case, Quinn was terminated for cause in 2021, and stopped performing in 2020.  DSUF ¶¶ 90-96.

"The second part of the test requires determining when compensation has wrongfully been withheld from the plaintiff." *Id.*; *see also Z-Modular, LLC v. MCN Build, Inc.*, 2024 WL 1486089, at *8 (D.D.C. Apr. 5, 2024) ("[T]he standard that governs when a quantum meruit claim accrues is when the defendant is unjustly enriched, at which point the plaintiff's last service has been rendered and compensation has been wrongfully withheld."). The defendant must engage in some wrongful act to trigger the limitations period, which occurs when a defendant communicates an unequivocal refusal to pay for the services provided. *Glenn*, 281 F. Supp. 3d at 136.

Here, if the Court finds that the VSST and the VCF are not covered by the Agreements, then Quinn's sole source of recovery, is a judgment, settlement, or other resolution of the Litigation that has not yet occurred. Defendants have not recovered any fees as set forth in the 2017 Agreements and have not been "enriched" such that Plaintiff's cause of action against Defendants for wrongfully withholding fees to which he is entitled would have accrued. Plaintiff's claims are unripe and must be dismissed until such time when his cause of action has accrued.

## **CONCLUSION**

For the foregoing reasons Defendants respectfully request that the Court grant their cross-motion for partial summary judgment on contract construction, and dismiss this case as unripe for adjudication, and deny plaintiff's motion for partial summary judgment on contract construction.

**Dated: November 15, 2024**

**Respectfully submitted by**

**STINSON LLP**

/s/
Eric Liebeler (DC Bar No.: 1049148)
Brandon R. Nagy (DC Bar No.: 1024717)
1775 Pennsylvania Ave., NW
Suite 800
Washington, D.C. 20006
Tel.: (202) 785-9100
Fax: (202) 572-9973
Email: eric.liebeler@stinson.com
        brandon.nagy@stinson.com


-and-


/s/
Emily Bab Kirsch (*pro hac vice*)
Craig S. Tarasoff (*pro hac vice*)
Kirsch & Niehaus, PLLC
950 Third Avenue, Suite 1900
New York, NY 10022
Tel: 212-832-0170
Mobile: 917-744-2888
Email: emily.kirsch@kirschniehaus.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2024, the foregoing was electronically filed and served upon on all counsel of record.

/s/ Craig S. Tarasoff
Craig S. Tarasoff