**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SUSANNA QUINN, personal representative of the Estate of John M. Quinn | ) ) ) ) | |
| *Plaintiff,* | ) ) | Case No. 1:21-cv-01824-RDM |
| v. | ) ) ) | |
| KRIENDLER & KRIENDLER LLP, *et al.* | ) ) | Date: November 15, 2024 |
| *Defendants.* | ) ) ) | |

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| **1.** | The basic events surrounding the 9/11 Terrorist Attacks of September 11, 2001 are well known. | |
| **2.** | Almost immediately after the attacks, the United States Government established the Victim Compensation Fund (the "Original VCF") to provide financial relief to the families of those murdered or injured by the attacks (the "9/11 Families") as an alternative to litigation. The Kreindler Firm represented the families of approximately 500 of the 2,966 people killed that day. | **DEX B, ¶ 3; DEX V.** |
| **3.** | In 2003, the lawsuits seeking accountability for the 9/11 Families in the court system for the terrorist attacks were consolidated in a single multi-district litigation in the federal district court for the Southern District of New York ("Litigation"). | ***In re: Terrorist Attacks on September 11, 2001,*** 1:03-md-1570, S.D.N.Y.; **DEX C, ¶ 3.** |
| **4.** | Defendant Kreindler & Kreindler LLP (the "Kreindler Firm") represents thousands of 9/11 Families and was and is one of the lead law firms leading the Litigation. | **PEX 1 at 89:6-19. DEX C, ¶ 3.** |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| **5.** | The Kreindler Firm obtained many clients and was appointed a leading law firm in the Litigation in part because of its well-known success in obtaining accountability or acts of terrorism. The Kreindler Firm had successfully sued Libya for the terrorist attack that brought down Pan Am Flight 103 over Lockerbie, Scotland. | **DEX A, ¶¶ 2, 4; PEX 1 at 36:18-37:3.** |
| **6.** | The Kreindler Firm was further successful securing the final 20% of Libya's settlement payment (the "Pan Am Settlement") by working with Congress to pass the Libya Claims Resolution Act (the "LCRA"). The LCRA resolved all currently pending litigation in the United States against Libya once the final 20% of the Pan Am Settlement was paid. It was in this context that the Kreindler Firm first worked with plaintiff Quinn, his lobbying firm, Quinn Gillespie and Associates ("QGA") and Quinn's partner, Ed Gillespie. | **DEX A, ¶ 4.** |
| **7.** | The Kreindler Firm believed it could establish that the Kingdom of Saudi Arabia ("KSA") provided substantial support to the terrorists. On behalf of its clients, the Kreindler Firm brought suit in 2002 against various alleged sponsors and perpetrators of the 9/11 Terrorist attacks, including certain officials of KSA. | **DEX A, ¶ 7; DEX C, ¶¶ 3, 7** |
| **8.** | Many of the KSA officials the Kreindler Firm had names were dismissed as defendants from the case pursuant to the Foreign Sovereign Immunity Act ("FSIA"). | ***In re: Terrorist Attacks on September 11, 2001,** 349 F. Supp. 2d 765 (S.D.N.Y. 2005);* **DEX C, ¶ 7.** |
| **9.** | KSA was not then, and is not now, a designated state sponsor of terror. It was only able to be named as a defendant in the 9/11 litigation after JASTA was passed, subject to establishing the jurisdictional criteria required by JASTA. | **DEX C, ¶¶ 7, 14, 15; PEX 3 at 87:9-88:14; U.S. Dep't of State, *State Sponsors of Terrorism*, available at https://www.state.gov/state-sponsors-of-** |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| | | terrorism/ (last visited on 11/13/24). |
| **10.** | The original lawsuits named Iran, a designated state sponsor of terror, as a defendant under 28 U.S.C. §1605A, an exception to FSIA that has existed for decades. Iran defaulted in 2003 and the Kreindler Firm obtained a certificate of default against Iran in 2011. Relying on that certificate of default, the Kreindler Firm obtained liability default judgments against Iran on behalf of many of its clients.  The claims against Iran are distinct from the claims against KSA. | **DEX C ¶¶ 11-14.** |
| **A.  The VCF Is Reauthorized in 2010 and the Kreindler Firm's Separate Practice Group Works to Represent Its Clients; Quinn Has No Involvement** | | |
| **11.** | The Original VCF was created by an Act of Congress less than two weeks after the terror attacks as an alternative to litigation to provide compensation to the families of those killed and others who were injured on September 11th.  The Original VCF closed in 2004. | **DEX B, ¶ 3; DEX V.** |
| **12.** | As of January 2, 2011 Congress amended the original VCF statute and the Victim Compensation Fund was reopened (the "VCF"). The VCF provided eligibility for compensation to include a constellation of specific illnesses based on specific exposure hours in lower Manhattan, the Pentagon, and Shanksville, PA.

The reopening of the VCF in 2011 was a result of intense lobbying efforts of a small group of advocates, most of whom represented labor unions whose members were sickened at ground zero in the days and months after 9/11. | **DEX B, ¶¶ 4, 5; DEX K.**

**DEX B, ¶¶ 4, 5; DEX K** |
| **13.** | The VCF practice group of the Kreindler Firm, through partner, Noah Kushlefsky, was deeply involved in the Original VCF (personally representing more than 150 families accessing the VCF).
Because of that deep involvement and experience, Mr. Kushlefsky was contacted by the VCF's Special Master to discuss the reopening of the VCF and associated logistics and policies | **DEX B, ¶¶ 3, 6.** |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| **14.** | Also because of that deep involvement and experience, Mr. Kushlefsky was contacted in 2010 after the reauthorization by attorneys representing thousands of first responders to request that the Kreindler Firm represent those first responders in making claims under the VCF. | **DEX B, ¶ 7.** |
| **15.** | Between 2011 and 2015, the Kreindler Firm played a significant role in intense lobbying efforts together with unions, advocacy groups, and attorneys representing claimants to fully fund the VCF and to extend it beyond its statutory five-year life.  Mr. Kushlefsky, on behalf of the Kreindler Firm's VCF practice, often traveled with busloads of sick claimants, lawyers, and advocates to Washington, D.C. to meet with senators and representatives seeking to extend the life of the VCF and fully fund awards. The Kreindler Firm also contributed substantially to funding the trips. Quinn had nothing to do with any of these efforts. | **DEX B, ¶ 8.** |
| **16.** | In December 2015, Congress reauthorized the VCF for five more years, requiring that claimants who received only 10% of their awards be fully compensated and allowing individuals to submit claims until December 18, 2020.  Though helpful, this was insufficient to address sicknesses that 9/11 Families were experiencing, and lobbying resumed in 2017.  Mr. Kushlefsky was heavily involved in these efforts. Quinn had no role in these efforts. | **DEX B, ¶ 9; DEX D.** |
| **17.** | On July 29, 2019, the president signed the Never Forget the Heroes: James Zadroga, Ray Pfeifer, and Luis Alvarez Permanent Authorization of the September 11th Victim Compensation Fund (the "VCF Permanent Authorization Act"). The VCF Permanent Authorization Act extends the VCF's claim filing deadline from December 18, 2020, to October 1, 2090, and appropriates such funds as may be necessary to pay all eligible claims.  Quinn played no role in these efforts. | **DEX B, ¶ 11; DEX D.** |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| 18. | By the end of 2011, the Kreindler Firm represented close to 3,000 exposure victims for claims in the VCF and assembled a large team to represent them properly. This team includes case managers, in-house marketing and legal advertising personnel, paralegals dedicated to probate and surrogate issues, and a four-person intake team. | DEX B, ¶¶ 12, 13. |
| 19. | The group within the Kreindler Firm that represents the exposure victims in the VCF is a completely separate practice group from the general litigation group, including the terror group that oversees the Litigation against KSA. The VCF team at the Kreindler Firm has dedicated websites, email addresses and telephone numbers separate from the Kreindler Firm's other practice areas. | DEX B, ¶¶ 12, 13. |
| 20. | The VCF group at the Kreindler Firm VCF now represents over 11,000 active claimants and is still retaining new claimants on a regular basis. Quinn has had nothing to do with this practice at any time. | DEX B, ¶ 14. |
| 21. | The VCF is widely marketed, both by the VCF itself to ensure that those with latent injuries are aware that the government seeks to compensate them, and by about a dozen law firms who practice in this area and seek representation of new clients. | DEX B, ¶ 16. |
| 22. | By 2013 (the year that Quinn and the Kreindler Firm entered into the first contingency agreement) the VCF had apportioned a total dollar value in compensation to 9/11 Families of $90,384,578.<br><br>By year end 2014 (the year Quinn, Robert Crowe ("Mr. Crowe"), and the Kreindler Firm first revised their contingency agreement), the VCF had apportioned a total dollar value in compensation to 9/11 Families of $792,380,981.<br><br>These figures were all made public by the government annual status reports and media reporting. | DEX D. |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| | **B.  The Kreindler Firm Retains Quinn and Mr. Crowe as Lobbyists: The 2013 and 2014 Agreements** | |
| 23. | In 2013, Mr. Kreindler approached Quinn to help lobby the United States government through incoming Secretary of State John Kerry to persuade first Pakistan (in connection with the Mumbai attacks), and then KSA, in connection with the 9/11 attacks to seek a diplomatic resolution that would compensate the victims outside of litigation.  Both countries and their officials then enjoyed immunity from suit. | **DEX A, ¶ 3; PEX 1 at 7:16-8:12;** |
| 24. | John Kerry, who had been a main architect of the Libyan diplomatic resolution, was the new incoming Secretary of State, and Mr. Kreindler believed there might be an opportunity to work with the government to help resolve the Litigation by working a diplomatic resolution with KSA. | **PEX 1 at 11:8-12:8; 23:21-24:4; DEX A, ¶¶ 3-5.** |
| 25. | Kreindler reached out to Quinn because Quinn was familiar with the work with Libya regarding compensating the victims of the terrorist bombing of Pan Am 103 over Lockerbie, Scotland. | **DEX A, ¶ 4.** |
| 26. | In the Pan Am case, after 17 years of litigation and securing 80% of the settlement proceeds from Libya, the Kreindler Firm retained and worked with Mr. Gillespie, Quinn's then partner at QGA. Mr. Gillespie was to help persuade President Bush to require Libya to pay the remaining 20% of the Pan Am Settlement as a condition of coming off the list of state sponsors of terrorism. | **DEX A, ¶ 4;** |
| 27. | After Mr. Gillespie failed and President Bush removed Libya from the list without requiring Libya's payment of the final 20%, Quinn assisted the Kreindler Firm in securing the final payment. In working with then-Senators Biden and Kerry in passing the LCRA, the Kreindler Firm secured the final payment of the Pan Am Settlement for the Pan Am Flight 103 victims, along with the resolution of all other pending United States lawsuits against Libya. | **DEX A, ¶ 4 ;** |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| **28.** | Quinn agreed to work with the Kreindler Firm to seek a diplomatic resolution to the Litigation funded by KSA using Pan Am 103 as a model. He brought Mr. Crowe into the effort because Mr. Crowe had a relationship with John Kerry. As of February 7, 2013, Mr. Crowe's firm at the time, Nelson Mullins Riley and Scarborough LLP ("Nelson Mullins"), and QGA entered into an agreement with the Kreindler Firm and the Silverman Law Firm[1] to "provide strategic counseling and public policy representation to [the Kreindler Firm] and The Silverman Law Firm" with respect to the Mumbai attacks. | **PEX 2 at 9:1-8; PEX 1 at 8:4-12; 24:5-21; PEX 6. PEX 13 at QUINN_000833-36; PEX 18 at QUINN_000921-22; PEX 20 at QUINN_000888; DEX H at KK000312.** |
| **29.** | Later that year, Quinn, Mr. Crowe and the Kreindler Firm entered into an agreement that expanded their relationship to include the Litigation (the "Original 2013 Agreement"). The Original 2013 Agreement provides: **"As compensation for their efforts in assisting in obtaining a recovery for the 9/11 victims and their families, Nelson Mullins and Quinn Gillespie shall receive a fee of 1% percent (sic) of the net recovery on each decedent's wrongful death and case and each personal injury case where the Kreindler Firm has or receives a fee in the consolidated 9/11 Terrorist Litigation."** | PEX 9 (emphasis added). |
| **30.** | At all times, beginning with the Original 2013 Agreement, Quinn was expected to help facilitate the settlement, in particular, by way of gathering support from members of Congress and other public officials whose viewpoint on this Litigation would be persuasive, with the goal to settle the Litigation. The efforts were focused on KSA because KSA was the only entity with resources to compensate the victims and was to become the principal defendant. | **PEX 3 at 10:8-11:9; PEX 1 at 90:12-16; PEX 2 at 46:3-47:10; DEX A, ¶¶ 5,7; DEX C, ¶ 6.** |
| **31.** | At first, the fees for Quinn's work would go to QGA. Shortly thereafter, Quinn arranged that his fee be split between himself and QGA in order to maximize the | **DEX E; DEX A, ¶ 26.** |

---

[1] The Silverman Law Firm was involved in litigation regarding the Mumbai attacks, but is not otherwise relevant to this dispute.

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| | fee he took for himself and minimize the fee to share with his partner. | |
| 32. | In July 2014, the parties signed an essentially identical agreement to the Original 2013 Agreement (the "2014 Agreement"), which differed in that it provided for Quinn to take the entirety of his portion of any fee instead of sharing any of it with QGA. <br><br> The 2014 Agreement provides: <br><br> "As compensation for their efforts in assisting [the Kreindler Firm] in obtaining a recovery for the 9/11 victims and their families, [the Kreindler Firm] agrees to pay Nelson Mullins Riley and Scarborough LLP ("Nelson Mullins") and John M. Quinn, Esq. **a combined fee of one percent of the net recovery on each decedent's wrongful death and case and each personal injury case where [the Kreindler Firm] has or receives a fee in the consolidated 9/11 Terrorist Litigation.**" | **DEX F, at Exh. 1-A.** <br><br><br><br> **DEX F, at Exh. 1-A** (emphasis added). |
| 33. | Quinn testified that the goal under the 2014 Agreement was the same as the Original 2013 Agreement: to resolve the Litigation. <br><br> The goal of resolving the cases was always to obtain a final resolution of the Litigation funded by KSA. <br><br> Quinn further testified that KSA was the "principal defendant," that KSA was likely the best positioned of any defendant to fund a resolution because no others had the resources to do so, and that the focus was principally on KSA. | **PEX 3 at 12:12-20** <br> **PEX 2 at 21:17-22:20** <br><br><br> **DEX A, ¶¶ 7-9;** <br> **DEX C, ¶ 6** <br><br> **PEX 3 at 14:22-15:1;** <br> **15:19-23;16:3-8;** <br> **18:12-22.** |
| 34. | The Original 2013 Agreement was a contingency agreement related to the 9/11 Litigation. | **PEX 3 at 10:19-23** |
| 35. | Quinn testified that he considered himself a "strategist in trying to figure out how to get the United States to convince Saudi Arabia to resolve the litigation finally" and that convincing KSA to resolve the Litigation | **PEX 3 at 25:19-26:1** |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| | finally was "the goal of the deal that [Quinn] had struck with the Kreindler [F]irm." | |
| 36. | Quinn has never served as co-counsel to the Kreindler Firm with respect to their clients.<br><br>The Original 2013 Agreement and the 2014 Agreement state the Quinn will counsel and advise the Kreindler Firm and Mr. Kreindler – not the Kreindler Firm's clients. Moreover, Quinn admitted that he has "never represented the [9/11] families."<br><br>Quinn has never been a party to a retainer agreement with any of the Kreindler Firm's clients. Quinn never entered a notice of appearance in the Litigation on behalf of the Kreindler Firm's clients and admitted that he was never authorized to. | **DEX F;**<br>**DEX G;**<br><br>**DEX A, ¶¶ 36-39;**<br><br>**PEX 3 at 6:25-7:4;**<br><br>**PEX 3 at 152:14-153:6;**<br><br>**PEX 3 at 127:1-12.** |
| 37. | The work done by Mr. Crowe and Quinn all demonstrate a singular focus: to lobby the U.S. government to find ways to bring KSA to the table to fund a resolution that would compensate the victims and finally resolve the Litigation.<br><br>Every talking points document and substantive memo advances the same strategy, and the record reflects no other efforts reflecting any other goal. | **PEX 13;**<br>**PEX 15;**<br>**PEX 18;**<br>**PEX 26;**<br>**PEX 30;**<br>**DEX H;**<br>**DEX A, ¶¶ 7-9.** |
| 38. | Quinn registered as a lobbyist for the Kreindler Firm as of October 23, 2013 to "Encourage settlement of litigation involving international terrorism." Quinn terminated his registration as a lobbyist for the Kreindler Firm effective July 15, 2016. | **DEX I;**<br>**DEX J.** |
| 39. | The "compensation fund" for 9/11 Families sought by Quinn, Mr. Crowe, and Mr. Kreindler would be funded by the KSA in exchange for no admission of liability and other diplomatic concessions from the US. | **PEX 13, 15;**<br>**DEX A, ¶ 9;**<br>**DEX A, ¶ 47-48.** |
| 40. | On or about October 23, 2013 Quinn and Mr. Crowe sent a memo to David Wade, Chief of Staff to Secretary of State John Kerry, setting forth the | **PEX 18.** |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| | objectives of seeking compensation for the terror victims of the Mumbai attacks from Pakistan and compensation for the 9/11 victims from KSA. The memo states that the LCRA can be a model, that the only way to achieve justice is to encourage the governments of Pakistan and KSA to compensate the terror victims, and that the United States government should insist it happens. | |
| 41. | On or about December 19, 2013, a document was prepared for Mr. Crowe who would be seeing Secretary Kerry over the holidays. The document again explains how and why the U.S. government should encourage KSA (and Pakistan) to compensate the terror victims and achieve final resolution of all pending litigation. It states "the Pan Am 103 and LCRA offer a model for resolving 9/11" | **DEX H.** |
| 42. | Neither Quinn nor Mr. Crowe ever mentioned, discussed or pursued how to obtain compensation for terror victims through any U.S. administrative relief fund, including the VCF or the United States Victims of State Sponsored Terrorism Fund (the "VSST"). | **DEX B, ¶¶ 5, 7-9, 11, 15, 17;**<br>**PEX 2 at 22:21-25.** |
| 43. | Mr. Crowe testified that his work with Quinn and the Kreindler Firm was always limited to obtaining compensation for the 9/11 Families in a manner that would finally resolve the Litigation and would be funded by the defendants to the Litigation. | **PEX 2 at 110:23-112:4.** |
| 44. | Quinn understood that the VCF would in fact be an obstacle to his work encouraging a KSA settlement. Quinn was warned by government officials that the existence of the VCF would undermine the work to obtain a KSA resolution of the Litigation and in turn warned Mr. Kreindler that the VCF stood in opposition to his work on KSA. | **DEX A, ¶ 14;**<br>**PEX 20.** |
| 45. | When efforts to obtain a government supported state-to-state solution were not proving successful, the importance of passing legislation that would allow the 9/11 victims to sue KSA for its role in the attacks, the Justice Against Sponsors of Terrorism Act | **DEX A, ¶ 9.** |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| | ("JASTA"), grew. As a jurisdictional statute that provides an exception to the Foreign Sovereign Immunities Act ("FSIA"), JASTA would enable the 9/11 Families to name KSA as a direct defendant in the Litigation, which would allow the Kreindler Firm to pursue its theory of liability and increase KSA's incentive to resolve the Litigation. | |
| **46.** | Quinn worked on securing the passage of JASTA. | **PEX 35.** |
| **47.** | JASTA was signed into law over presidential veto on September 28, 2016. | **DEX A, ¶ 23.** |
| **48.** | JASTA allows a victim of terrorism to sue a foreign nation for aiding and abetting the act of terrorism even where the foreign nation is not a previously designated state sponsor of terrorism (such as Iran), provided other jurisdictional criteria are met. JASTA permitted KSA to be named as a defendant in the Litigation, and in March 2017, the Kreindler Firm did in fact file a new complaint in the Litigation that targeted KSA as the key defendant. | **DEX A, ¶ 9; DEX C, ¶ 7, 8; PEX 2 at 28:19-21.** |
| **C.** | **Quinn Has No Involvement in the Kreindler Firm's Work to Secure Compensation for Its Clients Separate from the Litigation: Accessing the VCF and the VSST** | |
| **49.** | By December 31, 2016, VCF had distributed $1,819,801,385.54 and would be distributing close to another $400,000,000 by the time that Quinn renegotiated and drafted the 2017 Agreements. | **DEX K at 9.** |
| **50.** | Quinn had no involvement in the work done by the Kreindler Firm accessing the VCF. No document demonstrates Quinn did any work to help the Kreindler Firm access the VCF for its clients. No document reflects any involvement by Quinn in any lobbying effort related to the establishment, amendment or administration of the VCF. Quinn has never been involved in making a claim to the VCF.<br><br>Quinn could not name a single individual at the Kreindler firm that was involved with the VCF. | **PEX 3 at 103:16-21.**<br><br><br><br><br>**PEX 3 at 110:11-111:6.** |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| **51.** | The Kreindler Firm has a team dedicated to applying for compensation to the VSST for 9/11 Families. That effort, led by Megan Benett, is a difficult and time-consuming practice that has achieved good results for the Kreindler Firm's clients. | **DEX C, ¶ 20.** |
| **52.** | The Kreindler Firm's VSST practice focuses on two areas: (1) direct communications with clients and (2) applications to and resolving issues with the VSST and its personnel. The attorneys and investigators at the Kreindler Firm who work on the KSA litigation have no involvement in the work concerning the VSST. Additionally, the paralegals and case managers who work primarily on the VSST Fund efforts have little involvement in the KSA litigation.  Ms. Benett's direct work and oversight of VSST efforts is wholly separate from the KSA Litigation. | **DEX C, ¶ 21.** |
| **53.** | The Kreindler Firm also retains outside lobbyists to work on VSST Fund matters.   Since 2021, the Kreindler Firm has engaged separate groups of lobbyists to advocate specifically on the VSST whose registrations reflect that they were engaged in connection with the VSST.   While one of those lobbying firms was also engaged in efforts concerning the KSA, that firm's lobbying registrations for the VSST and the Litigation are separate, as appropriate, because those are two discrete and separate areas of the Kreindler Firm's work. | **DEX C, ¶ 22.** |
| **54.** | The Kreindler Firm has never once engaged with Quinn on efforts to represent clients in accessing the VSST. Ms. Benett never discussed with Quinn with respect to how the Kreindler Firm accesses the VSST, the work involved, the strategies employed, the legal advice given, the applications prepared, or anything at all whatsoever related to the VSST. | **DEX C, ¶ 24.** |
|  | Quinn has never attended, been involved in or even mentioned in any meetings that the Kreindler Firm and its lobbyists organized or held with senior staff of members of congress regarding the VSST. The Kreindler Firm has retained lobbyists other than Quinn | **DEX C, ¶¶25-26** |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| | to do this work and Quinn has never had anything to do with those lobbyists or this effort. | |
| **55.** | Quinn had no involvement in the work done by the Kreindler Firm accessing the VSST. No document demonstrates Quinn did any work to help the Kreindler Firm access the VSST for its clients. No document reflects any involvement by Quinn in any lobbying effort related to the establishment, amendment or administration of the VSST. Quinn does not know what steps need to be followed to file submission to access the VSST. <br><br> Quinn has never seen an application form for the VSST and could not name a single individual at the Kreindler firm that was involved with the VSST. | **PEX 3 at 86:3-5.** <br><br><br><br><br><br><br><br> **PEX 3 at 85:19-86:70; 104:1-4.** |
| **56.** | The VSST was established by statute enacted on December 18, 2015. Payments to claimants totaling $1,040,902,501.89 were authorized by December 2016 and the actual distributions were made in March 2017. All of this information was publicly available by government reports and media coverage. | **DEX X at 11.** |
| **57.** | Quinn testified that JASTA – which enabled KSA to be named as a defendant in the Litigation – doesn't have anything to do with the VSST other than "they're both things that bear on the same subject." | **PEX 3 at 35:20-36:5.** |
| **58.** | Quinn admitted that any compensation to a victim of state sponsored terrorism occurring through the mechanism of the VSST has absolutely nothing to do with the Litigation against KSA. | **PEX 3 at 99:15-20.** |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| **59.** | In October 2016, Quinn worked to oppose an effort to attack JASTA which wrongly associated JASTA with VSST. Quinn did not support VSST; VSST was seen as a means to attack JASTA.<br><br>In this context, Quinn agreed that: "They need to stop confusing, conflating or drawing any relationship between JASTA and the [VSST]. It's obvious they are spun up about the eligibility requirements for the [VSST]. That has nothing whatsoever to do with JASTA, period. The fact that Perles slapped a similar name on his bill doesn't make it a related measure. It is not."[2] | **DEX A, ¶¶ 17-20;**<br>**PEX 1 at 40:22-42:1;**<br>**45:5-46:20.**<br><br><br>**DEX L.** |
| **60.** | On October 22, 2016, Quinn recommended sending a memo to Senator Schumer, explaining that despite confusion to the contrary, JASTA and the VSST "have nothing to do with each other." | **DEX M;**<br><br>**DEX A, ¶ 17-20.** |
| **61.** | Quinn testified that doing the work of the VCF and the VSST was not within his purview because he "was representing the law firms" and the "client relationship was established by either Anderson Kill or Kreindler or whatever firm had the immediate client relationship." | **PEX 3 at 104:1-10.** |
| **D.  Quinn Seeks to Replace the Existing Contract to Maximize His Fees.** |||
| **62.** | Beginning in January 2017, Quinn sought to revise the Original 2013 Agreement and the 2014 Agreement. | **DEX A, 24;**<br>**DEX N;**<br><br>**PEX 38.** |
| **63.** | Quinn was the main driver of the revisions and the drafter of each version of the Agreements. The process was centered on clearly identifying and clarifying the sources and amounts of his fees. | **PEX 38;**<br>**DEX A, ¶ 25-26;**<br>**DEX N;**<br>**PEX 38;**<br>**DEX O;** |

---

[2] The VSST is sometimes referred to as the "Iran Fund", because it was originally conceived to provide relief to those taken hostage in Iran in 1979 and their families.

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| | | DEX P; PEX 38; DEX Q; DEX R; DEX S; DEX T; DEX U. |
| 64. | The parties entered into three new agreements in 2017 – one on May 19, 2017 (the "May 2017 Agreement"), a second on May 19, 2017 (the "Additional Compensation Agreement"), and an amendment on August 8, 2017 (the "August 2017 Amendment," together with the May 2017 Agreement and the Additional Compensation Agreement, the "2017 Agreements"). <br><br> The 2017 Agreements made no change to Quinn's ongoing duties which were still clearly limited to supporting the Kreindler Firm (not representing the Kreindler Firm clients) by (i) protecting JASTA which had now been passed, and (ii) helping the Kreindler Firm achieve a fair and final resolution of the Litigation against KSA. | DEX A, ¶ 25; DEX F (Dkt. 19-4, 19-5); DEX G (Dkt. 19-5). |
| 65. | The email correspondence reflects that Quinn's sole objective was to define and clarify the basis of his fee, not to expand the fees set forth in the prior agreements. | DEX A, ¶ 26; DEX N; PEX 38; DEX O; DEX P; PEX 38; DEX Q; DEX R; DEX S; DEX T; DEX U. |
| 66. | At that time, Quinn reaffirmed that the goal of the agreements was and had always been to achieve a settlement or other final resolution of the litigation funded by KSA and argued his entitlement to an | PEX 38. |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| | enlarged fees under the Agreement was grounded in "the bottom line reality … that the enactment of JASTA has been the key to our achieving a near-term settlement…." | |
| 67. | Quinn stated in 2017 "Our contracts on this matter clearly contemplate that our contingent compensation is in exchange for services that will assist in obtaining a recovery for the clients."<br><br>Quinn testified at his deposition that statement was true when he wrote it in 2017 and it remains true today.<br><br>Quinn testified that he "would not expect to get paid for work that he did not do." | **PEX 38;**<br><br><br><br>**PEX 3 at 31:9-16;**<br><br>**PEX 3 at 46:24-47:1.** |
| 68. | Quinn argued that he should be entitled to a much larger fee than Crowe because "JASTA certainly has enhanced the possibility of a recovery."<br>Quinn does not suggest that any recovery had already been had. Quinn makes no mention of the recoveries issued from the U.S. government administrative relief funds, the VCF or the VSST. | **PEX 38;**<br>**DEX N-U.** |
| 69. | The main impetus behind Quinn's desire to revise the Agreement was to provide for himself a larger share of the 1% that he had previously agreed to split equally with Mr. Crowe. | **PEX 38;**<br>**DEX A, ¶ 26.** |
| 70. | There is no dispute that the 2017 Agreements were contingency agreements. The contingencies were tied to the Litigation. | **PEX 3 at 69:11-72:23** |
| 71. | There was a sense of urgency at the time because the parties felt that newly inaugurated President Trump might do a deal with KSA quickly. | **DEX A, ¶ 28;**<br>**DEX R;**<br>**DEX U.** |
| 72. | In the process, Quinn sought to specifically identify and describe the sources of revenues that would provide the bases of his compensation. | **PEX 38;**<br>**DEX O;**<br>**DEX P;**<br>**DEX R;**<br>**DEX T;** |

16

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
|  |  |  |
| 73. | The May 2017 Agreement raised his previous 50% share of the Crowe/Quinn fee 0.775% of net recovery obtained by the Kreindler Firm from resolution of cases filed prior to July 2014 (the date of the 2014 Agreement) while reducing Mr. Crowe to 0.225% of net recovery obtained by the Kreindler Firm from resolution of cases filed prior to July 2014. | DEX F. |
| 74. | In the Additional Compensation Agreement, Quinn secured for himself the entire 1% of fees earned from resolution of cases filed in the Litigation after July 2014. Fees from these cases were not included in the 2014 Agreement. | DEX F. |
| 75. | Quinn had sought to ensure that the Additional Compensation Agreement specifically provided that his designated percentage would be taken from (i) cases brought for "new categories of plaintiffs" such as the latent injury cases, and (ii) from additional fees that the Kreindler Firm might be awarded by the Court at the end of the Litigation from a common benefit fund or for the Kreindler Firm's work on the Plaintiff's Executive Committee. | DEX T. |
| 76. | The Kreindler Firm and Mr. Kreindler agreed to most of these requests. | DEX S; DEX T. |
| 77. | The Kreindler Firm and Mr. Kreindler did not agree to language providing a catch all that Quinn's fees would apply to all "new categories of plaintiffs." | DEX T. |
| 78. | As of the date of the execution of the 2017 Agreements, the VCF had been in existence for six years and had distributed over $2.2 Billion. | DEX D. |
| 79. | As of the date of the execution of the 2017 Agreements, the VSST had been in existence for 18 months and had distributed $1,040,902,501.89. | DEX X. |
| 80. | At no time in the revisions, the associated correspondence, or the drafting process was either the VCF or the VSST mentioned. | PEX 3 at 57:24-58:10; DEX A, ¶¶ 24-27; PEX 38; |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| | | DEX N-U. |
| 81. | In August 2017, Quinn proposed the August 2017 Amendment to address points raised by Jerry Goldman of Anderson Kill P.C. ("Anderson Kill"), who also was a party to a different agreement with Quinn relating to seeking resolution of the Litigation against KSA. | PEX 52. |
| 82. | Quinn proposed a change to the definition of "litigation" to clean up prior drafting where "litigation" and "matter" had been used interchangeably. The change was not intended to expand or broaden the scope of the 2017 Agreements. | PEX 52; PEX 1 at 66:14-67:2. |
| 83. | Quinn also suggested language for the August 2017 Amendment to address a situation described by Mr. Goldman, namely that Mr. Goldman is "gathering clients with respect to whom he may never actually file a claim – *but still achieve a recovery and get a fee via settlement or other resolution.*" | PEX 52 (emphasis added). |
| 84. | Quinn wanted the same scenario covered in his agreement with the Kreindler Firm, and explained that the parties' intent in paragraph 2 of the August 2017 Amendment was to cover the scenario that there could be a resolution of the Litigation that provides compensation to the victims who had not yet filed claims in court. | PEX 3 at 114:22-115:8; PEX 1 at 68:8-70:11; DEX A, ¶ 30. |
| 85. | And finally, Quinn requested that should Mr. Crowe be disqualified from receiving his 0.225% fee on the early cases, that fee be redirected to Quinn, rather than have Mr. Crowe forfeit the fees back to the Kreindler Firm. | PEX 52; PEX 1 at 65:2-65:20. |
| 86. | Quinn testified that the August 2017 Amendment was not intended to "address the VCF or the VSST", but was only intended to address "the receipt of compensation from by whatever means we had previously made available…in earlier agreements." | PEX 3 at 118:1-14. |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| 87. | Quinn, the Kreindler Firm, and other plaintiffs' lawyers involved in the Litigation believed that a diplomatic resolution was possibly imminent in 2017. They believed that President Trump might broker a resolution with KSA whereby in exchange for ending the Litigation, KSA could provide a fund that would compensate all terror victims irrespective of claims filed in the Litigation.  Quinn wanted to ensure that he would get paid his fee of any KSA-funded payout to a victim resulting from a diplomatically engineered resolution, whether or not the victims had filed the claims we had identified in the Litigation. | DEX A, ¶¶ 28-31; PEX 3 at 114:22-115:8; PEX 1 at 42:2-43:22. |
| **E. Three Years After the 2017 Agreements and Seven Years Into the Parties' Relationship, Quinn First Requests Monies Under the VSST.** | | |
| 88. | In a May 2017 email to Dina Powell, Quinn purports to write on behalf of "several insurers" and "thousands of the 9/11 Families involved in litigation with the Kingdom of Saudi Arabia" presenting a proposal of how "the President could orchestrate a state-to-state resolution of the cases." | PEX 12. |
| 89. | Despite the parties' hopefulness that President Trump might secure a deal with KSA, he did not. KSA continued to litigate vigorously and has shown no interest in compensating the victims of 9/11. | DEX A; *In re Terrorist Attacks on September 11, 2001*, 1:03-md-1570; DEX C, ¶ 30. |
| 90. | In April 2020, Quinn first made demand for a percentage under the 2017 Agreements for fees derived from the Kreindler Firm's work in connection with the VSST. | DEX Y; DEX A, ¶¶ 20-22; |
| 91. | No request was made prior to this time. | DEX A, ¶¶ 20-22. |
| 92. | Quinn's request was prompted by a meeting with Senator Schumer who noted that Congress had just re-funded the VSST yet again. | DEX A, ¶ 22; DEX Z. |
| 93. | Quinn admitted to Mr. Kreindler at the time that he did not believe VSST was included in the 2017 | DEX A, ¶22; |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| | Agreements but claimed a lawyer told him the language might be broad enough to encompass VSST.<br><br>Quinn did not have counsel advising him in April 2020 on this issue; only friends who were lawyers that he consulted with informally who may have acted as his lawyer for a short period of time. | **PEX 3 at 137:16 – 141:22.** |
| 94. | Quinn made no request for a percentage on fees derived from the Kreindler Firm's work in connection with the VCF in April 2020, or indeed at any time prior to the filing of his Amended Complaint in October 2021. | **DEX A, ¶ 22; Dkt. No. 1; Dkt. No. 19.** |
| 95. | When the Kreindler Firm denied his request for fees on the VSST funds, purportedly on the advice of counsel, Quinn refused to do any work until the fee dispute was resolved. | **DEX AA;**<br>**DEX A, ¶¶ 41-45.** |
| 96. | On September 20, 2021, the Kreindler Firm advised Quinn that he was in continuing material breach of the 2017 Agreements. | **DEX AA;**<br>**DEX BB.** |
| 97. | Quinn never disagreed that he was in continuing material breach or responded to the Kreindler Firm in any way regarding the breach. | **DEX A, ¶ 46** |
| 98. | Quinn never communicated with the Kreindler Firm or Kreindler after January 2021. | **DEX A, ¶46;**<br>**PEX 3 at 158:12-15** |
| 99. | Quinn registered as a lobbyist in 2021 for Anderson Kill for Anti-terrorism Act matters, but did not file any similar lobbying registration to represent the Kreindler Firm.<br><br>Quinn admitted that he was not working for the Kreindler Firm at that time, because if he were, he would have registered on their behalf. | **PEX 3 at 153:20-155:24; DEX CC;**<br><br>**PEX 3 at 155:25-156:4.** |
| 100. | In 2021, Mr. Crowe advised Mr. Kreindler he was leaving Nelson Mullins and (with Nelson Mullins' agreement) wanted to amend his agreement to be between him personally and the Kreindler Firm. | **DEX A, ¶ 32;**<br>**DEX DD, ¶9.** |

| U.F. No. | Statement of Undisputed Facts | Citation to Evidentiary Record |
|---|---|---|
| **101.** | Because Quinn had brought his original suit in July 2021 asserting a claim to the VSST monies (though not yet asserting his additional claim to the VCF monies), Mr. Kreindler requested and Mr. Crowe agreed to have his amended agreement spell out what the parties have always known: that the agreements were limited to a final resolution of the Litigation funded by KSA, in whatever form that resolution took.<br><br>Mr. Crowe agreed, and his 2021 agreement contains specific language excluding the VSST. Had Mr. Kreindler known that Quinn would also make an unfounded claim that the 2017 Agreements reached the VCF in his amended complaint, months later, Mr. Kreindler would have asked Mr. Crowe to specifically exclude the VCF as well in his amended agreement. But that litigation position of Quinn's did not emerge until October 2021. | **DEX A, ¶¶ 33-35;**<br>**DEX DD;**<br>**DEX DD, Exh. C.** |
| **102.** | Mr. Crowe was so surprised by Quinn's claim, and he expressed that he believed it to be unfounded and contrary to the clear understanding of all the parties at the time.  Mr. Crowe agreed to sign a declaration memorializing his view.<br><br>Mr. Kreindler would have requested that August 2021 declaration and Agreement also address the VCF had he had any reason to imagine that Quinn would later make that outlandish claim. | **DEX A, ¶¶ 33-35;**<br>**DEX DD;**<br>**DEX DD, Exh. C.** |