# DEX A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SUSANNA QUINN, personal representative, of the Estate of John M. Quinn<br><br>*Plaintiff,*<br><br>v.<br><br>KRIENDLER & KRIENDLER LLP, *et al.*<br><br>*Defendants.* | ) | Case No. 1:21-cv-01824-RDM |

**DECLARATION OF JAMES P. KREINDLER**

James P. Kreindler, pursuant to 28 U.S.C. §1746, hereby declares under penalty of perjury:

1. I am a member of the Bar of the State of New York and a defendant in this matter. I submit this declaration in support of Defendants' Cross-Motion for Partial Summary Judgment and Opposition to Plaintiff Quinn's Motion for Summary Judgment. The facts set forth below are based on my personal knowledge except where indicated otherwise, in which case they are based on information and belief.

2. Kreindler & Kreindler LLP ("the Kreindler Firm") is a law firm established in 1952. The Kreindler Firm has a strong reputation for its leading work in aviation cases and terrorism litigation (Pan Am 103; 9/11), and also is well-known and regarded for its work in other practice areas as well.

**A. Retaining Quinn and Crowe for a Discrete Task**

3. After 12 years of leading the 9/11 Families' litigation against countries, banks, charities and individuals, on behalf of defendant law firm the Kreindler Firm, I sought Jack

Quinn's ("Quinn's") assistance for a discrete task. I wanted help accessing and engaging incoming Secretary of State John Kerry to persuade first Pakistan (in connection with the Mumbai attacks), and then the Kingdom of Saudi Arabia ("KSA") (in connection with 9/11) both of whom who then enjoyed immunity from suit, to compensate the victims of those terror attacks.

4. I had known Quinn from the work the Kreindler Firm did leading the litigation against Libya on behalf of the victims of the bombing of Pan Am Flight 103 that went down over Lockerbie, Scotland. In the Pan Am case, after 17 years of litigation and securing 80% of the settlement proceeds from Libya, my colleagues and I retained and worked with republican lobbyist Ed Gillespie, Quinn's then partner at Quinn Gillespie and Associates ("QGA"). Gillespie was to help persuade President Bush to require Libya to pay the remaining 20% of settlement proceeds as a condition of coming off the list of state sponsors of terrorism. After Gillespie failed and President Bush removed Libya from the list without requiring Libya's payment of the final 20%, Quinn assisted us in securing the final payment. In working with then Senators Biden and Kerry in passing the Libya Claims Resolution Act, we secured the final payment to the Pan Am Flight 103 victims along with the resolution of all other pending United States lawsuits against Libya.

5. In 2013 with John Kerry replacing Hillary Clinton as Secretary of State, I approached Quinn to find a conduit to Secretary of State Kerry to support the Kreindler Firm's work first on the Mumbai case, involving the terrorist attack supported by Pakistan that took the lives of five Americans and injured many more. Soon after, we added the task of supporting the Kreindler Firm's work with respect to 9/11. In both cases, Quinn was to lobby for government support in finding a resolution to litigation where the defendants are held accountable - in the model of what we had done with Libya. Quinn put us in touch with Bob Crowe — a lobbyist and close friend of John Kerry – to help with the efforts. Neither Pakistan nor Saudi Arabia was then

subject to jurisdiction in the United States federal courts because of the Foreign Sovereign Immunities Act. We hoped to persuade the U.S. government to exert diplomatic pressure on these states to encourage them to compensate the victims of the terrorism they supported.

6. Quinn's scope of work was limited to this singular endeavor. Neither Quinn nor Crowe was asked to be involved, and neither was involved, in the then twelve-year-old litigation in any substantive manner whatsoever. Quinn never filed an appearance in the litigation, did not enter into retainer agreements with our clients and was not involved in the lawyering of the 9/11 case, only lobbying efforts.

**B. Crowe and Quinn's Work was always limited to seeking a final resolution of the Litigation that would provide compensation to 9/11 Victims funded by KSA**

7. With respect to 9/11, Crowe and Quinn's role was singularly focused on KSA. We believed that we could establish that KSA knowingly aided, abetted and materially supported al Qaeda and the terrorists that carried out the attacks.

8. The memos and talking points Quinn worked on and used in his efforts all exclusively discuss engaging the United States Government to bring KSA to the table to fund compensation to the victims in a manner that would finally resolve the Litigation. For example, in 2013, Quinn's associate, Michael DiRoma, "crafted" the original such memo with "John (at Kreindler & Kreindler) … with Jim's direct input." *See* PEX 15 at Quinn 845. The memo supported a proposal to government officials for "an alternative path to this litigation. If we create a major settlement fund for 9/11 victims, 99% of terrorism cases could be resolved away from the court system." The proposed "major settlement fund" would be funded by contribution from KSA and benefit KSA because it would protect KSA from litigation in U.S. courts. PEX 15 at Quinn 847 and 863.

9. When the early efforts were not quickly successful, the importance of passing legislation that would allow the 9/11 victims to sue KSA for its role in the attacks, the Justice Against Sponsors of Terrorism Act ("JASTA"), grew. As a jurisdictional statute that provides an exception to the Foreign Sovereign Immunities Act, JASTA would enable us to name KSA as a direct defendant in the Litigation which would allow us to pursue our theory of liability and could increase KSA's incentive to resolve the Litigation.

**C. Quinn was well aware of the VCF and the VSST but had nothing to do with them and knew they were not included in our agreement.**

10. Quinn was never asked to be involved, and he was not involved, in any of the Kreindler Firm's work with the United States Government funded administrative funds offering assistance to United States terror victims.

11. The Kreindler Firm began representing the families of those killed on 9/11 in the original Victims Compensation Fund ("VCF") starting in 2002. Quinn never had any role in that work, either as an attorney or as a lobbyist.

12. Then when the VCF was amended in 2010 to allow recovery by certain individuals sickened through their exposure to toxins at and around Ground Zero following the 9/11 attacks, the Kreindler Firm took a leading role in representing those personal injury claimants. That work is led by my law partner Noah Kushlefsky, and I am not involved in it. The Kreindler Firm has been representing clients in the VCF from its establishment until the present. Quinn never had any role in that work, either as an attorney or a lobbyist. *See* Declaration of Noah Kushlefsky, submitted herewith as DEX B.

13. Indeed, at the time we engaged Quinn, my partner Noah Kushlefsky and his practice group were already (and still are) engaged in an enormous amount of work successfully accessing the VCF on behalf of our clients. Quinn was aware of the VCF and knew that that the Kreindler

Firm represented clients in the VCF, but had nothing to do with any of those clients, nor any claimants in the VCF ever.

14. To the contrary, as early as October 2013 Quinn reported on a meeting with the administration and advised us that the payments to 9/11 Families under the VCF and VCF2 could undermine the size of the KSA recovery we were seeking as an end to Litigation and was an obstacle to be overcome. *See, e.g.*, PEX 20 (last page). Quinn reported that Jonathan Schwartz "was concerned about 9/11 damages claims would and should be affected by the awards received through the victims fund...." Quinn did not suggest that he receive a share of those payments then, or at any time until eight years later when he filed the Amended Complaint against me in October 2021. This is because never at any time did either of us contemplate that the totally separate endeavor of seeking recovery from the VCF for 9/11 clients was a part of our arrangement regarding a diplomatic final resolution of the Litigation.

15. Similarly, in late 2015, a separate government administrative fund, the VSST, was established. My partner Megan Benett headed (and still heads) the efforts to access that United States funded relief fund for our clients. *See* Declaration of Megan Benett, submitted herewith as DEX C. Quinn was well aware of the VSST and our efforts to access and to secure funds for our clients, and never had anything to do with that effort either.

16. Similar to the VCF, the VSST also posed challenges to achieving our goals of obtaining a final resolution of the Litigation as against KSA and I discussed these issues with Quinn dozens of times.

17. As just one example (as I discussed in my deposition), in late 2016 I worked with Quinn and others to beat back an effort that threatened to weaken JASTA just weeks after it was signed into law. The heart of the matter was that certain 9/11 widows objected to the breadth of

the eligibility requirements for the VSST. They sought to have their concerns addressed through an amendment to JASTA. As the documents reflect, Quinn worked with my colleagues and me to ensure that lawmakers understood that the 9/11 widows' concerns with VSST were unrelated to the jurisdictional statute JASTA.

18. In this context, Quinn agreed that: "They need to stop confusing, conflating or drawing any relationship between JASTA and the [VSST]. It's obvious they are spun up about the eligibility requirements for the [VSST]. That has nothing to do with JASTA, period. The fact that Perles slapped a similar name on his bill doesn't make it a related measure. It is not." [1] *See,* DEX L.

19. In fact, Quinn himself generated a memo to be delivered to Senator Schumer the next day, saying exactly this. *See,* DEX M. We prevailed in our efforts demonstrating that there is no connection between JASTA and the VSST and the issue was resolved.

20. Quinn and I discussed the VSST often from its enactment in 2015 onward, including the above example which directly concerns its payments including to the Kreindler Firm clients and its possible obstacle to obtaining a satisfactory final resolution of the Litigation as against KSA. And yet, Quinn never once raised the possibility that VSST payments would be encompassed in our deal until a full five years later, in April 2020.

21. Quinn was well aware of the VCF and the VSST, discussed their payouts often, but for years never suggested those payouts should be included in his agreements. This is because our understanding was clear that they were never intended to be included.

22. In fact, in April 2020, when Quinn first suggested that he wanted fees from the VSST because Senator Schumer noted that Congress had just agreed to extend the VSST for

[1] The VSST is sometimes referred to as the "Iran Fund", because it was originally conceived to provide relief to those taken hostage in Iran in 1979 and their families.

another ten years, Quinn admitted he knew that the VSST had nothing to do with his deal. *See,* DEX 21. The email itself admits that his work was exclusively – and had always been – focused on obtaining relief from the KSA. And of course, the KSA has nothing to do with the VSST. Even more to the point, I told him in a phone conversation that he knew our deal had nothing to do with the VSST. He admitted that was the case and replied only that a lawyer read his contract and thought it broad enough to include VSST.

**D. Quinn Revises the Agreements After JASTA Is Passed to Maximize His Fees**

23. JASTA was in fact signed into law over presidential veto on September 28, 2016.

24. Almost immediately thereafter, by January 2017 Quinn sought to revise his agreements. Notably this is but six weeks after our considerable efforts to beat back the attack on JASTA based on the broad eligibility and payments to be made through the VSST discussed above. If Quinn ever thought our deal included recoveries from the VSST, this would have been the time to seek to clarify that in writing. He never mentioned VSST or VCF throughout the entire revision process.

25. And to be clear, the whole revision process from January – August 2017 was driven entirely by Quinn and was centered on clearly identifying and clarifying the sources and amounts of his fees. The new 2017 Agreements made no change to Quinn's ongoing duties which were still clearly limited to supporting the Kreindler Firm (not representing the Kreindler Firm clients) by (i) protecting JASTA which had now been passed, and (ii) helping the Kreindler Firm achieve a fair and final resolution of the Litigation against KSA.

26. Quinn was the drafter of every aspect of the revised 2017 Agreements. The email correspondence between us makes abundantly clear that Quinn was exclusively and single-mindedly focused on defining his fee and the bases for his compensation in the terms most

favorable to him individually. Having already adjusted the fee structure in 2014 to cut his partner, Ed Gillespie, down substantially (revising his previously agreed share of the fees to be split one-half to QGA and one-half to himself through his solo law practice), he now proceeded to seek to also reduce Crowe's portion of fees and increase his own.

- Quinn sought to increase – and did increase - his share of the Crowe/Quinn fee from resolution of cases filed prior to July 2014 (the date of the Earlier Agreement) from 50% to 77.5% (and commensurately reduced Crowe's share of that Crowe/Quinn fee from 50% to 22.5%).
- Quinn sought to secure for himself - and did secure for himself - the entire fee earned from resolution of cases filed in the Litigation after July 2014 (while Crowe was deprived of any of them).
- Quinn additionally sought – and received – an entitlement to be paid his fee on any additional fees that the Kreindler Firm might be awarded by the Court at the end of the Litigation from a common benefit fund or for the Kreindler Firm's work on the Plaintiff's Executive Committee, irrespective of whether those fees were tied to the Kreindler Firm clients or not.

27. Never once during the revision process did Quinn suggest that he be compensated on the wholly unrelated VCF or VSST monies even though he was well aware that the work was happening, and recoveries were being paid – and even though the whole point of the 2017 Agreements was for Quinn to pin down his fees in the broadest and most specific terms.

28. Quinn expressed an urgency to get the Agreements revised as quickly as possible. Quinn strongly believed and expressed to me many times, that with President Trump newly in office, his obvious interest in KSA and improving relations, and his deal-making ability, that a final resolution to the Litigation based on a diplomatic resolution was imminent. See, e.g.,

29. But we wanted to make sure that President Trump brokered a resolution with KSA addressed all the important issues or worse, might not provide sufficient damages for the 9/11 Families. In short, we were concerned that a resolution could take many forms and we had no idea what to expect.

30. Against this backdrop, Quinn sought the August 2017 Amendment. One possibility my colleagues and I discussed was that President Trump might broker a resolution with KSA that in exchange for ending the Litigation, KSA could provide a fund that would compensate all terror victims irrespective of claims filed in the Litigation. Quinn naturally wanted to ensure that he would get paid his fee of any KSA funded payout to a victim resulting from a diplomatically engineered resolution, whether or not the victims had filed the claims we had identified in the Litigation.

31. In fact, Quinn wrote to me at the time my colleague, Jerry Goldman at Anderson Kill was doing the same, i.e., "gathering clients" who might be eligible for this hypothetical fund that the Trump administration might have KSA set up, even if they were not yet Litigation plaintiffs. Quinn requested that if the Kreindler Firm also gathered new clients to access this putative KSA fund, he would get his fee on recoveries for these hypothetical new clients who might be eligible for this hypothetical KSA fund. I agreed, and this is what paragraph 2 of the August Amendment seeks to cover.

**E. Bob Crowe's 2021 Agreement**

32. In 2021, Mr. Crowe advised me he was leaving Nelson Mullins and (with Nelson Mullins' agreement) wanted to amend his agreement with us to be between him personally and the Kreindler Firm. I agreed.

33. Because Quinn had brought his original suit in July 2021 asserting a claim to VSST monies (though not yet asserting his additional claim to the VCF monies), we requested that Mr. Crowe's amended agreement spell out what the parties have always known: that the agreements were limited to a final resolution of the 9/11 Litigation funded by KSA, in whatever form that resolution took. DEX DD, and Exhibit C thereto.

34. Mr. Crowe agreed, and his 2021 agreement contains specific language excluding the VSST. Had I known that Quinn would also make an unfounded claim that his agreements reached the VCF, I would have asked Mr. Crowe to specifically exclude that as well in his amended agreement. But that litigation position of Quinn's did not emerge until October 2021.

35. When Mr. Crowe indicated to me that he found Quinn's claim to be unfounded and contrary to the clear understanding of all the parties at the time, I asked if Mr. Crowe would be willing to sign a declaration memorializing what he said to me, and Mr. Crowe agreed. DEX DD. The August 2021 declaration and Agreement also would have addressed the VCF had we known that Quinn would later make that outlandish claim.

**F. Quinn was never co-counsel to the Kreindler Firm**

36. I am aware that Quinn's position in this litigation is that he was co-counsel to the Kreindler Firm. This is false. He was never co-counsel, as the record makes clear.

37. First, the Agreements themselves describe that he is to advise and counsel ***the Kreindler Firm and me*** in connection with our "efforts to accomplish reasonable settlement or other resolution of the Litigation" – not to advise any 9/11 Families. If either of us thought otherwise, we would have drafted the 2017 Agreements differently.

38. Second, Quinn never had any written or signed retainer letter with any of the Kreindler Firm's clients. As members of the bar, we both understood that written retainers are required and if Quinn was intended to be our co-counsel in representing the 9/11 Families, we would have sought to obtain a written retainer.

39. And third, Quinn never filed a Notice of Appearance on behalf of any 9/11 Families client in the Litigation because, as he has admitted himself, he did not represent the any of the 9/11 Families and had no authorization file a notice of appearance on their behalf.

40. Quinn expressed that he needed to refer to himself as co-counsel occasionally in order to gain access to the White House or the media. I became aware of his doing so once or twice after the fact. I understood that Quinn apparently needed extra prestige and wanted him to succeed. But Quinn never was in fact co-counsel. Quinn knew it, I knew it and all our partners knew it. Despite the one internal comment I made to our PR consultant in 2017 in the context of a draft potential press release, I am not aware that we ever in fact did refer to Quinn as co-counsel in that or in any press statement. He was hired as a lobbyist and that was what he was.

**G. Quinn's misguided effort to explain away his refusal to work for us is inaccurate**

41. When giving his deposition after my deposition had already been conducted, Quinn mistakenly testified that I sought his help in working with Secretary of State Blinken. This is wrong.

42. First, I requested an introduction to Merrick Garland not Tony Blinken. I first met Tony Blinken in 1990's when he was a foreign policy assistant to Senator Joe Biden. I worked with Tony Blinken repeatedly over the years both on Pan Am 103 issues and then later on 9/11 issues. Through the eight years of the Obama Biden presidency, I met with and spoke with Tony Blinken without Quinn's assistance a number of times. In the leadup to the 2020 election, I had a number of conversations with both Tony Blinken and Brian McKeon who were foreign policy advisors to candidate, Joe Biden and Kamala Harris, without Quinn's assistance.

43. In my discussions with them, I explained the harm done to the 9/11 families by President Trump and Attorney General Bill Barr keeping the many FBI documents addressing the Saudi role in 9/11 secret. Indeed, the day after I and family members met with President Trump, Attorney General Bill Barr invoked "state secrets" to keep the FBI documents hidden from the 911 families. I asked Joe Biden, Tony Blinken and Brian McKeon to take a different

approach and if elected, reveal to the families as much of the FBI documents as could be done. When President Biden was elected, and Tony Blinken was nominated for Secretary of State I knew they would support 9/11 families in their quest for the FBI documents on the Saudi role.

44. When Merrick Garland was nominated as Attorney General, I spoke to Quinn who said he knew Garland well. I explained to Quinn my close relationship with Biden, Blinken and McKeon and their commitment to releasing FBI documents and asked him to facilitate a meeting with Merrick Garland so I could explain that history to Garland. The notion that I would ask Quinn for assistance in speaking to Tony Blinken is preposterous. As I immediately replied to Quinn's January 15, 2021 email refusing to reach out to "Secretary-Designate Blinken," I "[n]ever asked you to reach []out to Tony. Only to Garland." DEX AA.

45. Quinn refused to approach Merrick Garland because of the dispute over fees he had initiated. In his own words, he refused to engage in the communication because of "the position of your firm, which it is clear we soon will litigate" regarding, as he put it, the Kreindler Firm's "den[ial of] any contractual relationship between us." *Id.* He did not express any principled opposition to such a communication, saying only that his "legal advisors … strongly recommend that we defer your request until our dispute is resolved" (*Id.*) and his attempt to retroactively recast that decision is completely fabricated and based on false facts.

46. In September 2021, I sent a letter to Quinn informing him that he was in material breach of the 2017 Agreements. DEX BB. Quinn never responded to any part of that letter verbally or in writing. Quinn never disputed that he was in breach of the 2017 Agreements. In fact, Quinn and I never spoke substantively again about any work matters.

**H. Quinn's effort to confuse a "comprehensive compensation fund" funded by KSA or its proxies with the VCF or VSST is inaccurate and disingenuous**

47. Quinn deliberately confuses the comprehensive "compensation fund" we discussed with the Government Funded Relief Funds sponsored by the United States that are separate from the Litigation or what Quinn was hired to do.

48. As I testified at my deposition, we did discuss several different models of a fund, but each model necessarily included the critical feature that "it would constitute a global resolution of the 9/11 Litigation and perhaps other cases" (PEX 1 23:21-24:4). I testified that circumstances under which Quinn or QGA would be owed a fee under the agreement were "if we succeeded in our mission and, through John Kerry, we were able to settle the 9/11 litigation with Saudi Arabia and/or other defendants in the litigation." (PEX 1 22:5-11). Any suggestion that we referred to a U.S. funded relief fund that had no bearing on the resolution of the litigation and held no defendant to account is simply a willful mischaracterization of my testimony and, of course, the deal that the Kreindler Firm had with Quinn.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 14, 2024
New York, New York

James P. Kreindler