# DEX C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SUSANNA QUINN, personal representative, of the Estate of John M. Quinn,

*Plaintiff,*

v.

KRIENDLER & KRIENDLER LLP, *et al.*,

*Defendants.*

Case No. 1:21-cv-01824-RDM

**DECLARATION OF MEGAN WOLFE BENETT**

I, Megan Wolfe Benett, pursuant to 28 U.S.C. §1746, hereby declare under penalty of perjury:

1. I am a member of the Bar of the State of New York and a partner of the defendant law firm, Kreindler & Kreindler, LLP (the "Kreindler Firm"). I submit this declaration in support of Defendants' Cross-Motion for Partial Summary Judgment and Opposition to Plaintiff Quinn's Motion for Summary Judgment. The facts set forth below are based on my personal knowledge except where indicated otherwise, in which case they are based on information and belief.

2. I joined the Kreindler Firm in 2006, and I have been a partner since 2018.

**A. Background of Retaining Quinn as a Lobbyist**

3. The Kreindler Firm represents approximately 4,000 family members and estates of those killed in the 9/11 terrorist attacks ("9/11 Families"). Since filing its initial complaint in the Southern District of New York in 2002 against various alleged sponsors and perpetrators of the 9/11 terrorist attacks (the "9/11 Terrorism Litigation"), *Ashton et al. v. al Qaeda et al.*, 02-cv-6977 (S.D.N.Y.) (GBD), which was consolidated as part of *In re: Terrorist Attacks on September 11, 2001,* 1:03-md-1570 (the "MDL"), the Kreindler Firm has pursued compensation for its clients

through a variety of avenues. Over the past 22 years, those efforts include direct litigation, substantial collaborative work with 9/11 Families in their individual representation in the MDL and collateral issues, advocacy on behalf of 9/11 Families with government representatives including efforts to secure victims' funds and filing and perfecting individual claims providing 9/11 Families access to those victims' funds.

4. In support of those efforts, the Kreindler Firm has a team of attorneys, paralegals and other support staff whose work is entirely or substantially dedicated to the 9/11 litigation. Though there is some overlap, the teams of attorneys and staff dedicated to the MDL and pursuing recovery from KSA is a different team than the team dedicated to achieving recovery from the Victims Compensation Fund (the "VCF"), the Victims of State Sponsored Terror Fund (the "VSST"), and other advocacy. The Kreindler Firm, through its different teams, has also retained the services of many outside experts, investigators, consultants and lobbyists to advance the interests of the 9/11 Families over the course of the past twenty years.

5. In 2013, the Kreindler Firm hired plaintiff John Michael "Jack" Quinn ("Quinn") to work as a lobbyist for the firm first on behalf of the victims of the Mumbai terrorist attacks and then also to support the Kreindler Firm in its efforts on behalf of the 9/11 Families. The Kreindler Firm hoped that it might achieve a final resolution of the terrorist litigation claims that held the sovereign entities that supported or enabled the terrorist attacks accountable. Because we had been successful before asking the government to apply diplomatic pressure to achieve this type of final resolution to litigation, we were hopeful that we might do so again.

6. Quinn's role in this effort was to focus on how we might achieve recovery from the Kingdom of Saudi Arabia ("KSA"), and in order to do so primarily to lobby for the passage

and protection of what became the Justice Against State Sponsored Terrorism Act ("JASTA"), enacted in 2016.

7. Prior to JASTA, the district court overseeing the 9/11 Terrorism Litigation dismissed claims brought against officials of the Kingdom of Saudi Arabia ("KSA") under the doctrine of sovereign immunity. The passage of JASTA in 2016 permitted the Kreindler Firm to bring suit directly against the KSA for its role in the 9/11 attacks. We believed that the enactment and protection of JASTA (succeeding despite substantial lobbying efforts by the KSA) and naming KSA as a direct defendant, would, among other things, assist in getting the KSA to negotiate a resolution to the Litigation in which it assumed responsibility for its actions.

8. Following the passage of JASTA, the Kreindler Firm asserted claims against KSA on behalf of its clients in *Ashton v. Kingdom of Saudi Arabia*, 17-cv-2003 (S.D.N.Y.) (GBD). In addition, consistent with the process established by the District Court, the Kreindler Firm subsequently joined to the *Ashton* complaint hundreds of additional claims on behalf of immediate family members of those killed in the 9/11 terrorist attacks, with those claims also now consolidated in the MDL. The MDL remains ongoing and no recoveries against KSA have yet been obtained.

**B. The United States Victims of State Sponsored Terrorism Fund**

9. As set forth in more detail below, I run the Kreindler Firm's practice in accessing the VSST for our clients and have done so since the creation of the VSST. I devote a considerable amount of my professional time doing so and am very familiar with the relevant legislation as well as the practical operation of the VSST. I have reviewed Quinn's October 18, 2024 submission in this case (Dkt. No. 52) ("Quinn Br.") and respectfully correct certain errors in his description of the VSST, its history and its operation.

10. In late 2015, Congress passed United States Victims of State Sponsored Terrorism Act, which established the United States Victims of State Sponsored Terrorism Fund (the "VSST"). The VSST is sometimes referred to as the "Iran Fund" because, among other things, one of its original objectives was to provide compensation to the Americans taken hostage in Iran in 1979 and their families. Certain background of the VSST is set forth in the August 2017 Supplemental Report from the Special Master of the VSST submitted herewith as DEX X.

11. Congress created the VSST by statute codified at 34 U.S.C. 20144 *et seq*. (the "VSST Act") to provide some compensation to a specific group of international terrorism victims harmed by state sponsored terrorism. The VSST Act defines a state sponsor of terrorism as a country that the U.S. Secretary of State has determined has a government that has repeatedly provided support for acts of international terrorism. The U.S. Department of State lists current state sponsors of terrorism on its website: https://www.state.gov/state-sponsors-of-terrorism/.

12. Iran is one of the four such United States designated state sponsors of terror currently on the list. Iran has been a U.S. designated state sponsor of terrorism continuously since 1984.

13. After the Kreindler Firm served Iran with a complaint alleging its role in aiding and abetting the 9/11 hijackers in 2003, Iran failed to answer. Then, in 2011, the Kreindler Firm obtained a certificate of default against Iran in 2011 and, relying on that certificate of default, obtained a default judgment on liability against Iran in 2015. These are the necessary predicates for the final damages judgments that the Kreindler Firm obtained for its clients and submitted to the VSST for compensation. The default against Iran long predated Quinn's relationship as a lobbyist with the Kreindler Firm.

14. KSA is not now and has never been a U.S. Department of State formally designated state sponsor of terrorism. Accordingly, while a victim of an act of terrorism supported by Iran may qualify to be eligible for compensation from the VSST, if other criteria are also met, a judgment against the KSA for its role in a terrorist attack would not qualify the victim to be eligible to apply for VSST funds.

15. Quinn confuses the ability of a victim of terrorism to sue a U.S. designated state sponsor of terrorism, such as Iran, under the Foreign Sovereign Immunity Act ("FSIA") terrorism exception at 28 U.S.C. § 1605A because such sponsors of terror are *never* protected from terrorism litigation by the FSIA, with the ability of a victim of terrorism to sue a non-designated foreign sovereign under JASTA at 28 U.S.C. § 1605B. *Compare* 28 U.S.C. §1605A (no immunity for U.S. designated state sponsors of terrorism) with 28 U.S.C. §1605B (JASTA jurisdiction). Under JASTA, a defendant sovereign that would generally be immune from suit may be sued if the victim plaintiff can establish, *as a matter of jurisdiction,* that the defendant sovereign sponsored the specific terrorism act on U.S. soil, among other things. 28 U.S.C. §1605B. This of course was the whole reason that the passage of JASTA was critical to the Kreindler Firm's case against KSA for the 9/11 attacks and why JASTA (and Quinn's involvement with it) was relevant only to KSA. JASTA was enacted in September 2016 and in March 2017, the Kreindler Firm brought its JASTA case against KSA for aiding and abetting and providing material support to the Al-Qaeda hijacking, alleging facts to establish JASTA's jurisdictional requirements over KSA for this specific terrorist attack.

16. Quinn's suggestion, however, that "JASTA expanded …opportunities [to be eligible for the VSST] for the 9/11 victims for exposing Saudi Arabia to litigation, including the SDNY litigation" is mistaken. Quinn Br. at p.25. The VSST does not compensate victims of terror

holding a default judgment against a JASTA defendant – only against U.S. designated state sponsors of terrorism. Indeed, a redacted copy of a VSST Notice of Decision denying a claim by a non Kreindler Firm claimant because the judgment was based on a JASTA default judgment (under 28 U.S.C. § 1605B) and not a U.S. designated state sponsor of terrorism defendant (under 28 U.S.C. § 1605A) is submitted herewith as DEX FF.[1] This is confirmed by the VSST's FAQs, which explains that a claimant is eligible for payment *only* if the claimant has "a final judgment … against a foreign state that was designated as a state sponsor of terrorism at the time the acts described in clause … for which the foreign state was determined not to be immune from the jurisdiction of the courts of the United States under section 1605A, or section 1605(a)(7) (as such section was in effect on January 27, 2008), of title 28, United States Code (Foreign Sovereign Immunities Act, "FSIA"). *See* https://www.usvsst.com/Home/Faq#2.6, last accessed November 14, 2024.

17. Simply put, the VSST is available only to those clients of the Kreindler Firm with default judgments against Iran, which default judgments were predicated on the 2011 certificate of default, (subject to further specification of each claimant's damages judgments) – which pre-dated Quinn's retention as a lobbyist in 2013 to work solely on issues relating to KSA.

18. Further, Quinn's discussion of the subrogation provisions of the VSST is also mistaken. Quinn Br. at p. 25. Pursuant to the subrogation provisions, a payment by the VSST on a default judgment against a U.S. designated state sponsor of terrorism entitles the United States to stand in the shoes of the claimant as against the obligor (here, Iran). Having discharged a portion of Iran's debt, the United States is entitled to make its claim against Iran for reimbursement. This

[1] This Notice of Decision has come to my attention, but is not in respect of a Kreindler Firm client.

subrogation right would most likely only have application if the United States decided to release Iran from those obligations in the context of a larger diplomatic transaction.

19. Quinn's suggestion that the VSST subrogation provisions entitle the United States to claw back VSST payments from victims if or when KSA should pay compensation to the same victim is a perversion of the statute. The purpose and intent of the subrogation have nothing to do with linking some future KSA accountability for 9/11 with VSST payments made against a default judgment for Iran.

**C. The Kreindler Firm's VSST Practice**

20. I am the partner in charge of the Kreindler Firm's efforts to access relief funds for 9/11 Families through the VSST. This is a difficult and time-consuming practice that has achieved good results for our clients.

21. At the Kreindler Firm, the team involved in the VSST Fund focuses on two areas: (1) direct communications and interactions with clients and (2) applications to and resolving issues with the VSST Fund and its personnel. By and large, with the exception of myself, the attorneys at the Kreindler Firm who work on the KSA litigation have no involvement in the work concerning the VSST Fund. Additionally, the paralegals who work primarily on the VSST Fund efforts have little involvement in the KSA litigation. My direct work and oversight of VSST Fund efforts is wholly separate from my work in connection with the KSA litigation.

22. In addition to the substantial work that we perform within the Kreindler Firm to be able to submit and pursue claims with the VSST Fund, we also have outside lobbyists that have been working for the Kreindler Firm on VSST Fund matters. Since 2021, the Kreindler Firm has engaged two separate groups of lobbyists to advocate specifically on the VSST Fund, and those lobbyists' registrations reflect that they were engaged in connection with the VSST Fund. While

one of those lobbying firms was also engaged in efforts concerning the KSA, that firm's lobbying registrations for the VSST Fund and the KSA are separate, as appropriate because those are two discrete and separate areas of the Kreindler Firm's work.

23. Although I have been aware of Quinn's role as a lobbyist for the Kreindler Firm in connection with achieving resolution against KSA, I never once engaged with him on our efforts to represent clients in accessing the VSST during the time of his relationship with the Kreindler Firm. In fact, I am unsure whether I ever had any direct conversations with Quinn during his relationship with the Kreindler Firm other than a lunch with him and others many years ago in Washington, D.C. and perhaps other fleeting encounters. I certainly never discussed with him how we access the VSST Fund, the work involved, the strategies we employ, the legal advice we give, the applications we prepare, or anything at all whatsoever related to the VSST.

24. At no time did Quinn ever engage with any aspect of our work accessing the VSST. It is a completely separate work stream from our work seeking recovery from KSA through the MDL and Quinn had nothing to do with it.

25. To the contrary. In 2019, when the Kreindler Firm was advocating for its clients who had been initially left out of the VSST Fund under the original statutory language, I had several direct conversations with the staff of Members of Congress, none of which ever involved Quinn. For example, during the summer and fall of 2019, prior to passage of the USVSST Clarification Act, which allowed 9/11 victims, spouses and children to obtain compensation, I was regularly in contact the leadership counsel for Senator Schumer, and never once was Quinn mentioned during those conversations, let alone involved in them.

26. Similarly, as noted above, through additional lobbying work associated with the VSST Fund, I have retained other, non-Quinn, lobbyists to build support for narrow issues relating

to the VSST Fund, such as those that resulted in the Fairness for 9/11 Families Act, which passed in December 2022, and created additional compensation for 9/11 victims, spouses and children. Quinn was never involved in any of those efforts and did not even ever speak to me, my staff or our lobbyists about those efforts. In fact, the Kreindler Firm has spent substantial out-of-pocket money in connection with that lobbying work, with which Quinn had no connection.

27. I understand that Quinn points to a letter written in November 2020 addressed to the Acting Special Master of the VSST to suggest that Quinn was involved in this work and that the Kreindler Firm knew of such purported work. **PEX 50.** Both suggestions are wrong.

28. First, the letter was drafted by Jerry Goldman of Anderson Kill and was sent to me for approval to be an additional signatory. The letter was procedural in nature – we were requesting more expeditions processing of our respective clients' claims – a request that might be better received if more claims were represented by the letter's authors. I did approve the text of the letter and let Mr. Goldman know he had my permission to include me as a signatory. It was sent to me as a Word document and I do not recall ever seeing this letter on the "three firm letterhead" that Mr. Goldman created (and that to the best of my knowledge was only employed on the single occasion of the November 2020 letter) before it was sent. I did not know that Quinn would be copied on the letter, and to this day, I do not know why he was. Whether he was working with Mr. Goldman, or Mr. Goldman copied him on the letter for some other reason that I know nothing about, I cannot say.

29. Second, even had I seen that he was to be copied, I don't know that I would have thought anything of it one way or another. Quinn never had anything to do with our work for the VSST and it was irrelevant to me who the other firms may have wanted to copy on this simple letter.

30. Last, as of the time of that letter, I do not believe that Quinn was working with the Kreindler Firm at all. Beginning in or about 2020, Plaintiff began expressly refusing to perform any services for the Kreindler Firm pursuant to the Agreements or otherwise. Plaintiff stated in writing that he was refusing to reach out to certain public officials as the Kreindler Firm requested in connection with efforts to pursue holding KSA accountable for its role in the 9/11 attacks. Quinn then refused to engage in any communications whatsoever with the Kreindler Firm. As a result of Plaintiff's refusal to perform services relating to the KSA matter, the Kreindler Firm terminated all contractual relationships with Plaintiff for cause effective as of September 20, 2021. DEX BB.

31. The Kreindler Firm has received no fees in the MDL as against KSA, which was the subject of the parties Agreements, and continues to incur expenses in connection with the MDL. As such there is no determinable "net recovery" only net expenses to date.

32. No work done with or recoveries obtained from the VSST, or the VCF for that matter, has any bearing on the resolution of the Litigation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 14, 2024
New York, New York.

Megan Wolfe Benett