**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SUSANNA QUINN, personal representative of the Estate of John M. Quinn, | ) ) ) | |
| *Plaintiff,* | ) ) | Case No. 1:21-cv-01824-RDM |
| v. | ) ) ) | |
| KREINDLER & KREINDLER LLP, *et al.,* | ) ) | |
| *Defendants.* | ) ) ) | |

**DEFENDANTS' SUPPLEMENTAL AUTHORITIES IN FURTHER SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR
DISMISSAL AS UNRIPE FOR ADJUDICATION**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................2

    I.    Silence in the Writing Itself .........................................................................2

    II.   Silence Prior to and Contemporaneous with the Writing ...........................3

    III.  Silence Post-Contract as Evidence of
          What Was or Was Not Intended. ..................................................................7

    IV.  The 2017 Agreements Should Not Be Read to
          Reach Either the VCF or the VSST ............................................................9

         A.   The 2017 Agreements Do Not Reach the VCF ...............................9

         B.   The 2017 Agreements Do Not Reach the VSST .............................9

CONCLUSION ....................................................................................................................12

# TABLE OF AUTHORITIES

**Cases**

*Am. Hosp. Ass'n v. NLRB*,
   499 U.S. 606 (1991)....................................................................................4

*Ben-Zvi v. Edmar, Co.*,
   40 Cal. App. 4th 468 (1995) ......................................................................5

*Chevron U.S.A. Inc., v. Echazabal*,
   536 U.S. 73 (2002)......................................................................................2

*Chisom v. Roemer*,
   501 U.S. 380 (1991)................................................................................3, 4

*Crabtree v. Miller Pipeline, LLC*,
   2021 WL 1177961 (D.D.C. Mar. 29, 2021) ..............................................2

*Drescher v. Baby, It's You, LLC*,
   544 Fed. App'x 783 (9th Cir. 2013) ..........................................................8

*Esteras v. United States*,
   145 S. Ct. 2031 (2025)...............................................................................2

*Haines v. City of New York*,
   41 N.Y.2d 769 (1977)................................................................................6

*Integral Dev. Corp. v. Tolat*,
   2016 WL 8929073 (N.D. Cal. Dec. 23, 2016)..........................................7

*Jackson Constr. Co., Inc. v. U.S.*,
   62 Fed. Cl. 84 (Fed. Cl. 2004) ..............................................................4, 5

*Kennecott Corp. v. Union Oil Co.*,
   196 Cal. App. 3d 1179 (Cal. Ct. App. 1987).............................................7

*Miller v. Clinton*,
   687 F.3d 1332 (D.C. Cir. 2012).................................................................4

*Patterson v. District of* Columbia,
   795 A.2d 681 (D.C. Ct. App. 2002)...........................................................8

*Reiss v. Fin. Performance Corp.*,
   97 N.Y.2d 195 (2001)................................................................................6

*Rockland Esposition, Inc. v. Great Am. Assur. Co.*,
    746 F. Supp. 2d 528 (S.D.N.Y. 2010) ........................................................................3

*Tilley v. Mead Corp.*,
    927 F.2d 756 (4th Cir. 1991) ...................................................................................3

*Zahr v. Wingate Creek Acquisition Corp.,*
    827 F. Supp. 1061 (S.D.N.Y. 1993) ......................................................................4, 7

## Other Authorities

Antonin Scalia & Bryan A. Garner, Reading Law:
    The Interpretation of Legal Texts 428 (2012) ...........................................................2

Defendants Kreindler & Kreindler LLP (the "Kreindler Firm") and James P. Kreindler ("Mr. Kreindler," and together with the Kreindler Firm, "Defendants"), by and through their undersigned attorneys, hereby submit this Memorandum of Supplemental Authorities in further support of their cross-motion for partial summary judgment and for dismissal of the case as unripe for adjudication ("Defendants' Cross-Motion" or "Defs. Br.") in accordance with the Court's July 15, 2025 Order.

## INTRODUCTION

The most confounding aspect of Quinn's lawsuit, demanding payment of fees from the VCF and the VSST, is that at no time from Mr. Kreindler's first contact with Quinn in 2013, through the initial agreement with Quinn and Bob Crowe in 2014, through the work done together on the passage of JASTA, through the negotiation and execution of the 2017 Agreements, through the continuing work with the Trump administration, did any of the several written agreements or any of the parties to those agreements, including Quinn, ever once mention, suggest, allude to, reference, or in any way discuss the possibility that Quinn be entitled to a fee on awards made from the VCF or VSST, much less evidence any intent that the 2017 Agreements could or should reach either fund. It was not until April 21, 2020, three years after the 2017 Agreements were signed and eight years into the relationship, that Quinn first indicated he wanted fees from the VSST, and even then he relied solely on what he referred to as "the breadth of our Agreement." (DEX Y) [ECF 56-28]. Quinn said nothing then – or ever – to suggest that the parties had ever intended that the VSST be included in the arrangement, because the parties demonstrably did not so intend.  And even as Quinn sought to claim a fee on VSST awards based on the "plain words of the contract" (DEX Z) [ECF 56-29], Quinn mentioned nothing about the VCF. It would be another eighteen months – and not even when he sued the Defendants in June 2021 by his original

1

complaint seeking fees from the VSST [ECF 1] – until Quinn decided as an afterthought to seek fees from the VCF in the ***Amended Complaint*** filed in this court in October 2021. [ECF 19].

The Court has asked whether this remarkable eight-year silence, during which time the VCF was open, operational and paying awards, and subject to expanding and extending legislation, and during which time the VSST was enacted, opened and paying awards (and was also the subject of significant clarification and extending legislation), can be relied on as evidence that the parties did not intend to include either the VCF or the VSST as within the purview of Quinn's fee under the 2017 Agreements. The answer is yes. Courts routinely rely on silence where there is an expectation that something would have been said, as compelling evidence that the thing was never said because it was never intended.

## ARGUMENT

### I.     Silence in the Writing Itself

According to the linguistic canon *expressio unius est exclusio alterius*, "[t]he expression of one thing is the exclusion of another." *Crabtree v. Miller Pipeline, LLC*, 2021 WL 1177961, at *6 (D.D.C. Mar. 29, 2021) (*citing* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 428 (2012)). "Indeed, the *expressio unius* canon has particular force here because" the agreements at issue include terms that "constitute an 'established series,'" – resolution of claims by "judgment, settlement or otherwise" but omitting the already-in-existence administrative funds – "such that any 'omission' from that series necessarily 'bespeaks a negative implication." *Esteras v. United States*, 145 S. Ct. 2031, 2041 (2025) ("expressing one item of [an] associated group or series excludes another left unmentioned") (*quoting Chevron U.S.A. Inc., v. Echazabal*, 536 U.S. 73, 81 (2002)).

It is not in dispute that the 2017 Agreements do not mention either the VCF or the VSST in their text. Rather, the 2017 Agreements (i) are framed in terms of the litigation and the final

resolution of wrongful death and personal injury claims therein, (ii) specifically call out JASTA, the jurisdictional statute that enabled the Kreindler Firm to name KSA as a direct defendant in the litigation, and (iii) list a particular series of potential resolutions to the litigation, none of which is either the VCF or the VSST. Because the 2017 Agreements specifically identify the consolidated 9/11 Terrorist Litigation, the categories of plaintiffs with wrongful death and personal injury claims on whose recovery Quinn is entitled to a fee, the amount of his fee, and Quinn's further entitlement to a fee on any court ordered fees earned by the Kreindler Firm's work on the Plaintiffs' Executive Committees, the 2017 Agreements should be read as excluding other sources for Quinn's fees.

## II.    Silence Prior to and Contemporaneous with the Writing

To the extent the 2017 Agreements are deemed ambiguous as to awards earned from the VCF or the VSST and the Court looks to parol evidence, the Court may rely on the fact that not only are all of the agreements silent on this point, but also that the parties never once mentioned the VCF or VSST in connection with the 2017 Agreements as further evidence that the parties never intended to include those funds within the scope of the arrangement. As a starting point, the Supreme Court has relied on silence as evidence of what was *not* intended in its statutory construction.[1] In construing the Voting Rights Act Amendment of 1982 (the "Amendment") to the Voting Rights Act of 1965 (the "Act"), the Court rejected petitioner's proposed construction, relying in part on the absence of any indication that Congress so intended where such an indication would be expected. *Chisom v. Roemer*, 501 U.S. 380 (1991). The Act had previously ensured its protections extended to judicial elections as well as to legislative or executive elections. In

---

[1] This linguistic principle applies equally to contract construction. *See, e.g.*, *Rockland Esposition, Inc. v. Great Am. Assur. Co.*, 746 F. Supp. 2d 528, 537 n.8 (S.D.N.Y. 2010) ("It is not uncommon for courts interpreting contracts to rely on the same principles that guide statutory construction.") (*citing Tilley v. Mead Corp*., 927 F.2d 756, 771 (4th Cir. 1991)).

rejecting the Fifth Circuit's construction of the Amendment in a manner that would for the first time exclude judicial elections from certain protections, the Court explained: "We reject that construction because we are convinced that if Congress had such an intent, Congress would have made it explicit in the statute, or at least some of the Members would have identified or mentioned it at some point in the unusually extensive legislative history of the 1982 Amendment." *Chisom,* 501 U.S. at 396. The Court further explained: "Congress' silence in this regard can be likened to the dog that did not bark…." *Id.* at 396 n.23; *see also Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 613-14 (1991) (rejecting petitioner's construction of a rule amendment in part because "if this amendment had been intended" to operate as significantly as petitioner suggests, "we would expect to find some expression of that intent in the legislative history"); *Miller v. Clinton*, 687 F.3d 1332, 1349-50 (D.C. Cir. 2012) ("W]e must remark upon what is most important about the legislative history: namely what is not in it …. [I]f it really were 'clear ... from [the] statutory history that the Secretary was permitted' to include a mandatory retirement clause in Miller's employment contract … one would expect the history to contain a reference to mandatory retirement….").

Courts will also draw a negative inference from a contracting party's silence in the body of parol evidence where the party would have been expected to express its intent. For example, where a plaintiff failed to offer any credible evidence that the parties entered into an oral joint venture (which would be required for the plaintiff to establish his claim to a portion of the assets he sought in the litigation), the Court granted the defendant's motion for summary judgment. "Just like the dog that didn't bark of Sherlock Holmes lore, the fact that plaintiff has offered absolutely no evidence that a joint venture was contemplated let alone consummated is, in light of defendants' showing, compelling proof that no such agreement existed." *Zahr v. Wingate Creek Acquisition Corp.,* 827 F. Supp. 1061, 1069 (S.D.N.Y. 1993). Similarly, in *Jackson Constr. Co., Inc. v. U.S.,*

62 Fed. Cl. 84 (Fed. Cl. 2004), the court rejected the plaintiff construction company's "early completion claim" for damages resulting from a waterline shutdown for which the defendant was responsible.  An element of the early completion claim required the plaintiff to show an intent to complete the project early, but the plaintiff adduced no contemporaneous evidence that it intended to complete the project early or that it believed the waterline shutdown interfered with its ability to do so. The Court relied on the absence of evidence and explained: "[I]n certain instances, silence can be compelling evidence. In this case, Jackson's silence is evidence of a *lack* of intent to finish early. Jackson could have proven its intent to finish early in a number of ways, but it failed to provide any such evidence. … The Court, therefore, draws a negative inference from the fact that the 'dog did not bark' and finds that Jackson never intended to complete the contract [early]." *Jackson Constr. Co., Inc.*, 62 Fed. Cl. at 101-102.

These authorities are in accord with an analysis of whether a term or covenant may be implied in a contract.  Courts not only review what the parties did or did not say in the contract itself and in negotiations surrounding the contract, but also what they would have been expected to say. To effectuate the intent of the parties, an implied term may only be found if "after examining the contract as a whole it so obvious that the parties had no reason to state the covenant, the implication arises from the language of the agreement, and there is a legal necessity." *Ben-Zvi v. Edmar, Co.,* 40 Cal. App. 4th 468, 473 (Cal. Ct. App. 1995) (refusing to imply contract term that exclusive distributor for Israel was required to maintain residency in Israel where "the contract contains no express term requiring [distributor] to reside in Israel throughout its term ….There was no testimony or documentary evidence at trial indicating that the parties ever discussed the residency issue or that they considered this term too obvious to write down.").  Similarly, courts may refuse to imply a term that is silent as to a specific contingency where that contingency was

foreseeable, even if that contingency creates an unfair windfall or loss to one side. *See, e.g., Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195 (2001); *Haines v. City of New York*, 41 N.Y.2d 769 (1977) (court will not imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms).

It is not in dispute that neither the VCF or the VSST were ever once mentioned throughout the negotiations for the 2017 Agreements by the parties (or anyone else, such as Bob Crowe, who was involved in the relationship and subject to identical and nearly identical contracts) as having anything to do with the fees to be paid to Quinn for work for the Kreindler Firm. Not a word was spoken about including the VCF even though it is not in dispute that the VCF was in existence, operational, and making significant awards to Kreindler clients since 2011, and that Quinn was aware of the VCF, even noting that it could be an obstacle to his goals of seeking compensation via a state-to state resolution of the litigation. (PEX 20 at QUINN 00944) [ECF 52-19]. Not a word was spoken about including the VSST even though the VSST was enacted in 2015 (after the original 2014 agreement) and became operational in 2016, making significant awards by March 2017 (precisely during negotiations of and prior to the execution of the 2017 Agreements) and that Quinn was aware of the passage and operation of the VSST. To the contrary, Quinn's only public mention of the VSST per-2017 Agreements was his public position that the VSST is completely unrelated to JASTA, the federal jurisdictional statute that enabled the Kreindler Firm to name KSA as a defendant in the litigation. (DEX M) [ECF 56-16] (in seeking to protect JASTA in October 2016 Quinn explains to Senator Schumer that certain 9/11 widow activists had "significant confusion about the law" and while fairly upset with the eligibility requirements of the VSST, they

were wrongly "conflating, or creating a non-existent relationship between JASTA and the [VSST]" and reiterating that JASTA and the VSST "have nothing to do with each other.").

It is not in dispute that in 2013 and 2014, the relationship had been limited to the 9/11 Litigation and that in Quinn's own words, those original contracts "contemplated suits only against KSA." (DEX Z) [ECF 56-29]. Under these circumstances, if the parties intended the sea change of radically expanding the fee base to now include the VCF and VSST, they would be expected to have at some point, in some way, expressed this intent. *See Zahr*, 827 F. Supp. at 1069. The absence of even a murmur that the parties intended the 2017 Agreements to expand Quinn's fee to reach the administrative funds, even if one of them relied on a final court judgment against a state sponsor of terrorism (which the Kreindler Firm had in hand prior to the 2017 Agreements and had nothing to do with KSA or JASTA, *see infra*), is all the more glaring in light of the fact that the record demonstrates that the parties did discuss with clarity what changes (all to expand Quinn's fee) were intended by the 2017 Agreements.[2] Yet neither VCF nor VSST was referenced, even though either could potentially have provided Quinn additional fees if they had been included in the 2017 Agreements.

### III.    Silence Post-Contract as Evidence of What Was or Was Not Intended

Courts also look to the parties' conduct under a contract as important evidence of the parties' intent. "Evidence of the contracting parties' conduct after executing the contract but before any controversy has arisen as to its affects afford the most reliable evidence of the parties' intent." *Integral Dev. Corp. v. Tolat,* 2016 WL 8929073 (N.D. Cal. Dec. 23, 2016) (citations omitted). "The conduct of the parties after execution of the contract and before any controversy has arisen

---

[2] A thorough review of the parol evidence detailing the parties' negotiations of the 2017 Agreements can be found at Def. Br. [ECF 56] at pp. 12-16, and Defendants' Statement of Undisputed Facts [ECF 56-1] at ¶¶ 62-87 citing to PEX 38, 52, and DEX N – U [ECF 52-37, 52-51, and ECF 56-17 – 56-24, inclusive].

as to its effect affords the most reliable evidence of the parties' intentions." *Kennecott Corp. v. Union Oil Co.*, 196 Cal. App. 3d 1179, 1189-90 (Cal. Ct. App. 1987) (citations omitted). In this context, courts also rely on a party's silence as indicative of its intent. *See Drescher v. Baby, It's You, LLC,* 544 Fed. App'x 783 (9th Cir. 2013) (affirming district court's reliance on plaintiff's failure to object to the draft agreement on the grounds now advanced in litigation, particularly where plaintiff adopted litigation position only after learning that his prior objection advanced during negotiations lacked any legal merit).

Courts in the District of Columbia rely on parties' conduct following execution of an agreement to help discern what the parties intended the agreement to mean, and to differentiate what the parties intended when entering into an agreement from what a party might later assert as a litigation position. In *Patterson v. District of Columbia,* the court interpreted whether a settlement agreement negotiated and finalized during the period from May-August 1992 that covered all "costs" should be read to include all attorneys' fees as part of the costs. The court found that it did not. 795 A.2d 681 (D.C. Ct. App. 2002). "The most telling evidence of the parties' intent that counsel fees were not to be considered as part of the settlement agreement" was the fact that "at no time while the counsel fees litigation was ongoing between September 1992 and May 1993, did the District argue that the plaintiffs had waived their claim to counsel fees when they executed the releases and settled their individual claims. Throughout this period, the District opposed the petition for counsel fees on the grounds that 'none of the plaintiffs were prevailing parties,' or alternatively, that counsel's records were in adequate to support the amount of fees requested." *Patterson,* 795 A.2d at 684. Because the defendant did not develop or express its litigation position until after six months of conduct inconsistent with that position, the court rejected the position as inconsistent with the parties' intent. Here, it was three years after the 2017 Agreement was

executed before Quinn developed what became his litigation position with respect to his claim to fees on the VSST – three years of conduct inconsistent with any belief that he was entitled to those fees. And it was four and a half years before Quinn developed or expressed a litigation position that he be entitled to fees from the VCF, and then only after filing an amended complaint.

### IV.    The 2017 Agreements Should Not Be Read to Reach Either the VCF or the VSST

#### A.  The 2017 Agreements Do Not Reach the VCF

For all the reasons above and set forth in Defendants' prior papers, the 2017 Agreements should not be read to reach the administrative funds at all. This is abundantly clear with respect to the VCF which is undisputedly unrelated to the SDNY litigation in any way. Quinn cannot raise a material issue of fact that the parties intended the VCF to be included or that Quinn did any work related to the VCF.

#### B.  The 2017 Agreements Do Not Reach the VSST

Similar reasoning applies to the VSST. As discussed above, the 2017 Agreements list a variety of possible final resolutions to the litigation, but are conspicuously silent about the VSST, despite it having been in existence and issuing payments at the time that the 2017 Agreements were drafted (and re-drafted) and signed. Not only are the 2017 Agreements silent as to the VSST, Quinn has produced no evidence that the parties intended the 2017 Agreements to reach the VSST. Nor has Quinn raised any material issue of fact (or a shred of evidence) that he ever worked on any aspect of the case against Iran, was in any way involved in obtaining default judgments from Iran (the Kreindler firm having obtained both the liability judgment and final damages judgments prior to the 2017 Agreements, *see* 03-MD-1570 (SDNY), ECF 3014, Entered 08/31/2015, and ECF 3226, Entered 03/08/2016), later accessing the VSST for Kreindler clients, or lobbying for any legislation comprising any version or iteration of the VSST at any time.

Indeed, the VSST would not have been included because the U.S. Government's policy of making monetary awards to victims of state sponsored terrorism does nothing to finally resolve any aspect of the Kreindler Firm's 9/11 litigation, as against KSA, Iran or any other defendant. A VSST award is not covered by the 2017 Agreements simply because it has a prerequisite involving the MDL generally but leaves the litigation against *all* defendants fully intact; the 2017 Agreements speak to recoveries generated by litigation-ending contingent events ("through judgment, settlement or otherwise"). Even Quinn's first purported claim to the VSST in April 2020 demonstrates he understood this. Quinn agreed to table his half-hearted attempt to collect on awards from the VSST (which he knew were beyond the scope of his agreement) but expressed his real and "larger concern" that his fee might be in jeopardy if, there should be a "***global settlement of our KSA-9/11 claims …*** arranged through a proxy state." (DEX Z) [ECF 56-29] (emphasis added). The parties always intended Quinn's work and fee to be inextricably tied to an end to the litigation, particularly the KSA case, though they understood that the KSA case could be finally resolved in several different ways that could give rise to a fee. The VSST, which neither ends the litigation as to any defendant nor applies to KSA, was nowhere in the minds, hearts, or intent of the parties to the 2017 Agreements.

Quinn's argument that the VSST might be reached because the 2017 Agreements do not expressly limit their reach to funds obtained from Saudi Arabia is a red herring. The obvious truth was that KSA was, and is, the only defendant with the resources to finally resolve the litigation. *See,* PEX 3 [ECF 52-2]; 16:3-13 (Quinn agrees that KSA was best positioned of any defendant to fund what would be a "very considerable resolution" and "not sure" if any other defendant had the necessary resources). In arguing that he be entitled to take fees from the VSST because the text of the 2017 Agreements do not mention KSA by name, Quinn asks this court to ignore all the parol

evidence demonstrating the parties always understood and intended the relationship to be limited to obtaining compensation that resolved the litigation (particularly as against the well-resourced Saudi Arabia). *See* DEX Z [ECF 56-29] (Quinn writes to Kreindler in April 2020 acknowledging that the original contract "contemplated suits only against KSA");  25:19-26:2 (Quinn testified he was "a strategist in trying to figure out how to get the United States to convince Saudi Arabia to resolve the litigation finally" and agreed that "was pretty much the goal of the deal that you had struck with the Kreindler firm"); 18:20-22 (Quinn testified that "our focus was principally on the Kingdom of Saudi Arabia."); PEX 2 [ECF 52-1] 44:21-25 and DEX DD [ECF 56-33]  (Crowe testifies that "we were always focused on KSA and paving the way for K&K to sue KSA"); PEX 1 45:5-9 (filed under seal) (Kreindler testified that under the 2017 Agreements, Quinn "was expected to do the same thing he was expected to do under the first agreement under -- his role never changed. It was to work with me to achieve a resolution of the case against Saudi Arabia however we're able to accomplish that, with Saudi Arabia directly, with another country being a nominally settling defendant. That from the beginning was his unchanged role in the case"); PEX 3 [ECF 52-2] 70:19-71:13 (Quinn's testimony related to pre-contract email from Quinn setting forth intent of 2017 Agreements in accord that the 2017 Agreements would not change Quinn's duties and obligations under the Agreements and do not mention VCF or VSST).

To the extent the 2017 Agreements' silence about Quinn's fee reaching the VCF is meaningful, so is their silence as to the VSST meaningful – and so is the consistent and loud "barking" about the parties' intent that Quinn's fee be keyed to obtaining a final resolution of litigation as demonstrated in the parol evidence (particularly the extensive discussions of a resolution of the litigation funded by KSA, even if nomically paid by another defendant).

## CONCLUSION

For the foregoing reasons Defendants respectfully request that the Court grant their cross-motion for partial summary judgment on contract construction that the 2017 Agreements cannot be read to reach the VCF or the VSST and dismiss this case as unripe for adjudication.

**Dated: July 29, 2025**                          **Respectfully submitted by**

**STINSON LLP**

/s/
Eric Liebeler (DC Bar No.: 1049148)
Brandon R. Nagy (DC Bar No.: 1024717)
1775 Pennsylvania Ave., NW
Suite 800
Washington, D.C. 20006
Tel.: (202) 785-9100
Fax: (202) 572-9973
Email: eric.liebeler@stinson.com
           brandon.nagy@stinson.com

-and-

/s/
Emily Bab Kirsch (*pro hac vice*)
Craig S. Tarasoff (*pro hac vice*)
Kirsch & Niehaus, PLLC
950 Third Avenue, Suite 1900
New York, NY 10022
Tel: 212-832-0170
Mobile: 917-744-2888
Email: emily.kirsch@kirschniehaus.com

*Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 29, 2025, the foregoing was electronically filed and served upon on all counsel of record.

*/s/ Craig S. Tarasoff*
Craig S. Tarasoff
