**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SUSANNA QUINN, personal representative of the Estate of John M. Quinn,<br><br>*Plaintiff*,<br><br>v.<br><br>KREINDLER & KREINDLER, *et al.*,<br><br>*Defendants.* | Civil Action No. 21-1824 (RDM) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Susanna Quinn, personal representative for the Estate of John M. Quinn, (separately and collectively, "Quinn"), brings this action against Defendants Kreindler & Kreindler, LLP, and James P. Kreindler (collectively, "K&K"), alleging, among other things, that K&K has failed to pay Quinn the compensation that he is due for assisting with K&K's representation of family members and representatives of the victims of the September 11, 2001, terrorist attacks. Quinn alleges that K&K retained him to assist the firm in obtaining compensation for its clients by, among other things, helping to remove barriers posed by foreign sovereign immunity to obtaining judicial relief from "the Kingdom of Saudi Arabia and other nation states," Dkt. 19 at 5-6 (Am. Compl. ¶ 19); *see also id.* at 11-13 (Am. Compl. ¶¶ 39-43), resisting "efforts on the part of the Government of Sudan and the Department of State to . . . include[] in the Sudan Claims Resolution Act . . . language that would [have] effectively erase[d] the 9/11 families' claims against Sudan," *id.* at 13 (Am. Compl. ¶ 44), and "ensur[ing] that their shared clients could have access to the" Victims of State Sponsored Terrorism Fund ("VSSTF"), *id.* at 13-14 (Am. Compl. ¶ 45); *see also id*. at 14 (Am. Compl. ¶ 47).

Between 2013 and 2017, Quinn, K&K, and others entered into multiple contracts, addenda, and superseding contracts, none of which should serve as a model for future agreements of this type. The parties' first two agreements were, respectively, four and six sentences long. *Quinn v. Kreindler & Kreindler*, No. 21-cv-1824, 2023 WL 2351734, at *1 (D.D.C. Mar. 3, 2023) ("*Quinn I*"). Although those initial agreements may offer relevant background, the merits of the parties' present dispute turn on two agreements executed in May 2017 and one amendment executed in August 2017 (collectively, "2017 Agreements"), which supersede all prior agreements and which the parties agree are the operative agreements. Once again, these agreements are short on detail and clarity. Each is just a few paragraphs in length, and many key terms are left undefined. One of the May 2017 agreements governs services rendered by Quinn to K&K relating to the firm's representation of clients who had "filed cases in the litigation as of" July 10, 2014, Dkt. 56-9 at 5; the other, which builds on the first, governs services rendered by Quinn to K&K relating to the firm's representation of clients who "filed claims on or after July 10, 2014," *id.* at 2. The August 2017 amendment, among other things, modifies the May 2017 agreements to specify that "the litigation" includes cases not yet filed and expands Quinn's "bases for compensation" to include "the representation of clients on whose behalf claims are not filed in the litigation but who have retained K&K to assist in recovering compensation whether through the filing of claims or otherwise and who in fact received a recovery with respect to which K&K receives a fee." Dkt. 56-10 at 2.

The parties' dispute over the meaning of the 2017 Agreements did not emerge until 2020, when Quinn asserted a right to fees relating to recoveries obtained by K&K clients from the VSSTF, and K&K disagreed with Quinn's reading of the agreements. Dkt. 19 at 10 (Am. Compl. ¶ 37). Quinn initiated this action in 2021, asserting, among other claims, that K&K

breached the 2017 Agreements by failing to pay him fees relating to recoveries obtained by K&K's clients from the VSSTF and another administrative fund, the September 11th Victims Compensation Fund ("VCF"). Early on, the Court agreed to "limit the first round of discovery to the question of contract interpretation [and], in particular[,] [to] whether the alleged agreements include compensation received from the VSST[F] and VCF," and further agreed to "permit the parties to brief that threshold question . . . before authorizing further discovery." Min. Order (Nov. 9, 2023). Shortly before briefing was set to begin, however, Quinn passed away. Dkt. 42 at 1. Then, after a delay occasioned by the administration of Quinn's estate, Susanna Quinn appeared as the personal representative of the estate and, in that capacity, was substituted in place of John Quinn. Dkt. 49.

After the parties completed the focused discovery, they cross-moved for partial summary judgment on the question of contract interpretation. Dkt. 52; Dkts. 55–61. The Court heard oral argument on those motions and (1) denied Plaintiff's motion for partial summary judgment, (2) directed that the parties submit additional briefing regarding K&K's cross-motion, (3) referred the case for mediation, and (4) stayed the case following submission of the supplemental briefs. Min. Entry (July 15, 2025). The parties, in turn, filed their supplemental briefs, Dkt. 64; Dkt. 65, and then attempted to resolve the case in mediation. When that effort failed, they filed a joint status report in which K&K requested that the Court issue a decision on K&K's pending motion for summary judgment and Plaintiff requested that the Court authorize further discovery and set a trial date. Dkt. 67. The Court decided to take the former course and now turns back to K&K's motion for partial summary judgment and to dismiss Plaintiff's remaining claims as unripe, Dkt. 55.

For the reasons explained below, the Court will **DENY** K&K's motion.

## I. BACKGROUND

### A. The Victim Compensation Fund ("VCF")

Less than two weeks after the September 11, 2001, terrorist attacks on the United States, Congress enacted that the Air Transportation Safety and System Stabilization Act ("ATSSA"). *See* Pub. L. No. 107-42, 115 Stat. 230 (2001). Title IV of the ATSSA created the VCF "to provide compensation to any individual (or relative of a deceased individual) who was physically injured or killed as a result of the terrorist-related aircraft crashes of September 11." 115 Stat. 237, codified at 49 U.S.C. § 40101 note (2001). In its original form, the VCF covered only those who were present at the World Trade Center, the Pentagon, or the site of the aircraft crash at Shanksville, Pennsylvania, "at the time, or in the immediate aftermath, of the terrorist-related aircraft crashes on September 11," the crewmembers and passengers on the three aircraft, and the personal representatives of those who were killed, and it stopped accepting claims in 2003. *Id.*; *see also* Scott D. Szymendera, Cong. Rsch. Serv., R45969, The September 11th Victim Compensation Fund (VCF) 1–2 (2024) (hereinafter "CRS VCF Report").

On January 2, 2011, Congress enacted the James Zadroga 9/11 Health and Compensation Act of 2010, which extended the period for filing VCF claims until October 2016, *see* Pub. L. No. 111-347, 124 Stat. 3623, 3661–63, codified at 49 U.S.C. § 40101 note (2011); *see also* About the Victim Compensation Fund, https://www.vcf.gov/about, and also expanded eligibility to new categories of adversely affected persons and new types of illnesses and exposure, *see* 49 U.S.C. § 40101 note (2011); *see also* CRS VCF Report at 2. In 2015, Congress again reauthorized the VCF, extending the fund for another five years. Pub. L. No. 114-113, 129 Stat. 2242, 3001, codified at 49 U.S.C. § 40101 note (2015). Finally, in 2019, Congress enacted the Never Forget the Heroes: James Zadroga, Ray Pfiefer, and Luis Alverez Permanent Authorization of the September 11th Victim Compensation Fund Act, which extends the VCF's

claim-filing deadline to October 1, 2090, and appropriates funds to pay all eligible claims. *See* Pub. L. No. 116-34, 133 Stat. 1040, codified at 49 U.S.C. § 40101 note.

"The Civil Division of the Department of Justice administers the VCF." CRS VCF Report at 6. The Attorney General appoints the VCF special master, who determines eligibility and benefits. ATSSA § 404. Notably, the VCF offers a partially exclusive remedy. Congress established the VCF as an administrative alternative to litigation. With limited exceptions, a claimant who files a VCF claim "waives the right to file a civil action . . . in any Federal or State court for damages sustained as result of the" September 11 attacks "or for damages arising from or related to debris removal." *Id.* § 405(c)(3)(B). The only exceptions are for claims seeking to recover collateral source obligations, *id.*, and claims "against any person who is a knowing participant in any conspiracy to hijack any aircraft or commit any terrorist act." *Id.* § 408(c). Although a claimant dissatisfied with the special master's decision regarding his or her claim "may file an appeal and request a hearing before a VCF-appointed hearing officer," "[t]here is no further right of appeal or judicial review of VCF decisions." CRS VCF Report at 6.

According to a September 2025 report from the VCF special master, "the VCF has received over 102,000 claims" and has awarded "over $16 billion to nearly 70,000 claimants since opening in 2011." Message from the Special Master of the September 11th Victim Compensation Fund (Sept. 11, 2025), available at https://www.vcf.gov/blog/message-special-master-september-11th-victim-compensation-fund-0.

**B. The Victims of State Sponsored Terrorism Fund ("VSSTF")**

Since 1996, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, has authorized victims of certain acts of terrorism to bring suit in federal court to seek monetary damages against designated state sponsors of terrorism for the harm caused by such acts. *See* Pub. L. No. 104-132, § 221, 100 Stat. 1241 (1996). In its current form, the FSIA creates a

federal cause of action and withdraws foreign sovereign immunity for cases seeking money damages "for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if . . . engaged in by an official, employee, or agent of [the] foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a); *see also id.* § 1605A(c). A court may "hear a claim under" that section, however, only if "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred, or was so designated as a result of such act." *Id.* § 1605A(a)(2)(A)(i)(I). Designated state sponsors of terror include Iran, North Korea, and Cuba. *See* Jennifer K. Elsea, Cong. Rsch. Serv., IF10341, Justice for United States Victims of State Sponsored Terrorism Act: Eligibility and Funding 1 (2025) (hereinafter "CRS VSSTA Report").

Over the last three decades, this Court has awarded many billions of dollars in damages against state sponsors of terror pursuant to the FSIA. But for a variety of reasons, including the difficulty of executing judgments against state sponsors of terrorism, "the vast majority of terrorism judgments remain outstanding." *Id.* In 2015, Congress enacted the Justice for United States Victims of State Sponsored Terrorism Act ("Justice Act"), 34 U.S.C. §§ 20144 *et seq.*, to provide a mechanism for satisfying those judgments out of the U.S. Treasury and then subrogating the United States to the underlying claims.

To administer payments, the Justice Act created another fund: the VSSTF. *Id.* § 20144(e)(1). The VSSTF can make payments to a claimant who is, as relevant here, "a United States person" who has been awarded "compensatory damages . . . in a final judgment"

> (i) issued by a United States district court under State or Federal law against a foreign state that was designated as a state sponsor of terrorism at the time the acts described in clause (ii) occurred or was so designated as a result of such acts; and (ii) arising from acts of international terrorism, for which the foreign

> state was determined not to be immune from the jurisdiction of the courts of the United States under section 1605A, or section 1605(a)(7) . . . of title 28[.]

*Id.* § 20144(c)(1)(a), (c)(2)(A). Originally, "[u]nder the [Justice Act], a person who receive[d] a VCF award [was] barred from receiving any additional compensation from the [VSSTF]." CRS VCF Report at 8. In 2019, however, Congress clarified that victims of the September 11 attacks who have already received compensation from the VCF may also seek compensation from the VSSTF for judgments against Iran. CRS VSSTA Report at 1; *see also* Pub. L. 116-69, 133 Stat. 1140, 1143 (Nov. 21, 2019) ("A determination by the Special Master before the date of enactment of [the 2019 Act] that an award or award determination under section 405 of the Air Transportation Safety and Stabilization Act (49 U.S.C. § 40101 note) was controlling for purposes of the [VSSTF] (pursuant to subsection (d)(3)(A)(ii)(III) of the [Justice Act] (34 U.S.C. 20144(d)(3)(A)(ii)(III)), as such section was in effect on the day before the date of enactment of this Act) shall not prejudice a claim of a 9/11 victim, 9/11 spouse, or 9/ 11 dependent.").

Like the VCF, the VSSTF is administered by a special master, who is appointed by the Attorney General. *See* 34 U.S.C. § 20144(b)(1). "Applicants whose claims are denied may request a hearing with the Special Master of the Fund, but awards or denials of awards are not subject to judicial review." CRS VSSTA Report at 2; *see also* 34 U.S.C. § 20144(b)(3). The VSSTF authorized a first round of payments to claimants in December 2016, and it began issuing awards in March 2017. Dkt. 56-27 at 5–6. "Since [then], the [VSSTF] has made five rounds of payments totaling more than $7 billion." CRS VSSTA Report at 2.

### C. Factual Background

For purposes of resolving K&K's motion for summary judgment, the Court may rely only on the undisputed facts, and the Court must construe the record in the light most favorable to Quinn, the nonmoving party. *See Johnson v. District of Columbia*, 182 F.4th 1052, 1062 (D.C.

Cir. 2026). As Quinn notes, that limitation requires the Court to disregard many of K&K's assertions of fact and large portions of its declarations, which include an array of immaterial, disputed, or unsubstantiated factual assertions. Dkt. 58 at 8; *see generally* Dkt. 58-1. Other portions of K&K's factual proffer, however, are undisputed and are based on personal knowledge. For present purposes, the Court relies on those facts and disregards K&K's invocation of disputed or unsubstantiated facts. *See* Fed. R. Civ. P. 56(c)(2) (a district court need not rely only upon admissible evidence); Fed. R. Civ. P. 56(c)(4) (a district court may consider a declaration "made on personal knowledge" that "set(s) out facts that would be admissible in evidence, and show(s) that the affiant or declarant is competent to testify on the matters stated.").

K&K represents the estates of deceased victims of the September 11 attacks, first responders and others who suffered injuries related to the attacks, and family members whose relatives were killed or injured in the attacks. *See* Dkt. 56-1 at 1 (Defs.' SUMF ¶ 2). As part of those representations, K&K has served as counsel in the long-pending, consolidated litigation before the United States District Court for the Southern District of New York ("SDNY Litigation"). *Id.* (Defs.' SUMF ¶ 3); *see also In re: Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570, 2025 WL 1530755 (S.D.N.Y. May 29, 2025).

K&K maintains a practice ground, the "VCF Practice Group," which is "separate" from other practice groups and is dedicated to helping eligible claimants pursue administrative claims before the VCF. *See* Dkt. 56-1 at 5 (Defs.' SUMF ¶¶ 18–19); Dkt. 58-1 at 8–9 (Pl.'s Res. to Defs.' SUMF ¶¶ 18–19). K&K's VCF Practice Group "now represents over 11,000 active claimants and is still retaining new claimants on a regular basis." Dkt. 56-1 at 5 (Defs.' SUMF ¶ 20); Dkt. 58-1 at 9 (Pl.'s Res. to Defs.' SUMF ¶ 20). K&K also maintains a separate practice

group, the "VSSTF Practice Group," which assists K&K clients in accessing and submitting applications to the VSSTF. Dkt. 56-6 at 8 (Benett Decl. ¶ 21).

As part of its broader efforts to secure relief for its clients, K&K brought suit against the Republic of Iran, alleging that it provided material support to al Qaeda that was used to facilitate the September 11 attacks. Iran failed to answer, and K&K "obtained a certificate of default against Iran in 2011." Dkt. 56-1 at 3 (Defs.' SUMF ¶ 10); Dkt. 56-6 at 5 (Benett Decl. ¶ 13). Although the district court entered the "certificate of default" before K&K retained Quinn to assist its clients in 2014, K&K did not "obtain[] a default judgment on liability against Iran [until] 2015," after it retained Quinn. Dkt. 56-6 at 5 (Benett Decl. ¶ 13). K&K subsequently submitted "the final judgments that [it] obtained for its clients" against Iran to the VSSTF. *Id.* The record does not indicate when K&K submitted those final judgments to the VSSTF, how many individual claims it has submitted, the amount of those claims, how many claims the VSSTF has paid to K&K's clients, or the amount awarded to date, although presumably all awards postdate the 2015 default judgment.

K&K also "believed that it could establish that the Kingdom of Saudi Arabia provided substantial support to the terrorists" responsible for the September 11 attacks, and it "brought suit in 2002 against various alleged sponsors and perpetrators of the . . . attacks, including certain" Saudi officials. Dkt. 56-1 at 2 (Defs.' SUMF ¶¶ 7–8). But because the Kingdom of Saudi Arabia "was not then, and is not now, a designated state sponsor of terror," K&K was unable to bring suit against Saudi Arabia under the terrorism exception to the FSIA. *Id.* (Defs.' SUMF ¶ 9); *see also* Dkt. 52-35 at 4 (email from K&K employee that states "our plaintiffs were not parties to" the prior dismissal of the Kingdom of Saudi Arabia). Although K&K brought suit against certain Saudi officials, and although other counsel brought suit against Saudi Arabia, the

district court dismissed those claims, and the Court of Appeals for the Second Circuit affirmed the district court's order. *See In re: Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008). Subsequent attempts to reinstate the claims against Saudi Arabia under other FSIA exceptions to sovereign immunity also failed. *See, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, 741 F.3d 353 (2d Cir. 2013) (remanding case to district court for consideration of the "noncommercial tort" exception as applied to Saudi Arabia and Saudi instrumentality); *In re Terrorist Attacks on Sept. 11, 2001*, 134 F. Supp. 3d 774 (S.D.N.Y. 2015) (dismissing claims against Saudi Arabia and Saudi instrumentality).

Around 2013, K&K retained Quinn Gillespie & Associates (Quinn's then-existing public affairs firm) and Nelson Mullins (Robert Crowe's public affairs firm) ("June 2013 Agreement").[1] Dkt. 52-8 at 2. The parties dispute the scope of the work that Quinn was retained to perform, although it is undisputed that his responsibilities included, at a minimum, advocating for a diplomatic resolution with the Kingdom of Saudi Arabia, which would provide a source of compensation for the victims of the September 11 attacks. *See* Dkt. 56-1 at 6–7 (Defs.' SUMF ¶¶ 23–28); Dkt. 52-2 at 8–9, 56 (Quinn Dep. 25:19–26:2, 111:24–112:3).

The June 2013 Agreement was four sentences long and provided—in it entirety—as follows:

> As compensation for their efforts in assisting in obtaining a recovery for the 9/11 victims and their families, Nelson Mullins and Quinn Gillespie shall receive a fee of 1% . . . of the net recovery on each decedent's wrongful death case and each personal injury case where Kreindler & Kreindler has or receives a fee in the consolidated 9/11 Terrorist Litigation. The Nelson Mullins and Quinn

[1] At the same time, Quinn and Crowe were retained by another firm, Anderson Kill P.C. ("Anderson Kill"), to assist with the SDNY Litigation. Although that and subsequent agreements between Quinn and Anderson Kill are not pertinent to this case, the extrinsic evidence submitted in this case, at times, refers to Anderson Kill and Jerry Goldman, a lawyer at Anderson Kill who was working with Quinn and who was part of ongoing and simultaneous negotiating conversations with Quinn and K&K.

> Gillespie 1% fee shall be paid from the attorneys' fees in all said cases where Kreindler & Kreindler has or receives a fee. The attached is a list of the consolidated *Ashton* cases. In the event that the eventual attorneys['] fees received are reduced from the attorneys' fees specified in the retainer agreements executed by the Kreindler and Kreindler clients, then the Nelson Mullins and Quinn Gillespie 1% fee shall be proportionally reduced in accordance with any reduction in Kreindler & Kreindler fees.

Dkt. 52-8 at 2. Notably, this agreement contemplated the award of fees based on recoveries obtained in "the consolidated 9/11 Terrorist Litigation." *Id.* Consistent with that focus, the "attached . . . list of the consolidated *Ashton* cases" referred to cases brought by K&K in the SDNY Litigation. *Id.*

Less than two weeks later, the parties amended the June 2013 Agreement to add Quinn as a party and to specify that Quinn and Quin Gillespie would split their share of the 1% fee "equally between" themselves. Dkt. 52-13 at 1–3 ("July 2013 Agreement"). In other words, Quinn was entitled to receive .25% of "the net recovery on each decedent's wrongful death case and each personal injury case where Kreindler & Kreindler . . . receive[d] a fee in the consolidated 9/11 Terrorist Litigation." *Id.* at 3. Throughout 2013, Quinn and Quinn Gillespie prepared documents and advocated for a Saudi-funded diplomatic resolution to compensate provide compensation to the victims of the September 11 attacks. *See*, *e.g.*, Dkt. 52-12; Dkt. 52-17; Dkt. 52-19.

On July 10, 2014, the parties amended their agreement, making two material changes. Dkt. 56-9 at 8 ("July 2014 Agreement"). First, they removed Quinn Gillespie as a party, "relinquish[ing] any and all [of its] rights to fees established in all prior Agreements between these parties." *Id.* After Quinn Gillespie "relinquishe[d] any and all rights to fees," only K&K, Nelson Mullins, and Quinn remained as parties. *Id.* Second, the amendment clarified that "net recovery" means "the amount awarded to each plaintiff of [K&K] less out-of-pocket costs to

[K&K], exclusive of legal fees paid to K&K or others" and that, "[i]n the event that the eventual attorneys' fees received" by K&K pursuant to its client agreements "are reduced from" the fees "specified in the retainer agreements," "then the Nelson Mullins and Quinn one percent fee shall be proportionately reduced." *Id.*

Quinn continued his efforts advocating for a Saudi-sponsored state-to-state resolution, and he advocated for the passage of the Justice Against State Sponsored Terrorism Act ("JASTA"). *See* Dkt. 56-1 at 11 (Defs.' SUMF ¶ 46); *see*, *e.g*., Dkt. 52-25; Dkt. 52-29; Dkt. 52-34. JASTA is a jurisdictional statute that provides a limited exception to foreign sovereign immunity in addition to the exceptions set forth in the FSIA. In relevant part, JASTA provides:

> A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state from physical injury to person or property or death occurring in the United States and caused by—
>
> (1) an act of international terrorism in the United States; and
>
> (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless of where the tortious act or act of the foreign state occurred.

28 U.S.C. § 1605B(b). JASTA also permits U.S. nationals to bring suit against such foreign states under 18 U.S.C. § 2333 and removes the limitation contained in 18 U.S.C. § 2337, which otherwise applies. 28 U.S.C. § 1605B(c). JASTA does not, however, apply to suits alleging mere omissions or negligence. *Id.* at § 1605B(d). JASTA was enacted into law over presidential veto on September 28, 2016. S.2040 – Justice Against Sponsors of Terrorism Act, https://www.congress.gov/bill/114th-congress/senate-bill/2040/all-actions; *see also* Dkt. 56-1 at 11 (Defs.' SUMF ¶ 47).

Relying on JASTA's waiver of foreign sovereign immunity, K&K filed a new complaint in the SDNY Litigation naming the Kingdom of Saudi Arabia "as the key defendant." Dkt. 56-1 at 11 (Defs.' SUMF ¶ 48). Before K&K filed, Quinn provided suggestions and edits to K&K on the new complaint, *see* Dkt. 52-35 at 4–5, 10, 12, which K&K filed on March 20, 2017, *see* Complaint, No. 17-cv-02003, *Ashton v. Kingdom of Saudi Arabia*, ECF. No. 1. That action "remains ongoing and no recoveries against [the Kingdom of Saudi Arabia] have yet been obtained." Dkt. 56-6 at 4 (Benett Decl. ¶ 8).

About two months after K&K filed suit against Saudi Arabia, the parties entered into a new set of agreements, which supersede their prior agreements, and which constitute the operative agreements for present purposes. Two of these agreements were executed in tandem on May 19, 2017. Dkt. 56-9 at 2–6. Because these agreements are both short and of central importance to the present dispute, the Court will quote them in full. The first, which governs "cases in litigation as of" July 10, 2014 ("Old Claims Agreement"), provides as follows:

> The parties hereto acknowledge the agreement dated July 10, 2014 and annexed hereto as Exhibit "A" (henceforth the "Earlier Agreement") as the heretofore sole and governing agreement between John M. Quinn, Esq. (and his Law Office of John M. Quinn, PLLC) (hereafter collectively "Quinn") and Kreindler & Kreindler LIP (hereafter "K&K") relating to services rendered and to be rendered by Quinn to K&K in support of the representation by K&K of approximately 2000 clients who are plaintiffs in litigation whose claims were filed as of the Earlier Agreement (hereinafter the "Clients") in the Southern District of New York asserting wrongful death and personal injury causes of action relating to or arising out of the terrorist attacks that occurred on September 11, 2001 in New York, New York, Arlington, Virginia and Shanksville, Pennsylvania (hereafter "the litigation").
>
> This binding Agreement, effective nunc pro tunc, January 1, 2017, extinguishes, supersedes and replaces, as set forth below, any and all prior agreements or understandings, whether in writing or otherwise, including but not limited to those dated in July, 2013 and the Earlier Agreement. This Agreement shall henceforth be the sole basis of any obligation by K&K to Quinn and the Law Office of John M. Quinn, PLLC arising in any connection with the litigation or the resolution of it. Modification of this Agreement, to be binding, may only be

> done in writing. A separate agreement also extinguishes, supersedes and modifies the Earlier Agreement with Nelson, Mullins, Riley & Scarborough, LLP and Robert Crowe, Esq.
>
> Quinn will continue to serve as counsel to and advise K&K and Kreindler as requested or as Quinn deems advisable relating to the preservation of (or changes proposed to) the Justice Against Sponsors of Terrorism Act ("JASTA") and efforts to accomplish reasonable settlement or other resolution of the litigation. Quinn and the Law Office of John M. Quinn, PLLC will specifically provide a sustained effort, using and adhering to legal precedent, statutory requirements and lawful and appropriate government procedure to accomplish and make effective such advocacy and the expeditious and fair resolution of the subject claims. Quinn's important contribution to date to the litigation and to the enactment of JASTA is hereby acknowledged.
>
> As compensation for his sustained effort in assisting and advising K&K and Kreindler, K&K agrees to pay to Quinn a fee of 0.775 percent (seventy-seven and one half basis points) of the net recovery on each decedent's wrongful death and each personal injury claim with respect to which K&K receives a fee, whether by judgment, settlement or otherwise, for its representation of the Clients on whose behalf it filed cases in the litigation as of the date of the Earlier Agreement.
>
> The term "net recovery" shall mean the amount realized by each client less out-of-pocket costs to K&K and exclusive of legal fees paid to K&K. In the event the eventual attorneys' fees are reduced from the fees set forth in the K&K retainer agreements with K&K clients, then the Quinn fee shall be reduced in the same proportion represented by any reduction in the K&K fee.

*Id*. at 5–6.

The second agreement, which governs claims filed "on or after July 10, 2014" ("New Claims Agreement"), and which "incorporate[s]" and builds on the Old Claims Agreement, provides as follows:

> This binding Agreement, effective nunc pro tunc, January 2, 2017, between or among Kreindler & Kreindler LIP and the Law Office of John M. Quinn, PLIC (a/k/a John M. Quinn, Esq.) (hereafter collectively "Quinn"), by their respective partners, James P. Kreindler, Esq. and John M. Quinn, Esq. extends and modifies the Agreement between the parties hereto made effective nunc pro tunc January 1, 2017 . . . , a copy of which is annexed hereto as Exhibit "One." The terms of exhibit One are hereby expressly bound to and incorporated in this Agreement, and this Agreement shall be deemed bound and incorporated into the [Old Claims] Agreement. As used herein, the term "the litigation" refers to cases and

> claims arising out of the terror attacks carried out on September 11,[ ]2001 in New York City, NY, Arlington, VA and Shanksville, PA.
>
> The purpose of this Agreement is to supplement the [Old Claims] Agreement as follows: In addition to the compensation set forth in the [Old Claims] Agreement, K&K shall pay to Quinn a fee of 1% of the net recovery on each wrongful death, injury or any other claim for which K&K receives a fee, whether by judgment, settlement or otherwise, for its representation of clients on whose behalf K&K filed claims on or after July 10, 2014 or with respect to whom K&K is awarded fees by virtue of common benefit awards or participation in representation of other clients as a member of the plaintiffs' executive committee or through the operation of any common fund the purpose of which is to award compensation to other claimants in the litigation, except that K&K shall not be obligated to pay a fee to Quinn where and to the extent Quinn receives a fee in respect of the same claim pursuant to a separate fee-sharing agreement to which K&K and Quinn are parties.
>
> The term "net recovery" shall mean the amount realized by each client less out-of-pocket costs to K&K and exclusive of legal fees paid to K&K. In the event the eventual attorneys' fees are reduced from the fees set forth in the K&K retainer agreements with K&K clients, then the Quinn fee shall be reduced in the same proportion represented by any reduction in the K&K fee.

*Id*. at 2.

Finally, Quinn and K&K amended the Old Claims Agreement and the New Claims Agreement in August 2017. Dkt. 56-10 at 2. The amendment has three parts. First, it provides that the references to "the litigation" contained the Old Claims Agreement and the New Claims Agreement "include[s] the provision of services in cases filed, to be filed[,] or for which Kreindler & Kreindler is retained to file or otherwise [to] provide services in connection with matters arising out of the attacks." *Id.* Second, it expands the "bases for compensation" to include "the representation of clients on whose behalf claims are not filed in the litigation but who have retained K&K to assist in recovering compensation whether through the filing of claims or otherwise and who in fact receive a recovery with respect to which K&K receives a fee." *Id.* Third, it adds the following sentence to end of the fourth paragraph of the Old Claims Agreement: "If, for any reason, Nelson, Mullins, Riley & Scarborough and/or Robert Crowe are

unable or ineligible or otherwise fail to receive all or part of the fees contemplated by their contract with K&K, then such fees shall be paid to Quinn to the extent of the difference between the amount represented by 0.225 of the net recoveries contemplated by their contract with K&K and the amount actually received by them." *Id.*

For ease of reference, the Court will refer collectively to the three operative agreements—the Old Claims Agreement, the New Claims Agreement, and the August Amendment—as the "2017 Agreements." Although the Court will describe portions of the parties' negotiating history in further detail later, there is no question that "[a]t no time in the revisions, the associated correspondence, or the drafting process, was either the VCF or the VSST[F] mentioned." Dkt. 56-1 at 17 (Defs.' SUMF ¶ 80); Dkt. 58-1 at 37 (Pl.'s Res. to Defs.' SUMF ¶ 80).

In 2020, the parties' relationship began to sour. Quinn sent an email to Kreindler on April 21, 2020, asking about his "share of distributions from the [VSSTF]." Dkt. 52-46 at 2. K&K denied Quinn's request for fees from the VSSTF, Dkt. 56-1 at 20 (Defs.' SUMF ¶ 95), and, on January 15, 2021, Quinn emailed K&K "defer[ring]" the firm's request that he "reach out" to a senior, incoming government official "until our dispute is resolved," Dkt. 56-30 at 2. Then, on July 8, 2021, Quinn filed this action, Dkt. 1, and about two months later, K&K sent a letter to Quinn, informing him that he had "breached and remain[s] in material breach of [his] obligations to [K&K]," Dkt. 56-31 at 3. The letter asserted that Quinn "failed, and continue[s] to fail, to provide the services [he] agreed to provide to K&K in connection with K&K's representation of the 9/11 families." *Id.* The letter identified two examples of Quinn's alleged breach: (1) that he failed to conduct outreach "to Merrick Garland as the incoming Attorney General" and (2) that he failed to "speak directly to K&K at all." *Id.* Quinn has not, to date,

received any monetary compensation from Defendants for his work pursuant to the operative agreements. Dkt. 52 at 21 (Pl.'s SUMF ¶ 93); Dkt. 56-2 at 31 (Defs.' Res. to Pl.'s SUMF ¶ 93).

**D. Procedural History**

Quinn initiated this action against K&K in July 2021, Dkt. 1, and filed an Amended Complaint on October 18, 2021, Dkt. 19. "Quinn's complaint contains six counts: (I) Breach of Contract – 2013/2014 Agreements; (II) Breach of Contract – 2017 Agreements; (III) Breach of Duty of Good Faith and Fair Dealing; (IV) Accounting; (V) Quantum Meruit; and (VI) Constructive Trust." *Quinn I*, No. 21-cv-1824, 2023 WL 2351734, at *2 (citing Dkt. 19 (Am. Compl.)). Although Quinn's initial complaint asserted that Quinn was entitled to a portion of fees resulting from the VSSTF, Dkt. 1, Quinn raised his entitlement to fees resulting from the VCF only in his Amended Complaint, Dkt. 19. "K&K move[d] to dismiss all but Claim II, which it concede[d] survives the motion to dismiss stage." *Quinn I*, No. 21-cv-1824, 2023 WL 2351734, at *2 (citing Dkt. 21-1 at 7–8). On March 3, 2023, the Court granted in part and denied in part Defendants' partial motion to dismiss, dismissing only Quinn's Accounting and Constructive Trust claims. *See generally id.* at *5–*11. Defendants then moved to bifurcate both discovery and trial on the issues of liability and damages and to stay discovery on damages. Dkt. 33-1 at 5. After a hearing on the motion, the Court denied the motion and decided instead to "limit the first round of discovery to the question of contract interpretation, in particular whether the alleged agreements include compensation received from the VSST[F] and VCF," and to "permit the parties to brief that threshold question." Min. Order (Nov. 9, 2023). The parties proceeded with discovery, *see, e.g.*, Dkt. 37; Min. Order (Jan. 11, 2024); Min. Order (Mar. 11, 2024), and the Court set the matter for a first round of summary judgment briefing, Min. Entry (Apr. 17, 2024).

In May 2024, Quinn passed away. Dkt. 42. The Court stayed further proceedings to provide an opportunity for a personal representative to be appointed, who would then be eligible to file a motion for substitution in this case pursuant to Federal Rule of Civil Procedure 25. *See* Dkts. 43, 44, & 47; Min. Order (May 14, 2024); Min. Order (Aug. 8, 2024); Min. Order (Aug. 20, 2024). On September 12, 2024, Quinn's widow, Susanna Quinn, who had been appointed the personal representative of Quinn's estate, filed a motion for substitution. Dkt. 49. The Court granted that motion, substituted Susanna Quinn as the representative of Quinn's estate, and set a briefing schedule for cross-motions for summary judgment. Min. Order (Sep. 16, 2024). The parties concluded briefing partial cross-motions on the issue of Quinn's entitlement to fees from the VCF and VSSTF on December 18, 2024. *See* Dkts. 52, 55, 56, 58–60.

The Court held oral argument on the cross-motions on July 15, 2025. Min. Entry (July 15, 2025). The Court will describe the oral argument and its prior rulings on the motions in greater detail below. Dkt. 63. For now, it suffices to note that the Court denied Plaintiff's partial cross-motion and took Defendants' partial cross-motion under advisement. Min. Entry (July 15, 2025). The Court also stayed the case and referred the parties to mediation. *Id.* On October 30, 2025, the parties filed a joint status report indicating that "the parties were unable to come to an agreement regarding their respective valuations of the claims and assessment of their strengths and weaknesses." Dkt. 67 at 1. At that point, Defendants asked the Court to decide their pending motion for partial summary judgment, *id.*, while Plaintiff sought to proceed to discovery and trial, *id.* at 2.

Now pending before the Court is Defendants' motion (1) for partial summary judgment on the question whether the 2017 Agreements entitle Quinn to compensation based on claims paid to K&K clients from VCF and/or VSSTF and (2) to dismiss Plaintiff's breach of contract

and quantum meruit claims as unripe, if the Court agrees with Defendants' reading of the 2017 Agreements. Dkt. 55.

## II. LEGAL STANDARD

A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it can "show[] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it could affect the outcome of the litigation under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (citing *Liberty Lobby*, 477 U.S. at 248).

If the moving party carries its initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. If the nonmoving party's evidence is "merely

colorable" or "not significantly probative," the Court may grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

In conducting the summary judgment analysis, the Court "review[s] the record taken as a whole." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). But at summary judgment, it is not the Court's function to "weigh the evidence" or to "make credibility determinations," *Wheeler*, 812 F.3d at 1113, in order to determine "the truth of the matter," *Liberty Lobby*, 477 U.S. at 249.

## III. ANALYSIS

The parties agree that the 2017 Agreements govern their dispute. K&K's motion for partial summary judgment implicates two questions of contract interpretation—first, whether the 2017 Agreements entitle Quinn to compensation based on amounts recovered by K&K clients from the VCF, and, second, whether they entitle him to compensation based on amounts recovered by K&K clients from the VSSTF. Although both funds are administered by the Department of Justice, they differ in important respects; most notably, VCF claims are purely administrative, while the VSSTF is available only to those claimants who first obtain a final judgment in state or federal court against a covered foreign state.

As the Court has previously observed, "[n]either Quinn or K&K addresses choice-of-law, but both parties apply D.C. law in their briefs." *Quinn I*, 2023 WL 2351734, at *5 n.3. The Court, accordingly, treats any dispute over choice of law as "waive[d]," *CSX Transp., Inc. v. Com. Union Ins. Co.*, 82 F.3d 478, 482–83 (D.C. Cir. 1996), and proceeds on the reasonable

assumption that D.C. law controls. The Court starts with a brief summary of the relevant D.C. law before turning to the two specific questions posed by K&K's motion for summary judgment.

**A. D.C. Contract Law**

The District of Columbia "adhere[s] to an 'objective law' of contracts." *Sagalyn v. Found. For Preservation of Historic Georgetown*, 691 A.2d 107, 111 (D.C. 1997). "[T]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they entered into the contract, unless the . . . language is not susceptible of a clear and definite meaning," *see Aziken v. District of Columbia*, 70 A.3d 213, 218–19 (D.C. 2013) (quoting *Hartford Fin. Servs. Group v. Hand*, 30 A.3d 180, 187 n.12 (D.C. 2011)), or the written agreement is the product of "fraud, duress or mutual mistake," *Dyer v. Bilaal,* 983 A.2d 349, 355 (D.C. 2009). A contract "is not rendered ambiguous," moreover, "merely because the parties disagree over its proper interpretation." *Parker v. U.S. Trust Co*., 30 A.3d 147, 150 (D.C. 2011). Instead, "an ambiguity exists" only if a "reasonably prudent person" would conclude that "the language used in the contract is susceptible to more than one meaning." *Nat'l Hous. P'ship v. Mun. Cap. Appreciation Partners I, L.P.*, 935 A.2d 300, 310 (D.C. 2007). "Whether a contract is ambiguous is a legal question" for the court, not the factfinder, to decide. *Aziken*, 70 A.3d at 219.

On this much, D.C. law is clear. D.C. law is less clear, however, about whether and when courts may consider extrinsic evidence in determining if an ambiguity exists. *See N.W. v. District of Columbia*, 107 F. Supp. 3d 141, 147–48 (D.D.C. 2015) (noting conflict in D.C. precedent); *Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp*., No. 20-cv-784, 2023 WL 5206142, at *10 (D.D.C. Aug. 14, 2023) (same), *rev'd in part on other grounds*, 172 F.4th 895 (D.C. Cir. 2026). In general, D.C. courts applying the "objective standard" will look to "extrinsic evidence of the parties' subjective intent . . . only if the

document is ambiguous." *Christacos v. Blackie's House of Beef*, Inc., 583 A.2d 191, 194 (D.C. 1990). That "external evidence may be admitted to explain the surrounding circumstance and the positions and actions of the parties at the time of contracting" only if the court first determines that "the contract language is not susceptible of a clear and definite meaning." *Carlyle Inv. Mgmt., LLC v. Ace Am. Ins. Co*., 131 A.3d 886, 895 (D.C. 2016) (citations and internal quotation marks omitted); *see also 2301 M St. Coop. Ass'n v. Chromium LLC*, 209 A.3d 82, 86–88 (D.C. 2019); *Jacobson Holman, PLLC v. Gentner*, 244 A.3d 690, 696–700 (D.C. 2021); *Cap. River Enters., LLC v. Abod*, 301 A.3d 1234, 1239–40 (D.C. 2023); *CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc*., 325 A.3d 1235, 1250 (D.C. 2024); *Luo v. D.C. Dep't of Emp. Servs*., 331 A.3d 840, 847 (D.C. 2025). "[I]f the provisions of the contact are ambiguous, the correct interpretation becomes a question for the factfinder." *Debnam v. Crane Co*., 976 A.2d 193, 197–98 (D.C. 2009); *see also Carlyle Inv. Mgmt. LLC*, 131 A.3d at 895 (same).

"[A] subset of [] cases" from the D.C. Court of Appeals, however, "have allowed more liberal use of extrinsic evidence . . . to determine what a reasonable person in the parties' circumstances would have believed [the contractual term] meant." *Abdelrhman v. Ackerman*, 76 A.3d 883, 888 (2013); *see also id*. at 889 (collecting conflicting D.C. Court of Appeals cases). Although acknowledging that its "cases have not been a model of clarity in explaining the parol evidence rule," *id*., the D.C. Court of Appeals has—at least at times—suggested that courts may look to "the surrounding circumstances" in assessing "whether [a] contract's language appears ambiguous or not," *Patterson v. District of Columbia*, 795 A.2d 681, 683 (D.C. 2002). That is, a court may—at least at times—look to certain extrinsic evidence to determine whether the meaning of a contract is settled as a matter of law. Under this view, the Court of Appeals has

attributed the "confusion" regarding the use of extrinsic evidence in applying the "objective" rule to:

> a failure to distinguish between direct evidence as to what a particular party intended the language to mean, a *subjective* question, and evidence of the general situation, the relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealings between the parties, all of which may be useful aids in determining whether *objectively* the meaning of the contract language is not susceptible of a clear and definite undertaking.

*Abdelrhman*, 76 A.3d at 889 (emphasis added) (citations and internal quotation marks omitted).

"Although it remains unclear which approach should govern," *Inova Health Care Servs*., 2023 WL 5206142, at *11, "it is safe to conclude," as the D.C. Court of Appeals did in *Abdelrhman*, "that 'meaning can almost never be plain except in a context,'" *N.W.*, 107 F. Supp. 3d at 148 (quoting *Abdelrhman*, 76 A.3d at 888). At least in this limited sense, it follows that courts can only determine whether the contractual language at issue is unambiguous—and thus subject to interpretation as a matter of law—in light of the relevant objective context. *See* Restatement (Second) of Contracts § 212, comment b. The objective meaning of a written contract in which the defendant agreed to sell her "stock," for example, necessarily turns on whether she works on Wall Street or for a soup manufacturer. In other words, courts cannot wholly ignore extrinsic context in determining whether a written contract is susceptible to a clear, objective meaning, although the focus remains on whether the contractual language, when considered in light of the objective, extrinsic context, "is susceptible to only one reading," *Nat'l Hous. P'ship*, 935 A.2d at 309.

Summary judgment is therefore appropriate under three possible scenarios: First, the plain language of the contract, standing alone, is unambiguous; second, the text of the contract, when considered in light of the objective, extrinsic context, is unambiguous; and third, as in any

case pending on summary judgment, the contract is unclear but, when considered in light of the uncontroverted extrinsic evidence, no reasonable jury could find in favor of the non-moving party. In all other circumstances, a jury must weigh any extrinsic evidence and resolve the ambiguity. *Aziken*, 70 A.3d at 219; *Nat'l Hous. P'ship*, 935 A.2d at 309; *Young v. Delaney*, 647 A.2d 784, 790 (D.C. 1994) (citing *Beckman v. Farmer*, 579 A.2d 618, 629–30 (D.C. 1990)).

With this framework in mind, the Court turns to the questions of interpretation posed by K&K's motion for summary judgment.

**B. VCF**

At the last hearing, the Court denied Quinn's cross-motion for partial summary judgment regarding his asserted contractual entitlement to fees based on compensation recovered by K&K clients from the VCF. To prevail on summary judgment, Quinn bore the burden of demonstrating either that the 2017 Agreements supported his entitlement to the fees as a matter of law (that is, the agreements—as read in light of the undisputed, relevant context, if any—unambiguously support his claim) or that the undisputed facts (including the text of the agreements and the extrinsic evidence) entitled him to relief on this claim and that no reasonable jury could disagree. As the Court explained at the hearing, Quinn did not carry this burden. Dkt. 63 at 82–84.

K&K's cross-motion, in contrast, came closer to the mark, both on the contractual text and on the extrinsic evidence—or, more precisely, the lack of *any* evidence that the parties ever contemplated including administrative VCF claims in their agreement. Because the parties had not briefed the question whether this absence of extrinsic evidence might, like "the dog that did not bark," *Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991), provide a sufficient evidentiary basis for granting summary judgment in K&K's favor on Quinn's VCF claim, the Court deferred

ruling on K&K's cross-motion and granted the parties leave to file supplemental briefs. *See* Dkt. 63 at 84.

The Court has now reviewed the parties' supplemental briefs, Dkts. 64, 65, and has revisited the text of the agreements, the negotiating history, and other extrinsic evidence. Based on that review, the Court concludes that Quinn has raised triable issues of fact as to whether the 2017 Agreements entitle him to a fee based on at least some amounts recovered (or potentially recovered) by K&K clients from the VCF. Although the question is a close one, the Court cannot conclude, as K&K urges, that the 2017 Agreements unambiguously foreclose Quinn's claim to a share of at least some of the VCF recoveries or that no reasonable jury could find from the contractual text and extrinsic evidence that Quinn is entitled to prevail, at least in part, on this claim.

**1.**

The Court starts with the text of the 2017 Agreements. The three operative documents—the Old Claims Agreement, the New Claims Agreement, and the August Amendment—must be construed together. The parties advance competing interpretations of the collective text. K&K, for its part, at times contends that the 2017 Agreements entitle Quinn to payment "only on recoveries funded by [the Kingdom of Saudi Arabia] in connection with a resolution that ends the [l]itigation [pending in SDNY]," Dkt. 56 at 30, and, at other times, seems to concede that Quinn is entitled, more broadly, to compensation tied to "recoveries from the [l]itigation," *id.* at 41. K&K is emphatic, however, in maintaining that Quinn's compensation is not tied to "recoveries from the VCF" (or, for that matter, from the VSSTF). *Id.* Quinn, in contrast, contends that the 2017 Agreements entitle him to a share of any fees K&K recovers "as part of representing the 9/11 victims," regardless of the source of the recovery. Dkt. 58 at 19. None of

these contentions, however, finds "clear and definite" support, *Aziken*, 70 A.3d at 219, in the text of the agreements.

Although the 2017 Agreements are unartfully drafted, they do include clues to the objective intent of the parties. To start, the Old Claims Agreement defines both "the 'Clients'" and "the litigation." Dkt. 56-9 at 5. The "Clients" are defined as the "approximately 2000" individuals that K&K represents "in litigation whose claims were filed as of" July 10, 2014, and "the litigation" is defined as claims filed "in the Southern District of New York asserting wrongful death and personal injury cause of action relating to or arising out of the terrorist attacks that occurred on September 11, 2001." *Id.* The Old Claims Agreement then assigns Quinn a percentage "of the net recovery on each decedent's wrongful death and each personal injury claim with respect to which K&K receives a fee, whether by judgment, settlement, or otherwise, for its representation of *the Clients* on whose behalf it filed cases in *the litigation* as of" the cutoff date, July 10, 2014. *Id.* (emphasis added).

Although the Old Claims Agreement presents the strongest case for K&K's position, even that agreement contains a significant ambiguity. The agreement does not tie Quinn's compensation to amounts recovered in "the litigation" but, rather, to "the net recovery on each decedent's wrongful death and each personal injury claim with respect to which K&K receives a fee, whether by judgment, settlement or otherwise, for its representation of the Clients on whose behalf it filed cases in the litigation" as of July 10, 2014. *Id.* That language, to be sure, limits Quinn's compensation to a percentage of recoveries received by K&K "Clients on whose behalf [the firm] filed cases in the litigation." *Id.* But it is unclear whether the language defines the class of K&K clients whose recoveries—from any source—fall within the scope of the agreement or whether it defines the class of the recoveries that fall within the agreement. That

is, is Quinn entitled to compensation for any and all amounts recovered by K&K from any source on behalf of *clients* on whose behalf the firm filed claims in the litigation before July 10, 2014? Or is he entitled to compensation only for those amounts recovered *in the litigation*?

The structure of the compensation provision reasonably supports either view. It says that Quinn is entitled to a share of "the net recovery" for each "claim" as to which K&K receives a fee for its representation of the class of individuals "on whose behalf it filed cases in the litigation." *Id.* Thus, if K&K filed a case in the litigation on behalf of an individual, and later received payment from the VCF on behalf of that same individual, both essential conditions are arguably satisfied: K&K received a fee for representing someone who obtained a recovery, and the firm filed a case in the litigation on that person's behalf. Two additional textual clues, however, point in opposing directions. On the one hand, the agreement limits Quinn's compensation to a percentage of "the net recovery on each decedent's wrongful death and each personal injury claim," and, although the Old Claims Agreement does not define the term "claim," it refers in its opening paragraph to "claims . . . filed" in the litigation "asserting wrongful death and personal injury causes of action." *Id.* Reading the agreement as a whole, this parallel use of the terms "claims," "wrongful death," and "personal injury," weighs heavily in favor of K&K's proposed reading of the agreement. On the other hand, however, the word "claims" can—at least in the abstract—be used to refer to claims in litigation and/or purely administrative claims, and, even more to the point, the agreement refers to recoveries made "by judgment, settlement or otherwise," at least opening the door to Quinn's contention (discussed further below) that "or otherwise" is capacious enough to include administrative proceedings.

If the Court's analysis ended here, the Court might be persuaded that K&K not only has the better of the arguments, but that no reasonable jury could find otherwise. But the remaining

2017 Agreements are even less clear. Injecting some initial uncertainty, the New Claims Agreement redefines "the term 'the litigation' [to] refer to cases and claims arising out of the terror attacks carried out on September 11, [] 2001 in New York City, NY, Arlington, VA and Shanksville, PA." Dkt. 56-9 at 2. Notably, the agreement arguably draws a distinction between "cases" and "claims," and it drops the express reference to the SDNY litigation. The New Claims Agreement, to be sure, does incorporate the terms of the Old Claims Agreement, *id.*, and it would be odd, to the say the least, to define "the litigation" to include purely administrative claims, but the new definition of "the litigation" lacks the clarity of the prior definition.

More to the point, the New Claims Agreement departs (at least slightly) from the parallel use of terminology found in the Old Claims Agreement. While the Old Claims Agreement ties Quinn's compensation to recoveries for "wrong death" and "personal injury" claims—which tracks the agreement's definition of "the litigation"—the New Claims Agreement ties his compensation to recoveries "on each wrongful death, injury or *any other claim* for which K&K receives a fee." *Id.* (emphasis added). Moreover, the New Claims Agreement no longer limits Quinn's compensation to recoveries obtained by K&K clients "on whose behalf it filed cases in *the litigation*," *id*. at 5 (emphasis added), but, rather, to recoveries by K&K "clients on whose behalf K&K filed *claims*," *id.* at 2 (emphasis added). The New Claims Agreement goes on to expand Quinn's entitlement to compensation to include a percentage of recoveries received by clients "with respect to whom K&K is awarded fees by virtue of common benefit awards or participation in representation of other clients as a member of the plaintiffs' executive committee or through operation of any common fund the purpose of which is to award compensation to other claimants in the litigation." *Id.* Although this language arguably supports K&K's

contention that the agreements were about recoveries obtained in litigation and nothing more, it departs from the narrow definition of "Clients" contained in the Old Claims Agreement.

The August Amendment poses even more substantial difficulties for K&K's motion for summary judgment respecting compensation tied to payments received by K&K clients from the VCF. Like the earlier agreements, the August Amendment deals with K&K's provision of "services in connection with matters arising out of the [September 11] attacks." Dkt. 56-10 at 2. The Amendment once again revises the definition of "the litigation," this time expanding the definition to include "cases . . . to be filed or for which Kreindler & Kreindler is retained to file or otherwise provide services in connection with matters arising out of the attacks." *Id.* To be sure, that language is reasonably construed to apply only to "cases"—including *cases* not yet filed and *cases* in which K&K "otherwise provide[s] services in connection with matters arising out of the attacks." *Id.* The word "cases," in turn, means "civil . . . proceeding[s], action[], suit[s], controvers[ies] in law or in equity," CASE, Black's Law Dictionary (12th ed. 2024), so the sentence is reasonably read merely to expand the contractual definition of "the litigation" to include all "cases"—that is, all civil proceedings, actions, or suits—for which K&K has been retained, even if K&K is (or was) able to resolve the matter before the case was filed or K&K "otherwise provide[d] services." Dkt. 56-10 at 2.

The next paragraph, however, is not so easily explained. It provides an "addition[al]" basis "for compensation" and includes "compensation for the representation of clients on whose behalf claims are not filed in the litigation but who have retained K&K to assist in recovering compensation whether through the filing of claims or otherwise and who in fact receive a recovery with respect to which K&K receives a fee." *Id.* Although perhaps this language is a mere shorthand for claims that K&K might, for example, assert against the Kingdom of Saudi

Arabia in a non-judicial process set up to supplant the need for litigation, the language might also be read to entitle Quinn to compensation based on a percentage of recoveries obtained in every matter—whether involving litigation, a Saudi Arabia claims process, or the VCF—in which K&K provides assistance and "in fact receives a recovery with respect to which K&K receives a fee." *Id.*

The Court recognizes that reading this paragraph in the manner that Quinn suggests—that is, to entitle him to a share of *all* September 11 recoveries obtained by K&K, including purely administrative recoveries from the VCF, even when K&K never filed or planned to file litigation, and even when Quinn did nothing to assist in the recoveries—poses its own difficulties. Perhaps first and foremost among these difficulties is the fact that the August Amendment makes no mention of the VCF or, indeed, to any purely administrative process, yet adding the VCF would have vastly expanded the scope of the 2017 Agreements with what was, at most, a passing and ill-defined gesture. Notably, by 2017, when the parties entered the agreements at issue, the VCF had already made over $1.8 billion in distributions in just over 9,000 decisions, Dkt. 56-14 at 11, and, as of 2024, K&K "represent[ed] over 11,000 claimants" in VCF proceedings, Dkt. 56-5 at 6 (Kushlefsky Decl. ¶ 14). Although the record does not indicate what portion of the VCF distributions have gone to K&K clients, much less the size of those distributions by 2017, there is no doubt that Quinn's proposed reading of the 2017 Agreements would expand his right to compensation by millions of dollars, *see* Dkt. 56-14 at 10 (mean dollar value of person injury claims of $198,861 and mean value of claims of deceased individuals of $504,049). As with statutory interpretation, courts should avoid reading contractual claims "to find 'elephants in mouseholes.'" *Gallo v. Moen Inc.*, 813 F.3d 265, 269 (6th Cir. 2016) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *see also United States v. Volvo Powertrain Corp.*,

758 F.3d 330, 340 (D.C. Cir. 2014) (considering "elephants-in-mouseholes" principle in the context of interpreting a consent decree).

To bolster his expansive reading of the 2017 Agreements, Quinn also leans on the phrase "or otherwise," which appears in all three of the agreements, Dkt. 56-9 at 2, 5; Dkt. 56-10 at 2. On Quinn's telling, that phrase serves as a "catch-all provision" intended to include fees from "some different means than those already listed," including the VCF. Dkt. 58 at 19. K&K responds that "or otherwise" should be read in light of the terms that precede it, such as "judgment and settlement," and that it was meant to "refer to another way or manner of finally resolving the [l]itigation," such as "the very state-to-state resolution with [the Kingdom of Saudi Arabia] that Quinn was hired to lobby for." Dkt. 56 at 38–39.

As courts have observed, "otherwise" is a word of many different stripes. In some circumstances, a residual "otherwise" can mean "'in a different manner,' 'by other means,' or 'in other respects.'" *Fischer v. United States*, 603 U.S. 480, 491 (citation omitted). But the word 'otherwise' is not itself 'sufficient to demonstrate that the examples'" that precede it "'do not limit the scope of the clause.'" *Id.* (citation omitted). To the contrary, "[a] common aid for interpreting both statutes and contracts is *ejusdem generis*: Where general words follow specific words in a[n] . . . enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Nat'l Ass'n of Postmasters of U.S. v. Hyatt Regency Washington*, 894 A.2d 471, 476 (D.C. 2006); 11 Williston on Contracts § 32:10 (4th ed. May 2026 Update) ("The rule of ejusdem generis . . . applies when there is an enumeration or listing of specific things, followed by more general words relating to the same subject matter, in which case the general words are interpreted as meaning things of the same kind as the specific matters to which the parties refer."). In short, context matters.

Here, the phrase "or otherwise" arguably plays a similar role in each agreement. The Old Claims Agreement refers to fees received "by judgment, settlement *or otherwise*, for [K&K's] representation of the Clients on whose behalf it filed cases in the litigation." Dkt. 56-9 at 5 (emphasis added). The New Claims Agreement contains the exact same locution—fees obtained "by judgment, settlement or otherwise, for [K&K's] representation of clients on whose behalf K&K filed claims" in relation to September 11. *Id.* at 2. And the August Amendment refers to clients who have "retained K&K to assist in recovering compensation whether through the filing of claims or otherwise." Dkt. 56-10 at 2. Quinn reads the agreements to create a simple formula: Identify the clients whom K&K represented in covered proceedings, check the amount of the clients' recovery, obtained by litigation "or otherwise," and provide Quinn with his specified share of the fee. That reading is a plausible one, but it is not the only plausible reading. As K&K posits, "or otherwise" can also be read to embrace "only objects similar in nature to" "judgments and settlements," which are the "specific words" that precede the residual term, *Nat'l Ass'n of Postmasters*, 894 A.2d at 476, and the August Amendment, which refers to the recovery of compensation "through the filing of claims or otherwise" must be read in context and in light of the agreements that proceeded it.

To award summary judgment for K&K on the basis of the contractual text, the Court must conclude that no "reasonably prudent person" could read the 2017 Agreements to include fees based on recoveries obtained by K&K clients in administrative proceedings before the VCF. *See Nat'l Hous. P'ship*, 935 A.2d at 310. The Court is unconvinced. To the contrary, at least three possible interpretations emerge from the preceding discussion:

*First*, as K&K (at least at times) suggests, the agreements might apply only to recoveries that arise from actual or threatened litigation—whether obtained in a judgment, settlement, of

similar resolution, from a "common benefits award[]" or "participation in representing clients are a member of the plaintiff's executive committee," or a pre-filing settlement or similar pre-filing agreement or resolution with the Kingdom of Saudi Arabia or others. *Second*, the agreements might also entitle Quinn to compensation where K&K represents a client in such an actual or threatened litigation but, ultimately, opts to obtain recovery (or in whole or in part) for the same losses from the VCF. Although the VCF offers a partially exclusive remedy, which requires applicants to waive most federal or state court claims for damages related to the September 11 attacks, the ATSSA permits applicants to bring claims against those who knowingly participated in a conspiracy to hijack any aircraft to commit any act of terrorism, and it also permits applicants to recover from collateral sources, including life insurance benefits owed to the victims. Thus, it is plausible that Quinn sought to protect himself from the prospect that some of K&K's litigation clients might opt to accept a VCF recovery that would offset or reduce the amount that the client was in line to receive in the litigation. *Finally*, and most expansively, the August Amendment might be read vastly to expand Quinn's entitlement to fees to include a percentage of every (or almost every) September 11 recovery obtained by K&K. Although that reading is hard to square with the extrinsic evidence, which is discussed below, it finds some support in the text of the August Amendment.

K&K's contention that Quinn's entitlement to compensation is tied to financial recoveries resulting from actual or threatened litigation is not without textual support or appeal to common sense. But to prevail on summary judgment based on the contractual language, standing alone, K&K must do more than make a strong argument; it must show that a "reasonably prudent person" would conclude that "the language used in the contract is susceptible to" only the meaning that K&K subscribes to it. *Id.* Because K&K has failed to

clear that substantial hurdle, and because the text of the 2017 Agreements is far from clear, the Court turns to the extrinsic evidence.

**2.**

Generally, when "the provisions of [a] contact are ambiguous, the correct interpretation becomes a question for the factfinder." *Debnam*, 976 A.2d at 197–98. That general rule, however, is subject to the two possible exceptions discussed above. The first is a narrow one, which has vexed the D.C. courts, *see supra* at 21–23, but which admits of the possibility that extrinsic circumstances might resolve some ambiguity in the text. Under this exception, the Court's role is limited to determining whether consideration of the objective extrinsic context—recall the hypothetical about the plaintiff who agrees to sell her "stock" and either works on Wall Street or makes soup—might render the contractual text unambiguous. Ultimately, it is unclear whether this is best characterized as an exception or simply an application of the general rule, however, since the relevant question remains whether the contractual text (even if understood in context) is unambiguous.

The second and more substantial exception is found in Rule 56, which requires the Court to grant summary judgment in favor of the movant when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In cases involving contract interpretation, that means that movant is entitled to summary judgment, even if the contractual language is ambiguous, so long as the extrinsic evidence is undisputed and, based on that evidence and the contractual text, the Court concludes that no reasonable jury could find against the movant.

Here, the first exception has little purchase, since none of the proffered extrinsic evidence permits the Court to conclude that "the meaning of the contract language 'is . . . susceptible of a

clear and definite'" meaning. *Abdelrhman*, 76 A.3d at 889. K&K comes closer to the mark under the traditional summary judgment standard but falls just short there as well. The bulk of the extrinsic evidence supports K&K's view, and that evidence casts substantial (and perhaps dispositive) doubt on Quinn's most expansive claim relating to the VCF. But when the extrinsic evidence is considered along with the contractual text, the Court cannot exclude the possibility that a reasonable jury could find, at least in part, in Quinn's favor. That is, although the Court doubts that a reasonable jury could find based on the contractual language and the extrinsic evidence that Quinn is entitled to a share of *all* K&K recoveries from the VCF, including recoveries obtained on behalf of clients who never filed or threatened to file litigation, the Court is unpersuaded that K&K is entitled to prevail as a matter of law with respect to Quinn's claim to a share of VCF recoveries, if any, obtained by K&K clients who filed VCF claims and also filed or threated to file lawsuits in the SDNY litigation.

Extrinsic evidence includes objective "evidence of the general situation, the relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealings between the parties," *Abdelrhman*, 76 A.3d at 889, and evidence of the parties' subjective intent, *1010 Potomac Assocs. v. Grocery Mfrs. of America, Inc.*, 485 A.2d 199, 205–06 (D.C. 1984) (noting that it is permissible to consider extrinsic evidence of subjective intent only when there is contractual ambiguity). Here, the record includes (1) extensive email records regarding the parties' negotiations in the lead up to the Old Claims and New Claims Agreements and (2) a single email pertaining to the August Amendment. Much of that record favors K&K's view. For instance, the emails demonstrate that the parties thought little of Quinn's addition of the "or otherwise" language to paragraph four of the Old Claims Agreement—a last-minute technical edit suggested alongside other technical

edits. *See* Dkt. 58-3 at 7 ("this version deletes reference to [James Kreindler] in para 2, corrects reference to '[Nelson Mullins]' in para 3 and adds 'other [sic] otherwise[‘] in para 4."); *see generally* Dkt. 58-3 (finalizing and exchanging signatures on the Old Claims and New Claims Agreements). It would seem unlikely that this inconspicuous and undiscussed edit increased Quinn's compensation by millions of dollars. The record contains no other evidence of further negotiation or discussion around the addition of "or otherwise" into either the Old Claims and New Claims Agreements or about the meaning of that phrase. Nor does the extrinsic evidence mention the VCF or any other administrative compensation scheme.

The parties' email exchange in the lead up to the August Amendment provides little clarity for either side. Dkt. 52-51; Dkt. 63 at 33. On August 5, 2017, Quinn sent the draft August Amendment—which he characterized as a "short form amendment" to the Old Claims and New Claims Agreements—to K&K, noting that Quinn's discussion with another lawyer involved in similar matters brought to light a "number of suggestions, most of them stylistic, but one substantive." *Dkt.* 52-51 at 2. The "substantive" suggestion concerned the other lawyer's point that he (*i.e.*, the other lawyer) was:

> gathering clients with respect to whom he may never actually file a claim—but still achieve a recovery and get a fee via settlement or other resolution. So, he pointed out that my language could bite me in the ass. So, we fixed that and he recommended I do so in ours as well.

*Id.* On August 8, 2017, Kreindler assented to the August Amendment, responding that his assistant was "sending [his] signed [copy]." *Id.* This negotiating history suggests that the parties agreed to the relevant language in the August Amendment in order to (1) capture a new set of clients that K&K did not already have ("gathering clients"), (2) whose claims might be resolved "via settlement or other resolution" before the firm had a formal opportunity to file a suit in court. *Id.* It is unclear how broadly the "other resolution" language sweeps.

K&K contends that the relevant "resolution[s]" relate to litigation, not to the VCF or any other purely administrative compensation scheme. Consistent with this view, the undisputed evidence provides reason to think the parties anticipated a diplomatic settlement between the then-new Trump Administration and the Kingdom of Saudi Arabia "other[wise] resol[ving]" the claims pending in the Southern District of New York. Dkt. 56-1 at 19 (Defs.' SUMF ¶ 87); Dkt. 58-1 at 40 (Pl.'s Res. to Defs.' SUMF ¶ 87); Dkt. 63 at 31 (Defendants' counsel: "[T]here was great optimism that President Trump was going to do a deal" with the Kingdom of Saudi Arabia to resolve the litigation or settle claims against it); *id.* at 22 (Plaintiff's counsel: "President Trump had just come into office in 2017" and "there was hope" that he would be able to "get a state-to-state resolution of the issues from the Saudis."); *see, e.g.*, Dkt. 52-37 at 3 (Jan. 15, 2017 email in which Quinn references the "possibility of affecting a settlement with Trump's son or, indeed anyone [in] this new Administration," and notes "the bottom line reality that the enactment of JASTA has been the key to our achieving a near-term settlement."); *see id.* at 4 (proposing an addition to 2017 Agreements that could bring a third party in "for securing a negotiated settlement (whether through the Trump Administration or directly with [Kingdom of Saudi Arabia]."")). In sharing final versions of the Old Claims and New Claims Agreements with Kreindler and Goldman on May 16, 2017, Quinn noted his optimism, stating: "We're gonna get a deal. I feel it and think it." Dkt. 58-3 at 2. The parties' shared optimism about a settlement supports K&K's contention that the August Amendment was designed to ensure that Quinn would receive credit for compensation obtained through a settlement with Saudi Arabia—which was an adverse party in the pending litigation—regardless of the format of the settlement.

The negotiations also occurred against the backdrop of Quinn's course of performance. Quinn had made extensive efforts to lobby for a Saudi Arabia-sponsored state-to-state

settlement. *See, e.g.*, Dkt. 52-12; Dkt. 52-17; Dkt. 52-19; Dkt. 52-25; Dkt. 52-29. That advocacy continued in the days just before the parties signed the Old Claims and New Claims Agreements. *See* Dkt. 52-11 at 2 (May 8, 2017 email from Quinn to White House Advisor advocating for a Kingdom of Saudi Arabia–funded state-to-state resolution of the case).

Other contextual clues further support K&K's reading of the 2017 Agreements. Most notably, JASTA had just passed (over the President's veto) in September 2016, Dkt. 56-4 at 8 (Kreindler Decl. ¶ 23), in part due to Quinn's lobbying efforts, Dkt. 56-1 at 11 (Defs.' SUMF ¶ 46); *see, e.g.*, Dkt. 52-23, and that success permitted K&K to add Saudi Arabia as a defendant in the litigation, Dkt. 56-1 at 11 (Defs.' SUMF ¶ 48). The parties were also preparing a complaint against the Saudi Arabia, which K&K filed in the litigation in March 2017. *Id.*; Dkt. 52-35 at 4–5, 10, 12 (documenting Quinn's suggested edits to the Kingdom of Saudi Arabia complaint). The negotiating history shows that Quinn sought to renegotiate his contracts with K&K in part because he believed his contributions in promoting enactment of JASTA warranted a more favorable division in the fees between himself and Crowe and Nelson Mullins. *See, e.g.*, Dkt. 52-37 at 2–3 (Jan. 15, 2017 email from Quinn to Kreindler noting Quinn's contributions to JASTA in advocating for "new agreements"). Quinn's statements throughout the negotiations focused on his entitlement to fees resulting from the new claims and class actions filed against Saudi Arabia, or other "new categories of plaintiffs—via common benefit or [plaintiffs' executive committee] arrangements (say for Zadroga or other plaintiffs)." Dkt. 56-23 at 2;[2] Dkt. 52-35 at 13 (March 2, 2017 exchange referencing "class" and "putative class"); Dkt. 56-20 at 2

[2] During oral argument, Quinn's counsel was unable to represent that the reference to "Zadroga" was a reference to the VCF, and that, in fact, "Mr. Zadroga was also a plaintiff in the litigation." Dkt. 63 at 67. K&K's counsel clarified that the "Zadroga" was a reference to a category of "latent injury plaintiffs" in the Southern District of New York litigation. *Id.* at 74.

(April 12, 2017 email from Quinn seeing the benefit of making the agreements effective as of January 2017 as a "belt-and-suspenders" to cover "the incoming retainers"); Dkt. 56-23 at 2 (May 12, 2017 email from Quinn noting Goldman's concerns regarding Quinn's entitlement to one percent of "new plaintiffs [who] are joined to [Goldman's] class case"); Dkt. 58-3 at 2 (May 16, 2017 email from Quinn describing the agreements as to Crowe as "limited to clients for whom claims were asserted as of the date of the earlier agreements" and that he "has the *O'Neill* but not the class as that hasn't been certified or populated." (emphasis added)). These communications refer to litigation-related sources of funding for plaintiffs represented by K&K.

Finally, and perhaps most significantly, the negotiating history produced to date contains no mention of the VCF, and the parties' post-agreement course of dealing barely touches on this potentially enormous source of compensation. As Quinn's counsel conceded during oral argument, he can point to only "one piece of parol evidence" directly relating to the VCF, Dkt. 63 at 71: a single email that Quinn sent on September 25, 2019, in which he passed on to Kreindler information about potential legislative amendments to the VCF. Dkt. 58-7 at 2. In the email to Kreindler, Quinn recounts that he was called by a member of Senate Minority Leader Chuck Schumer's office to get his view on potential changes to the VCF, to identify various concerns raised by other Senate staff, and to convey Senator Schumer's desire to "get more money into the fund for the widows and children," so long as "getting money for some constituents [did not come] at the expense of others, be they parents or anyone else." *Id.* Quinn invokes this email to demonstrate that he worked on issues related to the VCF. Dkt. 58 at 35. One email, two years after the parties entered the 2017 Agreements, provides an exceedingly thin reed on which to hang Quinn's sweeping theory of the 2017 Agreements. Tellingly, Quinn fails to identify any other evidence regarding his course of performance or the parties' negotiations or

the circumstances surrounding the making of the contract that support his claim to fees generated from K&K's representation of clients before the VCF. And by comparison, Quinn's work on JASTA is not only well-documented but is also expressly referenced in the Old Claims Agreement. Dkt. 56-9 at 5 (acknowledging "Quinn's important contribution to date to the litigation and to the enactment of JASTA").

All of this weighs heavily in favor of K&K's contention that no reasonable jury could find that the 2017 Agreements entitle Quinn to potentially millions of dollars in compensation for recoveries obtained from the VCF by K&K on behalf its clients. The difficulty that K&K faces, however, is that the Court cannot consider the extrinsic evidence alone but must consider how that evidence intersects with the contractual text and common sense. Here, as explained above, the Old and New Claims Agreements admit of at least two plausible constructions. Under the first reading, Quinn is entitled to compensation only for recoveries obtained through actual or threatened litigation, whether by judgment, settlement, or otherwise. But under the second, his compensation is not based on *source* of the recovery (*i.e.*, recoveries obtained through actual or threatened litigation) but, rather, based on *who* obtains the recovery (*i.e.*, recoveries received from any source by a K&K client on whose behalf the firm filed or threatened to file a lawsuit). In the words of the Old Claims Agreement, Quinn is entitled to a percentage of net recoveries, if K&K filed a case in litigation on behalf of the client and the client obtains a recovery from any source. See Dkt. 56-9 at 5. That construction keeps the focus on Quinn's contribution to "the litigation," but it gives meaning to the phrase "or otherwise" and to at least some of the more expansive language contained in the August Amendment, while protecting Quinn from the prospect that litigation might be cut short, or a litigation recovery might be offset, by a decision to pursue VCF recovery for the same loss or some part of that loss.

Although the Court takes no view on which of these constructions is correct, or, indeed, on whether a third or fourth construction might have greater merit, the extrinsic evidence would not preclude a reasonable jury from adopting the second reading. Most notably, framed in this manner, the absence of any negotiating history and the slim course of performance relating to the VCF is relevant but not dispositive. A reasonable jury might find, for example, that K&K agreed to compensate Quinn for his assistance with the litigation but agreed that his compensation for that assistance would include any recovery obtained by each K&K litigation client, regardless of the source of that recovery. To be sure, a reasonable jury might, instead, find that K&K only agreed to compensate Quinn based on recoveries obtained through actual or threatened litigation. But that is a question for the jury, and not the Court. The Court merely holds that the contractual text is ambiguous and that, when the text and extrinsic evidence are considered together, K&K has not carried it burden of demonstrating that no reasonable jury could find, based on the undisputed evidence, that Quinn is entitled to compensation based, at least in part, on amounts recovered by K&K litigation clients from the VCF.

Finally, the Court notes that the August Amendment is astonishingly unclear and, standing alone, might be read to entitle Quinn to compensation based on amounts recovered by K&K clients that the firm has represented or currently represents exclusively in administrative VCF proceedings—where those clients never filed or threatened litigation and the recovery is wholly unrelated to any actual or threatened litigation. But given the history of K&K's practice before the VCF, which preceded Quinn's participation in related matters; the absence of any mention of the VCF in the negotiating history, including the negotiation of the August Amendment; Quinn's failure ever to suggest that he was entitled to a share of these recoveries over the long course of the parties' relationship; and the vast expansion of Quinn's potential

compensation that adding purely administrative VCF recoveries to the parties' agreement would entail, the Court doubts that a reasonable jury could find in Quinn's favor on this expansive theory. Simply put, it is unlikely that the perplexing language contained in the August Amendment would permit a reasonable jury to ignore the lack of any extrinsic evidence that the parties ever intended to embrace this sweeping form of compensation, much less that they intended fundamentally to rewrite their agreement in these vague terms, at this late date, with no discussion of the issue. For presents purposes, however, the Court need not resolve this question because, even putting this issue aside, K&K has failed to carry its burden of demonstrating that no reasonable jury could find that Quinn is entitled to compensation based on at least a portion of K&K's VCF recoveries. That provides sufficient basis to deny K&K's motion for summary judgment on this issue.

The Court will, accordingly, deny K&K's summary judgment motion with respect to Quinn's VCF claim.

**C. VSSTF**

The Court next turns to Quinn's cross-motion for summary judgment on his entitlement to a share of the recoveries K&K clients obtained from the VSSTF. In his supplemental brief, Quinn asserts that "the Court indicated willingness to grant-in-part [his] motion for partial summary judgment, noting that the plain language of the contract could entitle Quinn to recover through the VSST." Dkt. 65 at 5. That is only partially correct. The Court previously indicated that "nothing in the contractual language" limits Quinn's entitlement to fees resulting from recoveries in cases brought against Saudi Arabia, as opposed to other defendants in the litigation, and that there is no reason why "a judgment . . . obtained in the New York litigation and . . . collected . . . through the VSST" should "not be included" in the fee calculation. Dkt. 63 at 83. But, despite Quinn's suggestions, the Court did not enter summary judgment in Quinn's

favor on that claim. To the contrary, the Court stated on the record, "I am not convinced at this point that plaintiffs are entitled to summary judgment," *id.*, and the corresponding docket entry clearly denies Quinn's motion for partial summary judgment, Min. Entry (July 15, 2025).

The reason for the Court's hesitation, moreover, is equally clear: Quinn did not argue that he is entitled to fees resulting from judgments obtained in the SDNY litigation, or even fees resulting from clients who participated in the SDNY or analogous litigation, but, rather, argued that he was entitled to fees based on any and all K&K recoveries, regardless of the nature of the underlying or related proceedings. *See*, *e.g.*, Dkt. 52 at 38; *id.* at 48–49 ("Quinn's fee is not limited to recovery from the SDNY litigation, or to funds received from the Kingdo[m] of Saudi Arabia, but to any source from which clients receive a recovery 'with respect to which K&K receives a fee.'"). For the reasons explained above, that expansive theory is difficult to square with much of the contractual language and almost all of the extrinsic evidence, and it does not come close to satisfying the summary judgment standard.

To be sure, Quinn's theory began to shift at oral argument. At that late date, he argued for the first time that the default judgment that K&K obtained against Iran in the litigation constituted a "judgment" obtained in favor of K&K's clients in the litigation, even if that judgment is ultimately satisfied through a payment received from the VSSTF. Notably, Quinn's counsel candidly admitted that "[t]his is really the first time that I am really addressing" the issue of Quinn's entitlement to and work related to K&K's default judgment against Iran. Dkt. 63at 54. Against this backdrop, the Court was not prepared to grant summary judgment in Quinn's favor—based on a theory that only began to emerge at oral argument and that K&K never had the opportunity to brief. Since then, moreover, Quinn has not sought to renew his motion based on the theory that he first articulated in oral argument. As such, the only question before the

Court is whether K&K is entitled to judgment as a matter of law with regards to Quinn's VSSTF entitlement.

Turning to that question, the Court is unpersuaded that K&K is entitled to summary judgment with respect to Quinn's claim for compensation based on judgments obtained in the SDNY litigation and paid from the VSSTF. In considering this question, it helps to recall the fundamental differences between the VCF and the VSSTF. As explained above, the VCF offers a non-adversarial, administrative alternative to litigation. *See* 49 U.S.C. § 40101 note. The VSSTF, in contrast, provides a mechanism for satisfying "final judgment[s] . . . issued by" federal or state courts "against . . . foreign state[s] that [were at the relevant time] designated as . . . state sponsor[s] of terrorism" and that arise "from acts of international terrorism, for which the foreign state was determined not to be immune." 34 U.S.C. § 20144(c)(2). After payment is made, the United States is "subrogated to the rights" of the plaintiff "to the extent and in the amount of such payment." *Id.* § 20144(d)(5)(A).

This difference matters for purposes of the 2017 Agreements, which, as explained above, might plausibly be construed either to entitled Quinn to compensation based on amounts recovered through actual or threatened litigation or to amounts recovered on behalf of clients (or others) represented in litigation. But even giving K&K the benefit of the doubt (to which it is not entitled on summary judgment), the firm is required, at a minimum, to pay Quinn compensation based on recoveries obtained by K&K clients in the SDNY litigation. Although a payment received from the VCF bears no connection to the litigation, a judgment entered in the litigation and satisfied by the VSSTF—including a default judgment against a designated state sponsor of terrorism, like Iran—would seem to fall squarely within the terms of the agreements. A default judgment entered based on a case brought against Iran in the SDNY litigation before

July 10, 2014, for example, would seem to qualify under the Old Claims Agreement. That agreement entitles Quinn to "0.775 percent . . . of the net recovery on each decedent's wrongful death and personal injury claim with respect to which K&K receives a fee, whether by judgment, settlement or otherwise, for its representation of the Clients on whose behalf it filed cases in the litigation as of" July 10, 2014. Dkt. 56-9 at 5. Here, K&K does not dispute that it filed a case in the SDNY litigation against Iran before July 10, 2014, that its efforts resulted in the entry of a final judgment against Iran, and that it has (or will) receive fees based on "the amount realized by each client" as a result of that judgment. *Id.*

Instead, K&K presses a variety of arguments. At times, it has argued that Quinn is entitled "only" to "recoveries funded by [Saudi Arabia] in connection with a resolution that ends the litigation." Dkt. 56 at 30; *see also id.* at 33 ("the only reasonable reading of the 2017 Agreements is that, absent a clear statement to the contrary, they are limited to the recoveries derived from the resolution of the Litigation, presumably funded by [the Kingdom of Saudi Arabia]."). Although that contention might track Quinn's most substantial contribution to K&K's efforts, it bears no relation to the operative contractual language, which contains no such limitation. Indeed, even in describing Quinn's contribution, the Old Claims Agreement is more expansive than that—it refers to "Quinn's important contribution to date *to the litigation* and to the enactment of JASTA." Dkt. 56-9 at 5 (emphasis added).

At other times, K&K concedes that the 2017 Agreements entitle Quinn "to receive a fee on (i) recoveries from wrongful death and personal injury cases filed in the [l]itigation pre-2014, (ii) recoveries from wrongful death and personal injury cases filed in the [l]itigation post-2014, (iii) fees awarded to the [K&K] by the Court for its role on the [plaintiffs' executive committee] or through a different common benefit fund at the close of the [l]itigation, and in addition,

(iv) recoveries clients receive from a [Kingdom of Saudi Arabia]-funded compensation fund that ended the [l]itigation but did not require filed claims in the Litigation for eligibility." Dkt. 56 at 30–31; *see also id.* at 33 n.10. Thus, based on K&K's own description, Quinn is entitled to receive a fee based on "recoveries from wrongful death and personal injury cases filed" in the SDNY litigation, *in addition to* recoveries from any fund financed by the Kingdom of Saudi Arabia.

In any event, K&K's own lack of certainty regarding the meaning of the 2017 Agreements is fatal to its motion for summary judgment. If K&K cannot settle on a reading of the contracts, it cannot plausibly argue that they unambiguously foreclose Quinn's VSSTF claim. But beyond that difficulty, K&K offers no reading of the 2017 Agreements that clears the summary-judgment hurdle. As noted above, K&K's contention that the 2017 Agreements apply only to Saudi-funded recoveries is untethered to the operative text, and, in any event, does not come close to qualifying as an unambiguous reading of the agreements, such that the Court can adopt that construction as matter of law. Nor has K&K proffered undisputed, extrinsic evidence permitting the Court to conclude that no reasonable jury could find that the agreements entitle Quinn to fees relating to final judgments issued in the SDNY litigation that are satisfied though the VSSTF.

That leaves K&K's undeveloped suggestion that the 2017 Agreements apply only to judgments and settlements satisfied directly by the defendant in the relevant litigation, and not final judgments obtained in the litigation that are satisfied though the VSSTF. K&K suggests in its supplemental brief that the VSSTF is excluded because "the U.S. Government's policy of making monetary awards to victims of state sponsored terrorism does nothing to finally resolve any aspect of [K&K's] 9/11 litigation, as against [the Kingdom of Saudi Arabia], Iran[,] or any

other defendant." Dkt. 64 at 14. It further contends that "[a] VSST[F] award is not covered by the 2017 Agreements simply because it has a prerequisite involving the [SDNY litigation] generally but leaves the litigation against all defendants fully intact; the 2017 Agreements speak to recoveries generated by litigation-ending contingent events ('through judgment, settlement or otherwise')." *Id.*

The difficulty with that argument is that nothing in the 2017 Agreements limits the fee-triggering events to those that "finally resolve" the litigation as a whole, including the satisfaction of any judgment, much less anything that unambiguously does so. The 2017 Agreements merely refer to circumstances in "which K&K receives a fee, whether by judgment, settlement or otherwise." Dkt. 56-9 at 2, 5. Nor is there any reason to doubt that a default judgment entered against a state sponsor of terrorism constitutes a final judgment in all relevant respects. *See* JUDGMENT, Black's Law Dictionary (10th ed. 2014) ("final determination of the rights and obligations of the parties in a case"); *see also* Fed. R. Civ. P 54(a) ("'Judgment' refers to "a decree and any order from which an appeal lies"); Fed. R. Civ. P. 55(c) (noting that "final default judgment" may be set aside under Rule 60(b), the rule governing relief from final judgments).

At oral argument, the Court asked K&K's counsel to articulate why, "just as a matter of plain language," Quinn was not entitled to fees recovered from the VSSTF "in lieu of payments from Iran" as a result of the default judgment. Dkt. 63 at 50–51. Counsel demurred and, instead, pointed to extrinsic evidence that K&K obtained the Iran default before Quinn was retained; that Quinn did not work on obtaining the default judgments or submitting VSSTF claims; and that Quinn admitted that he did not expect payment for work he did not do. *Id.* K&K also argues that the parties' course of dealing demonstrates that "[d]espite the high-profile, high-value

distributions made from the VSST[F] . . . the parties never mentioned or discussed the possibility that Quinn would receive a fee from . . . VSST[F] payouts," and Quinn did not raise his entitlement to the VSSTF "until April 2020." Dkt. 56 at 37.

The first of these arguments—that K&K obtained the default judgment against Iran before Quinn was retained—is incorrect. As explained above, K&K "obtained a certificate of default against Iran in 2011," Dkt. 56-1 at 3 (Defs.' SUMF ¶ 10); Dkt. 56-6 at 5 (Benett Decl. ¶ 13), but did not obtain a default judgment against Iran until 2015, *id.*, after K&K had retained Quinn. The entry of a default is a routine step typically taken by the clerk of the court. *See* Fed. R. Civ. P. 55(a). Entry of a default judgment in a case brought against a state sponsor of terror, in contrast, requires "the claimant [to] establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).

K&K's remaining arguments cannot carry the day at this stage of the proceeding. Even assuming that D.C. law permits courts to "look[] beyond the language" of a contract "itself [to] determine[] what a reasonable person in the position of the parties would have thought the disputed language meant," *Potomac Elec. Power Co. v. Mirant Corp.*, 251 F. Supp. 2d 144, 149 (2003), that inquiry asks only "what a reasonable person in the position of the parties would have thought the *disputed language* meant." *Grocery Mfrs. of America, Inc.*, 485 A.2d at 205–06 (emphasis added). Here, however, K&K has yet to offer any coherent reading of any relevant "disputed language." Absent some interpretation of the terms of the 2017 Agreements that would, if accepted, entitle K&K to judgment as a matter of law, there is no basis to ask the Court to consider parol evidence, which can only "aid in determining the meaning of the contract," *id.* at 209 n.11.

Finally, K&K fails to identify any undisputed facts that would preclude a reasonable jury from finding that Quinn is entitled to compensation based on a "judgment" obtained in the SDNY litigation, Dkt. 56-9 at 5, which is satisfied, at least in part, through payments received from the VSSTF. It seems doubtful, for example, that the 2017 Agreements would preclude Quinn from receiving compensation based on a judgment obtained against a private company in the litigation, even if that judgment is satisfied by the company's insurer or successor-in-interest. If any reason exists for excluding "judgments" that are satisfied by anyone other than the defendant, K&K has yet to identify it.

The Court will, accordingly, deny summary judgment to K&K on the question of Quinn's entitlement to fees based on a judgment obtained in the SDNY litigation that is satisfied from VSSTF.

**D. Defendants' Motion to Dismiss**

Because the Court has yet to resolve whether and, if so, the extent to which Quinn has a contractual right to receive fees for his work on behalf of K&K, the Court will deny K&K's ripeness challenge to Quinn's breach-of-contract and quantum meruit claims. Dkt. 56 at 66–67. K&K first argues that Quinn's claims are premature because "the [SDNY] [l]itigation is ongoing and no recoveries have yet been recognized." *Id.* at 66. For support, K&K cites the declaration of Megan Wolfe Benett, who merely attests that "[t]he Kreindler Firm has received no fees in the [SDNY litigation] against" the Kingdom of Saudi Arabia. Dkt. 56-6 at 11 (Benett Decl. ¶ 31). But that argument merely assumes that K&K is correct that the 2017 Agreements entitle Quinn only to fees relating to recoveries obtained from Saudia Arabia. Because the Court has yet to reach that conclusion—and, indeed, doubts that it is sustainable—the argument fails. Notably, moreover, K&K does not posit that it has yet to receive any fee from other sources, including the default judgment entered against Iran.

K&K's quantum merit argument suffers from a similar flaw. K&K argues that any claim for quantum merit is also premature, since Quinn's "services have not yet resulted in any value to" K&K. Dkt. 56 at 66. As K&K candidly concedes, however, this argument turns on the premise that "the Court finds that the VSST and the VCF are not covered by the Agreements." *Id.* at 67. But, as explained above, K&K has yet to persuade the Court that recoveries obtained from the VCF or recoveries obtained from the VSSTF based on final judgments obtained in the SDNY litigation fall beyond the scope of Quinn's efforts or the parties' agreement.

The Court will, accordingly, deny K&K's motion to dismiss on ripeness grounds.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' cross-motion for partial summary judgment, Dkt. 55, is **DENIED**; and Defendants' motion to dismiss, Dkt. 55, is also **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: October 26, 2026